1  MIRCH & MIRCH
   KEVIN J. MIRCH, ESQ.
2  State Bar No. 000923
   MARIE C. MIRCH, ESQ.
3  State Bar No. 6747
   201 W. Liberty Street, Suite 201
4  Post Office Box 5396
   Reno, Nevada 89513-5396
5  Telephone: (775) 324-7444

6  Attorneys for Plaintiffs

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE DISTRICT OF NEVADA

10

11 Barbara J. Suter, Horace Burl Suter, Jr.,  )
   Rachael J. Suter,                          )
                                              )
12        Plaintiffs,                         )    Case No.: CV-N-99-00286 DWH (RAM)
                                              )
13        v.                                  )    **Plaintiffs' Motion for *Crateo* Indication**
                                              )    **to Consider Motion for Relief from**
14 Neal G. Cury, Jr., Hospital Corporation of )    **Order and to Re-Open Case File**
   America, Columbia-HCA, Inc., Thomas        )
15 A. Frist, Jr., Edward Stack, James Don,    )
   Health Acquisition Services, Inc.,         )
16 Nevada Psychiatric Company, Inc.,          )
   Doe Doctors I - XX, DOES I - X,            )
17                                            )
          Defendants.                         )
18 _____/

19        Plaintiffs, by and through their attorney of record, Kevin J. Mirch, Esq., hereby moves this

20 Court to entertain the following motion for relief from its Order dated August 28, 2000 and to re-

21 open the case file, based on the fact that Plaintiffs have recently acquired new evidence in which the

22 Defendant, HCA admits to the improper conduct alleged by the Plaintiffs in the underlying action.

23 This Motion is made pursuant to FRCP 60, the following points and authorities, exhibits, and

24 pleadings on file herein.

25 ///

26 ///

27

28 Motion for Crateo Indication

                                    1

# I

## FACTS

**a.**     **Introduction**

This action arises from the improper conduct of the Defendants whom had devised and participated in a scheme to defraud various courts throughout the United States; defame and destroy whistle blowers and/or plaintiffs that had filed actions against them; and to use political influence to illegally obviate the legal system.  In response to this conduct, on May 26, 1999, Plaintiffs commenced this action by filing a Complaint in the United States District Court, District of Nevada. This Complaint was stricken by Judge David Hagen in a sua sponte Order on July 9, 1999. Thereafter, Plaintiffs filed a First Amended Complaint on August 9, 1999, which alleged the following five causes of action: (1) breach of settlement agreement;  (2) civil rights; (3) conspiracy to commit fraud; (4) litigation fraud; and (5) declaratory judgment and injunction against enforcement of statute- Constitutional violations.

All of the Defendants, with the exception of James Don, who was never served in the action, filed motions to dismiss the First Amended Complaint. On August 28, 2000, the District Court filed an Order which granted all of the eight motions to dismiss, and instructed the District Court Clerk to administratively close the case. On September 27, 200, Plaintiffs appealed this Order to the United States Court of Appeals for the Ninth Circuit.  The appeal is presently pending before the Ninth Circuit Court.

**b.**     **Plaintiffs have recently discovered new evidence which warrants relief from the District Court's Order.**

In the First Amended Complaint, the Plaintiffs alleged that HCA devised and implemented a scheme,  throughout the United States, to deprive the Suters,  as well as other Plaintiffs in other jurisdictions, of their civil rights. *(Complaint at ¶98).* The scheme was simple. First,  knowingly false information was used in litigations brought throughout the United States against HCA (and its related entities) solely to  circumvent the legal rights of thousands of United States Citizens. *(Complaint at ¶99).*   Other illegal State Action was solicited and received from legislators and

Motion for Crateo Indication

2

1  jurists, and solely to improperly affect the judicial process. *(Complaint at ¶100)*. Hundreds of

2  other actions have been illegally affected in other jurisdictions as part of an overt scheme to defraud

3  patients, their parents, and insurance companies, and plaintiffs. *( Complaint at ¶101)*.

4      Now, following the dismissal of this action, and while the appeal is pending, the Plaintiffs

5  have obtained new evidence that confirms that HCA (and/or its related entities) used these illegal

6  means in order to hide medical malpractice caused by medical business fraud. Because of this

7  conduct, there have been recent convictions of high level HCA employees and several States and

8  Federal law enforcement agencies have ongoing investigations or litigation against HCA. *Exhibit*

9  *A; Affidavit of Barbara Suter.* In fact, HCA recently signed a settlement wherein they admitted to

10  the wrongdoing alleged by the Suters' in the present action:

11  2.   Beginning in May 1991, the DEFENDANT willfully and knowingly entered into an agreement with some of its employees to defraud the United States, and to commit

12  offenses against the United States, and to commit offenses against the United States in violation of Title 18, United States Code Section 1001, by hiring certain

13  employees, and then directing these employees to increase payments from the Programs by submitting inflated claims for payment to the United States for patients

14  in federal health benefit programs. These claims would falsely state the patients' true diagnoses and overstate the severity of the patients' illnesses. In or about December

15  1996, the DEFENDANT, acting through its employees, terminated this agreement and conspiracy by directing and training its employees to stop inflating claims to the

16  Programs.

17  3.   When entering into this agreement, DEFENDANT and its co-conspirators knew that the purpose and goal of the agreement and understanding was to fraudulently receive

18  money from the Programs by submitting inflated claims, and deliberately entered into this agreement intending to accomplish the goal and purpose by common plan and

19  joint action.

20  4.   In furtherance of this agreement, the DEFENDANT, acting through and in concert with its employees, committed at least one overt act, including:

21

22  A.   DEFENDANT'S employees trained other employees to engage in coding practices with resulted in the submission of inflated claims to the programs.

23  On or about April 25, 1996, two of DEFENDANT'S employees, employed as coding specialists, presented a seminar to DEFENDANT's Mid-America

24  Group employees in Nashville, Tennessee wherein they instructed the employees to assign diagnoses which were not documented by the doctor but

25  were instead based on medical record information other than doctors' documentation. The Programs' rules and regulations require that hospitals

26  submit claims to the Programs based on diagnoses determined by the doctor.

27  B.   DEFENDANT'S employees distributed "Focus" lists which identified

**Motion for Crateo Indication**

28                                      3

diagnoses, including pneumonia, which were susceptible to being inflated, and then pressured its employees to fraudulently inflate claims to the Programs with these diagnoses. On or about March 24, 1993, the DEFENDANT, acting through a regional Assistant Vice President, issued a memorandum which instructed hospital Chief Executive Officers in a region that included the states of Texas, Oklahoma and elsewhere to inflate claims to the Programs for patients diagnosed with pneumonia, a diagnosis on the "Focus" lists.

...

F.  For employees who failed to meet targets and goals, DEFENDANT'S employees would threaten to fire or discipline with counseling, reprimands, poor performance evaluations, and public admonishments. On or about March 5, 1996, an employee chastised other employees at a hospital in Illinois for not meeting coding targets and goals.

*See Exhibit B:17-20, Joint Stipulation of facts in support of Plea Agreement, In the United States District Court for the Middle District of Tennessee, Case No. 3:00-00206, 1-3.*

During December of 2000, HCA entered into a civil and administrative settlement agreement which provided in pertinent part as follows:

A.  HCA is a Delaware corporation that through its predecessors and/or its subsidiaries and affiliates operates or has operated over 400 hospitals, over 500 home health agencies, and numerous ancillary health care facilities in at least thirty states.

...

(2) DRG Upcoding

From January 7, 1990 through December 31, 1997, HCA hospitals identified in **Attachment 2**[1] to this agreement **"upcoded"** claims to the government health care programs for inpatient hospital admissions by assigning diagnosis codes that were not supported by physician documentation in the patients' medical records for the purpose of improperly increasing reimbursement on inpatient claims submitted for the following Diagnosis Related Groups (DRGs): 076, 079, 087, 121, 124, 132, 138, 316, 416 and 475; and the complication and comorbidity DRGs ("cc" DRGs) identified in Attachment 3 to this agreement.

...

F.  The following States ("the States") contend that they have certain civil claims against HCA for the conduct specified in Paragraphs D(1) (oupatient laboratory), (2) (DRG upcoding) and (4) (home health billing) above: Alaska, Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentuckyu, Louisiana, Main, Massachusetts, ississippi, Missouri, **Nevada,** New Hampshire, New

---

[1] Attachment 2 includes Truckee Meadows Hospital in Reno, Nevada, where Ms. Suter was treated.

**Motion for Crateo Indication**                                    4

Mexico, North Caroline, Ohio, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wyoming. HCA and the States will execute separate settlement agreements regarding these claims in exchange for payment specified in Paragraph 1 (b) below. *[emphasis]*.

*See Exhibit C, Settlement Agreement, pages 4, 5 and 7. Also, see Exhibit D, various informations, plea agreements and settlement agreements.* The settlement agreement does provide that it does not constitute an admission of any party or any liability of wrongful conduct. This Court should excersize its discretion to allow the settlement agreement as impeachment evidence of HCA's contention that it was not operating a nationwide conspiracy to defraud not only the United States, but separate states and citizen plaintiffs. *See FRE 607.* The plea agreements are admission under *FRE 801(d)(2)* of wrongful conduct in a number of jurisdictions and when read in conjunction with the settlement agreement, it is clear that HCA has not been candid with this Court. Instead, it has perpetuated litigation fraud for several years against the Plaintiffs to this action and other related actions.

**c.      In light of new evidence, the Court should be willing to entertain a FRCP 60(b) motion**

As indicated above, since the underlying action was dismissed by this Court, the Plaintiffs have discovered new evidence in which HCA admits to the conduct alleged in the First Amended Complaint.  Plaintiffs acknowledge that because of the pending appeal, the District Court had no jurisdiction to enter an order under Rule 60(b). However, the District Court is permitted to make a *"Crateo* Indication" concerning its willingness to  "entertain" such a motion or indicate that it would grant such a motion. *Crateo,  Inc. v. Intermark, Inc.*, 536 F.2d 862, 869 (9th Cir.1976), *citing, Canadian Ingersoll-Rand Co. v. Peterson Products*, 350 F.2d 18, 27-28 (9th Cir. 1965). If Plaintiffs  receive such an indication, they can then apply to the Ninth Circuit Court of appeals for a remand. *Id.*  Plaintiffs respectfully request that the Court advise that it is willing to entertain the present Rule 60(b) motion, and that it would grant the motion.

**d.      Judgment in favor of the Defendants should be reversed as in light of the new evidence**

The dismissal and judgment in favor of the Defendants in this action should be reversed in light of the new evidence obtained by the Plaintiffs in which the Defendant, HCA, admits to the

Motion for Crateo Indication

1   illegal and improper conduct which are the subject matter of the underlying action.  Clearly, the

2   Rooker-Feldman doctrine should not apply when no dispute exists between state and federal courts

3   because an admission has been made in a criminal plea agreement. The Rooker-Feldman doctrine

4   is intended to avoid contrary results.  To apply that doctrine in this case, in light of the plea

5   agreements, would create the conflict between the state and federal courts, thus obviating the purpose

6   for the Rooker-Feldman doctrine. Since, HCA has admitted in its plea agreements to the conduct

7   complained of by the Suters, they respectfully request that this Court reconsider its previous order

8   dismissing this action.

9                                             **II**

10                               **POINTS AND AUTHORITIES**

11   **a.      The District Court is permitted to indicate its wilingnes to entertain and to grant a
             FRCP 60(b) motion despite the fact that a case is on appeal**

12

13        The District Court lacks jurisdiction to consider a FRCP 60(b) motion when an action is on

14   appeal. However, as mentioned above,  the District Court is permitted to make a *"Crateo* Indication"

15   concerning its willingness to  "entertain" such a motion or indicate that it would grant such a motion,

16   thus enabling the moving party to seek a remand from the appellate court. *Crateo,  Inc. v. Intermark,*

17   *Inc.*, 536 F.2d 862, 869 (9th Cir.1976),  *citing, Canadian Ingersoll-Rand Co. v. Peterson Products,*

18   350 F.2d 18, 27-28 (9th Cir. 1965).

19        Remand of a case to the district court for consideration of a Rule 60(b)(2)  motion  is

20   appropriate, when there is newly discovered evidence.  *Sea Hawk Foods, Inc. v. Exxon Corporation,*

21   206 F.3d 900 at 903 (9th Cir. 2000).   In this case, it is appropriate for the District Court to indicate

22   its willingness to consider and grant Plaintiffs' Rule 60(b)(2) motion, because the new evidence

23   recently discovered by the Plaintiffs undisputedly supports their allegations in this action.

24   **b.      The Court Should Vacate its Order of August 28, 2000:**

25        A motion for reconsideration may be brought under either Fed. R. Civ. P. (" FRCP") 59 (e)

26   or 60(b).   *School Dist. No. 1J v. AC and S, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993), cert. denied,

27   114 S. Ct. 2742 (1994).  Federal Rules of Civil Procedure Rule 60(b)(2) allows relief from a final

28   Motion for Crateo Indication

                                             6

judgment where as in this case, there has been discovery of new evidence that was not previously available.

Courts have established three grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the discovery of new evidence not previously available; and (3) the need to correct clear or manifest error in law or fact, to prevent manifest injustice. *Carnell v. Grimm*, 872 F.Supp. 746, 758-759 (D. Hawaii 1994). In this case, the discovery of new evidence in which the Defendants admit to the illegal and improper conduct warrants the Court's reconsideration of its Order dismissing this action. Further, to prevent manifest injustice, the District must indicate its willingness to vacate said order.

**b.**   **The Judgment and Order are Based on Fraud of the Defendants**

In this case, in order to prevent manifest injustice, Plaintiff relies on Fed. R. Civ. Proc. 60(b)(2) and (3) and asserts that the Court should reconsider its Order and judgment because of the discovery of new evidence which confirms the fraudulent conduct of the Defendants. FRCP 60 (b) provides:

> On motion and upon such terms as are just, the court may relieve a party . . .from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . ., misrepresentation, or other misconduct by an adverse party . . .; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. ...

Here there are errors in fact in that the Defendants offered false information in support fo their motions to dismiss, and Plaintiffs have just recently obtained new evidence in which the Defendants admit to their wrongdoing. Clearly, HCA has operated a scheme to defraud patients, the United States, and States for financial gain. Nevada was one such state. Parallel with this scheme, HCA conducted litigation fraud to cover up their nefarious conduct. The Suters have been deprived of a fair adjudication of their claims. Reconsideration is proper to avoid manifest injustice.

## VI.

## CONCLUSION

Motion for Crateo Indication

7

1    The new evidence discovered by the Plaintiffs in this action overwhelmingly supports that

2  the order of dismissal be vacated by the District Court.   Not only has the Defendant admitted to

3  illegal and improper conduct throughout the United States, said admission includes conduct at the

4  very hospital that is the subject of Plaintiffs' Complaint - i.e. Truckee Meadows Hospital.   See

5  Exhibit C, Exhibit 2 to Civil and Administrative Settlement Agreement.   This   Court   should

6  evaluate the new evidence submitted by the Plaintiffs in this action, and indicate that it is willing to

7  entertain, and grant, Plaintiffs' FRCP 60(b) motion.   If the Court is inclined to grant the motion and

8  re-open the case, the Plaintiffs are then permitted to apply to the Ninth Circuit Court of Appeals for

9  a remand in order to reinstate jurisdiction of this Court to act in such a manner.

10    WHEREFORE, Plaintiff respectfully beseeches this Court to  grant Plaintiffs' request for a

11  "*Crateo* Indication" and advise of its willingness to entertain, and grant the forgoing Motion for

12  Relief from Order and to Re-Open Case.

13    DATED this _9_ day of March, 2001.

14

15                                        LAW OFFICE OF MIRCH & MIRCH

16

17                                        By _Kevin Mirch_

18                                           KEVIN MIRCH
                                             Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28  **Motion for Crateo Indication**

                                8

1

## CERTIFICATE OF SERVICE

2       Pursuant to FRCP 5, I declare that I am an employee of Kevin J. Mirch, Esq., over the age

3   of EIGHTEEN (18) and not a party to this action. In that capacity, I served by United States Mail,

4   postage prepaid, a true and correct copy of the foregoing **Plaintiffs' Motion for *Crateo* Indication**

5   **to Consider Motion for Relief from Order and to Re-Open Case File** upon the following

6   individuals at the following addresses:

7
         Christopher R. Hooper, Esq.
8        Allen Wilt, Esq.
         LIONEL SAWYER & COLLINS
9        50 W Liberty Street, Ste #1100
         Reno, NV 89501
10

11       DATED this 9 day of March, 2001.

12

13

14

15                                            Marie Mue

16

17

18

19

20

21

22

23

24

25

26

27
    Motion for Crateo Indication
28                                     9

LAW OFFICE OF MIRCH & MIRCH
KEVIN J. MIRCH, ESQ.
SBN:000923
MARIE C. MIRCH, ESQ.
SBN: 6747
201 W. Liberty St.,Ste.201
Reno, NV 89501
Telephone: (775) 324-7444

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

RACHAEL J. SUTER, HORACE BURL
SUTER, JR., and BARBARA J. SUTER,        )
                                         )
            Appellants,                  )        Supreme Court Case No.  29249
                                         )
                                         )        **Affidavit of Kevin J. Mirch Authenticating**
       v.                                )        **Exhibits**
                                         )
                                         )
Neal G. Cury, Jr., et al.                )
                                         )
_____/

I, KEVIN J. MIRCH, after first being duly sworn, depose and say:

1.      I am duly licensed to practice law in the State of Nevada and I am attorney of record for Plaintiff in the above-entitled matter.

2.      I have personal knowledge of the facts stated herein, and could and would competently testify thereto, except as those matters stated upon information and belief, and as to those matters, I believe them to be true.

3. Exhibit A  is a true and correct copy of an Affidavit Barbara Suter which was filed in Support of an Opposition to Motion to Dismiss in this action.  Said document was prepared and maintained in this office during the normal course of business in this litigation.

4. Exhibit B is a true and correct copy of a Criminal Information filed in the United States District Court for the Middle District of Tennessee. This document was obtained from Patricia Sank

*Affidavit of Kevin J. Mirch*
*Authenticating Exhibits*                     Page 1

1  U.S. Dept Justice Criminal Division Washington, D.C. on February 28, 2001, and has been

2  maintained in this office during the normal course of business during this litigation.

3      5. Exhibit C is a true and correct copy of the Civil and Administrative Settlement Agreement

4  between HCA - The Heathcare Company, formally known as Columbia/HCA Healthcare

5  Corporation and the United States f America, Department of Justice. This document was obtained

6  from Patricia Sank U.S. Dept Justice Criminal Division Washington, D.C. on February 28, 2001, and

7  has been maintained in this office during the normal course of business during this litigation.

8      6.   Exhibit D is a true and correct copy of the Plea Agreement in the case of United States

9  of America v. Colombia Homecare Group, Inc., and their parent, HCA. This document was obtained

10  from Patricia Sank U.S. Dept Justice Criminal Division Washington, D.C. on February 28, 2001, and

11  has been maintained in this office during the normal course of business during this litigation.

12      7.     I declare under penalty of perjury under the laws of the State of Nevada that the

13  foregoing is true and correct.

14      DATED this _9th_ day of _March_, 2001.

15

16

17                                    _____
                                              KEVIN J. MIRCH

18  SUBSCRIBED and SWORN to before me
    this _9th_ day of _March_, 2001
19
    by KEVIN J. MIRCH.
20

21  _____

22  NOTARY PUBLIC in and for the
    State of Nevada
23

24

25

26

27  *Affidavit of Kevin J. Mirch*
    *Authenticating Exhibits*              Page 2
28

MERCEDESE L. WITTY
NOTARY PUBLIC
STATE OF NEVADA
WASHOE COUNTY
93-1583-2 My Appnt. Expires July 15, 2001

1  KEVIN J. MIRCH, ESQ.
   State Bar No. 000923
2  131 Ryland Street
   Post Office Box 5396
3  Reno, Nevada 89513-5396
   Telephone: (775) 324-7444
4
   Attorney for Plaintiff
5

6              IN THE UNITED STATES DISTRICT COURT

7                 FOR THE DISTRICT OF NEVADA

8

9  Barbara J. Suter, Horace Burl Suter, Jr.,    )
   Rachael J. Suter,                            )
10                                              )
        Plaintiffs,                             )    **Case No.: CV-N-99-00286 DWH (RAM)**
11                                              )
        v.                                      )
12                                              )
   Neal G. Cury, Jr., Hospital Corporation of   )
13 America, Columbia-HCA, Inc., Thomas          )
   A. Frist, Jr., Edward Stack, James Don,      )
14 Health Acquisition Services, Inc.,           )
   Nevada Psychiatric Company, Inc.,            )
15 Doe Doctors I - XX, DOES I - X,              )
                                                )
16      Defendants.                             )
                                               /
17
                  **AFFIDAVIT OF BARBARA J. SUTER**
18
        My name is Barbara J. Suter.
19
        1. If called upon to testify, I have personal knowledge of the following facts and could
20
   competently testify to the same as follows.
21
        2.  I have been involved in providing information to the United States Attorney's Office
22
   concerning this case and understand that certain high level HCA officials have been found guilty of
23
   felonies in the State of Florida. Currently, those convicted HCA Officials are negotiating a deal to
24
   implicate other HCA officials.
25
        3. I am informed that a number of other States and Federal Agencies are investigating HCA,
26
   its previous and current officers for similar criminal conduct.
27
28 *Opposition to Motion to Dismiss - Stack*      Page 1


                        **EXHIBIT A**

4.  While Kevin Christensen was acting as the Director of the Office of Protection and Advocacy he agreed to testify in my case. After the summer of 1993, I could not get a hold of Mr. Christensen. I now understand that he was ill as a result of misconduct by these defendants and other State of Nevada employees.

5.  I was not aware of the political and judicial intervention that affected our substantive due process rights and accordingly, has no opportunity to adjudicate those claims in State Court.

6.  I was not aware of the improper political influence exerted not only against the Suters USBJ and our  witnesses during our case, but also the influence peddled by the Defendants to certain political officials that directly impacted the care that our child received.

7.  Kidview was a Reno project that Mr. Stack approved.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated this ___ day of November, 1999.

Barbara Suter

STATE OF NEVADA        )
                       ) ss.
COUNTY OF WASHOE       )

On this ___ day of November, 1999, personally appeared before me a notary public, Barbara Suter, and executed the foregoing affidavit.



MERCEDESE I. WITTY
NOTARY PUBLIC
STATE OF NEVADA
WASHOE COUNTY
93-1588-2  My Appnt. Expires July 15, 2001

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA )
)
      v. )      Criminal Information
)
COLUMBIA MANAGEMENT COMPANIES, INC.)
             Defendant. )
)

The United States charges:

## COUNT ONE

### INTRODUCTION

1.  DEFENDANT COLUMBIA MANAGEMENT COMPANIES, INC. is a
Delaware corporation formed on December 31, 1996.  At all times
relevant to this Information, DEFENDANT COLUMBIA MANAGEMENT
COMPANIES, INC. maintained its principal place of business in
Nashville, Tennessee and was a subsidiary of COLUMBIA/HCA, now
known as HCA – The Healthcare Company.

2.  DEFENDANT COLUMBIA MANAGEMENT COMPANIES, INC. is the
successor in interest to certain unincorporated operating groups
of COLUMBIA/HCA and its predecessors, including but not limited
to the Mid-America Group, the Eastern Group, and the operating
groups of Healthtrust, Inc., a hospital company acquired by
COLUMBIA/HCA in 1994.  DEFENDANT COLUMBIA MANAGEMENT COMPANIES,
INC., its predecessors, and its subsidiaries (hereinafter
collectively referred to as COLUMBIA MANAGEMENT COMPANIES) were
in the business of operating and managing COLUMBIA/HCA's and its
predecessor's hospitals and health care facilities.

3.  The Department of Health and Human Services is an agency

**Attachment E**

Exhibit B;1

of the United States which administers the Medicare and Medicaid programs. Medicare is a federally funded health insurance program covering inpatient and outpatient medical services for persons aged 65 or over who are entitled to retirement benefits and persons under age 65 who are entitled to benefits due to disability.  Medicaid is a federally and state-funded health insurance program for indigent persons of any age.

4.   The Department of Defense is an agency of the United States which administered the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS").  CHAMPUS was a federal health program which provided health and medical insurance benefits to retired members of the armed services and to dependents of both active duty and retired members of the armed services.

5.   For patients who are treated in a hospital, the hospital submits claims for payment to the Medicare, Medicaid, or CHAMPUS programs (hereinafter "Programs") for the patients' treatment. For inpatient treatment, the Programs pay the hospital an amount which is based on the severity of the patients' illnesses. Generally, the Programs pay the hospitals more money when a doctor diagnoses a patient with a severe illness as compared to a less severe illness.  For example, the Programs will pay the hospital more money for a patient with a complicated pneumonia as compared to a simple pneumonia.

6.   A doctor may also diagnose patients with additional medical problems known as complications or comorbidities ("CC").

B, 2

A patient with a CC is generally sicker and requires additional medical care.  For example, a patient may have dehydration in addition to pneumonia.  The Programs will pay the hospital more money when a patient has a CC.

7.  The Programs use a disease classification system which assigns a numerical code ("diagnosis code") to each possible illness.  Each diagnosis code is then classified (or "grouped") with diagnosis codes for similar illnesses into a Diagnoses Related Group (DRG).  The Programs pay hospitals an amount which depends on the DRG.  The Programs regularly publish the payment rates for each DRG.

8.  The Programs' rules and regulations require: (1) that the doctor diagnose the patient's  illnesses, (2) that if the doctor diagnoses more than one medical problem, the doctor determine which diagnosis is the "principal" diagnosis; (3) that the doctor write the diagnoses in the patient's medical record; and (4) that the hospital submit claims to the Programs based on the principal and all other diagnoses.

9.  A hospital employee, known as a coder, translates the doctors' diagnoses into diagnosis codes. Generally, when assigning diagnosis codes, the coders will know the DRG for the diagnosis codes and the DRG's payment rate.  The hospital lists the diagnosis codes, instead of the diagnoses, on the claim they submit to the Programs for the patient's treatment.   The Programs then group the diagnosis codes to a DRG.

10.  Until August 1995, the Programs required that hospitals

-3-

β,3

have doctors sign forms attesting that the diagnoses listed on claims submitted to the Programs were correct. These forms included each diagnosis and its corresponding diagnosis code, for example, "Gram negative pneumonia, 482.83." In August 1995, the Medicare Program no longer required that doctors sign a separate form, but required that doctors attest to patients' diagnoses by including the diagnoses in and signing the patients' medical records.

11. DEFENDANT COLUMBIA MANAGEMENT COMPANIES used supervisory coders at the Group and Division levels ("Group coders"), and, at times, hired outside coding consultants, to ensure that DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others received maximum reimbursement from the Programs. These Group coders and coding consultants would issue coding policies and procedures, train coders, and direct the assignment of diagnosis codes to medical records.

12. From in or about May 1991 until in or about December 1996, the DEFENDANT,

COLUMBIA MANAGEMENT COMPANIES, INC.

did unlawfully, willfully and knowingly combine, conspire, and agree with other persons known and unknown to the United States to:

A. Defraud the United States and agencies thereof, to wit, the Department of Health and Human Services and the Department of Defense, by impairing, impeding and obstructing by craft, trickery, deceit, and dishonest

-4-

8,4

means, their lawful and legitimate functions in
administering federal health insurance plans, including
the Medicare, Medicaid and CHAMPUS programs, and

B.  Commit offenses against the United States, that is, in
a matter within the jurisdiction of agencies and
departments of the United States, to wit, the
Department of Health and Human Services and the
Department of Defense, to knowingly and willfully make
and use false writings and documents knowing the same
to contain materially false, fictitious, and fraudulent
statements and entries, in violation of Title 18,
United States Code, Section 1001.

### PURPOSE OF THE CONSPIRACY

13.  The purpose of the conspiracy was for DEFENDANT
COLUMBIA MANAGEMENT COMPANIES and others to fraudulently receive
money from the Programs by submitting inflated claims which
falsely stated the patients' true diagnoses and overstated the
severity of the patients' illnesses.

### MANNER AND MEANS

14.  It was a part of the conspiracy that DEFENDANT COLUMBIA
MANAGEMENT COMPANIES and others would submit false and fraudulent
claims to the Programs by assigning incorrect and higher paying
diagnosis codes which misrepresented the patients' true diagnoses
and overstated the severity of the patients' illnesses.  This
practice is often referred to as "upcoding."

15.  It was further a part of the conspiracy that DEFENDANT

-5-

B.5

COLUMBIA MANAGEMENT COMPANIES and others would train its
employees, including hospital coders and hospital managers, to
fraudulently upcode claims to the Programs.

16.   It was further a part of the conspiracy that DEFENDANT
COLUMBIA MANAGEMENT COMPANIES and others would distribute "Focus"
lists which identified diagnoses, including pneumonia, which were
susceptible to upcoding, and would then pressure its employees to
fraudulently upcode claims to the Programs with these diagnoses.

17.   It was further a part of the conspiracy that DEFENDANT
COLUMBIA MANAGEMENT COMPANIES and others would set "targets" and
"goals" which induced its hospitals to claim that a specified
percentage (or greater) of its Program patients had high paying
and severe illnesses, regardless of the patients' true illness.
For example, DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others
would set a goal that hospitals should submit claims for
pneumonia patients stating that 80% of pneumonia patients had a
complicated pneumonia, even if these patients had a simple
pneumonia.

18.   It was further a part of the conspiracy that DEFENDANT
COLUMBIA MANAGEMENT COMPANIES and others would set targets and
goals which induced its hospitals to claim that a specified
percentage (or greater) of its Program patients had a CC,
regardless of whether the patients actually had a CC.

19.   It was further a part of the conspiracy that DEFENDANT
COLUMBIA MANAGEMENT COMPANIES and others would set these targets
and goals in order to increase the amount of money it would

receive from the Programs. Because not enough patients had the serious illnesses and CCs needed to meet the targets and goals, DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others well knew that these targets and goals could create incentives for coders to fraudulently upcode claims.

20. It was further a part of the conspiracy that DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others would set revenue goals. for each hospital and would financially reward and give bonuses to its management employees for meeting those goals. Group and Division management employees, including Chief Executive Officers, Chief Operating Officers and Chief Financial Officers, would then pressure the hospital coders to fraudulently upcode claims, in order to increase the hospital's income and meet revenue goals.

21. It was further a part of the conspiracy that DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others would financially reward its employees, including coders and management employees, who met or exceeded the coding and revenue targets and goals with bonuses, promotions, public recognition and incentive pay. If the employees did not meet the targets and goals, DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others would threaten to fire or discipline the employees with counseling, reprimands, poor performance evaluations, and public admonishments.

22. It was further a part of the conspiracy that DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others would encourage coding consultants to fraudulently upcode Program claims by paying them

a percentage of the additional revenue received from the Programs.

23. It was further a part of the conspiracy that when DEFENDANT COLUMBIA MANAGEMENT COMPANIES' officers learned that certain Group coders were improperly instructing employees to fraudulently upcode claims, DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others did not take effective action to stop and correct the fraudulent activity and, instead, allowed Group coders to continue past practices.

24. It was further a part of the conspiracy that when DEFENDANT COLUMBIA MANAGEMENT COMPANIES and others learned as a result of coding audits that it had submitted inflated claims to and received excess payments from the Programs, they would not disclose the excess payments and not return the excess amount to the Programs.

## OVERT ACTS

In order to effect the objects of the conspiracy and in furtherance of the conspiracy, DEFENDANT COLUMBIA MANAGEMENT COMPANIES committed and caused to be committed the following overt acts in the Middle District of Tennessee and elsewhere:

1. On or about December 31, 1991, DEFENDANT COLUMBIA MANAGEMENT COMPANIES paid a Group coder, **"A"**, an incentive payment of $9,000 because the Group coder's hospitals had met Program coding targets and goals.

2. On or about March 24, 1992, a regional Assistant Vice President instructed hospital Chief Executive Officers in a

B,8

region that included the states of Texas, Oklahoma and elsewhere to upcode claims from simple pneumonia to higher paying complicated pneumonia.

3.     On or about July 10, 1992, **"B"**, a Group coder, encouraged hospital coders in a region that included the states of Texas, Oklahoma and elsewhere to upcode claims for pneumonia to complicated pneumonia, and recognized that the region had increased its percentage of claims coded to higher paying pneumonia from 30% to 52% over a six month period.

4.     On or about November 4, 1992, a Group coder, **"B"**, commended hospital coders in a region that included the states of Texas, Oklahoma, and elsewhere for a 29% increase in the number of claims for pneumonia upcoded to complicated pneumonia.

5.     On or about July 26, 1993, a Group coder, **"C"**, congratulated seven hospitals in Kentucky and their coders for adding CCs to all claims for June 1993.

6.     On or about July 29, 1993, a Group coder, **"D"**, instructed coders at a hospital in Tennessee that the goal for claims coded without a CC diagnosis should be less than three percent.

7.     On or about September 24, 1993, a Group coder, **"E"**, instructed hospital coders at a hospital in North Carolina to upcode pneumonia claims based on "clinical picture guidelines" instead of the doctor's diagnoses.

8.     On or about October 31, 1993, a Group coder, **"E"**, instructed coders at hospitals in the Carolinas and Virginia that

-9-

B,9

their goal was to assign a CC to 96.2% of all claims.

9.    On or about December 20, 1993, a Group coder, "E",
instructed hospital managers at a hospital in North Carolina that
their coders were not assigning enough CCs to patients with
cardiac-related diagnoses.

10.    In or about 1994, a Group coder, "B", instructed
coders at a seminar in Tennessee to list diagnosis codes on the
doctor's attestation forms for more severe illnesses, but change
the diagnoses descriptions to match the doctor's lower paying and
less severe diagnoses.

11.    On or about January 24, 1994, a regional Assistant
Vice President, "F", issued coding goals and targets to hospital
officers and said that he would be monitoring their progress in
meeting these coding goals.

12.    On or about May 26, 1994, DEFENDANT COLUMBIA
MANAGEMENT COMPANIES hired a Group coder, "G", and agreed to pay
her a 25% incentive bonus if she met certain goals.

13.    In or about June 1994, an external coding consultant,
"D", instructed coders at a hospital in Tennessee to upcode
several Program claims without reviewing the medical record or
verifying that the doctor agreed with the diagnosis codes to be
submitted to the Programs.

14.    In or about July 1994, a Florida hospital required,
as a condition of employment, that its senior coder meet
specified coding goals and targets.

15.    On or about August 25, 1994, and September 8, 1994,

B, 10

Group coders, **"B" and "G"**, issued coding targets and goals to hospitals in a region that included Alabama, Louisiana, Mississippi, and elsewhere, and instructed coders that they should assign diagnosis codes which were not based on the doctor's diagnoses, but based on other information in the medical record.

16.    On or about October 4, 1994, a Group coder, **"G"**, issued to hospitals in a region that included Alabama, Louisiana, Mississippi, and elsewhere, a Focus list of lower paying DRGs and a table of coding targets and goals.

17.    On or about November 21, 1994, at a hospital in Texas, a Group coder, **"H"**, misrepresented the treating doctors' diagnoses to the Programs by upcoding several pneumonia claims.

18.    On or about December 19, 1994, a Group coder, **"B"**, instructed coders at a hospital in Texas that "Your DRG 79 [expensive pneumonia] percent is currently 23 percent for November and should increase to at least 60 percent."

19.    On or about March 23, 1995, a Group coder set a goal for the National Group that hospitals should code as complicated pneumonia 75% of all pneumonia claims submitted to the Programs.

20.    On or about April 4, 1995, a hospital in Tennessee implemented an Incentive Pay Plan for coders which financially rewarded coders for meeting coding targets and goals.

21.    On or about May 23, 1995, a Group coder, **"E"**, instructed coders at hospitals in the Carolinas to list on claims diagnosis codes which were not based on the doctor's diagnoses,

-11-

B, 11

but based on other information in the medical record.

22.    On or about June 6, 1995, a Group coder, **"E"**, told the CEO at a hospital in North Carolina that, "'[c]oders need to improve assignment of optimal DRG . . . . Current hospital practice of routinely asking physicians permission to code optimally needs to stop; this largely contributes to 'no' responses from physicians. When information to code optimally is documented and/or can be ascertained from chart, the coder is to assign the correct, optimal DRG."

23.    On or about June 18, 1995, at a hospital in New Mexico, a Group coder, **"B"**, instructed coders that they should assign a CC to 96% of the hospital's claims, and that the hospital should set goals for upcoding pneumonia and other claims.

24.    On or about July 12, 1995, a Group coder, **"B"**, instructed a coder at a hospital in Kentucky that the coder should bill the case using the diagnosis code assigned by the coder although the doctor's attestation was different.

25.    On or about July 13, 1995, the Mid-America Group set a goal for its hospitals in Kentucky that its coders should add a CC to at least 96% of its claims, and published statistics showing that a hospital in Kentucky had added a CC to 100% of its Medicare claims.

26.    On or about August 8, 1995, a Group coder, **"E"**, instructed Health Information Management Directors at hospitals in the Carolinas that coders could ignore doctors who disagreed

$\beta,12$

with the coder's diagnosis and code a different diagnosis because
Medicare no longer required doctors to attest to the diagnosis
codes.

27.   In or about October 1995, a Group president, "I", and
other Group employees for the Mid-America Group stated that
coders could assign a CC to 100% of all claims.

28.   In or about November 1995, a Group president, "I",
and other Group employees for the Mid-America Group stated that
coders should be able to assign codes for diagnoses not
documented or approved by the patient's doctor, and that if the
coders could not do so, the Group would not meet coding targets.

29.   In or about 1996, a Chief Financial Officer at a
hospital in Texas, "J", presented a seminar entitled "Cash is
King" wherein the Chief Financial Officer set coding targets and
goals, and predicted that the hospital would earn $295,300 in
additional revenue if coders implemented a "Focus DRG
Optimization Program."

30.   On or about January 30, 1996, at a hospital in
Tennessee, a Group coder, "B", told corporate auditing personnel
that coders should be able to assign codes for diagnoses not
documented or approved by the patient's doctor, and that Medicare
was not smart enough to focus their reviews to catch upcoding.

31.   On or about February 12, 1996, a corporation vice-
president "K", after receiving information that certain Group
coders were improperly coding claims and training hospital coders
to improperly code claims, nonetheless issued a policy that Group

B,13

coders would supervise coding and train coders at hospitals.

32.    On or about March 1, 1996, a Group coder, "B", stated in her annual performance review that her objectives were to "[i]mprove DRG reimbursement and decrease [length of stay] for National Group hospitals," focusing on hospitals in Kentucky, Utah, Colorado, New Mexico, and elsewhere.

33.    On or about March 5, 1996, a Group coder, "B", instructed coders and hospital managers at a hospital in Illinois to assign diagnosis codes for diagnoses not documented or approved by the patient's doctor.  The Group coder and hospital management then chastised the coders for not following the Group coder's instructions, and further instructed the hospital's coders to attend a Group coding training seminar.

34.    On or about April 25, 1996, Group coders, "A" and "B", presented a coding seminar to Mid-America Group coders in Nashville, Tennessee wherein they instructed that coders could code diagnoses not documented or approved by the doctor.

35.    On or about May 22, 1996, Group coders, "B" and "E", instructed coders at a Mid-American Group training seminar to assign diagnosis codes for diagnoses not documented or approved by the patient's doctor.

36.    On or about May 31, 1996, hospital managers at a hospital in North Carolina directed that hospital coders should assign diagnosis codes for diagnoses not documented or approved or confirmed by a patient's doctor.

37.    On or about June 10, 1996, a Group coder, "B",

-14-

B,14

visited a hospital in Illinois to ensure that the hospital's coders were following her instructions and that they had attended proscribed training.

38.     On or about June 12, 1996, a hospital coder, "L", instructed a Health Information Management Director, "M", at a hospital in Tennessee that even if the doctor did not diagnose an illness, "coders need to be given authority to code aggressively when the chart indicates possibility/probability of [a diagnosis]."   "L" then stated that coders should code complicated pneumonia even when the doctor did not document or approve that diagnosis.

39.     In or about August, 1996, a Group coder, "B", instructed coders at a hospital in Kentucky to assign a diagnosis code for a diagnosis that was not documented or approved by the patient's doctor and stated that the government would not catch the upcoded claim.

40.     In or about September 1996, a hospital in Indiana entered into a contract with an external coding consulting company, "N", to review claims and make recommendations on how to upcode claims for more money, which contract paid the company 35% of the additional money earned through upcoding.

41.     On or about September 20, 1996, a CFO in a Kentucky hospital, "O", stated that coders should assign diagnosis codes for diagnoses which were not documented or approved by the patient's doctor.

All in violation of Title 18, United States Code, §371.

-15-

$B_1$'$\mathsf{S}$

Respectfully submitted,

JOSHUA R. HOCHBERG
Chief, Fraud Section,
Criminal Division, U.S. Department
of Justice


By: _____
DENISE E. BIEHN
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
P.O. Box 28188
McPherson Square
Washington, D.C.   20038

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

FILED
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

DEC 1 5 2000

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA      )
                              )
          v.                  )
                              )   Case No.  3:00-00206
COLUMBIA MANAGEMENT COMPANIES, INC.)
          Defendant.          )     8:00 CR 461-T-24A
                              )

## JOINT STIPULATION OF FACTS IN SUPPORT OF PLEA AGREEMENT

DEFENDANT COLUMBIA MANAGEMENT COMPANIES, INC. has agreed to
plead guilty to an Information charging conspiracy, in violation
of Title 18, United States Code Section 371.  The United States
and Defendant jointly offer the following statement of facts and
evidence in support of the Information filed in the above-
captioned action.

1.   Paragraphs One through Eleven of the Information, which
set forth factual allegations, are true and accurate.

2.   Beginning in May 1991, the DEFENDANT willfully and
knowingly entered into an agreement with some of its employees to
defraud the United States, and to commit offenses against the
United States in violation of Title 18, United States Code
Section 1001, by hiring certain employees, and then directing
these employees to increase payments from the Programs by
submitting inflated claims for payment to the United States for
patients in federal health benefit programs.  These claims would
falsely state the patients' true diagnoses and overstate the
severity of the patients' illnesses.  In or about December 1996,

-1-

- Exhibit B - 17

the DEFENDANT, acting through its employees, terminated this agreement and conspiracy by directing and training its employees to stop inflating claims to the Programs.

3. When entering into this agreement, DEFENDANT and its co-conspirators knew that the purpose and goal of the agreement and understanding was to fraudulently receive money from the Programs by submitting inflated claims, and deliberately entered into this agreement intending to accomplish the goal and purpose by common plan and joint action.

4. In furtherance of this agreement, the DEFENDANT, acting through and in concert with its employees, committed at least one overt act, including:

A. DEFENDANT's employees trained other employees to engage in coding practices which resulted in the submission of inflated claims to the Programs. On or about April 25, 1996, two of DEFENDANT's employees, employed as coding specialists, presented a seminar to DEFENDANT's Mid-America Group employees in Nashville, Tennessee wherein they instructed the employees to assign diagnoses which were not documented by the doctor but were instead based on medical record information other than doctors' documentation. The Programs' rules and regulations require that hospitals submit claims to the Programs based on diagnoses determined by the doctor.

B. DEFENDANT's employees distributed "Focus" lists which identified diagnoses, including pneumonia, which were susceptible to being inflated, and then pressured its employees to fraudulently inflate claims to the Programs with these

-2-

$B_1 18$

diagnoses.  On or about March 24, 1992, the DEFENDANT, acting through a regional Assistant Vice President, issued a memorandum which instructed hospital Chief Executive Officers in a region that included the states of Texas, Oklahoma and elsewhere to inflate claims to the Programs for patients diagnosed with pneumonia, a diagnosis on the "Focus" lists.

C.  DEFENDANT's employees set "targets" and "goals" which induced other employees and hospitals to claim that a specified percentage (or greater) of its Program patients had high paying and severe illnesses, regardless of the patients' true illness.  On or about November 4, 1992, one of DEFENDANT's employees issued Program coding targets and goals to hospitals in the Southwest region, including a goal that hospitals should submit 50% of its Program claims for pneumonia patients as high paying pneumonia.

D.  DEFENDANT's employees hired outside coding consultants and paid them a percentage of the additional revenue received from the Programs.  In or about September 1996, hospital managers for a hospital in Indiana entered into a contract with an external coding consulting company to review claims and make recommendations on how to inflate claims for more money, which contract paid the company 35% of the additional revenues.

E.  DEFENDANT's employees would sometimes financially reward employees who met or exceeded the coding and revenue targets and goals with bonuses, promotions, public recognition and incentive pay.  On or about January 1, 1992, DEFENDANT paid an employee a bonus of $9,000 for meeting coding performance

-3-

B, 19

targets and goals.

F.   For employees who failed to meet targets and goals, DEFENDANT's employees would threaten to fire or discipline with counseling, reprimands, poor performance evaluations, and public admonishments.   On or about March 5, 1996, an employee chastised other employees at a hospital in Illinois for not meeting coding targets and goals.

4.   From in or about May 1991 through December 1996, as a result of this conspiracy, the United States suffered a loss of $16.9 million.

So Stipulated and agreed this _1 /_th day of _Diieeb_ 2000.

JOSHUA R. HOCHBERG
Chief, Fraud Section,
Criminal Division,
U.S. Department of Justice

By: _____
DENISE E. BIEHN
Trial Attorney
Fraud Section,
Criminal Division
U.S. Department of Justice
P.O. Box 28188
McPherson Square
Washington, D.C.   20038

COLUMBIA MANAGEMENT
COMPANIES, INC.

By: _____
ROBERT A. WATERMAN
SENIOR VICE PRESIDENT
General Counsel

B, 20

CIVIL AND ADMINISTRATIVE SETTLEMENT AGREEMENT

## I.   PARTIES

This Civil and Administrative Settlement Agreement (Agreement) is entered into between the following (hereinafter "the Parties") through their authorized representatives: the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS); the TRICARE Management Activity (TMA)(formerly the Office of Civilian Health and Medical Program of the Uniformed Services (OCHAMPUS), through its General Counsel; the Office of Personnel Management (OPM), which administers the Federal Employees Health Benefits Program (FEHBP), through the United States Attorney's Office for the District of Columbia; (collectively the "United States"); and HCA - The Healthcare Company, formerly known as Columbia/HCA Healthcare Corporation, on behalf of its predecessors and current and former affiliates, divisions and subsidiaries (collectively "HCA").

## II.   PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.    HCA is a Delaware corporation that through its predecessors and/or its subsidiaries and affiliates operates or has operated over 400 hospitals, over 500 home health agencies,

Ex C, 1

and numerous ancillary health care facilities in at least thirty states.

B.   Dennis J. Wyman, M.D.,   Robert K. Rothfeder, M.D., Health Outcomes Technologies, Donald S. McLendon, Tonya M. Atchison, Randal T. Boston, Sharon Christian, Martha Long, Kristen Kuhn, Pamela Cianci, Mary R. Hampton, Sara Ortega, John W. Schilling, Madelyn Rappaport, J. Watson Maxwell, Francis M. Patton, and Francesco Lanni (the "relators") filed <u>qui tam</u> actions in various United States District Courts that are now pending before the District Court for the District of Columbia captioned as follows:

(1) <u>U.S. ex rel. Wyman and Rothfeder v. HealthTrust, Columbia/HCA, et al.</u>, No. 99 - 3310 (D.D.C.)(formerly D.Utah);

(2) <u>U.S. ex rel. Health Outcomes Technologies v. Columbia Medical Center-East, et al.</u>, No. 99 - 3297 (D.D.C.)(formerly E.D.Pa.);

(3) <u>U.S. ex rel. McLendon v. Columbia Healthcare Corp., et al.</u>, No. 99-3295 (D.D.C.)(formerly N.D.Ga.);

(4) <u>U.S. ex rel. Cianci v. Columbia/HCA Healthcare Corp., et al.</u>, No. 99-2761-CIV-T-23E (formerly M.D. Fla.);

(5) <u>U.S. ex rel. Atchison v. Columbia/HCA Healthcare, Inc.</u>, No. 99-2399 (D.D.C.)(formerly M.D. Tenn.);

(6) <u>U.S. ex rel. Atchison v. Columbia/HCA Healthcare, Inc.</u>, No. 99-3307 (D.D.C.)(formerly W.D.Tex.);

C,2

(7) <u>U.S. ex rel. Boston v. Columbia/HCA Healthcare Corp.</u>, No. 99-3301 (D.D.C.)(formerly N.D. Tex.);

(8) <u>U.S. ex rel. Christian, Long and Kuhn v. Columbia/HCA Healthcare Corp., et al.</u>, No. 99-3303 (D.D.C.)(formerly S.D. Tex.);

(9) <u>U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp., et al.</u>, No. 99-3294 (D.D.C.)(formerly M.D.Ga.);

(10) <u>U.S. ex rel. Ortega v. Columbia/HCA Healthcare Corp., et al.</u>, No. 99-3305 (D.D.C.)(formerly W.D.Tex.);

(11) <u>U.S. ex rel. Schilling v. Columbia/HCA Healthcare Corp., et al.</u>, Civ. No. 96-1264-CIV-T-23B (formerly M.D.Fla.);

(12) <u>U.S. ex rel. Rappaport v. Hospital Corporation of America et al.</u>, Civ. No. 99-3228 (formerly N.D. Ala.);

(13) <u>U.S. ex rel. Lanni v. Curative Health Services, Inc. et al.</u>, No. 00-2584 (D.D.C.)(formerly S.D.N.Y.).

C.    HCA submitted or caused to be submitted claims for payment to the Medicare Program (Medicare), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg, the Medicaid Program, 42 U.S.C. §§ 1396-1396v; the TRICARE Program (hereinafter referred to as TRICARE), 10 U.S.C. § 1071 - 1107,and the FEHBP, 5 U.S.C. §§ 8901 <u>et seq.</u> (collectively "the government health care programs").

C,3

D.  The United States contends that it has certain civil claims under the False Claims Act, 31 U.S.C. § 3729-33, and other federal statutes and/or common law doctrines, as specified in Paragraph 2 below, against HCA, for engaging in the following conduct (hereinafter referred to as the "Covered Conduct").

### (1)  **Outpatient Laboratory Billing**

From January 1, 1989 through December 31, 1997, HCA hospitals identified in Attachment 1 to this Agreement billed the government health care programs for outpatient laboratory tests designated by the CPT Codes in the 80000-89999 range, and by CPT Codes G0058, G0059 and G0060, without regard for whether they were medically necessary, had been properly ordered by physicians or were being billed appropriately.

### (2)  **DRG Upcoding**

From January 1, 1990 through December 31, 1997, HCA hospitals identified in Attachment 2 to this Agreement "upcoded" claims to the government health care programs for inpatient hospital admissions by assigning diagnosis codes that were not supported by physician documentation in the patients' medical records for the purpose of improperly increasing reimbursement on inpatient claims submitted for the following Diagnosis Related Groups (DRGs):  076,  079, 087, 121, 124, 132, 138, 316, 416, and 475; and the complication and comorbidity DRGs ("cc" DRGs) identified in Attachment 3 to this Agreement.

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -4-

c,4

(3) **Home Health Community Education**

For cost report years 1994 through 1997, HCA submitted claims to Medicare for reimbursement of costs, including administrative and general costs, that it had allocated to community education activities. In fact, some of these costs were attributable to nonreimbursable advertising and marketing functions performed by home health community educators, including, but not limited to, patient care coordinators, home care coordinators, community liaisons and community liaison nurses. The conduct described in this Paragraph does not include claims, if any, submitted to Medicaid, TRICARE or FEHBP.

(4) **Home Health Billing Issues**

Between January 1, 1995 and December 31, 1998, the HCA-owned home health agencies listed in Attachment 4 to this Agreement submitted claims to Medicare, Medicaid, and TRICARE (a) for visits to patients who did not qualify for home health services because (i) the patients were not homebound, (ii) there was no medical need for such services, or (iii) there was no medical need for skilled services; (b) for visits that were not provided; (c) for visits to deliver services that were in fact or should have been provided by an assisted living facility; (d) for visits that lacked proper physician authorization because (i) the home health agency had not received physician orders prior to billing for services, (ii) the home health agency had not properly obtained the physician signature, (iii) the home health agency

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*                    -5-

C5

provided the services after expiration of the written order from the physician; and (e) for visits billed but not documented. The conduct described in this Paragraph does not include claims, if any, submitted to FEHBP.

### (5) Home Health Management Fees

For cost report years 1993 through 1998, HCA improperly included in Medicare cost reports the management fee costs related to the acquisition of the Olsten, ResCare, AbleCare, CareOne and Central (a/k/a Simeone Central) home health agencies in Florida, Georgia and Alabama. The costs referred to in this Paragraph include all kickback, related party, undisclosed rebate and cost report claims relating to these acquisitions, but do not include duplicative services or non-allowable costs included in administrative and general costs not otherwise covered in this release allocated to the acquired agencies. The conduct described in this Paragraph does not include claims, if any, submitted to Medicaid, TRICARE or FEHBP.

E.    The United States also contends that it has certain administrative claims against HCA under the provisions for permissive exclusion from the Medicare, Medicaid, and other Federal health care programs, 42 U.S.C. § 1320a-7(b), the provisions for civil monetary penalties, 42 U.S.C. § 1320a-7a, permissive exclusion from TRICARE, 32 C.F.R. § 199.9, and permissive exclusion from FEHBP, 5 U.S.C. § 8902a and 5 C.F.R. Part 970, for the Covered Conduct.

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -6-

C, W

F.   The following States ("the States") contend that they have certain civil claims against HCA for the conduct specified in Paragraphs D (1)(outpatient laboratory), (2)(DRG upcoding) and (4)(home health billing) above:  Alaska, Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Mississippi, Missouri, Nevada, New Hampshire, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wyoming.  HCA and the States will execute separate settlement agreements regarding these claims in exchange for the payment specified in Paragraph 1(b) below.

G.   The relators identified in Paragraph B above are among those who claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Agreement, but the relators and the United States have not agreed on the entitlement or amount of that award, if any.  This Agreement does not cover the claims of any relator to payment of attorney's fees under 31 U.S.C. § 3730(d).

H.   This Settlement Agreement does not constitute evidence or an admission by any party of any liability or wrongful conduct.

I.   HCA has executed letters of credit in favor of the United States in the total amount of one billion dollars ($1,000,000,000) pursuant to a February 1999 Letter of Credit

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -7-

C. 7

Agreement (LOC Agreement).  The LOC Agreement is incorporated herein by reference.

J.  HCA and OIG-HHS have executed a separate Corporate Integrity Agreement (CIA), which is incorporated herein by reference.

K.  To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the claims set forth above, the Parties hereby reach a full and final settlement of the claims against HCA pursuant to the Terms and Conditions set forth below.

### III.  <u>TERMS AND CONDITIONS</u>

NOW, THEREFORE, in reliance upon the representations contained herein, in consideration of the mutual promises, covenants, and obligations set forth below, and for good and valuable consideration as stated herein, the Parties agree as follows:

1.  HCA agrees to pay to the United States and the States $745,000,000.00, plus interest accruing at a simple rate of 6.5% per annum from May 18, 2000 through and including the Payment Date (the Settlement Amount).  The "Payment Date" shall be within five (5) days of approval of this Agreement by the United States District Court for the District of Columbia.  HCA agrees to pay the Settlement Amount as follows:

(a)  HCA agrees to pay $731,367,246.23 plus interest accruing at a simple rate of 6.5% per annum from May 18,

*Civil And Administrative Settlement Agreement
Between U.S. & HCA*               -8-

C,8

2000 through and including the Payment Date to the United States by electronic funds transfer pursuant to written instructions to be provided by Michael F. Hertz, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice.   The $731,367,246.23 represents the total of the following settlement amounts: $90,016,350 (outpatient laboratories);   $395,567,650 (DRG upcoding); $50,000,000 (home health community education); $90,000,000 (home health management fees);   $105,783,246.23 (home health billing).

(b)   HCA also agrees to pay the States $13,632,753.77, plus interest accruing at a simple rate of 6.5% per annum from May 18, 2000 through and including the Payment Date in a separate escrow, as designated by the States, for distribution to the individual States upon completion of the separate State settlement agreements.

2.   Subject to the exceptions in Paragraph 10 below, in consideration of the obligations of HCA set forth in this Agreement, conditioned upon HCA's payment in full of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release HCA together with its current and former parent corporations, each of its direct and indirect subsidiaries, brother or sister corporations, divisions, current or former owners and affiliates, and the successors and assigns of any of them from any civil or administrative monetary claim the United States has or may have

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -9-

C.9

under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, breach of contract, and fraud, for the Covered Conduct.

3.  On the Payment Date, conditioned upon receipt of the Settlement Amount, the LOC Agreement is hereby amended as follows:

(a)  The unconditional guarantee by the Company (as defined in the LOC Agreement) of the Obligations (as defined in the LOC Agreement) in the form of the Letters of Credit (as defined in the LOC Agreement), and the aggregate amount which may be drawn under the Letters of Credit by the United States, shall be two hundred fifty million dollars ($250,000,000) rather than one billion dollars ($1,000,000,000).

(b)  Upon receipt by the United States of any payment made in satisfaction of any of the Obligations following the Payment Date, whether pursuant to an Actionable Order or Settlement Agreement (as such terms are defined in the LOC Agreement) and including any payment made through a drawing under any Letter of Credit, the unconditional guarantee by the Company of the Obligations in the form of the Letters of Credit, and the aggregate amount which may be drawn under the Letters of Credit by the United States, shall immediately be reduced dollar-for-dollar by the amount of such payment.  Reductions pursuant to

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*                    -10-

C,10

this clause (b) shall be cumulative and in addition to the reduction described in clause (a) above.  For purposes of this clause (b), a payment shall be deemed made in satisfaction of an obligation only if acknowledged in writing as such by the United States or if made through a drawing under a Letter of Credit.

(c)  In connection with any reduction of the Company's guarantee of the Obligations described in clause (a) or (b) above, the Company may elect to replace the then outstanding Letter(s) of Credit with one or more new Letter(s) of Credit in an amount at least equal to the reduced amount of the Company's guarantee set forth in clause (a) or (b) (as applicable), so long as the new Letter(s) of Credit are issued by a Letter of Credit issuer acceptable under Paragraph 2 of the LOC Agreement.  The replaced Letter(s) of Credit shall be returned for cancellation to the Company in exchange for the replacement Letter(s) of Credit.

HCA and the United States acknowledge that the foregoing agreement to replace the Company's unconditional guaranty of the Obligations in the form of the Letters of Credit on the Payment Date with two hundred fifty million dollars ($250,000,000) rather than one billion dollars ($1,000,000,000) is not based on the amount or expected amount of HCA's remaining liability for conduct not addressed by this Agreement.

4.  This Agreement is expressly conditioned upon resolution, through execution of plea agreement(s) or otherwise,

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*                    -11-

C,11

of the Company's corporate criminal liability, with the Department of Justice (the Criminal Condition) as set forth in the Plea Agreement executed on December 14, 2000.  As used in this Paragraph, the term "resolution" includes, where appropriate, acceptance by the appropriate court(s) of any plea agreement(s) and imposition of any sentence(s) necessary to effectuate the Criminal Condition.

     5.  After the execution of this Agreement, the United States and HCA will move the United States District Court for the District of Columbia for (1) dismissal with prejudice of the claims against HCA in the Civil Actions identified in Paragraph B (1) - (4) above; and (2)  dismissal with prejudice of those claims against HCA in the Civil Actions identified in Paragraph B (5) - (13) above that are co-extensive with the Covered Conduct. The motions to dismiss will be conditioned upon receipt by the United States of the Settlement Amount.  The claims that the United States and HCA agree are co-extensive with the Covered Conduct are identified in Attachment 5 to this Agreement, incorporated by reference herein.  The parties agree that they reserve the right to seek to dismiss any claim of any relator other than those identified on the grounds they are coextensive with the Covered Conduct or are otherwise barred.  The United States also agrees to use reasonable good faith efforts to cause the dismissal or release of any claims filed by relators (with prejudice to relators but without prejudice to the United States)

C, 12

in the Civil Actions identified in Paragraph B (5) – (13) above that: 1) relate to home health community education claims (as described in Paragraph D (3) above) submitted to Medicaid, TRICARE or FEHBP; 2) relate to home health billing claims (as described in Paragraph D (4) above) submitted to FEHBP; and 3) relate to home health management fees claims (as described in Paragraph D (5) above) submitted to Medicaid, TRICARE or FEHBP.

6.   Should this Agreement be challenged by any relator as not fair, adequate or reasonable pursuant to 31 U.S.C. § 3730(c)(2)(B), the United States and HCA agree that they will take all reasonable and necessary steps to defend this Agreement.

7.   In consideration of the obligations of HCA set forth in this Agreement and the CIA, conditioned upon HCA's payment in full of the Settlement Amount, the OIG-HHS agrees to release and refrain from instituting, directing or maintaining any administrative action seeking exclusion from the Medicare, Medicaid, or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against HCA under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities), for the Covered Conduct, except as reserved in Paragraph 10, below, and as reserved in this Paragraph. The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude HCA together with its current and former parent corporations, each of its direct and indirect

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -13-

C.13

subsidiaries, brother or sister corporations, divisions, current or former owners, affiliates, and the successors and assigns of any of them from the Medicare, Medicaid, or other Federal health care program under 42 U.S.C. § 1320a-7(a)(mandatory exclusion) based upon the Covered Conduct.

8.    In consideration of the obligations of HCA set forth in this Agreement, conditioned upon HCA's payment in full of the Settlement Amount, TMA agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from the TRICARE/CHAMPUS Program against HCA under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in Paragraph 10, below, and as reserved in this Paragraph.  TMA expressly reserves authority to exclude HCA together with its current and former parent corporations, each of its direct and indirect subsidiaries, brother or sister corporations, divisions, current or former owners, affiliates, and the successors and assigns of any of them, from the TRICARE/CHAMPUS program under 32 C.F.R. §§ 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii), based upon the Covered Conduct.

9.    In consideration of the obligations of HCA set forth in this Agreement, conditioned upon HCA's payment in full of the Settlement Amount, OPM agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from the FEHBP program against HCA under 5 U.S.C. § 8902a or 5 C.F.R. Part 970 for the Covered Conduct,

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*            -14-

C,14

except as reserved in Paragraph 10, below and except if excluded by the OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a).

10.  Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including HCA and Relators) are any and all of the following claims of the United States:

a.  Any civil, criminal or administrative liability to the United States arising under Title 26, U.S. Code (Internal Revenue Code);

b.  Any criminal liability;

c.  Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

d.  Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.  Any claims of the United States based upon such obligations as are created by this Agreement;

f.  Any claims by FEHBP for the Covered Conduct identified in Paragraph D(3)(home health community education), (4)(home health billing), and (5)(home health management fees) above.

g.  Any claims by TRICARE/CHAMPUS for the Covered Conduct identified in Paragraph D(3)(home health community education) and (5)(home health management fees) above.

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -15-

C,15

h.     Any claims by the United States or the States relating to the Medicaid Program for the Covered Conduct identified in Paragraph D(3)(home health community education) and (5)(home health management fees) above.

i.     Any express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services, provided by HCA;

j.     Any claims for personal injury or property damage or for other similar consequential damages arising from the Covered Conduct;

k.     Any claims of the United States based on a failure to deliver items or services due (with the exception of home health services that the United States alleges were not provided, as described in Paragraph D(4));

l.     Any civil or administrative claims of the United States against individuals (including current or former directors, officers, employees, agents, or shareholders of HCA).

11.  HCA has entered into a Corporate Integrity Agreement (CIA) with HHS, attached as Attachment 6, which is incorporated into this Agreement by reference.  HCA will implement its obligations under the CIA immediately upon the execution of this Agreement.

12.  HCA waives and will not assert any defenses HCA may have to any criminal prosecution or administrative action relating to the Covered Conduct, which defenses may be based in

C.16

whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Settlement bars a remedy sought in such criminal prosecution or administrative action. HCA agrees that this settlement is not punitive in purpose or effect. Nothing in this Paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code.

13. HCA fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) which HCA has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct and the United States' investigation and prosecution thereof.

14. The Settlement Amount will not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or by FEHBP or TRICARE or any State payer, related to the Covered Conduct; and HCA agrees not to resubmit to any Medicare carrier or intermediary or to FEHBP or TRICARE or any State payer any

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -17-

C,17

previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

15.  HCA agrees to the following:

(a)  <u>Unallowable Costs Defined:</u>  HCA agrees that all costs (as defined in the Federal Acquisition Regulations (FAR) 48 C.F.R. § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations promulgated thereunder) incurred by or on behalf of HCA, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement and any related plea agreement,

(2) the Government's audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement,

(3) HCA's investigation, defense, and corrective actions undertaken in response to the Government's audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorney's fees and the obligations undertaken pursuant to the CIA incorporated in this Agreement),

(4) the negotiation and performance of this Agreement and any Plea Agreement, and

C.18

(5) the payment HCA makes to the United States
pursuant to this Agreement and any payments that HCA may make to
relators,

are unallowable costs on Government contracts and under the
Medicare Program, Medicaid Program, TRICARE Program, and Federal
Employees Health Benefits Program (FEHBP).

(All costs described or set forth in this Paragraph 15(a) are
hereafter, "unallowable costs").

(b)  Future Treatment of Unallowable Costs: These
unallowable costs will be separately estimated and accounted for
by HCA, and HCA will not charge such unallowable costs directly
or indirectly to any contracts with the United States or any
State Medicaid Program, or seek payment for such unallowable
costs through any cost report, cost statement, information
statement, or payment request submitted by HCA or any of
its subsidiaries to the Medicare, Medicaid, TRICARE, or FEHBP
Programs.

(c)  Treatment of Unallowable Costs Previously
Sought: HCA further agrees that within 60 days of the effective
date of this Agreement it will identify to applicable Medicare
and TRICARE fiscal intermediaries, carriers, and/or contractors,
and Medicaid, VA and FEHBP fiscal agents, any unallowable costs
(as defined in this Paragraph) included in payments previously
sought from the United States, or any State Medicaid Program,
including, but not limited to, payments sought in any cost

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*              -19-

C, 19

reports, cost statements, information reports, or payment requests already submitted by HCA or any of its subsidiaries, and will request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs.  HCA agrees that the United States will be entitled to recoup from HCA any overpayment as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.  Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by HCA or any of its subsidiaries on the effect of inclusion of unallowable costs (as defined in this Paragraph) on HCA or any of its subsidiaries' cost reports, cost statements, or information reports.  Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or reexamine the unallowable costs described in this Paragraph.

16.  HCA agrees to cooperate fully and completely with the United States in any criminal, civil and/or administrative investigations and proceedings of any present and former officers, directors, employees and agents, and of any parties with whom it had or has a business or professional relationship

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -20-

C,20

with respect to the Covered Conduct. HCA will itself provide information through testimony and/or oral briefings by competent corporate representatives upon request of the United States. HCA will furnish to the United States, upon reasonable request, complete and un-redacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct which it has undertaken, or which has been performed by others on its behalf, and agrees that it will not assert any claim of privilege with respect to information requested by the United States to establish the authenticity or evidentiary foundation for the non-privileged information it has provided. HCA agrees not to impair, and, upon reasonable notice, will encourage, the cooperation of its directors, officers, employees and agents in any investigation of the Covered Conduct. HCA also agrees to use its best efforts to make available, and encourage the cooperation of, former directors, officers and employees for interviews and testimony, consistent with the rights and privileges of such individuals in any investigation of the Covered Conduct. The obligations referred to in this Paragraph shall in no way limit HCA's obligations under any other agreement with the United States or the States, including, but not limited to, the Plea Agreement that HCA is entering with the United States.

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -21-

C,21

17.   This Agreement is intended to be for the benefit of the Parties and the States only, and by this instrument the Parties and the States do not release any claims against any other person or entity, except to the extent specifically provided for in this Agreement.

18.   HCA agrees that it will not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents or sponsors.  HCA waives any causes of action against these beneficiaries or their sponsors or responsible parties based upon the claims for payment covered by this Agreement.

19.   Except as may be expressly provided to the contrary in this Agreement, each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

20.   This Agreement is governed by the laws of the United States.  The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement will be the United States District Court for the District of Columbia, except that disputes arising under the Corporate Integrity Agreement shall be resolved exclusively under the dispute resolution provisions in the Corporate Integrity Agreement and disputes arising under the separate agreements with

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*          -22-

C,22

the States shall be governed by the relevant provisions of those agreements.

21.   This Agreement may not be amended except by written consent of the Parties, except that only HCA and OIG-HHS must agree in writing to modification of the Corporate Integrity Agreement.

22.   The undersigned individuals signing this Agreement on behalf of HCA represent and warrant that they are authorized by HCA to execute this Agreement.  The undersigned United States signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

23.   This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

24.   This Agreement is binding on HCA's successors, transferees, heirs, and assigns.

25.   This Agreement is effective on the date of signature of the last signatory to the Agreement.  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Settlement Agreement.

C, 23

THE UNITED STATES OF AMERICA

DATED: __12/14/00__          BY: _____

JOYCE R. BRANDA
Deputy Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*                    -24-

C, 24

DATED: _12/13/00_          BY: _____

LEWIS MORRIS
Assistant Inspector General
Office of Counsel to the
  Inspector General
Office of Inspector General
United States Department of
  Health and Human Services

*Civil And Administrative Settlement Agreement
Between U.S. & HCA*          -25-

C.25

DATED: _12-12-00_     BY: _[signature]_

ROBERT L. SHEPHERD
Deputy General Counsel
TRICARE Management Activity
United States Department
    of Defense

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*                    -26-

C, 26

DATED: December 13, 2000

BY: _____

WILLIAM E. FLYNN III
Associate Director for
Retirement and Insurance
Service, United States
Office of Personnel
Management

*Civil and Administrative Settlement Agreement*
*Between U.S. & HCA*          *-27-*

C,27

DATED: _December 14, 2000_          BY: _E. Jeremy Hutton_

                                     E.  JEREMY HUTTON
                                     Assistant Inspector General
                                       for Legal Affairs
                                     United States Office of
                                       Personnel Management

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*                    -28-

C,28

## HCA - The Healthcare Company

DATED:_____   BY: _____
                                     ROBERT A. WATERMAN
                                     General Counsel
                                     HCA

DATED:_____   BY: _____
                                     CATHRYN L. SOWERS
                                     Vice President
                                     Litigation
                                     HCA

DATED: 12/14/00                 BY: _____
                                     ROGER S. GOLDMAN
                                     Latham & Watkins
                                     Counsel for HCA

DATED:_____   BY: _____
                                     S. CRAIG HOLDEN
                                     Ober, Kaler, Grimes & Shriver
                                     Counsel for HCA

*Civil And Administrative Settlement Agreement*
*Between U.S. & HCA*            -29-

C,29

Periods of Ownership for Columbia/HCA Facilities    **Attachment No. 1**

| Provide | Name | Acq. Type | How Acquired | Acquired | Sold |
|---|---|---|---|---|---|
| 010015 | Thomasville Hospital | Merger | BAMI merger | 07/15/92 | 08/17/93 |
| 010119 | Doctor's Hospital of Mobile | Merger | Doctor's Hospital of Mobile, | 12/20/71 | 05/31/90 |
| 010127 | Medical Center of Huntsville | Merger | Galen merger | 05/02/63 | 03/23/94 |
| 010152 | Knollwood Park Medical Center | Merger | Knollwood Park Hospital, Mobile, | 01/01/87 | 05/31/90 |
| 040088 | Medical Center - South Arkansas | Joint Venture | Joint Venture-Medical Center | 02/27/96 | 05/11/99 |
| 050022 | Riverside Community Hospital | Joint Venture | C/HCA entered into JV per | 05/01/97 | |
| 050140 | Brotman Medical Center | Merger | Brotman Medical Center, Culver | 01/01/87 | 05/31/89 |
| 050158 | Encino Tarzana Regional Medical Center | Merger | HTI merger | 08/26/81 | 01/01/93 |
| 050186 | Valley Medical Center | | Sold by HTI 2/17/93 | 02/17/93 | |
| 050368 | Humana Hospital- Westminster | | Sold by Galen 10/15/92 | 01/01/85 | 10/15/92 |
| 050418 | Visalia Community Hospital | | Visalia Community Hospital, | 05/04/94 | 08/31/94 |
| 050593 | Westlake Medical Center | Asset Purchase/Exchange | Universal Health Services, Inc. | 07/07/95 | 07/25/96 |
| 100056 | North Beach Community Hospital | Merger | North Beach Hospital, Fort | 01/01/87 | 03/31/90 |
| 100152 | North Gables Hospital | Asset Purchase/Exchange | Asset purchase from Abbey | 10/31/91 | 01/01/92 |
| 100186 | Humana Hospital- Sun Bay | | Sold by Galen 12/20/90 | 01/01/85 | 12/20/90 |
| 100194 | Humana Hospital- South Broward | | Closed by Galen 10/15/91 | 01/01/85 | 10/15/91 |
| 100217 | Sebastian Hospital | Merger | Galen merger | 01/01/85 | 09/01/93 |
| 100219 | St. Augustine General Hospital | | St. Augustine General Hospital, | 08/26/81 | 10/31/91 |
| 100226 | Orange Park Medical Center | Merger | Galen merger | 03/08/74 | |
| 100227 | Humana Women's Hospital | | Sold by Galen 8/30/90 | 01/01/85 | 08/30/90 |
| 100263 | South Seminole Community Hospital | | South Seminole sold 11/30/92 by | 01/01/87 | 11/30/92 |
| 100273 | Destin Hospital | Merger | HCA merger | 01/01/86 | 08/31/94 |
| 110166 | Middle Georgia Hospital | Asset Purchase/Exchange | Asset transaction | 05/01/98 | |
| 110201 | Macon Northside Hospital | Asset Purchase/Exchange | Asset transaction | 05/01/98 | |
| 110207 | Wheeler County Hospital | Merger | BAMI merger | 07/15/92 | 01/01/94 |
| 130058 | Walker Center | | | 04/01/92 | 08/30/91 |
| 140172 | Chicago Osteopathic (Hospital & Medical | Asset Purchase/Exchange | Asset purchase from Midwestern | 10/01/95 | 03/01/96 |
| 150134 | North Clark Community Hospital | | North Clark Community Hospital, | 03/01/85 | 12/31/91 |
| 170148 | Bethany Medical Center | Asset Purchase/Exchange | Asset purchase from Bethany | 10/31/97 | 12/04/98 |
| 180128 | Humana Hospital- Louisa (Three Rivers | | Galen sold 5/27/93 | 01/01/85 | 05/27/93 |
| 180138 | Tri-County Community Hospital | Merger | BAMI merger | 07/15/92 | 09/30/92 |
| 190198 | Westpark Hospital | | | 07/30/91 | |
| 220089 | MetroWest Leonard Morse | Joint Venture | Partnership with Tenet | 05/01/96 | 11/03/98 |
| 250001 | UMC University Medical Pavilion | | HCA sold to The Medical Cener | | 12/30/91 |
| 250122 | Natchez Community Hospital | Merger | Galen merger | 01/01/85 | 09/01/93 |
| 340073 | Raleigh Community Hospital | Merger | HCA merger | 01/01/77 | 09/15/98 |
| 360045 | St. Luke's Medical Center (Cleveland) | Joint Venture | Joint Venture - Sisters of Charity | 03/01/97 | |
| 370017 | Seminole Municipal Hospital | | No information that this facility | | |
| 420076 | Doctor's Hospital of Spartanburg | | | | |
| 440026 | Edgefield Hospital | | Edgefield Hospital, Nashville, TN, | 08/01/88 | 07/31/94 |
| 440067 | Lakeway Regional Hospital (Humana | Merger | Galen merger | 01/01/87 | 08/31/90 |
| 440115 | Humboldt Cedar Crest Hospital | | Humboldt Cedar Crest Hospital, | 01/01/85 | 05/27/93 |
| 440134 | Smyrna Hospital | | HCA converted to Ambulatory | | |
| 440136 | Humana Hospital- McFarland | | Galen sold 5/1/90 | | |
| 440145 | Benton Community Hospital | | Benton Community | 01/01/85 | 05/01/90 |
| 440161 | Centennial Medical Center | Merger | HCA merger | 03/31/85 | 10/05/90 |
| 440211 | Whitwell Medical Center (Hospital; part of | Asset Purchase/Exchange | Asset purchase from SP | 08/31/68 | |
| 450027 | Gulf Coast Hospital | | HCA sold this facility 9/1/92 to | 10/31/96 | |
| 450043 | Plaza Medical Center - East (St. Joseph | Asset Purchase/Exchange | Columbia purchased from HCA | 08/26/81 | 09/01/92 |
| 450060 | Westbury Hospital | Merger | HTI merger | 01/01/87 | 07/01/95 |
| 450131 | Northwest Hospital (Riverside Hospital; | Merger | HTI merger | 09/01/88 | 07/31/95 |
| 450175 | Colonial Hospital | | | | |
| 450259 | Doctor's Hospital East Loop | Merger | HTI merger | 10/01/91 | 12/31/92 |
| 450353 | Alice Regional Hospital (Alice Physicians & | Merger | HTI merger | 04/25/94 | 07/16/98 |
| 450366 | Sam Houston Memorial Hospital | Merger | HEI merger | 09/01/88 | 05/11/99 |
| 450388 | Southwest Texas Methodist Hospital | Joint Venture | Joint Venture with Southwest | 07/01/90 | 07/01/94 |
| 450431 | St. David's Medical Center | | Contribution with St. David's | 01/15/95 | |
| 450535 | Humana Hospital- Baytown | | Sold by Galen 12/11/90 | 05/01/96 | |
| 450550 | North Houston Medical Center-Airline | Asset Purchase/Exchange | C/HCA acquired from DHA- | 01/01/85 | 12/11/90 |
| 450637 | Doctors Hospital (Conroe) | Merger | HTI merger | 10/31/95 | |
| 450660 | Medical Center Hospital (Medical Center Del | Merger | HCA merger | 08/26/81 | 06/01/95 |
| 450719 | Mansfield Hospital | | Mansfield Hospital, Mansfield, | 08/26/81 | 09/01/95 |
| 450780 | Methodist Ambulatory Surgical Hospital - | Asset Purchase/Exchange | Medical Care America | 09/16/94 | |
| 450802 | Panhandle Surgical Hospital | Merger | HTI merger | 12/15/94 | 05/11/99 |
| 460051 | Jordan Valley Hospital (Holy Cross) | Merger | HTI merger | 08/15/94 | 02/29/96 |
| 490015 | Humana Hospital- Richmond | | Galen sold 9/9/91 | 01/01/85 | 08/31/90 |
| 490019 | Humana Hospital- Bayside | | | | |

Periods of Ownership for Columbia/HCA Facilities

| Provider | Name | Acq. Type | How Acquired | Acquired | Sold |
|---|---|---|---|---|---|
| 510006 | Raleigh General Hospital | Merger | HCA merger | | |
| 010036 | Andalusia Hospital | Merger | HTI merger | 07/31/69 | 07/09/97 |
| 010049 | Medical Center - Enterprise | Merger | Galen merger | 07/01/75 | 05/11/99 |
| 010081 | Montgomery Regional Medical Center | Merger | Galen merger | 01/01/85 | 05/01/94 |
| 010094 | Northwest Medical Center | Merger | Galen merger | 01/01/89 | 09/01/98 |
| 010108 | Northridge Medical Center (previously | Asset Purchase/Exchange | Asset exchange with Champion | 01/01/74 | 11/02/98 |
| 010118 | Four Rivers Medical Center (Selma Medical | Merger | HTI merger | 03/01/96 | 09/01/98 |
| 010123 | Florence Hospital | Merger | Galen merger | 07/13/70 | 11/02/98 |
| 010124 | Medical Center - Shoals | Merger | Galen merger | 06/01/74 | 10/01/98 |
| 010131 | Crestwood Hospital (Med. Ctr. of Huntsville) | Merger | HTI merger | 06/01/74 | 11/02/98 |
| 010149 | East Montgomery Medical Center | Merger | Galen merger | 01/01/69 | 05/11/99 |
| 020017 | Alaska Regional Hospital | Merger | Galen merger | 04/18/83 | 09/01/98 |
| 030008 | Phoenix Regional Medical Center (Humana | Merger | Galen merger | 12/04/81 | |
| 030080 | El Dorado Medical Center (Hospital) | Merger | HTI merger | 02/02/78 | 05/11/99 |
| 030083 | Paradise Valley Hospital (Humana Hospital | Merger | Galen merger | 01/01/78 | 05/11/99 |
| 030085 | Northwest Hospital | Merger | HTI merger | 01/01/83 | 05/11/99 |
| 040091 | Medical Park Hospital (North Park Hospital) | Merger | HTI merger | 09/17/87 | 05/11/99 |
| 040107 | DeQueen Regional Medical Center | Merger | HTI merger | 09/01/88 | 05/11/99 |
| 040116 | Doctor's Hospital (Little Rock) | Merger | HCA merger | 10/01/84 | 05/11/99 |
| 050215 | San Jose Medical Center | Asset Purchase/Exchange | Asset purchase from Good | 08/26/81 | 02/01/98 |
| 050264 | San Leandro Hospital | Merger | Galen merger | 12/13/95 | |
| 050328 | West Side Hospital | Merger | HTI merger | 02/02/78 | 05/11/99 |
| 050331 | Healdsburg General Hospital | Merger | HTI merger | 02/02/78 | 07/01/96 |
| 050380 | Good Samaritan Hospital COL Mission Oaks | | HTI purchase | 09/01/88 | 11/16/98 |
| 050385 | Palm Drive Hospital | Merger | HTI merger | 01/01/96 | 02/01/99 |
| 050424 | Green Hospital of Scripps Clinic | | HCA closed this facility 2/7/92 | 01/01/71 | 05/11/99 |
| 050426 | West Anaheim Medical Center | Merger | Galen merger | 04/27/85 | 10/31/91 |
| 050456 | Community Hospital Gardena | Merger | Community Hospital of Gardena. | 02/02/78 | 05/11/99 |
| 050481 | West Hills Regional Medical Center | Merger | Galen merger | 08/26/81 | 12/31/91 |
| 050526 | Huntington Beach Medical Center | Merger | Galen merger | 01/01/85 | |
| 050549 | Los Robles Regional Medical Center | Merger | HCA merger | 01/01/85 | 05/11/99 |
| 050585 | San Clemente Hospital & Medical Center | Joint Venture | Limited liability partnership | 01/01/71 | |
| 050586 | Chino Valley (Hospital) Medical Center | Merger | HTI merger | 05/18/95 | 05/05/98 |
| 050598 | Mission Bay Hospital | Merger | HTI merger | 08/26/81 | |
| 050685 | South Valley Hospital | Asset Purchase/Exchange | Asset purchase from Good | 09/01/88 | 05/11/99 |
| 060014 | Presbyterian/St. Luke's Medical Center | Joint Venture | Joint Venture with HealthOne | 01/04/96 | |
| 060032 | Rose Medical Center | Joint Venture | Contribution / Columbine to lease | 10/31/95 | |
| 060034 | Swedish Medical Center (Rocky Mountain | Joint Venture | Joint Venture with HealthOne | 04/27/95 | 10/31/95 |
| 060065 | North Suburban (Medical Center) - JV | Merger | Galen merger | 10/31/95 | |
| 060087 | Aurora Regional Medical Center (Medical | Merger | Galen merger | 02/02/78 | 10/31/95 |
| 060100 | Aurora Presbyterian Hospital | Joint Venture | Joint Venture with HealthOne | 01/01/85 | 10/31/95 |
| 100009 | Cedars Medical Center | Joint Venture | Contribution between Cedars and | 10/31/95 | |
| 100054 | Twin Cities Hospital (Niceville-Valparaiso | Asset Purchase/Exchange | HCA merger | 02/17/93 | |
| 100059 | Miami Heart (Institute) - North (Miami Beach | Asset Purchase/Exchange | Asset purchase from St. Francis | 07/11/78 | |
| 100060 | Miami Heart Institute South (consolidated | Asset Purchase/Exchange | Asset purchase from St. Francis | 04/17/91 | |
| 100068 | Medical Center - Peninsula | Merger | HCA merger | 01/03/92 | 01/01/92 |
| 100080 | JFK Medical Center | Stock Purchase | Stock purchase from JFK Medical | 01/01/87 | 05/17/96 |
| 100089 | Kissimmee Memorial Hospital | Merger | BAMI merger | 07/14/95 | |
| 100100 | Victoria Hospital (merged with Victoria | Joint Venture | Contribution between Cedars and | 07/15/92 | 08/12/93 |
| 100107 | East Pointe Hospital | Merger | HTI merger | 12/01/88 | 02/17/93 |
| 100108 | Hamilton Memorial Hospital | Asset Purchase/Exchange | Asset purchase from The Board of | 07/01/81 | |
| 100110 | Medical Center - Osceola (Humana Hospital - | Merger | Galen merger | 12/13/94 | |
| 100121 | Bartow Memorial Hospital (Bartow | Joint Venture | Contribution agreement between | 03/08/74 | |
| 100122 | North Okaloosa Medical Center | Merger | HTI merger | 08/16/96 | 05/11/99 |
| 100124 | Santa Rosa Medical Center | Merger | HTI merger | 07/11/78 | 03/15/96 |
| 100131 | Aventura Hospital and Medical Center | Merger | Galen merger | 04/27/85 | 05/17/96 |
| 100156 | Lake City Medical Center | Merger | HTI merger | 02/02/78 | |
| 100161 | Medical Center - Sanford (Central Florida | Merger | HCA merger | 09/01/88 | |
| 100162 | Winter Park Memorial Hospital | Joint Venture | Contribution agreement between | 01/01/80 | |
| 100166 | Sarasota Doctor's Hospital | Asset Purchase/Exchange | Asset purchase from Doctor's | 03/01/94 | |
| 100167 | Plantation General Hospital | Merger | HTI merger | 03/04/94 | |
| 100174 | Clearwater Community Hospital | Merger | HTI merger | 10/01/79 | |
| 100179 | Medical University Hospital (Memorial | Stock Purchase | Stock purchase from Memorial | 03/01/90 | |
| 100180 | St. Petersburg Medical Center (Humana | Merger | Galen merger | 01/03/95 | |
| 100189 | Northwest Medical Center (Northwest | Merger | HCA merger | 03/08/74 | |
| 100191 | New Port Richey Hospital | Merger | HCA merger | 08/26/81 | |
| 100199 | Pompano Beach Medical Center (Humana | Merger | Galen merger | 02/02/78 | 12/17/98 |

Prepared for Settlement Discussions Only

C. 3

Periods of Ownership for Columbia/HCA Facilities

| Provide | Name | Acq. Type | How Acquired | Acquired | Sold |
|---|---|---|---|---|---|
| 100204 | North Florida Regional Medical Center | Merger | HCA merger | 02/06/73 | |
| 100207 | Palm Beach Regional Hospital | Merger | HTI merger | 07/01/80 | 08/21/95 |
| 100208 | Deering Hospital (Miami Dade General) | Asset Purchase/Exchange | Asset purchase from HCA | 02/16/83 | |
| 100209 | Kendall Regional Medical Center | Asset Purchase/Exchange | Asset purchase from AMI | 03/20/91 | |
| 100211 | Dade City Hospital | Merger | Galen merger | 03/08/74 | |
| 100212 | Ocala Regional Medical Center | Merger | HCA merger | 09/24/73 | |
| 100213 | Blake Medical Center | Merger | HCA merger | 07/01/79 | |
| 100220 | Regional Medical Center SW Florida | Merger | BAMI merger | 07/15/92 | |
| 100221 | Park Medical Center (formerly Humana | Merger | Galen merger | 03/08/74 | |
| 100223 | Fort Walton Beach Medical Center | Merger | Galen merger | 07/22/74 | |
| 100224 | University Hospital & Medical Center | Asset Purchase/Exchange | Asset purchase by HCA from | 01/01/87 | |
| 100228 | Westside Regional Medical Center (Humana | Merger | Galen merger | 09/03/73 | |
| 100229 | Medical Center - Daytona (Humana Hospital | Merger | Galen merger | 03/08/74 | |
| 100230 | Pembroke Pines Hospital (Humana Hospital | Merger | Galen merger | 01/01/90 | 07/01/95 |
| 100231 | West Florida Regional Medical Center | Merger | HCA merger | 05/12/75 | |
| 100232 | Putnam Medical Center | Merger | HCA merger | 08/29/75 | |
| 100234 | Columbia Hospital (Humana Hospital - Palm | Merger | HCA merger | 02/02/78 | |
| 100235 | University Hospital (University General | Asset Purchase/Exchange | Acquired - Exchange Agreement | 02/09/95 | 05/01/98 |
| 100236 | Fawcett Memorial Hospital | Merger | BAMI merger | 07/15/92 | |
| 100238 | Northside Medical Center (Hospital) | Merger | Galen merger | 07/12/82 | |
| 100239 | Edward White Hospital | Merger | HTI merger | 03/01/77 | |
| 100242 | Gulf Coast Medical Center (Panama City) | Merger | HCA merger | 01/02/77 | |
| 100243 | Brandon Regional Medical Center (Brandon | Merger | Galen merger | 07/26/78 | |
| 100246 | Lawnwood Regional Medical Center | Merger | HCA merger | 01/01/78 | |
| 100248 | Largo Medical Center | Merger | HCA merger | 06/05/78 | |
| 100252 | Raulerson Hospital | Merger | HCA merger | 02/09/79 | |
| 100254 | Tallahassee Community Hospital | Merger | HCA merger | 09/11/79 | |
| 100256 | Regional Medical Center at Bayonet Point | Merger | HTI merger | 10/03/79 | |
| 100259 | South Bay Hospital | Merger | HCA merger | 12/06/82 | |
| 100260 | Medical Center - Port St. Lucie | Merger | HCA merger | 10/01/83 | |
| 100264 | Regional Medical Center Oak Hill | Merger | BAMI merger | 06/06/84 | |
| 100267 | Englewood Community Hospital | Merger | HTI merger | 07/15/92 | |
| 100269 | Palms West Hospital | Merger | BAMI merger | 03/06/86 | |
| 100279 | Gulf Coast Hospital (Ft. Myers) | Merger | Galen merger | 01/01/91 | |
| 110020 | Peachtree Regional Hospital (Humana | Merger | Galen merger | 01/01/82 | |
| 110030 | Cartersville Medical Center | Merger | HCA merger | 01/01/85 | |
| 110033 | Northlake Medical Center (Doctor's | Merger | HTI merger | 12/01/85 | |
| 110045 | Barrow Memorial Hospital (Barrow Medical | Asset Purchase/Exchange | Asset purchase from Hospital | 09/01/88 | 05/11/99 |
| 110050 | Murray Medical Center | Asset Purchase/Exchange | Asset purchase from Polk General | 12/07/94 | 03/06/98 |
| 110120 | Polk General Hospital, Inc. | Merger | HCA merger | 07/02/96 | |
| 110125 | Fairview Park Hospital (Lauren's Memorial | Merger | HCA merger | 03/28/81 | |
| 110163 | Palmyra Medical Center | Merger | HCA merger | 02/01/71 | |
| 110164 | Coliseum Medical Center | Merger | HCA merger | 02/15/71 | |
| 110168 | Redmond Regional Medical Center | Asset Purchase/Exchange | Asset exchange with Quorum | 07/04/72 | |
| 110169 | Metropolitan Hospital | Merger | HCA merger | 05/01/94 | |
| 110171 | West Paces Medical Center | Asset Purchase/Exchange | HCA asset exchange with | 10/02/72 | |
| 110172 | Dunwoody Medical Center | Merger | Galen merger | 05/01/94 | |
| 110177 | Augusta Medical Center | Merger | HCA merger | 02/02/78 | |
| 110179 | Parkway Medical Center | Merger | HTI merger | 01/01/80 | |
| 110186 | Doctor's Hospital (Columbus) | Merger | HTI merger | 05/01/76 | |
| 110188 | Lanier Park Regional Hospital | Merger | Galen merger | 06/12/77 | |
| 110192 | Eastside Medical Center (Gwinnett | Merger | HCA merger | 02/02/78 | |
| 110200 | Hughston Sports Medicine Hospital | Merger | HTI merger | 10/25/84 | |
| 130014 | West Valley Medical Center | Merger | HTI merger | 01/01/73 | |
| 130018 | Eastern Idaho Regional Medical Center | Asset Purchase/Exchange | Asset purchase from LaGrange | 03/05/90 | |
| 140065 | LaGrange Memorial Hospital | Merger | Galen merger | 07/28/95 | 02/01/99 |
| 140075 | Michael Reese Hospital & Medical Center | Asset Purchase/Exchange | Asset purchase from Grant | 03/01/91 | 11/12/98 |
| 140207 | Grant Hospital of Chicago (Columbia Grant | Merger | Galen merger | 01/26/94 | 11/12/98 |
| 140290 | Hoffman Estates Medical Center | Merger | Galen merger | 01/01/85 | 02/01/99 |
| 150046 | Terre Haute Regional Hospital | Merger | HTI merger | 07/01/75 | |
| 150136 | Women's Hospital, The - (of) Indianapolis | Merger | Galen merger | 08/01/83 | |
| 170123 | Wesley Medical Center | Merger | HCA merger | 06/24/85 | |
| 170144 | Halstead Hospital | Asset Purchase/Exchange | Asset exchange with Paracelsus | 05/17/96 | 05/11/99 |
| 170175 | Western Plains Regional Hospital (Humana | Merger | Galen merger | 12/27/76 | 05/11/99 |
| 170176 | Overland Park Regional Medical Center | Merger | Galen merger | 12/17/78 | 05/11/99 |
| 180007 | Hospital Lexington (a/k/a Good Samaritan | Asset Purchase/Exchange | Asset purchase | 07/28/95 | |
| 180014 | Audubon Regional Medical Center | Merger | Galen merger | 01/27/80 | 09/02/98 |

Periods of Ownership for Columbia/HCA Facilities

| Provide | Name | Acq. Type | How Acquired | Acquired | Sold |
|---|---|---|---|---|---|
| 180019 | Meadowview Regional Medical Center | | | | |
| 180024 | Spring View Hospital | Merger | HTI merger | 12/09/81 | 05/11/99 |
| 180046 | Bourbon Community Hospital (Hospital | Merger | HTI merger | 02/27/80 | 11/02/98 |
| 180066 | Logan Memorial Hospital | Merger | HTI merger | 06/17/80 | 05/11/99 |
| 180101 | Hospital Georgetown (Georgetown | Merger | HTI merger | 07/01/85 | 05/11/99 |
| 180116 | Pine Lake Regional Hospital | Merger | HTI merger | 01/01/87 | 05/11/99 |
| 180123 | Suburban Hospital | Merger | HTI merger | 06/01/69 | 05/11/99 |
| 180124 | Greenview Regional Hospital | Merger | Galen merger | 06/01/74 | 09/01/98 |
| 180127 | Hospital Frankfort | Merger | HCA merger | 09/12/72 | |
| 180132 | Lake Cumberland Regional Hospital | Merger | HCA merger | 07/09/74 | |
| 180133 | Southwest Hospital | Merger | Galen merger | 05/13/76 | 05/11/99 |
| 180137 | University of Louisville (Hospital) | Merger | Galen merger | 09/04/78 | 09/01/98 |
| 190003 | Dauterive Hospital | Merger | Galen merger | 09/12/83 | 02/06/96 |
| 190025 | Savoy Medical Center | Merger | HTI merger | 08/26/81 | |
| 190026 | Rapides Regional Medical Center | Merger | HTI merger | | |
| 190088 | Springhill Medical Center | Joint Venture | Joint Venture | 09/01/94 | |
| 190090 | Winn Parish Medical Center | Merger | Galen merger | 01/01/74 | 05/11/99 |
| 190092 | Elmwood Medical Center (Jefferson Medical | Merger | Galen merger | 06/01/74 | |
| 190099 | Avoyelles Hospital | Asset Purchase/Exchange | Asset and stock exchange between | 11/28/95 | 05/11/99 |
| 190106 | Oakdale Community Hospital | Merger | Galen merger | 05/03/74 | |
| 190112 | Highland Hospital | Merger | Galen merger | 05/03/74 | |
| 190167 | Ville Platte Medical Center (Humana | Merger | HCA merger | 08/26/81 | |
| 190176 | Tulane University Hospital and Clinic | Merger | Galen merger | 05/03/74 | 09/01/96 |
| 190177 | Lakeview Regional Medical Center | | Contribution between Columbia | 04/01/95 | |
| 190182 | Lakeside Hospital | Merger | HTI merger | 05/04/94 | |
| 190191 | Doctor's Hospital of Opelousas | Merger | HTI merger | 10/01/78 | |
| 190196 | Women's & Children's Hospital | Merger | HTI merger | 09/01/88 | |
| 190197 | North Monroe Hospital | Merger | HTI merger | 06/06/83 | |
| 190200 | Lakeland Medical Center | Merger | HCA merger | 08/15/83 | |
| 190201 | Women & Children's Hospital - Lake Charles | Merger | Galen merger | 08/29/84 | |
| 190202 | Medical Center of Baton Rouge | Merger | Galen merger | 10/21/84 | 05/11/99 |
| 190205 | Medical Center - Southwest Louisiana | Merger | HTI merger | 02/01/85 | 10/01/98 |
| 190207 | Riverview Medical Center | Merger | HTI merger | 06/25/85 | |
| 250031 | Vicksburg Medical Center | Merger | HTI merger | 09/01/88 | 05/11/99 |
| 250123 | Garden Park Community Hospital, Ltd. | Merger | HTI merger | 08/01/82 | |
| 260095 | Independence Regional Health Center | Asset Purchase/Exchange | Asset purchase from Reorganized | 05/05/94 | |
| 260197 | Hospital North and South | Merger | HTI merger | 02/03/94 | 05/11/99 |
| 290003 | Sunrise Hospital & Medical Center | Merger | Galen merger | 09/01/88 | 07/31/98 |
| 290039 | Mountain View Hospital | | New-1996 | 02/02/78 | |
| 300017 | Parkland Medical Center | Merger | HCA merger | 02/01/96 | |
| 300029 | Portsmouth Regional Hospital | Merger | HCA merger | 07/01/82 | |
| 320063 | Medical Center - Carlsbad (Guadeloupe | Merger | HCA merger | 03/01/86 | |
| 320065 | Lea Regional Medical Center | Merger | HCA merger | 08/21/77 | 05/11/99 |
| 340094 | Cape Fear Memorial Hospital | Asset Purchase/Exchange | Asset purchase | 04/01/79 | 05/11/99 |
| 340107 | Heritage Hospital | Merger | HTI merger | 05/01/96 | 11/01/98 |
| 340144 | Davis Community Hospital | Merger | HTI merger | 10/01/79 | 11/02/98 |
| 340153 | Presbyterian Orthopedic Hospital | Merger | HTI merger | 10/01/79 | 11/19/98 |
| 340158 | Brunswick Hospital | Merger | HTI merger | 08/26/81 | 07/31/98 |
| 340164 | Highsmith-Rainey Memorial Hospital | Merger | HCA merger | 07/01/83 | |
| 360037 | St. Vincent Charity | Joint Venture | Joint Venture - Sisters of Charity | 05/14/83 | 05/03/99 |
| 360070 | Mercy Medical Center | Joint Venture | Joint Venture - Sisters of Charity | 11/02/95 | |
| 360123 | St. John West Shore Hospital | Joint Venture | Joint Venture - Sisters of Charity | 11/02/95 | |
| 370026 | St. Mary's Medical Center | Joint Venture | Joint Venture - Sisters of Charity | 11/02/95 | |
| 370039 | Claremore Regional Hospital | Merger | HCA merger | 11/02/95 | |
| 370078 | Tulsa Regional Medical Center | Merger | HTI merger | 04/01/85 | 09/30/95 |
| 370093 | Presbyterian Hospital (operating in | Asset Purchase/Exchange | Asset purchase from EPIC | 09/01/88 | 05/11/99 |
| 370097 | Southwestern Medical Center | Merger | HCA merger | 01/01/96 | 12/31/98 |
| 370141 | Doctor's Hospital - Tulsa | Merger | HCA merger | 10/01/85 | |
| 370148 | Edmond (Regional) Medical Center | Merger | HTI merger | 05/04/94 | |
| 370159 | Bethany (Hospital Health Center) | Merger | HTI merger | 09/01/88 | 12/31/98 |
| 370166 | Wagoner Community Hospital | | Owned by the City of Bethany, | 01/01/95 | |
| 380064 | Douglas Medical Center (Community | Merger | HTI merger | 04/01/95 | |
| 380071 | Williamette Valley Medical Center | Merger | HTI merger | 06/01/79 | 05/11/99 |
| 420026 | Providence Hospital | Merger | HTI merger | 03/01/86 | 05/11/99 |
| 420030 | Colleton Regional Hospital | Joint Venture | C/HCA acquired in Joint Venture | 01/01/71 | |
| 420054 | Marlboro Park Hospital | Merger | HTI merger | 11/01/95 | |
| 420062 | Chesterfield General Hospital | | Marlboro Park Hospital, | 01/01/82 | |
| | | | Chesterfield General Hospital, | 10/01/81 | 01/13/93 |
| | | | | 03/01/81 | 01/13/95 |

C.33

Periods of Ownership for Columbia/HCA Facilities

| Provide | Name | Acq. Type | How Acquired | Acquired | Sold |
|---|---|---|---|---|---|
| 420079 | Trident Regional Medical Center | Merger | HCA merger | | |
| 420082 | Aiken Regional Medical Center | Merger | HCA merger | 07/21/75 | |
| 420085 | Grand Strand Regional Medical Center | Merger | HCA merger | 02/23/76 | 07/07/95 |
| 440006 | Nashville Memorial Hospital | Merger | HCA merger | 04/21/78 | |
| 440018 | Sycamore Shoals Hospital | Merger | HTI merger | 12/06/93 | |
| 440020 | Hillside Hospital | Asset Purchase/Exchange | Asset exchange between | 07/01/81 | 09/01/98 |
| 440046 | Horizon Medical Center (Goodlark Regional | Stock Purchase | Stock purchase from Goodlark | 03/15/96 | 05/11/99 |
| 440058 | Southern Tennessee Medical Center | Merger | HTI merger | 03/01/74 | |
| 440061 | Volunteer General Hospital | Merger | HCA merger | 06/01/93 | 05/11/99 |
| 440064 | South Pittsburg (Municipal) Hospital | Merger | HTI merger | 07/01/80 | 06/01/98 |
| 440068 | Athens Regional Medical Center | Merger | HCA merger | 08/26/71 | |
| 440105 | Johnson City Specialty Hospital | Merger | HTI merger | 10/16/78 | |
| 440148 | DeKalb General Hospital | | Dekalb General Hospital | 10/01/81 | 11/02/98 |
| 440149 | Trinity Hospital | Merger | HTI merger | 01/01/69 | 07/31/92 |
| 440150 | Summit Medical Center (Replaced Donelson | Merger | HCA merger | 01/01/69 | 05/11/99 |
| 440151 | River Park Hospital | Merger | HTI merger | 01/01/70 | |
| 440156 | Parkridge Medical Center | Merger | HCA merger | 03/01/70 | |
| 440175 | Crockett General Hospital | Merger | HTI merger | 01/01/71 | |
| 440176 | Indian Path Medical Center | Merger | HCA merger | 02/25/88 | 05/11/99 |
| 440178 | East Ridge Hospital (part of Parkridge) | Merger | Galen merger | 03/01/74 | 11/02/98 |
| 440184 | Northside Hospital | Merger | HTI merger | 01/01/74 | 08/31/96 |
| 440186 | Smith County Memorial Hospital | Merger | HTI merger | 05/01/80 | 10/16/98 |
| 440187 | Livingston Regional Hospital | Merger | HTI merger | 04/06/78 | 05/11/99 |
| 440189 | Regional Hospital of Jackson | Merger | HCA merger | 07/14/76 | 05/11/99 |
| 440194 | Hendersonville Hospital | Merger | HTI merger | 05/01/78 | 05/01/98 |
| 440197 | Southern Hills Medical Center | Merger | HCA merger | 08/26/81 | |
| 440200 | Stones River Hospital | Merger | HTI merger | 10/15/79 | |
| 440205 | Cheatham Medical Center | Stock Purchase | Stock purchase of Goodlark | 11/20/80 | |
| 450070 | Gilmer Medical Center | Merger | HTI merger | | |
| 450074 | Southside Community Hospital | Asset Purchase/Exchange | Asset purchase | 09/17/87 | 10/28/95 |
| 450087 | North Hills Hospital (formerly Glenview) | Merger | HCA merger | 10/19/90 | 07/13/93 |
| 450094 | Medical Center - Dallas SW | Asset Purchase/Exchange | C/HCA acquired in asset | 08/26/81 | |
| 450097 | Bayshore Medical Center | Merger | HTI merger | 07/07/95 | |
| 450099 | Medical Center - Pampa (Panhandle | Merger | HTI merger | 11/25/68 | |
| 450107 | Medical Center - West (Sun Towers; | Asset Purchase/Exchange | HCA sub, El Paso Healthcare | 04/01/79 | 05/11/99 |
| 450111 | Humana Hospital - Southmore | | Humana sold this facility to | 01/01/87 | |
| 450118 | Doctor's Regional Medical Center | Merger | Galen merger | 01/01/85 | 08/30/90 |
| 450126 | East Houston Medical Center | Merger | HTI merger | 01/01/78 | |
| 450142 | HEB Hospital a/k/a Northeast Community | Merger | HTI merger | 08/26/81 | 08/01/98 |
| 450147 | DeTar Hospital | Merger | HTI merger | 08/26/81 | 05/31/96 |
| 450214 | Gulf Coast Medical Center (Wharton) | Merger | HTI merger | 01/01/72 | 05/11/99 |
| 450222 | Conroe Regional Medical Center | Merger | HTI merger | 06/01/83 | 05/11/99 |
| 450299 | Medical Center College Station (Brazos | Merger | Galen merger | 05/14/93 | |
| 450320 | Rosewood Medical Center | Merger | HEI merger | 06/01/74 | 05/11/99 |
| 450340 | San Angelo Community Medical Center | | C/HCA acquired the facility from | 07/01/90 | |
| 450393 | Community Medical Center of Sherman | Merger | HTI merger | 03/15/95 | 05/11/99 |
| 450403 | Medical Center - McKinney (North Texas | Merger | HTI merger | 09/01/88 | 05/11/99 |
| 450418 | Bellaire Medical Center | Stock Purchase | Stock purchase from American | 09/01/88 | |
| 450447 | Navarro Regional Hospital | Merger | HCA merger | 04/01/92 | |
| 450484 | Woodland Heights Medical Center | Merger | HTI merger | 01/01/80 | 05/11/99 |
| 450523 | Diagnostic Center Hospital | | Diagnostic Center Hospital | 11/01/80 | 05/11/99 |
| 450530 | Mainland Medical Center (Danforth | Merger | HTI merger | 11/06/69 | 08/31/93 |
| 450538 | Alvin Medical Center | Merger | HTI merger | 09/01/88 | |
| 450544 | North Houston Med. Center (f/k/a | Merger | HTI merger | 09/01/88 | |
| 450546 | Heights Hospital | Asset Purchase/Exchange | Asset purchase from AMI, Inc. | 09/01/88 | |
| 450558 | Abilene Regional Medical Center | Merger | Galen merger | 04/01/92 | 08/31/94 |
| 450570 | Silsbee Doctors Hospital | Merger | HEI merger | 01/01/85 | 05/01/94 |
| 450587 | Brownwood Regional Medical Center | Merger | HTI merger | 07/01/90 | 05/11/99 |
| 450605 | North Bay Hospital (Coastal Bend Hospital) | Merger | HTI merger | 08/29/80 | 05/11/99 |
| 450617 | Clear Lake Regional Medical Center | Merger | Galen merger | 09/01/88 | |
| 450630 | Spring Branch Medical Center | Merger | HCA merger | 01/01/83 | |
| 450631 | San Antonio Regional Hospital (Humana | Merger | Galen merger | 08/26/81 | |
| 450633 | Metropolitan Methodist Hospital (Humana | Merger | Galen merger | 02/02/78 | |
| 450634 | Medical Center - Denton (Denton Regional) | Merger | HTI merger | 05/01/83 | 01/11/95 |
| 450643 | Doctor's Hospital of Laredo | Merger | HTI merger | 09/01/88 | |
| 450644 | West Houston Medical Center | Merger | HCA merger | 09/01/88 | 05/11/99 |
| 450647 | Medical Center - East (Vista Hills) | Asset Purchase/Exchange | CHC purchased from HTI (a sub | 08/26/81 / 01/01/87 | |

Periods of Ownership for Columbia/HCA Facilities

| Provider | Name | Acq. Type | How Acquired | Acquired | Sold |
|---|---|---|---|---|---|
| 450647 | Medical City Dallas | Merger | Galen merger | 07/22/75 | |
| 450651 | Medical Center - Plano (Willow Park | Merger | HCA merger | 12/14/87 | |
| 450662 | Valley Regional Medical Center | Merger | HTI merger | 04/10/86 | 05/11/99 |
| 450666 | Beaumont Medical & Surgical Hospital | Merger | Galen merger | 01/01/85 | |
| 450669 | Medical Center - Lewisville | Merger | HCA merger | 07/16/87 | |
| 450672 | Plaza Medical Center of Ft. Worth | Merger | HCA merger | 01/01/83 | |
| 450674 | Woman's Hospital of Texas (Women's & | Merger | HCA merger | 01/01/78 | |
| 450675 | Medical Center - Arlington | Merger | HCA merger | 09/01/76 | 05/11/99 |
| 450683 | Medical Center - Terrell | Merger | HTI merger | 05/04/94 | 01/31/96 |
| 450694 | El Campo Memorial Hospital | Merger | HTI merger | 09/17/87 | 03/13/98 |
| 450696 | Medical Arts Hospital - Dallas | Merger | HTI merger | 09/01/88 | 05/11/99 |
| 450702 | Longview Regional Hospital | Merger | HTI merger | 06/16/80 | 12/31/97 |
| 450703 | Medical Arts Hospital - Texarkana | Merger | HTI merger | 09/01/88 | |
| 450706 | Katy Medical Center | Merger | HCA merger | 08/27/82 | |
| 450711 | Rio Grande Regional Hospital | Merger | HCA merger | 09/22/82 | 05/03/96 |
| 450713 | South Austin Community Hospital | Merger | HTI merger | 01/03/83 | |
| 450715 | Medical Center - Lancaster (Midway Park | Merger | HTI merger | 09/01/88 | |
| 450717 | Fort Bend Medical Center | Merger | HTI merger | 09/01/88 | |
| 450718 | St. David's Round Rock Hospital (Medical | Merger | Galen merger | 07/01/84 | |
| 450725 | Methodist Women's & Children's Hospital | Merger | Galen merger | 02/18/90 | 11/13/96 |
| 450733 | Northeast Methodist Hospital (Village Oaks) | Merger | HCA merger | 01/01/87 | |
| 450743 | Denton Community Hospital | | | 09/16/94 | |
| 450774 | TOPS Surgical Specialty Hospital | | Contribution between C/HCA | 10/31/95 | |
| 450775 | Kingwood Medical Center | | | 08/31/83 | |
| 450785 | Surgacare Specialty Hospital | | Columbia opened facility | 09/14/93 | |
| 450788 | Bay Area Medical Center | | C/HCA acquisition | 02/07/95 | |
| 450804 | Texas Orthopedic Hospital | Asset Purchase/Exchange | Joint Venture - Austin Diagnostic | 07/05/95 | |
| 450809 | Austin Diagnostic Medical Center (North | Joint Venture | | 08/15/94 | |
| 460005 | Ogden Regional Medical Center | Merger | HTI merger | 01/27/79 | 05/17/96 |
| 460008 | Pioneer Valley Hospital | Merger | HTI merger | 02/01/79 | 05/11/99 |
| 460011 | Castleview Hospital | Merger | HTI merger | 10/01/77 | |
| 460013 | Mountain View Hospital | Merger | HTI merger | 07/31/76 | |
| 460017 | Brigham City Community Hospital (Cooley | Merger | HTI merger | 01/01/80 | 05/11/99 |
| 460030 | Ashley Valley Medical Center | Merger | Galen merger | 01/11/76 | 05/17/96 |
| 460041 | Davis Hospital & Medical Center | Merger | HTI merger | 09/19/76 | |
| 460042 | Lakeview Hospital (South Davis Community | Merger | HCA merger | 12/31/87 | |
| 460047 | St. Mark's Hospital | Joint Venture | Joint Venture - Arlington | 11/01/96 | |
| 490014 | Pentagon City Hospital (was National Hosp. | Asset Purchase/Exchange | Asset purchase from Hopewell | 09/01/95 | |
| 490020 | John Randolph Medical Center | Merger | HCA merger | 11/08/68 | 01/01/9? |
| 490028 | Johnston-Willis Hospital | Merger | HCA merger | 01/01/87 | |
| 490048 | Lewis-Gale Medical Center | Joint Venture | Joint venture with the Board of | 11/01/96 | |
| 490050 | Arlington Hospital | Merger | Galen merger | 08/26/81 | |
| 490060 | Clinch Valley Medical Center | Asset Purchase/Exchange | Asset purchase from Retreat | 07/01/95 | 05/17/9? |
| 490071 | Retreat Hospital, The | Merger | HTI merger | 11/01/82 | 11/01/? |
| 490073 | Northern Virginia Doctors Hospital | Merger | HCA merger | 11/09/86 | |
| 490107 | Reston Hospital Center (was 34633) | Merger | HTI merger | 08/30/71 | |
| 490110 | Montgomery Regional Hospital | Merger | HCA merger | 09/01/72 | |
| 490112 | Chippenham Medical Center (Johnston- | Merger | HTI merger | 09/15/73 | |
| 490116 | Pulaski Community Hospital | Merger | HCA merger | 08/26/81 | |
| 490118 | Henrico Doctors Hospital | Stock Purchase | Stock Purchase from Alleghany | 07/01/95 | |
| 490126 | Alleghany Regional Hospital | Merger | HTI merger | 02/01/85 | 11/19/? |
| 500139 | Capital Medical Center | Merger | Galen merger | 01/01/74 | |
| 510002 | Greenbrier Valley Medical Center | Merger | Galen merger | 02/28/95 | |
| 510031 | St. Francis Hospital | Joint Venture | Joint Venture - St. Joseph's | 08/01/94 | 02/01 |
| 510033 | St. Joseph's Hospital (50/50 JV) | Merger | Galen merger | 04/30/74 | |
| 510067 | St. Luke's Hospital (Humana Hospital St. | Stock Purchase | Stock purchase following asset | 06/13/97 | 05/1? |
| 510070 | Beckley Hospital | Merger | HCA merger | 03/01/85 | |
| 510085 | Putnam General Hospital | Merger | HTI merger | 11/05/81 | |
| 530139 | Riverton Memorial Hospital | | | NA | |
| 054078 | Columbia Las Encinas Hospital | | | NA | |
| 064010 | Columbine Psychiatric Center | | | NA | |
| 114015 | Columbia Coliseum Psychiatric hospital | | | NA | |
| 144005 | Columbia Chicago Lakeshore Hospital | | | NA | |
| 144009 | Columbia Riveredge Hospital | | | NA | |
| 144031 | Columbia Woodland Hospital | | | NA | |
| 194000 | Columbia Depaul Hospital | | | NA | |
| 344014 | Holly Hill Charter Behavioral Health Systems | | | | |

Prepared for Settlement Discussions Only

C.35

Periods of Ownership for Columbia/HCA Facilities

| Provide | Name | Acq. Type | How Acquired | Acquired | Sold |
|---------|------|-----------|--------------|----------|------|
| 444012 | Columbia Indian Path Medical Center | | | NA | NA |
| 453034 | Columbia Rehabilitation of South Texas | | | NA | NA |
| 454069 | Pavilion at St. Davids' | | | NA | NA |
| 494001 | Columbia Peninsula Center for Behavioral | | | NA | NA |
| | | | | NA | NA |

Prepared for Settlement Discussions Only

C, 30

Attachment No. 2

Current and Former C... -/HCA Hospitals
(Includes all parent corporations)

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | CityAbbrev |
|---|---|---|---|---|---|---|---|
| Wilbur Creek Hospital | | | Sold to Adventist Health Systems, Inc. | 1/1/87 | 8/12/93 | TX | Thomasville |
| Thomasville Hospital | 01-0015 | Asset Purchase | Sold to S&J Corporation | 3/31/91 | 8/17/93 | AL | Thomasville |
| Andalusia Hospital | 01-0076 | BAMI merger / HTI merger | Lifepoint Spin-Off | 7/1/75 | 5/11/99 | AL | Andalusia |
| | | | Exchanged with Quorum Health Group (swapped for Dunwoody Medical Center and Metropolitan/Atlanta) | | | | |
| Medical Center - Enterprise | 01-0049 | Galen merger | Sold to Baptist Health | 1/1/85 | 5/1/94 | AL | Enterprise |
| Montgomery | 01-0081 | Galen merger | Sold to Baptist Health | 1/1/89 | 9/1/98 | AL | Montgomery |
| Northwest Medical Center | 01-0094 | Galen merger | Sold to Eliza Coffee Memorial Hospital | 1/1/74 | 11/2/98 | AL | Russellville |
| Northridge Medical Center (previously Autauga) | 01-0108 | Holdings, Inc. | Sold to Baptist Health | 11/9/95 | 9/1/98 | AL | Prattville |
| Four Rivers Medical Center (Selma Medical Center) | 01-0118 | HTI merger | Sold to Baptist Health | 7/13/70 | 11/2/98 | AL | Selma |
| | | Doctor's Hospital of Mobile, Mobile, AL, sold | | | | | |
| Doctor's Hospital of Mobile | 01-0119 | 5/31/90 by HTI to University of South Alabama | Sold to University of South Alabama | 12/20/71 | 5/31/90 | AL | Mobile |
| Florence Hospital | 01-0123 | Galen merger | Sold to Eliza Coffee Memorial Hospital | 6/1/74 | 10/1/98 | AL | Florence |
| Medical Center - Shoals | 01-0124 | Galen merger | Sold to Eliza Coffee Memorial Hospital | 6/1/74 | 11/2/98 | AL | Muscle Shoals |
| Medical Center of Huntsville | 01-0127 | Galen merger | Sold to the Healthcare Authority, City of Huntsville | 5/2/63 | 3/23/94 | AL | Huntsville |
| Crestwood Hospital (Med. Ctr. of Huntsville) | 01-0131 | HTI merger | Triad Spin-Off | 1/1/69 | 5/11/99 | AL | Huntsville |
| East Montgomery Medical Center | 01-0149 | Galen merger | Sold to Baptist Health | 4/18/83 | 9/1/98 | AL | Montgomery |
| | | 5/31/90 by HTI to University of South Alabama (renamed USA Knollwood) | | | | | |
| Knollwood Park Medical Center | 01-0152 | Galen merger | Sold to University of South Alabama | 9/17/87 | 5/31/90 | AL | Mobile |
| Alaska Regional Hospital | 02-0017 | Galen merger | Active | 12/4/81 | | AK | Anchorage |
| Phoenix Regional Medical Center (Humana Hospital - Phoenix) | 03-0408 | Galen merger | Triad Spin-Off | 2/2/78 | 5/11/99 | AZ | Phoenix |
| El Dorado Medical Center (Hospital) | 03-0080 | HTI merger | Triad Spin-Off | 1/1/78 | 5/11/99 | AZ | Tucson |
| Paradise Valley Hospital (Humana Hospital Desert Valley) | 03-0383 | Galen merger | Triad Spin-Off | 1/1/83 | 5/11/99 | AZ | Phoenix |
| Northwest Hospital | 03-0385 | HTI merger | Triad Spin-Off | 9/17/87 | 5/11/99 | AZ | Tucson |
| Paradise Valley Psychiatric Services | 03-0320 | Opened by Columbia/HCA sub | Triad Spin-Off | 7/1/94 | 5/11/99 | AZ | Phoenix |
| Medical Center - South Arkansas | 04-0088 | Foundation | Triad Spin-Off | 2/27/96 | 5/11/99 | AR | El Dorado |
| Medical Park Hospital (North Park Hospital) | 04-0091 | HTI merger | Triad Spin-Off | 9/1/88 | 5/11/99 | AR | Hope |
| DeQueen Regional Medical Center | 04-0107 | HTI merger | Triad Spin-Off | 10/1/84 | 5/11/99 | AR | DeQueen |
| Doctor's Hospital (Little Rock) | 04-0116 | HCA merger | Sold to St. Vincent Infirmary Medical Center | 8/26/81 | 2/1/98 | AR | Little Rock |
| Riverside Community Hospital | 05-0022 | Agreement | Active | 4/7/97 | | CA | Riverside |
| | | Brotman Medical Center, Culver City, CA sold May 31, 1989 by HTI to Republic Health | | | | | |
| Biotman Medical Center | 05-0014 | Corporation (OrNda), a Delaware corporation. | Sold by HTI prior to merger | 1/1/89 | 5/31/98 | CA | Culver City |
| Encino Tarzana Regional Medical Center | 05-0158 | HTI merger | JV with Tenet | 8/26/81 | 1/1/93 | CA | Encino |
| Valley Medical Center | 05-0186 | Sold by HTI 2/17/93 | Sold | 9/1/89 | 3/16/93 | CA | El Cajon |

C.37

Current and Former Co. /HCA Hospitals
(Includes all parent corporations)

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| San Jose Medical Center | 05-0215 | Healthcare System | Active | 12/13/95 | | CA | San Jose |
| San Leandro Hospital | 05-0364 | Galen merger | Trial Spin-off | 2/2/78 | 5/11/99 | CA | San Leandro |
| West Side Hospital | 05-0328 | HTI merger | Sold to Westside Hospital, LLC | 2/2/78 | 7/1/96 | CA | Los Angeles |
| Healdsburg General Hospital | 05-0331 | HTI merger | Sold to Nuestro Hospital, Inc. | 2/2/78 | 11/16/98 | CA | Healdsburg |
| Humana Hospital- Westminster | 05-0368 | Sold by Galen 10/15/92 | Sold by Galen prior to merger | 9/1/88 | 10/15/92 | CA | Westminster |
| Good Samaritan Hospital COL Mission Oaks Hospital | 05-0380 | HTI purchase | Operations consolidated with Good Samaritan Hospital (COL Mission Oaks) | 1/1/90 | 2/1/99 | CA | San Jose |
| Palm Drive Hospital | 05-0385 | HTI merger | Trial Spin-Off | 1/1/71 | 5/11/99 | CA | Sebastopol |
| Visalia Community Hospital | 05-0418 | 8/31/94 by HTI to Kaweah Delta Hospital District. | | 5/4/94 | 8/31/94 | CA | Visalia |
| Green of Hospital of Scripps Clinic | 05-0124 | HCA closed this facility 2/7/92 | Lease terminated | 4/27/85 | 10/31/91 | CA | San Diego |
| West Anaheim Medical Center | 05-0126 | Galen merger | Trial Spin-Off | 2/2/78 | 5/11/99 | CA | Anaheim |
| Community Hospital Gardena | 05-0356 | sold 12/31/91 by HTI to Gardena Physicians Hospital, Inc. | Sold by HTI prior to merger | 8/26/81 | 12/31/91 | CA | Gardena |
| Ukiah Hospital | 05-0473 | | | 1/1/87 | 8/7/88 | CA | |
| West Hills Regional Medical Center | 05-0481 | Galen merger | Active | 1/1/85 | | CA | West Hills |
| Huntington Beach Medical Center | 05-0526 | Galen merger | Trial Spin-Off | 1/1/85 | 5/11/99 | CA | Huntington Beach |
| Los Robles Regional Medical Center | 05-0549 | HCA merger | Active | 1/1/71 | | CA | Thousand Oaks |
| LaHabra Community Hospital | 05-0565 | w/Samaritan Health Sys. & COL/HCA San | Active | 1/1/87 | 3/31/88 | CA | |
| San Clemente Hospital & Medical Center | 05-0565 | Clemente, Inc. | Lease Expired | 5/18/95 | 5/5/98 | CA | San Clemente |
| Chino Valley (Hospital) Medical Center | 05-0566 | HTI merger | Active | 8/26/81 | | CA | Chino |
| Westlake Medical Center | 05-0593 | Universal Health Services, Inc. | Consolidated with Columbia Los Angeles Hospital | 7/7/95 | 7/25/96 | CA | Westlake Village |
| Mission Bay Hospital | 05-0598 | HTI merger | Trial Spin-Off | 9/1/88 | 5/11/99 | CA | San Diego |
| South Valley Hospital | 05-0685 | Healthcare System | Closed | 12/13/95 | 8/24/99 | CA | Gilroy |
| Woodview-Calabasas Hospital | 05-049 | HAI acquisition | Active | 8/26/81 | | CA | Calabasas |
| Las Encinas Hospital | 05-4078 | HCA merger | Active | 1/1/87 | 3/31/93 | CA | Pasadena |
| Cedar Vista Psychiatric Hospital | 05-4091 | HCA built | sold | 1/1/87 | | CA | Fresno |
| Canyon Ridge Hospital | 05-4111 | HCA built | sold | 10/1/87 | 1/1/94 | CA | Chino |
| Presbyterian/St. Luke's Medical Center | 06-0014 | Joint Venture with HealthOne | Active | 10/1/87 | 1/1/94 | CO | Denver |
| Rose Medical Center | 06-0032 | Rose | Contributed to Joint Venture with HealthOne | 10/31/95 | | CO | Denver |
| Swedish Medical Center (Rocky Mountain Rehab combined) (Mountainview) | 06-0034 | Joint Venture with HealthOne | Active | 4/27/95 | | CO | Englewood |
| Aurora Regional Medical Center (Medical Center of Aurora) | 06-0065 | Galen merger | Contributed to JV with HealthOne | 10/31/95 | | CO | Thornton |
| Aurora Regional Medical Center | 06-0067 | Galen merger | Contributed to HealthONE Joint Venture | 2/2/78 | | CO | Aurora |
| Aurora Presbyterian Hospital | 06-0100 | Joint Venture with HealthOne | Active | 10/31/95 | | CO | Aurora |

C,36

Current and Former C... /HCA Hospitals
(Includes all parent corporations)

| Name | MC # | How-C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| Spalding Rehabilitation Hospital (worked) | 06-3027 | Joint Venture with HealthOne | Active | 10/31/95 | | CO | Aurora |
| Columbine Psychiatric Center | 06-3209 | Acquired from Spalding Rehabilitation LLC | Active | 10/31/95 | | CO | Aurora |
| Bethesda Psych Hospital | 06-4010 | CHC acquired from HCA | Contributed to Joint Venture with HealthOne | 1/1/87 | | CO | Littleton |
|  | 06-5014 | Joint Venture with HealthOne | Active | 10/31/95 | | CO | Denver |
| Rockford Center, The | 08-4002 | HCA merger | Sold to Charter Rockford Behavioral Health Sys., Inc. | 1/1/87 | 8/31/96 | DE | Newark |
| Cedars Medical Center | 10-0009 | (Columbia) | Active | 2/17/93 | | FL | Miami |
| Iven Cities Hospital (Niceville-Valparaiso Hospital; n/L/a Palm Coast Community Hospital) |  | HCA merger | Active | 7/11/78 | | FL | Niceville |
| North Beach Community Hospital | 10-0056 | North Beach Hospital, Fort Lauderdale, FL, sold 3/31/90 by ITI to Cleveland Clinic Foundation | Sold prior to ITI merger | 8/26/81 | 3/31/90 | FL | Fort Lauderdale |
| Institute South | 10-0059 | Asset purchase from St. Francis Hospital | Active | 4/17/91 | | FL | Miami |
| Medical Center - Peninsula (North) | 10-0060 | Asset purchase from St. Francis Hospital | Consolidated with Miami Heart - North | 12/18/92 | 1/1/92 | FL | Miami |
| JFK Medical Center | 10-0068 | HCA merger | Exchanged with Paracelsus | 1/1/87 | 5/17/96 | FL | Ormond Beach |
| Kissimmee Memorial Hospital | 10-0080 | Stock purchase from JFK Medical Center, Inc. | Active | 1/1/85 | | FL | Atlantis |
|  | 10-0089 | BAMI merger | Sold to Adventist Health System | 7/15/92 | 8/12/93 | FL | Kissimmee |
| Victoria Hospital (merged with Victoria Pavilion) | 10-0100 | (Columbia); operations consolidated with Cedars | Consolidated operations with Cedars Medical Center | 12/1/88 | 2/17/93 | FL | Miami |
| East Pointe Hospital | 10-0107 | ITI merger | Active | 7/1/81 | | FL | Lehigh Acres |
| Hamilton Memorial Hospital | 10-0108 | Asset purchase from The Board of Trustees of Hamilton County Memorial Hospital | Active | 12/13/94 | | FL | Jasper |
| Medical Center - Osceola (Humana Hospital - Kissimmee) | 10-0110 | Galen merger | Active | 3/8/74 | | FL | Kissimmee |
| Coastal Communities | 10-0118 |  |  | 1/1/86 | 9/30/86 | FL |  |
| Bartow Memorial Hospital (Bartow Healthcare System, Ltd.) | 10-0121 | Contribution agreement between Bartow Memorial Hospital, Inc. and HCA | Lifepoint Spin-Off | 5/30/96 | 5/11/99 | FL | Bartow |
| North Okaloosa Medical Center | 10-0122 | ITI merger | Sold to Community Health Systems, Inc. | 7/11/78 | 3/15/96 | FL | Crestview |
| Santa Rosa Medical Center | 10-0124 | ITI merger | Sold to Paracelsus Healthcare Corporation | 4/27/85 | 5/17/96 | FL | Milton |
| (Bayppo) | 10-0131 | Galen merger | Active | 2/2/78 | | FL | Aventura |
| North Gables Hospital | 10-0152 | Asset purchase from Abbey Health Services, Inc. | Sold to Vencor, Inc. | 10/31/91 | 1/7/92 | FL | Coral Gables |
| Lake City Medical Center | 10-0156 | ITI merger | Active | 9/1/88 | | FL | Lake City |
| Medical Center - Sanford (Central Florida Regional; Seminole Memorial Hospital) | 10-0161 | HCA merger | Active | 1/1/80 | | FL | Sanford |
| Winter Park Memorial Hospital | 10-0162 | Contribution agreement between Columbia and Winter Park Memorial Hospital Ass'n, Inc. | Active | 3/1/94 | | FL | Winter Park |
| Sarasota Doctor's Hospital | 10-0166 | Sarasota, Ltd. | Active | 1/1/87 | | FL | Sarasota |

C.39

Current and Former C.. ..?HCA Hospitals
[Includes all parent corporations]

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | CityAbbrev |
|---|---|---|---|---|---|---|---|
| Fawcett Memorial Hospital | 10-0236 | BAMI merger | Active | 7/15/82 | | FL | Port Charlotte |
| Northside Medical Center (Hospital) | 10-0238 | Galen merger | Active | 7/12/82 | | FL | St. Petersburg |
| Edward White Hospital | 10-0239 | HTI merger | Active | 3/1/77 | | FL | St. Petersburg |
| Gulf Coast Medical Center (Panama City) | 10-0242 | HCA merger | Active | 1/2/77 | | FL | Panama City |
| Brandon Regional Medical Center (Brandon Regional Hospital) | 10-0243 | Galen merger | Active | 7/28/78 | | FL | Brandon |
| Lawnwood Regional Medical Center | 10-0246 | HCA merger | Active | 1/1/78 | | FL | Fort Pierce |
| Harbour Shores Hospital of Lawnwood | 10-0246 | HCA merger | Active | 1/1/78 | | FL | Fort Pierce |
| Largo Medical Center | 10-0248 | HCA merger | Active | 6/5/78 | | FL | Largo |
| Raulerson Hospital | 10-0252 | HCA merger | Active | 2/9/79 | | FL | Okeechobee |
| Tallahassee Community Hospital | 10-0254 | HCA merger | Active | 9/11/79 | | FL | Tallahassee |
| Regional Medical Center at Bayonet Point | 10-0256 | HCA merger | Active | 10/3/79 | | FL | Hudson |
| South Bay Hospital | 10-0259 | HTI merger | Active | 12/6/82 | | FL | Sun City Center |
| Medical Center - Port St. Lucie | 10-0260 | HCA merger | Active | 10/1/83 | | FL | Port St. Lucie |
| South Seminole Community Hospital | 10-0263 | unknown) | Active | 1/1/87 | 11/30/92 | FL | Longwood |
| Regional Medical Center Oak Hill | 10-0264 | BAMI merger | Active | 6/6/84 | | FL | Spring Hill |
| Englewood Community Hospital | 10-0267 | BAMI merger | Active | 5/1/82 | | FL | Englewood |
| Palms West Hospital | 10-0269 | HTI merger | Active | 3/6/86 | | FL | Loxahatchee |
| Destin Hospital | 10-0273 | HCA merger | Closed | 1/1/86 | 8/31/94 | FL | Destin |
| Gulf Coast Hospital (Ft. Myers) | 10-0279 | BAMI merger | Active | 1/1/91 | | FL | Fort Myers |
| Specialty Hospital of Jacksonville | 10-2012 | System, Inc. | Active | 1/3/96 | | FL | Jacksonville |
| Highland Park General Hospital | 10-4028 | | Consolidated | 1/1/87 | 5/31/88 | FL | |
| West Lake Hospital | 10-1031 | HCA merger | Consolidated | 1/1/87 | 12/22/92 | FL | Longwood |
| Behavioral Health Center (Doral Palms Hospital, Miami Hospital) | 10-4037 | Contribution between Columbia and Cedars | Contributed to Joint Venture with Cedars Healthcare Group, Ltd. And Columbia Behavioral Health Ltd. | 6/7/96 | 6/7/96 | FL | Miami |
| University of South Florida - Center for Psychiatry | 10-4058 | Authority 2/20/93. | sold | 1/12/87 | 2/20/93 | FL | Tampa |
| University Pavilion | 10-4044 | Acquired from Florida Medical Center, Inc. | sold | 8/21/87 | 10/1/93 | FL | Tamarac |
| Grant Center of Deering | 10-5308 | Columbia assumed lease | Leased Facility | | | FL | Miami |
| Grant Center Hospital of North Florida | 10-5206 | Forum Group, Inc. acquisition | closed | 3/31/85 | 2/7/92 | FL | Miami |
| Peachtree Regional Hospital (Humana Hospital - Newnan) | 11-0020 | Galen merger | Active | 1/1/82 | | GA | Newnan |
| Cartersville Medical Center | 11-0050 | Galen merger | Active | 1/1/85 | | GA | Cartersville |
| Northlake Regional Medical Center (Doctor's Hospital) | 11-0033 | HCA merger | Active | 12/1/85 | | GA | Tucker |
| Barrow Memorial Hospital (Barrow Medical Center) | 11-0045 | HTI merger | Lifepoint Spin-Off | 9/1/88 | 5/11/99 | GA | Winder |
| Murray Medical Center | 11-0050 | Murray County, GA | Sold to Hamilton Healthcare Systems | 12/7/94 | 3/6/98 | GA | Chatsworth |
| Polk General Hospital, Inc. | 11-4120 | Authority | Active | 7/3/96 | | GA | Cedartown |

C, 40

Current and former C/HCA Hospitals
(includes all parent corporations)

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | CityAbbrev |
|---|---|---|---|---|---|---|---|
| Plantation General Hospital | 10-0167 | HTI merger | Active | 10/1/79 | | FL | Plantation |
| Clearwater Community Hospital | 10-0174 | HTI merger | Active | 3/1/90 | | FL | Clearwater |
| Medical University Hospital (Memorial Hospital Jacksonville) | 10-0179 | System, Inc. | Active | 1/1/85 | | FL | Jacksonville |
| Humana Hospital (Memorial Hospital, St Petersburg) | 10-0180 | Galen merger | Active | 3/8/74 | | FL | St. Petersburg |
| Humana Hospital - Sun Bay | 10-0186 | Sold by Galen 12/20/90 | | 1/1/85 | 12/20/90 | FL | St. Petersburg |
| Northwest Medical Center (Northwest Regional Hospital) | 10-0189 | HCA merger | Active | 8/26/81 | | FL | Margate |
| New Port Richey Hospital | 10-0191 | HCA merger | Active | 7/1/78 | | FL | New Port Richey |
| Humana Hospital- South Broward | 10-0194 | Closed by Galen 10/15/91 | Closed | 1/1/85 | 10/15/91 | FL | Hollywood |
| Pompano Beach Medical Center (Humana Hospital - Cypress) | 10-0199 | Galen merger | Closed | 2/3/78 | 12/17/98 | FL | Pompano Beach |
| North Florida Regional Medical Center | 10-0204 | HCA merger | Active | 2/6/73 | | FL | Gainesville |
| Palm Beach Regional Hospital | 10-0207 | HTI merger | Closed after merger | 7/1/80 | 8/31/95 | FL | Lake Worth |
| Deering Hospital (Miami Dade General; Coral Reef Hospital) | 10-0208 | Asset purchase from HCA | Active | 5/21/90 | | FL | Miami |
| Kendall Regional Medical Center | 10-0209 | Asset purchase from AMI | Active | 3/20/91 | | FL | Miami |
| Dade City Hospital | 10-0211 | Galen merger | Active | 3/8/74 | | FL | Dade City |
| Ocala Regional Medical Center | 10-0212 | HCA merger | Active | 9/24/73 | | FL | Ocala |
| Blake Medical Center | 10-0213 | HCA merger | Active | 7/1/79 | | FL | Bradenton |
| Sebastian Hospital | 10-0217 | Galen merger | Sold to Health Management Associates, Inc. | 1/1/85 | 9/1/93 | FL | Sebastian |
| St. Augustine General Hospital | 10-0219 | FL, sold 10/31/91 by HTI to Flagler Hospital, St. Augustine, FL | | 8/26/81 | 10/31/91 | FL | St. Augustine |
| Regional Medical Center SW Florida | 10-0220 | BAMI merger | Active | 5/1/75 | | FL | Fort Myers |
| Park Medical Center (formerly Humana Lucerne) | 10-0221 | Galen merger | Active | 3/8/74 | | FL | Orlando |
| Fort Walton Beach Medical Center | 10-0223 | Galen merger | Active | 7/22/74 | | FL | Fort Walton Beach |
| University Hospital & Medical Center | 10-0224 | Corp., Inc. | Active | 11/20/74 | | FL | Tamarac |
| Orange Park Medical Center | 10-0226 | Galen merger | Active | 3/8/74 | | FL | Orange Park |
| Humana Women's Hospital | 10-0227 | Sold by Galen 8/30/90; | | 1/1/85 | 2/23/93 | FL | Tampa |
| Bennett | 10-0228 | Galen merger | Active | 9/3/73 | | FL | Plantation |
| Medical Center - Daytona (Humana Hospital Daytona; Daytona Medical Center) | 10-0229 | Galen merger | Active | 3/8/74 | | FL | Daytona |
| Pembroke Pines Hospital (Humana Hospital - Pembroke) | 10-0230 | Galen merger | Leased to South Broward Hospital District; CHC owns | 1/1/90 | 7/1/95 | FL | Pembroke Pines |
| West Florida Regional Medical Center | 10-0231 | HCA merger | Active | 5/12/75 | | FL | Pensacola |
| Putnam Medical Center | 10-0232 | HCA merger | Active | 8/29/75 | | FL | Palatka |
| Columbia Hospital (Humana Hospital - Palm Beaches) | 10-0234 | Galen merger | Active | 2/3/78 | | FL | West Palm Beach |
| University Hospital (University General Hospital) | 10-0235 | Okaloosa Medical Center, Inc. and Community Health Systems, Inc. | Closed | 2/9/95 | 5/1/98 | FL | Seminole |

C, 41

Current and Former HCA Hospitals
(Includes all parent corporations)

| Name | HIC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| Farview Park Hospital (Laurens Memorial Hospital) | 11-0175 | HCA merger | Active | 3/28/81 | | GA | Dublin |
| Worth Community Hospital | 11-0134 | | | 1/1/86 | 3/31/88 | GA | |
| Palmyra Medical Center | 11-0163 | HCA merger | Active | 2/1/71 | | GA | Albany |
| Coliseum Medical Center | 11-0163 | HCA merger | Active | 2/15/71 | | GA | Macon |
| Middle Georgia Hospital | 11-0164 | Asset transaction | | 5/1/98 | | GA | Macon |
| Redmond Regional Medical Center | 11-0168 | HCA merger | Active | 7/4/72 | | GA | Rome |
| Metropolitan Hospital | 11-0169 | Asset exchange with Quorum Health Group | Active | 5/1/94 | | GA | Atlanta |
| West Paces Medical Center | 11-0171 | HCA merger | | 10/2/72 | | GA | Atlanta |
| Dunwoody Medical Center | 11-0172 | Group | | 5/1/94 | | GA | Atlanta |
| Augusta Medical Center | 11-0177 | Galen merger | Active | 2/2/78 | | GA | Augusta |
| Parkway Medical Center | 11-0179 | HCA merger | Active | 1/1/80 | | GA | Lithia Springs |
| Doctor's Hospital (Columbus) | 11-0186 | ITT merger | Active | 5/1/76 | | GA | Columbus |
| Lanier Park Regional Hospital | 11-0188 | ITT merger | Active | 6/12/77 | | GA | Gainesville |
| Eastside Medical Center (Gwinnett Community Hospital) | 11-0192 | Galen merger | Active | 2/2/78 | | GA | Snellville |
| Hughston Sports Medicine Hospital | 11-0200 | HCA merger | Active | 10/25/84 | | GA | Columbus |
| Macon Northside Hospital | 11-0201 | Asset transaction | | 5/1/98 | | GA | Macon |
| Wheeler County Hospital | 11-0207 | BAMI merger | Closed/Discontinued Operations | 1/1/82 | 1/1/94 | GA | Glenwood |
| Coliseum Psychiatric Hospital | 11-0015 | HCA merger | Active | 1/1/87 | | GA | Macon |
| West Valley Medical Center | 13-0014 | ITT merger | Active | 1/1/73 | | ID | Caldwell |
| Eastern Idaho Regional Medical Center | 13-0018 | ITT merger | Active | 1/1/87 | | ID | Idaho Falls |
| Walter Center | 13-0058 | | | 5/1/98 | | ID | |
| Mountain River | 13-0007 | | Active | 4/1/87 | 8/30/91 | ID | Gooding |
| LaGrange Memorial Hospital | 14-0065 | Health Systems, Inc. | Sold to Adventist Health System | 7/28/95 | 2/1/96 | IL | La Grange |
| Michael Reese Hospital & Medical Center | 14-0075 | Galen merger | Sold to Doctor's Community Healthcare Corporation | 3/1/91 | 11/12/98 | IL | Chicago |
| Olympia Fields Osteopathic Hospital & Medical Center | 14-0172 | CHC | Active | 10/1/95 | | IL | Chicago |
| Chicago Osteopathic (Hospital & Medical Center) | 14-0172 | Asset purchase from Midwestern University | Closed | 10/1/95 | 3/1/96 | IL | Chicago |
| Grant Hospital of Chicago (Columbia Grant Hospital) | 14-0207 | Asset purchase from Grant Hospital of Chicago | Sold to Doctor's Community Healthcare Corp. | 1/26/94 | 11/12/98 | IL | Chicago |
| Hoffman Estates Medical Center | 14-0290 | Galen merger | Sold to Alexian Brothers Health System | 1/1/85 | 2/1/99 | IL | Hoffman Estates |
| Barclay Hospital | 14-0009 | Asset purchase from Charter Behavioral Health System of Chicago, Inc. | Merged with Chicago Lakeshore | 6/7/96 | 2/1/97 | IL | Chicago |
| Chicago Lakeshore Hospital | 14-0005 | HCA merger | Active | 8/26/81 | 2/1/97 | IL | Chicago |
| Riveredge Hospital | 14-0009 | HCA merger | Active | 8/26/81 | | IL | Forest Park |
| Woodland Hospital | 14-0011 | HCA merger | Sold to Alexian Brothers Health System, Inc. | 1/1/91 | 8/18/98 | IL | Hoffman Estate |
| Terre Haute Regional Hospital | 15-0046 | ITT merger | Active | 7/1/75 | | IN | Terre Haute |

C.42

Current and Former C.
(Includes all parent corporations)

| Name | MC # | How C/HCA Acquired (IN; sold 12/31/91 by ITT to American) | G/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| Hadik Clark Community Hospital | 15-0131 | | | 3/1/85 | 12/31/91 | IN | Charlestown |
| Women's Hospital, The- (of) Indianapolis | 15-0136 | Methdisal, Inc. | | 8/1/83 | | IN | Indianapolis |
| Wesley Medical Center | 17-0123 | Galen merger | Active | 6/24/85 | | KS | Wichita |
| Halstead Hospital | 17-0114 | HCA merger | Lifepoint Spin-Off | 5/17/96 | 5/11/99 | KS | Halstead |
| Bethany Medical Center | 17-0148 | Asset exchange with Paracelsus | Sold to Cental Medical Center, Inc. | 10/31/97 | 12/4/98 | KS | Halstead |
| City | 17-0175 | Asset purchase from Bethany Medical Center | Lifepoint Spin-Off | 12/27/76 | 5/11/99 | KS | Kansas City |
| Overland Park Regional Medical Center | 17-0176 | Galen merger | Triad Spin-Off | 12/17/78 | 5/11/99 | KS | Dodge City |
| Lexington | 18-0307 | Asset purchase | Active | 7/28/95 | | KS | Overland Park |
| Audubon Regional Medical Center | 18-0314 | Galen merger | Sold to Alliant Health System, Inc. | 1/27/80 | 9/2/98 | KY | Lexington |
| Meadowview Regional Medical Center (Hospital Maysville) | 18-0319 | Galen merger | Lifepoint Spin-Off | 12/9/81 | 5/11/99 | KY | Louisville |
| Spring View Hospital | 18-0324 | ITI merger | Sold to Alliant Health Systems, Inc. | 2/27/80 | 11/2/98 | KY | Maysville |
| Bourbon Community Hospital (Hospital Paris) | 18-0346 | HTI merger | Lifepoint Spin-Off | 6/17/80 | 5/11/99 | KY | Lebanon |
| Logan Memorial Hospital | 18-0066 | ITI merger | Lifepoint Spin-Off | 7/1/85 | 5/11/99 | KY | Paris |
| Hospital Georgetown (Georgetown Community Hospital; Scott General Hospital) | 18-0001 | ITI merger | Lifepoint Spin-Off | 1/1/87 | 5/11/99 | KY | Russellville |
| Pine Lake Regional Hospital (Community Hospital) | 18-0016 | ITI merger | Lifepoint Spin-Off | 6/1/69 | 5/11/99 | KY | Georgetown |
| Valley View Medical Center | 18-0122 | ITI merger | Lifepoint Spin-Off | 1/1/87 | 5/11/99 | KY | Mayfield |
| Suburban Hospital | 18-0023 | | | 6/1/74 | | KY | Louisville |
| Greenview Regional Hospital | 18-0024 | Galen merger | Sold to Alliant Health Systems, Inc. | 9/12/72 | 9/1/87 | KY | Bowling Green |
| Hospital Frankfort | 18-0127 | HCA merger | Active | 7/9/74 | | KY | Frankfort |
| Humana Hospital- Louisa (Three Rivers Hospital) | 18-0128 | HCA merger | Active | 1/1/85 | | KY | Louisa |
| Lake Cumberland Regional Hospital | 18-0132 | Galen sold 5/27/93 | Lifepoint Spin-Off | 5/13/76 | 5/27/93 | KY | Somerset |
| Southwest Hospital | 18-0133 | Galen merger | Lifepoint Spin-Off | 9/4/78 | 5/11/99 | KY | Louisville |
| University of Louisville (Hospital) | 18-0137 | Galen merger | Sold to Alliant Health Systems, Inc. | 9/12/83 | 9/1/98 | KY | Louisville |
| Tri-County Community Hospital | 18-0138 | Galen merger | Lease Terminated | 7/15/92 | 2/6/96 | KY | La Grange |
| Dauterive Hospital | 19-0003 | BAMI merger | Sold to Baptist Healthcare Affiliates, Inc. | 8/26/81 | 9/30/92 | LA | New Iberia |
| Medical Center) | 19-0025 | HCA built in 1985 | Active | 1/1/85 | | LA | Lafayette |
| Savoy Medical Center | 19-0025 | ITI merger | Active | 1/31/85 | | LA | Lafayette |
| Rapides Regional Medical Center | 19-0026 | HTI merger | Active | 8/10/94 | | LA | Alexandria |
| Springhill Medical Center | 19-0088 | Limited Liability Co. | Lifepoint Spin-Off | 1/1/74 | 5/11/99 | LA | Springhill |
| Winn Parish Medical Center | 19-0090 | Galen merger | Active | 6/1/74 | | LA | Winnfield |
| Elmwood Medical Center (Jefferson Medical Center) | 19-0092 | Galen merger | Lifepoint Spin-Off | 11/28/95 | 5/11/99 | LA | Jefferson |
| Avoyelles Hospital | 19-0099 | and Columbia | Active | 5/3/74 | | LA | Marksville |
| Oakdale Community Hospital | 19-0106 | Galen merger | Active | 5/3/74 | | LA | Oakdale |

C, 43

Current and Former C...ia/HCA Hospitals
[Includes all parent corporations]

| Name (Highland Hospital) | NIC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| Highland Hospital | 19-0112 | HCA merger | Active | 8/26/81 | | LA | Shreveport |
| Ville Plate Medical Center (Humana Hospital - Ville Plate) | 19-0167 | Galen merger | Sold to Hospital Service District No. 1 of Evangeline Parish | | | LA | Ville Plate |
| Tulane University Hospital and Clinic | | Contribution between Columbia and University Healthcare System | | 5/3/74 | 9/1/95 | LA | New Orleans |
| Lakeview Regional Medical Center (Highland Park Hospital) | 19-0176 | HTI merger | Active | 4/1/95 | | LA | Covington |
| Lakeside Hospital | 19-0177 | HTI merger | Active | 9/19/76 | | LA | Metairie |
| Doctor's Hospital of Opelousas | 19-0182 | HTI merger | Active | 10/1/78 | | LA | Opelousas |
| Women's & Children's Hospital | 19-0191 | HTI merger | Active | 9/1/88 | | LA | Lafayette |
| North Monroe Hospital | 19-0196 | HTI merger | Active | 6/6/83 | | LA | Monroe |
| Westpark Hospital | 19-0197 | HCA merger | Active | 8/15/83 | | LA | Monroe |
| Lakeland Medical Center | 19-0198 | | Active | | | LA | Hammond |
| Women & Children's Hospital - Lake Charles | 19-0200 | Galen merger | Active | 9/1/88 | 12/1/92 | LA | New Orleans |
| Medical Center of Baton Rouge | 19-0201 | Galen merger | Triad Spin-Off | 8/29/84 | | LA | Shreveport |
| Medical Center - Southwest Louisiana | 19-0202 | HTI merger | Sold to Baton Rouge Healthcare System | 10/21/84 | 5/11/99 | LA | Lake Charles |
| Riverview Medical Center | 19-0205 | HTI merger | Active | 2/1/85 | 10/1/98 | LA | Baton Rouge |
| DePaul Hospital | 19-0207 | HTI merger | Lifepoint Spin-Off | 6/25/85 | | LA | Lafayette |
| Humana Hospital- Brentwood | 19-4000 | HCA merger | Contributed to JV with Tulane University | 9/1/88 | 5/11/99 | LA | Gonzales |
| Cypress Hospital | 19-4004 | Galen sold 9/11/90 | sold | 4/22/81 | | LA | New Orleans |
| Parkland Medical Center | 19-4010 | HCA merger | Sold assets to Charter Behavioral Group | | 9/11/90 | LA | Shreveport |
| DePaul Northshore Hospital | 19-4013 | HAI acquisition | sold | 8/26/81 | 7/1/95 | LA | Lafayette |
| North Monroe Pavilion | 19-4015 | HCA built | sold | 8/26/81 | 10/30/92 | LA | Baton Rouge |
| MetroWest Medical Center | 19-5197 | | | 1/28/85 | 2/1/92 | LA | Covington |
| MetroWest Medical Center | 22-0089 | Partnership with Tenet | Sold to Tenet Health System Inc. | 1/1/89 | | MA | Framingham |
| MetroWest Leonard Morse | 22-0089 | Partnership with Tenet | Sold to Tenet Health System NW, Inc. | 5/1/96 | 11/3/98 | MA | Framingham |
| UMC University Medical Pavilion | | HCA sold to The Medical Center Educational Building Corp. 12/30/91 | Sold to Tenet Health System NW, Inc. | 5/1/96 | 11/3/98 | | |
| Vicksburg Medical Center | 25-0031 | HTI merger | Sold prior to HCA merger | | 12/30/97 | MS | Jackson |
| Natchez Community Hospital | 25-0122 | Galen merger | Active | 8/1/82 | | MS | Vicksburg |
| Garden Park Community Hospital, Ltd. | 25-0023 | HTI merger | Sold stock to Health Management Ass'n, Inc. | 1/1/85 | 9/1/93 | MS | Natchez |
| Independence Regional Health Center | 26-0095 | Asset purchase from Reorganized Church of Jesus Christ of Latter Day Saints, et al. | Active | 9/15/88 | | MS | Gulfport |
| St. Peters Hospital | 26-0191 | | Triad Spin-Off | 2/3/94 | 5/11/99 | MO | Independence |
| Hospital North and South | 26-0197 | HTI merger | Sold to Cox Health Systems | 1/1/87 | 2/10/88 | MO | Springfield |
| Research Psychiatric Center | 26-4016 | HCA merger | Triad Spin-Off | 9/1/88 | 7/31/98 | MO | Kansas City |
| Sunrise Hospital & Medical Center | 29-0003 | Galen merger | Active | 1/1/87 | 5/11/99 | MO | Las Vegas |
| | | | | 2/2/78 | | NV | |

Current and Former v/HCA Hospitals
(Includes all parent corporations)

| Name | MC # | How C/HCA acquired | G/HCA OWNERSHIP/STATUS | Start Date | End Date | State | CityAbbrev |
|---|---|---|---|---|---|---|---|
| Mountain View Hospital | 29-0039 | New-1996 | sold | 2/1/96 | | NV | Las Vegas |
| Tree Lee Meadows Hospital | 29-4003 | HCA acquisition | sold | 8/26/81 | 7/1/93 | NV | Reno |
| Monte Vista Hospital | 29-4004 | HCA built | Active | 6/1/85 | 7/1/93 | NV | Las Vegas |
| Parkland Medical Center | 30-0017 | HCA merger | Active | 7/1/82 | | NH | Derry |
| Portsmouth Regional Hospital | 30-0029 | HCA merger | Active | 3/1/86 | | NH | Portsmouth |
| Portsmouth Pavilion | 30-5029 | HCA merger | Consolidated with Portsmouth Regional Hospital | 1/1/88 | 1/1/96 | NH | Portsmouth |
| Lovelace Medical Center | 32-0019 | | | | 3/30/90 | NM | |
| Medical Center - Carlsbad (Guadalupe Medical Center) | 32-0363 | HCA merger | Triad Spin-Off | 1/1/87 | 5/11/99 | NM | Carlsbad |
| Lea Regional Medical Center | 32-0365 | HCA merger | Triad Spin-Off | 8/31/77 | 5/11/99 | NM | Hobbs |
| Heights Psychiatric Hospital | 32-4003 | HCA merger | Sold | 4/1/79 | | NM | Albuquerque |
| Raleigh Community Hospital | 34-0073 | HCA merger | Sold to Duke University Health System | 1/1/87 | 9/15/98 | NC | Raleigh |
| Cape Fear Memorial Hospital | 34-0094 | Asset purchase | Sold to New Hanover Regional Medical Center | 1/1/77 | 11/1/98 | NC | Wilmington |
| Heritage Hospital | 34-0107 | HTI merger | Sold to Pitt County Memorial Hospital | 3/15/96 | 11/2/98 | NC | Tarboro |
| Daves Community Hospital | 34-0144 | HTI merger | Sold to NetCare | 10/1/79 | 31/1/98 | NC | Statesville |
| Presbyterian Orthopedic Hospital | 34-0153 | HTI merger | Sold to Presbyterian Regional Hospital Corporation | 10/1/79 | 7/31/98 | NC | Charlotte |
| Brunswick Hospital | 34-0158 | HTI merger | Active | 8/26/81 | | NC | Supply |
| Highsmith-Rainey Memorial Hospital | 34-0161 | HCA merger | Sold | 7/1/83 | 5/3/99 | NC | Fayetteville |
| | | | | 5/14/83 | | | |
| Holly Hill Hospital | 34-4014 | HCA merger | Contribution - JV with Charter Northridge Behavioral Health System, Inc., Wake Psychiatric Hospital, Inc. | 1/1/87 | 5/1/95 | NC | Wake Forest |
| St. Vincent Charity | 36-0037 | Joint Venture - Sisters of Charity | Active | 9/2/95 | 2/28/97 | OH | Cleveland |
| St. Luke's Medical Center (Cleveland) | 36-0045 | Joint Venture - Sisters of Charity | Active | 9/2/95 | 2/28/97 | OH | Cleveland |
| Mercy Medical Center | 36-0070 | Joint Venture - Sisters of Charity | Active | 9/2/95 | 2/28/97 | OH | Canton |
| St. John West Shore Hospital | 36-0123 | Joint Venture - Sisters of Charity | Active | 9/2/95 | 2/28/97 | OH | Westlake |
| St. Mary's Medical Center | 37-0026 | HCA merger | Sold to St. Mary's Hospital of Enid, OK, Inc. | 4/1/85 | 9/30/95 | OK | Enid |
| Claremore Regional Hospital | 37-0039 | HTI merger | Triad Spin-Off | 9/1/88 | 5/11/99 | OK | Claremore |
| Tulsa Regional Medical Center | 37-0078 | Asset purchase from EPIC | Sold to Hillcrest System | 1/1/88 | 12/31/98 | OK | Tulsa |
| Presbyterian Hospital (operating in conjunction with University Hospital and Children's Hospital of Oklahoma) | | | | | | | |
| Southwestern Medical Center | 37-0093 | HCA merger | Active | 10/1/85 | | OK | Oklahoma City |
| Doctor's Hospital - Tulsa | 37-0097 | HTI merger | Active | 1/1/88 | | OK | Lawton |
| Edmond (Regional) Medical Center | 37-0141 | HTI merger | Sold to Triad | 9/1/88 | 12/31/98 | OK | Tulsa |
| | 37-0148 | HTI merger | Active | 1/1/81 | | OK | Edmond |
| Bethany (Hospital) Health Center | 37-0159 | Owned by the City of Bethany, OK; HCA Health Services of Oklahoma, Inc. manages | Active | 4/1/95 | | OK | Bethany |
| Wagoner Community Hospital | 37-0166 | HTI merger | Triad Spin-Off | 6/1/79 | 5/11/99 | OK | Wagoner |

C,45

Current and Former Columbia/HCA Hospitals
(Includes all parent corporations)

| Name | HC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | CityAbbrev |
|---|---|---|---|---|---|---|---|
| ___ling Hospital | 37-0177 | HTI merger | | 1/1/87 | 2/10/88 | OK | |
| Specialty Hospital of Tulsa | 37-2007 | HTI merger | Sold to Hillcrest System | 5/5/94 | 12/23/98 | OK | Tulsa |
| Rehabilitation Institute of Oklahoma | 37-3025 | | | 1/1/87 | 6/7/88 | OK | |
| Douglas Medical Center (Community Hospital) | 38-0064 | HTI merger | Triad Spin-Off | 3/1/86 | 5/11/99 | OR | Roseburg |
| Hospital) | 38-0071 | HTI merger | | 1/1/71 | | OR | McMinnville |
| Haverford Hospital | 39-0215 | | | 8/1/81 | 10/24/91 | PA | |
| Providence Hospital | 42-0026 | of Charity | Active | 9/2/95 | | SC | Columbia |
| Colleton Regional Hospital | 42-0030 | HTI merger | Active | 1/1/82 | | SC | Walterboro |
| Marlboro Park Hospital | 42-0054 | Marlboro Park Hospital, Bennettsville, SC, sold 1/13/93 by HTI to Dynamic Health, Inc. | | 10/1/81 | 1/13/93 | SC | Bennettsville |
| Chesterfield General Hospital | 42-0062 | Chesterfield General Hospital, Cheraw, SC, sold 1/13/93 by HTI to Dynamic Health, Inc. | | 3/1/81 | 1/13/95 | SC | Cheraw |
| Doctor's Hospital of Spartanburg | 42-0076 | | closed | 8/1/88 | | SC | Spartanburg |
| Trident Regional Medical Center | 42-0079 | HCA merger | Active | 7/21/75 | | SC | Charleston |
| Summerville Medical Center | 42-0079 | This facility is the outpatient services center of Trident Regional Medical Center | | | | SC | Charleston |
| Aiken Regional Medical Center | 42-0082 | HCA merger | Asset exchange | 7/29/89 | | SC | Aiken |
| Grand Strand Regional Medical Center | 42-0085 | HCA merger | Active | 2/25/76 | 7/7/95 | SC | Myrtle Beach |
| Nashville Memorial Hospital | 44-0006 | HCA merger | Active | 4/21/78 | | TN | Madison |
| Sycamore Shoals Hospital | 44-0018 | HTI merger | Active | 12/6/93 | | TN | Elizabethton |
| Hillside Hospital | 44-0020 | HTI merger; Systems, Inc. and North Okaloosa Medical Center, Inc. | Sold to Johnson City Medical Center Hospital, Inc. | 7/1/81 | 9/1/98 | TN | Pulaski |
| Edgefield Hospital | 44-0026 | Edgefield Hospital, Nashville, TN, sold 8/31/90 by HTI to Edgefield (RedLeg) Healthcare Limited Partnership, Birmingham, AL. Center, Inc. | Lifepoint Spin-Off | 10/23/95 | 5/11/99 | TN | Nashville |
| Horizon Medical Center (Goodlark Regional Medical Center) | 44-0046 | Center, Inc. | Active | 1/1/81 | 8/31/90 | TN | Dickson |
| Emerald Hodgson Hospital (Sewanee Clinic) | 44-0058 | HTI merger | Lifepoint Spin-Off | 3/1/74 | 5/11/99 | TN | Sewanee |
| Southern Tennessee Medical Center | 44-0058 | HTI merger | Lifepoint Spin-Off | 4/1/93 | 5/11/99 | TN | Sewanee |
| Volunteer General Hospital | 44-0061 | HCA merger | Leased to Methodist Healthcare | 6/1/93 | 6/1/98 | TN | Martin |
| South Pittburg (Municipal) Hospital | 44-0064 | HTI merger | Active | 7/1/80 | | TN | South Pittburg |
| Lakeway Regional Hospital (Humana Hospital - Morristown) | 44-0067 | Galen merger | Sold to Community Health Systems | 8/26/81 | 5/27/95 | TN | Morristown |
| Athens Regional Medical Center | 44-0092 | HCA merger | Active | 10/16/78 | | TN | Athens |
| Johnson City Specialty Hospital | 44-0105 | HTI merger | Sold to Johnson City Medical Center Hospital, Inc. | 10/1/81 | 11/2/98 | TN | Johnson City |

C.46

Current and Former C₁ HCA Hospitals
(Includes all parent corporations)

HCA Hospitals

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Above |
|---|---|---|---|---|---|---|---|
| Humboldt Cedar Crest Hospital | 44-0415 | NT, sold 10/21/89 by ITI to Humboldt General Hospital, Inc., a Tennessee non-profit Corporation. | Sold | 9/17/87 | 10/21/89 | TN | Humboldt |
| Smyrna Hospital | 44-0434 | HCA converted to Ambulatory Care Center | | | | TN | Smyrna |
| Humana Hospital- McFarland | 44-0436 | 7/31/87; No longer licensed as hospital. Galen sold 5/1/90 | Active | 1/1/85 | 5/1/90 | TN | Lebanon |
| Benton Community Hospital | 44-0415 | 10/5/90 by ITI to Resource Housing of America, Atlanta, GA. | | 3/31/85 | 10/5/90 | TN | Camden |
| DeKalb General Hospital | 44-0448 | 7/31/92 by ITI to Nice Acquisition Corporation. | | | | | |
| Trinity Hospital | 44-0449 | ITI merger | Lifepoint Spin-Off | 1/1/69 | 7/31/92 | TN | Smithville |
| Summit Medical Center (Replaced Donelson Hospital) | 44-0450 | HCA merger | Active | 1/1/69 | 5/11/99 | TN | Erin |
| River Park Hospital | 44-0451 | ITI merger | Active | 1/1/70 | | TN | Hermitage |
| Parkridge Medical Center | 44-0456 | HCA merger | Active | 3/1/70 | | TN | McMinnville |
| Valley Psychiatric Hospital (includes Valley Hospital) | 44-0456 | HCA merger | Merged with Valley Hospital | 1/1/71 | | TN | Chattanooga |
| Centennial Medical Center (Park View) | 44-0461 | HCA merger | Active | 1/1/71 | 6/13/96 | TN | Chattanooga |
| Centennial Medical Center/Parthenon Pavilion | 44-1615 | HCA merger | Consolidated with Centennial Medical Center | 9/31/68 | 3/31/96 | TN | Nashville |
| Diagnostic Center | 44-0462 | | | 9/31/68 | 10/16/88 | TN | Nashville |
| Park West Medical Center | 44-0473 | | | 8/26/81 | 10/16/88 | TN | |
| Haywood Park Hospital | 44-0473 | | | 1/1/87 | 8/26/90 | TN | |
| Crockett General Hospital | 44-0474 | | | 1/1/87 | 4/1/88 | TN | |
| Indian Path Medical Center | 44-0475 | ITI merger | Lifepoint Spin-Off | 9/17/87 | 5/11/99 | TN | Lawrenceburg |
| East Ridge Hospital (part of Parkridge) | 44-0476 | HCA merger | Sold to Johnson City Medical Center Hospital, Inc. | 3/1/74 | 11/2/98 | TN | Kingsport |
| Northside Hospital | 44-0478 | Galen merger | Combined with Parkridge | 1/1/76 | 8/31/96 | TN | East Ridge |
| Smith County Memorial Hospital | 44-0484 | ITI merger | Sold to Johnson City Medical Center Hospital, Inc. | 5/1/80 | 10/16/98 | TN | Johnson City |
| Livingston Regional Hospital | 44-0486 | ITI merger | Lifepoint Spin-Off | 4/6/78 | 5/11/99 | TN | Carthage |
| Regional Hospital of Jackson | 44-0489 | HCA merger | Lifepoint Spin-Off | 7/14/76 | 5/11/99 | TN | Livingston |
| Hendersonville Hospital | 44-0494 | ITI merger | Leased (40 year lease) by Methodist Health Systems | 5/1/78 | 5/1/98 | TN | Jackson |
| Southern Hills Medical Center | 44-0497 | HCA merger | Active | 8/26/81 | | TN | Hendersonville |
| Stones River Hospital | 44-0200 | HTI merger | Active | 10/15/79 | | TN | Nashville |
| Cheatham Medical Center | 44-0205 | Center, Inc. | Active | 11/20/80 | | TN | Woodbury |
| Whitwell Medical Center (Hospital, part of South Pittsburgh) | 44-0211 | Corporation | Active | 7/7/95 | | TN | Ashland City |
| Indian Path Pavilion | 44-012 | HCA merger | Sold to Johnson City Medical Center Hospital, Inc. | 10/31/96 | | TN | Whitwell |
| Vanderbilt Child and Adolescent Psychiatric Hospital | 44-4986 | HCA merger | Sold to Vanderbilt Health Services, Inc. | 1/1/87 | 11/2/98 | TN | Kingsport |
| Gulf Coast Hospital | 45-0027 | Healthcare Corp. | | 1/1/87 | 4/30/99 | TN | Nashville |
| | | | | 8/26/81 | 9/1/92 | TX | Baytown |

result

outcome

Current and Former Co- of HCA Hospitals
(Includes all parent corporations)

| Name | MIC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | CityAbbrev |
|---|---|---|---|---|---|---|---|
| Plaza Medical Center - East (St. Joseph Hospital) | 45-0043 | Columbia purchased from HCA | Closed/Merged with C/HCA Plaza Medical Center of Ft. Worth | 1/1/87 | 7/1/95 | TX | Fort Worth |
| Westbury Hospital | 45-0060 | HTI merger | Closed | 9/1/88 | 7/31/95 | TX | Houston |
| Gilmer Medical Center | 45-0070 | HTI merger | Closed | 9/17/87 | 10/28/95 | TX | Gilmer |
| Southside Community Hospital | 45-0074 | Asset purchase | Sold to Memorial Hospital | 10/19/90 | 7/13/93 | TX | Corpus Christi |
| North Hills Hospital (formerly Glenview) | 45-0087 | HCA merger | Active | 8/26/81 | | TX | N. Richland Hills |
| Medical Center - Dallas SW | 45-0094 | C/HCA acquired in asset exchange with Universal Health Services, Inc. | Active | 7/7/95 | | TX | Dallas |
| Bayshore Medical Center | 45-0097 | HTI merger | Active | 11/25/68 | | TX | Pasadena |
| Hospital) | 45-0099 | HTI merger | Triad Spin-Off | 4/1/79 | 5/11/99 | TX | Pampa |
| Medical Center - West (Sun Towers Behavioral Health Center) | 45-0107 | purchased from Texas Psychiatric Company, Inc.; | Active | 1/1/87 | | TX | El Paso |
| Humana Hospital - Southmore | 45-0111 | Humana sold this facility to Pasadena Health Care Management, Inc. 8/30/90 | | | 8/30/90 | TX | Pasadena |
| Doctor's Regional Medical Center | 45-0118 | Galen merger | Active | 1/1/78 | | TX | Corpus Christi |
| East Houston Medical Center | 45-0126 | HTI merger | Closed | 8/26/81 | 8/1/98 | TX | Houston |
| Northwest Hospital (Riverside Hospital; Rosetown Hospital) | 45-0131 | HTI merger | Active | 9/26/88 | | TX | Corpus Christi |
| HEB Hospital a/k/a Northeast Community | 45-0142 | HTI merger | Closed | 8/26/81 | 5/31/96 | TX | Bedford |
| DeTar Hospital | 45-0147 | HTI merger | Lifepoint Spin-Off | 1/1/72 | 5/11/99 | TX | Victoria |
| Colonial Hospital | 45-0175 | | | 10/1/91 | 12/31/92 | TX | Terrell |
| Gulf Coast Medical Center (Wharton) | 45-0214 | HTI merger | Triad Spin-Off | 6/1/83 | 5/11/99 | TX | Wharton |
| Conroe Regional Medical Center | 45-0222 | HTI merger | Active | 5/14/93 | | TX | Conroe |
| Doctor's Hospital East Loop | 45-0259 | Galen merger | Sold to Heritage Care of East Houston | 4/25/94 | 7/16/98 | TX | Houston |
| Medical Center College Station (Brazos Valley Medical Center) | 45-0299 | HEI merger | Triad Spin-Off | 6/1/74 | 5/11/99 | TX | College Station |
| Rosewood Medical Center | 45-0320 | HEI merger | Active | 7/1/90 | | TX | Houston |
| Angelo) | 45-0340 | Care, Inc. | Triad Spin-Off | 1/1/90 | 5/11/99 | TX | San Angelo |
| Alice Regional Hospital (Alice Physicians & Surgeons Hospital) | 45-0353 | HTI merger | Triad Spin-Off | 9/1/88 | 5/11/99 | TX | Alice |
| San Jacinto Memorial Hospital | 45-0366 | HEI merger | Consolidated operations with Spring Branch - OP | 7/1/90 | 7/1/94 | TX | Houston |
| Southwest Texas Methodist Hospital | 45-0388 | Hospital | Active | 1/11/95 | | TX | San Antonio |
| Sherman) | 45-0393 | HTI merger | Triad Spin-Off | 9/1/88 | 5/11/99 | TX | Sherman |
| Westpark Medical Center Wyeong Medical Center | 45-0094 | | | 1/1/87 | 1/31/90 | TX | |
| Medical Center - McKinney (North Texas Medical Center) a/b/a North Central Medical Center | 45-0403 | HTI merger | Active | 9/1/88 | | TX | McKinney |
| Bellaire Medical Center | 45-0418 | Stock purchase from American Medical (Central), Inc. and Amisub (Bellaire), Inc. | Active | 4/1/92 | | TX | Houston |

C,148

**Current and Former HCA Hospitals**
(Includes all past corporations)

| Name | NCC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| St David's Medical Center | 45-0031 | System | Active | 4/30/96 | | TX | Austin |
| Havana Regional Hospital | 45-0047 | HCA merger | Triad Spin-Off | 1/1/80 | 5/11/99 | TX | Corsicana |
| Woodland Heights Medical Center | 45-0084 | HTI merger | Triad Spin-Off | 11/1/81 | 5/11/99 | TX | Lufkin |
| | | 8/31/93 by HTI to The Methodist Hospital | | | | | |
| Diagnostic Center Hospital | 45-0523 | System | | 11/6/69 | 8/31/93 | TX | Houston |
| Mainland Medical Center (Danforth Hospital) | 45-0530 | HTI merger | Active | 9/1/88 | | TX | Texas City |
| Humana Hospital-Baytown | 45-0535 | Sold by Galen 12/11/90 | | 1/1/85 | 12/11/90 | TX | Baytown |
| Alvin Medical Center | 45-0538 | HTI merger | Consolidated with Columbia Clear Lake Regional Medical Center (34336) | 9/1/88 | | TX | Webster |
| North Houston Med. Center (f/k/a Parkway) | 45-0544 | HTI merger | Active | 9/1/88 | | TX | Houston |
| Heights Hospital | 45-0546 | Asset purchase from AMI, Inc. | Sold to ATH Heights, Inc. and Beverly Enterprises | 4/1/92 | 8/31/94 | TX | Houston |
| North Houston Medical Center-Airline Campus (Doctor's Hospital Airline) | 45-0550 | C/HCA acquired from DHA - Acquisition, Inc. | Merged with North Houston Medical Center (Parkway) 9/1/96 and closed 6/30/98 | 10/31/95 | 6/30/98 | TX | Airline |
| Abilene Regional Medical Center | 45-0558 | Galen merger | Exchanged with Quorum Health Group | 1/1/85 | 5/1/94 | TX | Abilene |
| Silsbee Doctors Hospital | 45-0570 | HEI merger | Triad Spin-Off | 7/1/90 | 5/11/99 | TX | Silsbee |
| Brownwood Regional Medical Center | 45-0587 | HTI merger | Triad Spin-Off | 4/29/80 | 5/11/99 | TX | Brownwood |
| North Bay Hospital (Coastal Bend Hospital) | 45-0606 | HTI merger | Active | 9/1/88 | | TX | Aransas Pass |
| Clear Lake Regional Medical Center | 45-0617 | Galen merger | Active | 9/1/88 | | TX | Webster |
| Spring Branch Medical Center | 45-0630 | HCA merger | Active | 1/1/83 | | TX | Houston |
| Metropolitan | 45-0631 | Galen merger | Active | 8/26/81 | | TX | San Antonio |
| (Antonio) | 45-0633 | Galen merger | Transferred to San Antonio Regional Hospital, Inc. | 2/2/78 | | TX | San Antonio |
| Medical Center - Denton (Denton Regional) | 45-0634 | HTI merger | Active | 5/1/83 | 1/1/95 | TX | Denton |
| Doctors Hospital (Conroe) | 45-0637 | HTI merger | Closed / Facility Sold - replaced by Columbia Conroe Regional Medical Center | 9/1/88 | | TX | Conroe |
| Doctor's Hospital of Laredo | 45-0643 | HTI merger | Triad Spin-Off | 8/26/81 | 6/1/95 | TX | Laredo |
| West Houston Medical Center | 45-0644 | HCA merger | Active | 9/1/88 | 5/11/99 | TX | Houston |
| Medical Center - East (Vista Hills) | 45-0646 | CHC purchased from HTI (a spinoff of HCA) | Active | 8/26/81 | | TX | El Paso |
| Medical City Dallas (34325) | 45-0647 | Columbia acquisition (sublease) | Active | 1/1/87 | | TX | Dallas |
| | | | Contributed to Columbia Hospital at Medical City Dallas Subsidiary, LP Partnership - Active | 7/22/75 | | | |
| Medical Center - Plano (Willow Park Hospital) | 45-0651 | Galen merger | Active | 7/22/75 | | TX | Dallas |
| Medical Center Hospital (Medical Center Del Oro) | 45-0660 | HCA merger | Active | 12/14/87 | | TX | Plano |
| Valley Regional Medical Center | 45-0662 | HCA merger | Closed | 8/26/81 | 9/1/95 | TX | Houston |
| Neurological Center | 45-0666 | HTI merger | Active | 4/10/86 | | TX | Brownsville |
| Medical Center - Lewisville | 45-0669 | Galen merger | Triad Spin-Off | 1/1/85 | 5/11/99 | TX | Beaumont |
| | | HCA merger | Active | 7/16/87 | | TX | Lewisville |

C-49

Current and Former Co...
(Includes all parent corporations)
/HCA Hospitals

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| Plaza Medical Center of Ft Worth (Medical Plaza Houston) | 45-0672 | HCA merger | Active | 1/1/83 | | TX | Fort Worth |
| Women's Hospital of Texas (Women's & Children's Hospital) | 45-0674 | HCA merger | Active | 1/1/78 | | TX | San Antonio |
| Medical Center - Arlington | 45-0675 | HCA merger | Active | 9/1/76 | | TX | Arlington |
| Medical Center - Terrell | 45-0683 | HTI merger | Triad Spin-Off | 9/1/88 | 5/11/99 | TX | Terrell |
| UT Camps Memorial Hospital | 45-0694 | HTI merger | Lease Terminated | 9/17/87 | 1/31/96 | TX | El Campo |
| Medical Arts Hospital - Dallas | 45-0696 | HTI merger | Sold to Lifecare Medical Arts Hospital, LLP | 9/1/88 | 3/13/98 | TX | Dallas |
| Longview Regional Hospital | 45-0702 | HTI merger | Triad Spin-Off | 6/16/80 | 5/11/99 | TX | Longview |
| Medical Arts Hospital - Texarkana | 45-0703 | HTI merger | Closed | 9/1/88 | 12/31/97 | TX | Texarkana |
| Katy Medical Center | 45-0706 | HTI merger | Active | 9/1/88 | | TX | Katy |
| Rio Grande Regional Hospital | 45-0711 | HCA merger | Active | 9/1/88 | | TX | McAllen |
| South Hospital | | | Active | 8/27/82 | | TX | Austin |
| Medical Center - Lancaster (Midway Park General) | 45-0713 | HCA merger | JV: Contributed to St. David's Health Care System | 9/22/82 | | TX | Lancaster |
| Fort Bend Medical Center | 45-0717 | HTI merger | Active | 1/3/83 | | TX | Missouri City |
| Rock) | 45-0718 | HTI merger | Active | 9/1/88 | | TX | Round Rock |
| Mansfield Hospital | 45-0719 | 12/31/89 to Veneor, Inc., a Delaware Corporation | Sold | 1/1/87 | 12/31/89 | TX | Mansfield |
| Methodist Women's & Children's Hospital (Humana Women's & Children's Hospital) | 45-0725 | Galen merger | Active | 7/1/84 | | TX | San Antonio |
| Northeast Methodist Hospital (Village Oaks) | 45-0733 | Galen merger | Active | 9/17/87 | | TX | San Antonio |
| Denton Community Hospital | 45-0743 | HCA merger | Sold to Denton Hospital, Inc. | 1/1/87 | 11/19/96 | TX | Denton |
| TOPS Surgical Specialty Hospital | 45-0774 | | Active | 9/16/94 | | TX | Houston |
| Kingwood Medical Center | 45-0775 | Consolidations, Inc. | Active | 1/1/95 | | TX | Kingwood |
| Methodist Ambulatory Surgical Hospital - Northwest | 45-0780 | Medical Care America | Active | 9/16/94 | | TX | San Antonio |
| Surgicare Specialty Hospital | 45-0785 | | Active | 8/31/83 | | TX | Corpus Christi |
| Bay Area Medical Center | 45-0728 | Columbia opened facility | Active | 9/14/93 | | TX | Corpus Christi |
| Panhandle Surgical Hospital | 45-0802 | HTI merger | Triad Spin-Off | 12/15/94 | 5/11/99 | TX | Amarillo |
| Texas Orthopedic Hospital | 45-0804 | C/HCA acquisition | Active | 2/7/95 | | TX | Houston |
| Austin Diagnostic Medical Center (North Austin Medical Center) | 45-0809 | Joint Venture - Austin Diagnostic Clinic (29.25%) | Contributed to Columbia St. David's Healthcare System JV | 9/22/82 | | TX | Austin |
| Medical Center - Las Colinas | 45-0822 | Columbia/HCA built | Active | 8/25/97 | | TX | Irving |
| West Park Medical Center (West Park Surgery Center - Wysong Campus) | 45-1115 | HTI merger Enterprises, Inc. | Is a sub of North Central Medical Center, f/k/a North Texas Medical Center; Active | 1/17/90 | | TX | McKinney |
| Rehabilitation Hospital (of South Texas) | 45-3034 | | Active | 3/3/94 | | TX | Corpus Christi |
| St. David's Rehabilitation Center (see 6676) | 45-3038 | St. David's Health Care System | Active | 5/1/96 | | TX | Austin |

C,50

Current and Former
(includes all parent corporations)
HCA Hospitals

| Name | MC# | How CJ/HCA acquired | CJ/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|------|-----|---------------------|--------------------------|------------|----------|-------|-------------|
| Beaumont Medical & Surgical Hospital (Beaumont Neurological Center) | 45-4007 | HCA merger | Consolidated operations with Beaumont Medical & Surgical Hospital; Triad Spin-Off | 8/26/81 | 5/11/99 | TX | Beaumont |
| Belle Park Hospital | 45-4015 | HAI acquisition | closed | 8/26/81 | 8/27/93 | TX | Houston |
| Greenleaf Psychiatric Hospital | 45-4117 | Forum Group, Inc. | closed | 3/31/85 | 4/19/93 | TX | Killeen |
| Red River Hospital | 45-4018 | HAI acquisition | sold | 8/26/81 | 10/1/93 | TX | Wichita Falls |
| Houston International Hospital | 45-4020 | HAI acquisition. | closed | 8/26/81 | 11/1/90 | TX | Houston |
| Sun Belt Regional Hospital | 45-4027 | Healthcare Corp. acquisition | sold | 12/10/81 | | TX | El Paso |
| Shoal Creek Hospital | 45-4029 | HAI acquisition | sold | 8/26/81 | 7/1/93 | TX | Austin |
| Brazos Center for Psychiatry | 45-4032 | Forum Group, Inc. acquisition | sold | 3/31/85 | 12/21/92 | TX | Waco |
| Bayview) | 45-4032 | International, Inc. | Active | 4/1/86 | | TX | Corpus Christi |
| Gulf Pines Psychiatric Hospital | 45-4046 | HCA built | closed | 10/1/86 | 10/1/93 | TX | Houston |
| Hill Country Hospital | 45-4017 | | closed | 1/1/87 | 3/1/92 | TX | San Antonio |
| Richland Hospital | 45-4051 | HCA built | sold | 3/1/87 | 7/1/93 | TX | North Richland |
| St. David's Pavilion | 45-4069 | St. David's Health Care System | Active | 5/1/96 | | TX | Austin |
| Deer Park Hospital | 45-4080 | HAI acquisition | closed | 8/26/81 | 2/12/93 | TX | |
| Columbia Behavioral Center | 45-5071 | HCA acquired from Healthcare Corporation | Active | 12/10/81 | | TX | |
| Ogden Regional Medical Center | 46-0005 | HTI merger | Active | 8/15/94 | | UT | Ogden |
| Pioneer Valley Hospital | 46-0008 | HTI merger | Sold (FTC consent decree) (asset exchange) with Paracelsus | 1/27/79 | 5/17/96 | UT | West Valley City |
| Castleview Hospital | 46-0011 | HTI merger | Paracelsus | 2/1/79 | 5/11/99 | UT | Price |
| Mountain View Hospital | 46-0013 | HTI merger | Lifepoint Spin-Off | 10/1/77 | | UT | Payson |
| Ashley Valley Medical Center | 46-0017 | HTI merger | Active | 7/31/76 | | UT | Brigham City |
| Davis Hospital & Medical Center | 46-0030 | HTI merger | Active | 1/1/80 | 5/11/99 | UT | Vernal |
| Lakeview Hospital (South Davis Community Hospital) | 46-0041 | Galen merger | Lifepoint Spin-Off | 1/11/76 | 5/17/96 | UT | Layton |
| St. Mark's Hospital | 46-0042 | HTI merger | Sold to Paracelsus Healthcare Corp. | 9/19/76 | | UT | Bountiful |
| | 46-0017 | HCA merger | Active | 12/31/87 | | UT | Salt Lake City |
| Jordan Valley Hospital (Holy Cross) Rehab) | 46-0051 | HTI merger | Sold to Champion Healthcare Holdings, Inc. (Facility was divested 11/9/95 pursuant to FTC requirement) | 12/3/93 | 2/29/96 | UT | West Jordan |
| Humana Hospital, Richmond | 49-0014 | Joint Venture - Arlington Healthcare System | Active | 11/1/96 | | VA | Arlington |
| John Randolph Medical Center | 49-0015 | Galen sold 9/9/91 | Sold | | 9/9/91 | VA | Richmond |
| | 49-0020 | Authority | Active | 5/31/95 | | VA | Hopewell |
| Johnston-Willis Hospital | 49-0026 | HCA merger | Consolidated operations with Chippenham Medical Center | 11/8/68 | 1/1/96 | VA | Richmond |
| Lewis-Gale Medical Center | 49-0048 | HCA merger | Active | 1/1/87 | | VA | Salem |

C.51

**Current and Former C /HCA Hospitals**
(Includes all parent corporations)

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|---|---|---|---|---|---|---|---|
| Arlington Hospital | 49-0060 | Joint venture with the Board of Trustees of the Arlington Hospital Association in Arlington, VA | Active | 11/1/96 | | VA | Arlington |
| Clinch Valley Medical Center | 49-0060 | Galen merger | Active | 8/26/81 | | VA | Richlands |
| Retreat Hospital, Inc. | 49-0071 | Inc. | Active | 7/1/95 | | VA | Richmond |
| Northern Virginia Doctors Hospital | 49-0073 | HTI merger | Sold to Vencor, Inc. | 11/1/82 | 5/17/95 | VA | Arlington |
| Reston Hospital Center (was 34633) | 49-0107 | HCA merger | Joint Venture with the Board of Trustees of the Arlington Hospital Association in Arlington, VA | 11/9/86 | 11/1/96 | VA | Reston |
| Montgomery Regional Hospital | 49-0110 | HTI merger | Active | 8/30/71 | | VA | Blacksburg |
| Chippenham Medical Center (Johnston-Willis Hospital) | 49-0112 | HCA merger | Active | 9/1/72 | | VA | Richmond |
| Pulaski Community Hospital | 49-0116 | HTI merger | Active | 9/15/73 | | VA | Pulaski |
| Henrico Doctors Hospital | 49-0118 | HTI merger | Active | 8/26/81 | | VA | Richmond |
| Humana Hospital- Bayside | 49-0119 | HCA merger | Active | 1/1/85 | 8/31/90 | VA | Virginia Beach |
| Allegheny Regional Hospital | 49-0126 | Stock Purchase from Allegheny Highlands Healthcare Services, Inc. | Active | 7/1/95 | | VA | Low Moor |
| Peninsula Psychiatric Hospital | 49-0001 | HCA merger | Active | 8/26/81 | | VA | Hampton |
| Psychiatric Center) | 49-0015 | HCA merger | Consolidated with Lewis-Gale Hospital | 1/1/87 | | VA | Salem |
| Poplar Springs Hospital (Petersburg Psychiatric Hospital) | 49-0022 | HCA merger | Sold to PSH Acquisition Corporation (pursuant to FTC) | 8/26/81 | 2/15/97 | VA | Petersburg |
| Dominion Hospital | 49-0023 | HCA merger | Contributed to JV with the Board of Trustees of the Arlington Hospital Ass'n. Arlington, VA | 8/26/81 | | VA | Falls Church |
| Barcroft Institute | 49-6525 | HCA closed this facility 7/19/91 | closed | 8/26/81 | | VA | |
| Capitol Medical Center | 50-0139 | HTI merger | Active | 1/16/85 | | WA | Olympia |
| Greenbrier Valley Medical Center | 51-0002 | Galen merger | Sold to NetCare | 1/1/74 | 11/19/98 | WV | Ronceverte |
| Raleigh General Hospital | 51-0006 | HCA merger | Consolidated with C/HCA Raleigh General Hospital | 7/31/69 | | WV | Beckley |
| St. Francis Hospital | 51-0031 | Galen merger | Active | 2/28/95 | | WV | Charleston |
| St. Joseph's Hospital (50/50 JV) | 51-0033 | Joint Venture - St. Joseph's | Active | 8/1/96 | | WV | Parkersburg |
| St. Luke's Hospital (Humana Hospital St. Luke's) | 51-0067 | Galen merger | Per Contribution Agreement, Galen of West Virginia, Inc. holds 40% membership interest | 4/30/74 | | WV | Bluefield |
| Beckley Hospital | 51-0070 | Stock purchase following asset contribution | Active | 6/13/97 | 2/1/99 | WV | Beckley |
| Putnam General Hospital | 51-0085 | HCA merger | Active | 3/1/85 | | WV | Hurricane |
| Parkway Regional Hospital | 51-0014 | HCA merger | Active | 2/10/94 | | WV | Huntington |
| Riverton Memorial Hospital | 52-4033 | HAI acquisition | sold | 8/26/81 | 12/31/93 | WY | Riverton |
| | 53-0008 | HTI merger | Lifepoint Spin-Off | 11/5/81 | 5/11/99 | WI | Madison |
| Spalding - Cheyenne Rehab | 53-5044 | HTI merger | Active | 10/31/95 | | WY | Cheyenne |

C.52

Current and Former Col     .ICA Hospitals
(Includes all parent corporations)

| Name | MC # | How C/HCA acquired | C/HCA OWNERSHIP STATUS | Start Date | End Date | State | City/Abbrev |
|------|------|--------------------|------------------------|------------|----------|-------|-------------|
| Cross Roads Residential Center | | sold 12/31/91 by HTI to Cardena Physicians Hospital, Inc. | sold | 1/1/87 | 10/1/92 | CA | |
| North Star Hospital | | | | 4/30/96 | 8/1/96 | | |
| Willow Springs Center | | Asset purchase from Samissa Corporation | Contributed to JV with Charter | 1/1/89 | 7/1/93 | | |
| Cedar Crest RTC | | | | 1/1/89 | 7/1/93 | | |
| The Aurora Pavilion | | | | 1/1/92 | 12/31/93 | SC | |
| Truckee-Meadows-North/Pinebrook Center | | | | 1/1/87 | 5/31/90 | | |
| Sonora Desert Psychiatric Hospital | | | Closed | 1/1/87 | 5/29/92 | | |
| Champions Treatment Center | | | Closed | 8/6/93 | 6/15/97 | | |
| Tri-County Medical Center | | CHC acquisition, Humana sold 10/21/80 | Sold before Galen merger | | 10/21/80 | | |
| Seminole Hospital and Women's Center (Women's Hospital & Medical Center) | | Medical Center, Inc. and Community Health Systems, Inc. | Consolidated with University Hospital and closed; | 3/4/80 | 10/1/96 | | |

C,53

Attachment 3— CC DRGs

| | | |
|---|---|---|
| 7 | 182 | 320 |
| 10 | 188 | 323 |
| 16 | 191 | 325 |
| 18 | 193 | 328 |
| 24 | 195 | 331 |
| 28 | 197 | 334 |
| 31 | 205 | 336 |
| 34 | 207 | 346 |
| 46 | 210 | 348 |
| 68 | 214 | 354 |
| 83 | 218 | 358 |
| 85 | 221 | 366 |
| 89 | 223 | 370 |
| 92 | 226 | 383 |
| 94 | 228 | 398 |
| 96 | 233 | 401 |
| 99 | 240 | 403 |
| 101 | 244 | 406 |
| 110 | 250 | 413 |
| 130 | 253 | 419 |
| 135 | 257 | 434 |
| 141 | 259 | 442 |
| 144 | 263 | 444 |
| 146 | 265 | 449 |
| 148 | 269 | 452 |
| 150 | 272 | 454 |
| 152 | 274 | 463 |
| 154 | 277 | 478 |
| 157 | 280 | 493 |
| 159 | 283 | |
| 161 | 292 | |
| 164 | 296 | |
| 166 | 300 | |
| 168 | 304 | |
| 170 | 306 | |
| 172 | 308 | |
| 174 | 310 | |
| 177 | 312 | |
| 180 | 318 | |

C,54

# Attachment No. 4

## Columbia/HCA
### Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Columbia Alaska Regional Hospital | 020017 | 30201 | Columbia Alaska Regional Home Health | 027022 | 6595 | Parent | 2801 DeBarr Road, 7th Floor | Anchorage | AK | 99508 |
| 2 | Columbia Andalusia Regional Hospital | 010036 | 30119 | Columbia Homecare Covington | 017121 | 30176 | Parent | 209 Dunson Street | Andalusia | AL | 36420 |
| 3 | Columbia Andalusia Regional Hospital | 010036 | 30119 | Columbia Homecare Covington | 017121 | 30176 | Branch | 1410 E. 5th Avenue | Florala | AL | 36442 |
| 4 | Columbia Regional Medical Center | 010081 | 30134 | Columbia Homecare Regional | 017319 | 30180 | Parent | 4745 Court Street, Suite 120 | Montgomery | AL | 36104 |
| 5 | Columbia Regional Medical Center | 010081 | 30134 | Columbia Homecare Regional | 017319 | 30180 | Branch | 350 Taylor Road, Suite 2600 & 2700 | Montgomery | AL | 36117 |
| 6 | Columbia Regional Medical Center | 010081 | 30134 | Columbia Homecare Regional | 017319 | 30180 | Branch | 306 Park Plaza | Clanton | AL | 35045 |
| 7 | Columbia Regional Medical Center | 010081 | 30134 | Columbia Homecare Regional | 017319 | 30180 | Branch | 466A East Main Street | Prattville | AL | 36067 |
| 8 | Columbia Regional Medical Center | 010081 | 30134 | Columbia Homecare Regional | 017131 | 30180 | Admin | 746 Adams Avenue | Montgomery | AL | 36104 |
| 9 | Columbia Northwest Medical Center | 010094 | 30110 | Columbia Homecare Northwest | 017319 | 30013 | Parent | 719 Highway 43, Suite F | Russellville | AL | 35653 |
| 10 | Columbia Four Rivers Medical Center | 010118 | 30116 | Columbia Homecare Camden | 017320 | 30179 | Branch | 219 Claiborne Street | Camden | AL | 36726 |
| 11 | Columbia Four Rivers Medical Center | 010118 | 30116 | Columbia Homecare Demopolis | 017320 | 30179 | Branch | 1050 Bailey Drive | Demopolis | AL | 36732 |
| 12 | Columbia Four Rivers Medical Center | 010118 | 30116 | Columbia Homecare Gilbertown | 017320 | 30179 | Branch | Suite #2, Gilbertown Plaza | Gilbertown | AL | 36908 |
| 13 | Columbia Four Rivers Medical Center | 010118 | 30116 | Columbia Homecare Grove Hill | 017320 | 30179 | Branch | 127-C Clarke Street | Grove Hill | AL | 36451 |
| 14 | Columbia Four Rivers Medical Center | 010118 | 30116 | Columbia Homecare Marion | 017320 | 30179 | Branch | 421 Washington Street | Marion | AL | 36756 |
| 15 | Columbia Four Rivers Medical Center | 010118 | 30116 | Columbia Homecare Selma | 017320 | 30179 | Parent | 1792 Highway 14 East | Selma | AL | 36701 |
| 16 | Columbia Four Rivers Medical Center | 010118 | 30116 | Columbia Homecare Selma | 017320 | 30179 | Admin | 1015 Medical Center Park | Selma | AL | 36701 |

C,55

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|----------|-------------|-------------|--------|------------|------------|--------|---------|------|-------|-----|
| 17 | Columbia Medical Center of Huntsville | 010011 | 30124 | Columbia Homecare Huntsville | 017030 | 6788 | Parent | 2905 Westcorp Blvd., Suite 119 | Huntsville | AL | 35805 |
| 18 | Columbia Medical Arts Hospital at Texarkana | 150703 | 38333 | Columbia Homecare Northeast Texas | 097140 | 39214 | Parent | 1623 Arkansas Blvd | Texarkana | AR | 71854 |
| 19 | Medical Center of South Arkansas | 040088 | 30316 | MCSA Home Health Care | 047021 | 30417 | Parent | 460 West Oak, P.O. Box 1998 | El Dorado | AR | 71731-1998 |
| 20 | Medical Center of South Arkansas | 040088 | 30316 | MCSA Home Health Care | 047021 | 30417 | Branch | 9671 Strong Hwy. | Strong | AR | 71765 |
| 21 | Columbia Medical Park Hospital | 040091 | 30406 | Columbia Homecare Hope | 047091 | 30413 | Parent | 2418 Hwy. 73 E, P.O. Box 1537 | Hope | AR | 71802 |
| 22 | Columbia Medical Park Hospital | 040091 | 30406 | Columbia Homecare Hope | 047091 | 30413 | Branch | P.O. Box 987, Hwy. 82 | Lewisville | AR | 71845 |
| 23 | Columbia Medical Park Hospital | 040091 | 30406 | Columbia Homecare Hope | 047091 | 30413 | Branch | 1705 Eastridge Drive | Magnolia | AR | 71753 |
| 24 | Columbia Medical Park Hospital | 040091 | 30406 | Columbia Homecare Hope | 047091 | 30413 | Branch | 210 S. Main | Nashville | AR | 71852 |
| 25 | Columbia Medical Park Hospital | 040091 | 30406 | Columbia Homecare Hope | 047091 | 30413 | Branch | 120 W. 2nd North | Prescott | AR | 71857 |
| 26 | Columbia Medical Park Hospital | 040091 | 30406 | Columbia Homecare Glenwood | 017344 | 30413 | Sub-Unit | 100 Mountain View, Suite 2 | Glenwood | AR | 71943 |
| 27 | Columbia Medical Park Hospital | 040091 | 30406 | Columbia Homecare Camden | 047345 | 30413 | Sub-Unit | 1137 Washington S.W., Unit 113 | Camden | AR | 71701 |
| 28 | Columbia DeQueen Regional Medical Center | 040107 | 30107 | Columbia Homecare DeQueen | 047150 | 30411 | Parent | 821 N. Maple | DeQueen | AR | 71832 |
| 29 | Columbia Medical Center Phoenix | 030008 | 30301 | Columbia Homecare Medical Center Phoenix | 037137A | 30318 | Parent | 1901 East Thomas, Suite 208 | Phoenix | AZ | 85016 |
| 30 | Columbia El Dorado Hospital | 030016 | 30316 | Columbia Homecare El Dorado | 037147 | 30326 | Parent | 1200 North El Dorado Place, Suite 550 E | Tucson | AZ | 85715 |
| 31 | Columbia Paradise Valley Hospital | 030083 | 30306 | Columbia Homecare Paradise Valley | 037172 | 30319 | Parent | 16601 North 40th Street, Suite 101A | Phoenix | AZ | 85032 |
| 32 | Columbia Northwest Medical Ctr. | 030085 | 30317 | Columbia Homecare Northwest | 037153 | 30325 | Parent | 2001 W. Orange Grove Road, #202 | Tucson | AZ | 85704 |

C, 50

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | Columbia West Valley Medical Center | 130014 | 31201 | Columbia Homecare Alturas | 137006 | 31201 | Branch | 114 W. 3rd Street | Alturas | CA | 96101 |
| 34 | Riverside Community Hospital | 050022 | 7150 | Riverside Community Hospital/Home Health | 057682 | 7151 | Parent | 4445 Magnolia Avenue, 2nd Floor | Riverside | CA | 92501 |
| 35 | Columbia San Jose Medical Center | 050215 | 30574 | Columbia Homecare and Hospice-San Jose | 057012 | 30580 | Parent | 2025 Gateway Place, Suite 260 | San Jose | CA | 95110 |
| 36 | Columbia San Jose Medical Center | 050215 | 30574 | Columbia Homecare and Hospice-San Jose | 057012 | 30579 | Branch | 7855 Wren Avenue, Suite D | Gilroy | CA | 95020 |
| 37 | Columbia San Leandro Hospital | 050264 | 30512 | Columbia Homecare-San Leandro | 557410 | 30520 | Parent | 151 Callan Avenue, Suite 212 | San Leandro | CA | 94578 |
| 38 | Columbia Healdsburg General Hospital | 050331 | 30538 | Columbia Homecare Healdsburg | 057612 | 6614 | Parent | 911 Medical Center Plaza, Suite 24 | Windsor | CA | 95492 |
| 39 | Columbia Palm Drive Hospital | 050385 | 30516 | Columbia Homecare Palm Drive | 557295 | 6615 | Parent | 652 Petaluma Avenue, Suite D | Sebastopol | CA | 95472 |
| 40 | Columbia West Anaheim Medical Center | 050426 | 30502 | Columbia Homecare West Anaheim | 557548 | 30543 | Parent | 3055 West Orange Avenue, Suite 201 | Anaheim | CA | 92804 |
| 41 | Columbia West Hills Medical Center | 050481 | 30404 | Columbia Homecare West Hills | 557122 | 30516 | Parent | 7320 Woodlake Avenue, Suite 110 | West Hills | CA | 91307 |
| 42 | Columbia Los Robles Hospital and Medical Center | 050549 | 30555 | Columbia Homecare Los Robles | 557517 | 30582 | Parent | 2190 Lynn Road, Suite 320 | Thousand Oaks | CA | 91360 |
| 43 | Columbia San Clemente Hospital and Medical Center | 050585 | 30596 | Columbia Homecare-San Clemente | 557717 | 6591 | Parent | 651 Camino de los Mares, Suite 104 | San Clemente | CA | 92673 |
| 44 | Columbia Chino Valley Medical Center | 050586 | 30532 | Columbia Homecare Chino Valley | 057630 | 30569 | Parent | 12401 Central Avenue | Chino | CA | 91710 |
| 45 | Columbia Mission Bay Memorial Hospital | 050598 | 30535 | Columbia Homecare Mission Bay | 557009 | 30568 | Parent | 4901 Morena Blvd, Suite 214 | San Diego | CA | 92117 |
| 46 | Columbia Rose Medical Center | 060032 | 30619 | Columbia Homecare Colorado | 067113 | 35617 | Parent | 8565 S. Poplar Way | Littleton | CO | 80126 |
| 47 | Columbia Rose Medical Center | 060032 | 30619 | Columbia Homecare Colorado | 067113 | 35617 | Branch | 550 E. Thornton Parkway, #202 | Thornton | CO | 80229 |
| 48 | Columbia Rose Medical Center | 060032 | 30619 | Columbia Homecare Colorado | 067113 | 35617 | Branch | 8565 S. Poplar Way | Littleton | CO | 80126 |

C,57

**Columbia/HCA**
**Home Health Agency List for 1996 and 1997**

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 | North Suburban Medical Center | 060065 | 30667 | Columbia Homecare Colorado | 067245 | Y6631 | Parent | 550 E. Thornton Parkway, Suite 202 | Thornton | CO | 80229 |
| 50 | North Suburban Medical Center | 060065 | 30667 | Columbia Homecare Colorado | 067245 | 35631 | Branch | 696 Mountain View, Suite 4 | Longmont | CO | 80501 |
| 51 | Aurora Regional Medical Center | 060100 | 30666 | Columbia Homecare Colorado | 067102 | 35630 | Parent | 1400 S. Potomac Street, Suite 200 | Aurora | CO | 80012 |
| 52 | Columbia Homecare Group | Freestanding | N/A | Columbia Homecare | 067083 | 30652 | Parent | 425 S. Cherry, #800 | Denver | CO | 80222 |
| 53 | Columbia Cedars Medical Center | 100009 | 35932 | Columbia Homecare | 107081 | 35935 | Parent | 1400 NW 12th Avenue, 4th Floor | Miami | FL | 33136 |
| 54 | Columbia Twin Cities Hospital | 100054 | 30948 | Columbia Homecare | 107240A | 38958 | Parent | 490 Highway 85 North | Niceville | FL | 32578 |
| 55 | Columbia Twin Cities Hospital | 100054 | 30948 | Columbia Homecare | 107240A | 38958 | Branch | 2221 S. Ferdon Blvd. | Crestview | FL | 32536-9433 |
| 56 | Columbia Miami Heart Institute | 100060 | 35930 | Columbia Homecare | 107096A | 36982 | Parent | 1111 Park Centre Blvd, Suite 480 | Miami | FL | 33169 |
| 57 | Columbia Medical Center - Peninsula | 100068 | 38988 | Columbia Homecare Peninsula | 107121 | 6551 | Parent | 1236 Oceanshore Blvd. | Ormond Beach | FL | 32176 |
| 58 | Columbia Medical Center - Peninsula | 100068 | 38988 | Columbia Homecare Peninsula | 107121 | 6551 | Branch | 25 Old King's Road | Palm Coast | FL | 32137 |
| 59 | Columbia JFK Medical Center | 100080 | 37969 | Columbia Homecare Palm Beach County | 107111 | 37970 | Parent | 2829 B 10th Avenue North | Lake Worth | FL | 33461 |
| 60 | Columbia JFK Medical Center | 100080 | 37969 | Columbia Homecare Palm Beach County | 107111 | 37970 | Branch | 1100 N. Main Street, Suite D | Belle Glade | FL | 33430 |
| 61 | Columbia JFK Medical Center | 100080 | 37969 | Columbia Homecare Palm Beach County | 107111 | 37970 | Branch | 2700 PGA Blvd, Suite 106 | Palm Beach Gardens | FL | 33410 |
| 62 | Columbia East Pointe Hospital | 100107 | 37932 | Able Care | 102295B | 38974 | Parent | 401-A Ida Street | Lehigh Acres | FL | 33936 |
| 63 | Columbia Hamilton Medical Center | 100108 | 36993 | Columbia Homecare Hamilton | 107474 | 6005 | Parent | Hwy. 129 N & Shady Oak Lane | Jasper | FL | 32052 |
| 64 | Columbia Medical Center - Osceola | 100110 | 30902 | Columbia Homecare Kissimmee | 107112 | 35993 | Parent | 501 E. Oak Street, Suite B | Kissimmee | FL | 34741 |

C, 58

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 65 | Columbia Medical Center - Osceola | 100110 | 30902 | Columbia Homecare Osceola | 107112 | 35993 | Admin | 700 West Oak Street | Kissimmee | FL | 34741-4900 |
| 66 | Columbia Medical Center - Osceola | 100110 | 30902 | Columbia Homecare St. Cloud | 107112 | 35993 | Branch | 1700 13th Street, Suite 1 | St. Cloud | FL | 34769 |
| 67 | Columbia Medical Center - Osceola | 100110 | 30902 | Trico Home Health Services - Barefoot Bay | 107112 | 35991 | Branch | 937 Barefoot Blvd., Suite B | Barefoot Bay | FL | 32976 |
| 68 | Columbia Medical Center - Osceola | 100110 | 30902 | Trico Home Health Services - Cocoa | 107112 | 35994 | Branch | 3815 N. US. Hwy. 1 | Cocoa | FL | 32926 |
| 69 | Columbia Medical Center - Osceola | 100110 | 30902 | Trico Home Health Services - Melbourne | 107112 | 35989 | Branch | 1600 Sarno Road, Suite 215 | Melbourne | FL | 32935 |
| 70 | Columbia Medical Center - Osceola | 100110 | 30902 | Trico Home Health Services - Palm Bay | 107112 | 35991 | Branch | 1071 Port Malabar Blvd. N.E., Suite 203 | Palm Bay | FL | 32905 |
| 71 | Columbia Medical Center - Osceola | 100110 | 30902 | Trico Home Health Services - Palm Bay | 107293 | 35991 | Parent | 1071 Port Malabar Blvd. N.E., Suite 203 | Palm Bay | FL | 32905 |
| 72 | Columbia Aventura Hospital and Medical Center | 100131 | 30920 | Columbia Homecare | 107109A | 36961 | Parent | 640 E. Hallandale Beach Blvd. | Hallandale | FL | 33009 |
| 73 | Columbia Lake City Medical Center | 100156 | 37938 | Columbia Homecare Branford | 107420 | 38940 | Branch | 210 Suwannee Avenue | Branford | FL | 32008 |
| 74 | Columbia Lake City Medical Center | 100156 | 37938 | Columbia Homecare Lake City | 107420 | 38940 | Parent | 4580 Commerce Blvd., Route 18, Box 2 | Lake City | FL | 32025 |
| 75 | Columbia Lake City Medical Center | 100156 | 37938 | Columbia Homecare Live Oak | 107420 | 38940 | Branch | 1431 North Ohio Avenue | Live Oak | FL | 32060 |
| 76 | Columbia Lake City Medical Center | 100156 | 37938 | Columbia Homecare Live Oak | 107370A | 38940 | Parent | 1431 North Ohio Avenue | Live Oak | FL | 32060 |
| 77 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare DeLand | 107304 | 38945 | Branch | 145 East Rich Avenue | DeLand | FL | 32724 |
| 78 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Deltona | 107304 | 38945 | Branch | 1200 Deltona Blvd., Suite 61 | Deltona | FL | 32725 |
| 79 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Lake Mary | 107304 | 38945 | Admin | 100 Waymont Court, Suite 120 | Lake Mary | FL | 32746 |
| 80 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Sanford | 107301 | 38945 | Parent | 1401 W. Seminole Blvd. | Sanford | FL | 32771 |

C, 59

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 81 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare | 107338 | 38918 | Parent | 220 S. Ridgewood Avenue, Suite 230 | Daytona Beach | FL | 32114 |
| 82 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare New Smyrna Beach | 107338 | 38948 | Branch | 505 Canal Street | New Smyrna Beach | FL | 32106 |
| 83 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Port Orange | 107338 | 38918 | Branch | 3930 S. Nova Road, Suite 301 | Port Orange | FL | 32127 |
| 84 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Sanford | 107102 | 37992 | Parent | 1401 W. Seminole Blvd. | Sanford | FL | 32771 |
| 85 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Daytona | 107161A | 6738 | Parent | 220 S. Ridgewood Avenue, Suite 230 | Daytona Beach | FL | 32114 |
| 86 | Winter Park Memorial Hospital | 100162 | 35977 | Park Home Care | 107161 | 35984 | Parent | 1604 Dodd Road | Winter Park | FL | 32792 |
| 87 | Winter Park Memorial Hospital | 100162 | 35977 | Park Home Care | 107234 | 35983 | Parent | 1992 Mizell Avenue | Winter Park | FL | 32792 |
| 88 | Winter Park Memorial Hospital | 100162 | 35977 | Park Home Care | 107234 | 35983 | Branch | 1604 Dodd Road | Winter Park | FL | 32792 |
| 89 | Winter Park Memorial Hospital | 100162 | 35977 | Park Home Care | 107257 | 35978 | Parent | 1604 Dodd Road | Winter Park | FL | 32792 |
| 90 | Winter Park Memorial Hospital | 100162 | 35977 | Trico Home Health Services - Titusville | 107377 | 35981 | Parent | 1295 S. Park Avenue | Titusville | FL | 32796 |
| 91 | Columbia Doctors Hospital of Sarasota | 100166 | 36930 | Columbia Homecare Sarasota | 107105 | 36950 | Parent | 7400 S. Tamiami Trail | Sarasota | FL | 34231 |
| 92 | Columbia Doctors Hospital of Sarasota | 100166 | 36930 | Columbia Homecare Sarasota | 107132A | 36951 | Parent | 7400 S. Tamiami Trail | Sarasota | FL | 34231 |
| 93 | Columbia Doctors Hospital of Sarasota | 100166 | 36930 | Columbia Homecare Sarasota | 107198A | 36952 | Parent | 7400 S. Tamiami Trail | Sarasota | FL | 34231 |
| 94 | Columbia Clearwater Community Hospital | 100174 | 37953 | Columbia Homecare | 107273 | 38927 | Parent | 1721 Main Street | Dunedin | FL | 34698 |
| 95 | Columbia Memorial Hospital Jacksonville | 100179 | 36957 | Columbia Homecare | 107102A | 38962 | Parent | 1965 Beach Way Road, Suite 100 | Jacksonville | FL | 32207 |
| 96 | Columbia Memorial Hospital Jacksonville | 100179 | 36957 | Columbia Homecare | 107290A | 38962 | Parent | 1965 Beach Way Road, Suite 100 | Jacksonville | FL | 32207 |

Page 6 of 28

C, 60

ColumbiaHCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 97 | Columbia St. Petersburg Medical Center | 100180 | 30901 | Columbia Homecare | 107084 | 36975 | Parent | 5510 Gulfport Blvd. South | Gulfport | FL | 33707 |
| 98 | Columbia St. Petersburg Medical Center | 100180 | 30901 | Columbia Homecare | 107084 | 36975 | Branch | 5535 Park Street North, Eagle Park | St. Petersburg | FL | 33709 |
| 99 | Columbia Northwest Medical Center | 100189 | 30995 | Columbia Homecare Boca | 107498 | 7077 | Parent | 880 N. W. 13th Street, Suite 101 | Boca Raton | FL | 33486 |
| 100 | Columbia Northwest Medical Center | 100189 | 30995 | Columbia Homecare Ft. Lauderdale | 107490A | 36980 | Parent | 3600 W. Commercial Blvd, Suite 201 | Ft. Lauderdale | FL | 33309 |
| 101 | Columbia Northwest Medical Center | 100189 | 30995 | Columbia Homecare Northwest | 107490A | 36980 | Branch | 5800 Colonial Drive, #200 | Margate | FL | 33063 |
| 102 | Columbia New Port Richey Hospital | 100191 | 30941 | Columbia Homecare | 107311A | 36965 | Parent | 5622 Marine Parkway, #3 | New Port Richey | FL | 34652 |
| 103 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107340 | 38925 | Parent | Highway 26 North, Route 1, Box 1032 | Trenton | FL | 32693 |
| 104 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107357 | 38925 | Parent | 319 West Call Street, Suite B | Starke | FL | 32091 |
| 105 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107175A | 38925 | Parent | 319 West Call Street, Suite B | Starke | FL | 32091 |
| 106 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107486A | 38925 | Parent | 1004 N.W. 57th Street | Gainesville | FL | 32605 |
| 107 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107486A | 38925 | Branch | 319 West Call Street, Suite C | Starke | FL | 32091 |
| 108 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107486A | 38925 | Branch | 1109 N. W. 22nd Avenue, P.O. Box 1518 | Chiefland | FL | 32626 |
| 109 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107486A | 38925 | Branch | 728 E. W. State Road 26 | Trenton | FL | 32693 |
| 110 | Columbia North Florida Regional Medical Center | 100204 | 30916 | Columbia Homecare North Florida | 107486A | 38925 | Branch | 240 N. E. 1st Avenue | High Springs | FL | 32643 |
| 111 | Columbia Kendall Medical Center | 100209 | 35911 | Columbia Homecare | 107267A | 36991 | Parent | 11750 Bird Road | Miami | FL | 33175 |
| 112 | Columbia Dade City Hospital | 100211 | 30907 | Columbia Homecare | 107148 | 38970 | Parent | 206 South Florida Avenue | Bushnell | FL | 33513 |

07/20/2000

C.61

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PRIV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|----------|-------------|-------------|--------|------------|------------|--------|---------|------|-------|-----|
| 113 | Columbia Dade City Hospital | 100211 | 30907 | Columbia Homecare | 107312A | 36948 | Parent | 37802 Medical Arts Court, Bldg. 3 | Zephyrhills | FL | 33541 |
| 114 | Columbia Dade City Hospital | 100211 | 30907 | Columbia Homecare | 107312A | 38915 | Branch | 6014 US Highway 19, Suite 100 | New Port Richey | FL | 34652 |
| 115 | Ocala Regional Medical Center | 100212 | 30927 | Columbia Homecare | 107512 | 38923 | Parent | 18810 U. S. Hwy. 441 | Mt. Dora | FL | 32757 |
| 116 | Ocala Regional Medical Center | 100212 | 30927 | Columbia Homecare | 107512 | 38923 | Branch | 9030 West Ft. Island Trail, Suite 9A | Crystal River | FL | 34429 |
| 117 | Ocala Regional Medical Center | 100212 | 30927 | Columbia Homecare | 107512 | 38923 | Branch | 18810 U. S. Hwy. 441 | Mt. Dora | FL | 32757 |
| 118 | Ocala Regional Medical Center | 100212 | 30927 | Columbia Homecare | 107512 | 38921 | Branch | 1211 LaGrande Blvd. | Lady Lake | FL | 32159 |
| 119 | Ocala Regional Medical Center | 100212 | 30927 | Columbia Homecare | 107533 | 38923 | Parent | 2303 SE 17th Street, Suite 102A | Ocala | FL | 34471 |
| 120 | Blake Medical Center | 100213 | 30949 | Columbia Homecare | 107116 | 36960 | Parent | 1986 59th Street West | Bradenton | FL | 34209 |
| 121 | Blake Medical Center | 100213 | 30949 | Columbia Homecare | 107116 | 36960 | Branch | 1105 53rd Avenue East, Suite C | Bradenton | FL | 34203 |
| 122 | Columbia Regional Medical Center Southwest Florida | 100220 | 35955 | Able Care | 107150 | 36911 | Parent | 3800 Evans Avenue | Fort Myers | FL | 33901 |
| 123 | Columbia Regional Medical Center Southwest Florida | 100220 | 35955 | Able Care | 107150 | 36911 | Branch | 28451 South Tamiami Trail | Bonita Springs | FL | 34134 |
| 124 | Columbia Regional Medical Center Southwest Florida | 100220 | 35955 | Able Care | 107150 | 36911 | Branch | 1003 Del Prado Blvd. | Cape Coral | FL | 33990 |
| 125 | Columbia Park Medical Center | 100221 | 30905 | Columbia Homecare Orlando | 107390 | 37982 | Parent | 77 Underwood Street, Suite 200 | Orlando | FL | 32806 |
| 126 | Columbia Fort Walton Beach Medical Center | 100223 | 30909 | Columbia Homecare | 107276 | 36929 | Parent | 417 NW Racetrack Road, Suite C | Fort Walton Beach | FL | 32547 |
| 127 | Columbia Fort Walton Beach Medical Center | 100223 | 30909 | Columbia Homecare | 107276 | 36929 | Branch | 4432 Avalon Blvd. | Milton | FL | 32570 |
| 128 | Columbia Fort Walton Beach Medical Center | 100223 | 30909 | Northwest Florida Home Health Agency | 107323 | 6939 | Parent | 1326 Lewis Turner Blvd. | Fort Walton Beach | FL | 32547 |

C, 162

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 129 | Columbia University Hospital and Medical Center | 100254 | 30040 | Columbia Homecare | 107219 | 35909 | Parent | 7201 N. University Drive | Tamarac | FL | 33321 |
| 140 | Columbia Orange Park Medical Center | 100236 | 30913 | Columbia Homecare | 107505 | 38971 | Parent | 1512 Kingsley Avenue, Suite 114 | Orange Park | FL | 32073 |
| 131 | Columbia Orange Park Medical Center | 100236 | 30913 | Columbia Homecare | 107505 | 38971 | Branch | 100 S. Park Blvd , Suite 202 | St. Augustine | FL | 32086 |
| 132 | Columbia Orange Park Medical Center | 100236 | 30913 | Columbia Homecare | 107505 | 38971 | Admin | 1855 Wells Road, Bldg. I, Suite 4 | Orange Park | FL | 32073 |
| 133 | Columbia Westside Regional Medical Center | 100228 | 30908 | Columbia Homecare Hollywood | 107105A | 36985 | Parent | 3878 Sheridan Street | Hollywood | FL | 33021 |
| 134 | Columbia Westside Regional Medical Center | 100228 | 30908 | Columbia Homecare Plantation | 107105A | 36987 | Branch | 8201 W. Broward Blvd. | Plantation | FL | 33324 |
| 135 | Columbia West Florida Regional Medical Center | 100231 | 30928 | Northwest Florida Home Health Agency | 107100 | 6525 | Parent | 4700 Bayou Blvd., Bldg. 5 | Pensacola | FL | 32503 |
| 136 | Columbia West Florida Regional Medical Center | 100231 | 30928 | Northwest Florida Home Health Agency | 107100 | 6525 | Branch | 3806 Hwy. 90 | Pensacola | FL | 32571 |
| 137 | Columbia West Florida Regional Medical Center | 100231 | 30928 | Northwest Florida Home Health Agency | 107100 | 6525 | Branch | 14 West Jordan Street, Suite 2E | Pensacola | FL | 32501 |
| 138 | Columbia West Florida Regional Medical Center | 100231 | 30928 | Advanced Home Health Care | 107194 | 37907 | Parent | 4700 Bayou Blvd., Bldg, 2-3 | Pensacola | FL | 32503 |
| 139 | Columbia Putnam Medical Center | 100232 | 30929 | Columbia Homecare | 107152 | 37903 | Parent | 205 Zeagler Drive, #401, P.O. Box 778 | Palatka | FL | 32178 |
| 140 | Columbia Putnam Medical Center | 100232 | 30929 | Columbia Homecare | 107514 | 37903 | Parent | 205 Zeagler Drive, #401, P.O. Box 778 | Palatka | FL | 32178 |
| 141 | Columbia Putnam Medical Center | 100232 | 30929 | Columbia Homecare | 107376A | 37903 | Parent | 205 Zeagler Drive, #401, P.O. Box 778 | Palatka | FL | 32178 |
| 142 | Columbia Hospital | 100234 | 30923 | Columbia Homecare | 107230A | 36979 | Parent | 4700 North Congress Avenue, Suite 101 | West Palm Beach | FL | 33407 |
| 143 | Columbia Fawcett Memorial Hospital | 100236 | 35953 | Columbia Homecare | 107194 | 36903 | Parent | 3280 Tamiami Trail, Suite 45-47 | Port Charlotte | FL | 33952 |
| 144 | Columbia Fawcett Memorial Hospital | 100236 | 35953 | Columbia Homecare | 107169A | 36977 | Parent | 3280 Tamiami Trail, Suite 45-47 | Port Charlotte | FL | 33952 |

C. 63

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 145 | Columbia Northside Medical Center | 100238 | 30950 | Columbia Homecare | 107171A | 36967 | Parent | 13577 Feather Sound Drive, Suite 170 | Clearwater | FL. | 34622 |
| 146 | Columbia Northside Medical Center | 100238 | 30950 | Columbia Homecare | 107171A | 36967 | Branch | 13771 Icot Blvd., Suite 517 | Clearwater | FL. | 34620 |
| 147 | Columbia Edward White Hospital | 100239 | 37934 | Columbia Homecare | 107005 | 38935 | Parent | 5200 16th Street North | St. Petersburg | FL. | 33703 |
| 148 | Columbia Edward White Hospital | 100239 | 37934 | Columbia Homecare | 107228 | 7857 | Parent | 8383 Seminole Blvd. | Seminole | FL. | 34642 |
| 149 | Gulf Coast Medical Center | 100242 | 35954 | Able Care | 107165A | 36941 | Parent | 4100 Goodlette Road, Suite 200 | Naples | FL. | 34103 |
| 150 | Gulf Coast Medical Center | 100242 | 35954 | Columbia Homecare Gulf Coast | 107275A | 38952 | Parent | 107 West 19th Street | Panama City | FL. | 32405 |
| 151 | Gulf Coast Medical Center | 100242 | 35954 | Columbia Homecare Gulf Coast | 107275A | 38952 | Branch | 410 Long Avenue | Port St. Joe | FL. | 32456 |
| 152 | Gulf Coast Medical Center | 100242 | 35954 | Columbia Homecare Gulf Coast | 107275A | 38952 | Branch | 4261 Lafayette Street | Marianna | FL. | 32446 |
| 153 | Columbia Brandon Regional Medical Center | 100243 | 30917 | Columbia Homecare | 107117 | 38963 | Parent | 5001 Cypress Street, Suite 100 | Tampa | FL. | 33609 |
| 154 | Columbia Brandon Regional Medical Center | 100243 | 30917 | Columbia Homecare | 107166A | 36745 | Parent | 124 S. Florida Avenue | Lakeland | FL. | 33815 |
| 155 | Columbia Brandon Regional Medical Center | 100243 | 30917 | Columbia Homecare | 107166A | 37962 | Branch | 600 East Hinson Avenue | Haines City | FL. | 33844 |
| 156 | Columbia Brandon Regional Medical Center | 100243 | 30917 | Columbia Homecare | 107229A | 36936 | Parent | 1195 Oakfield Avenue, Suite 225 | Brandon | FL. | 33511 |
| 157 | Columbia Brandon Regional Medical Center | 100243 | 30917 | Columbia Homecare | 107137A | 36941 | Parent | 10001 Dale Mabry, Suite 101 | Tampa | FL. | 33618 |
| 158 | Columbia Lawnwood Regional Medical Center | 100246 | 30912 | Columbia Homecare Lawnwood | 107393 | 38918 | Parent | 2500 Rhode Island Avenue | Ft. Pierce | FL. | 34947 |
| 159 | Columbia Largo Medical Center | 100248 | 30936 | Columbia Homecare | 107213A | 36962 | Parent | 300 South Duncan, Suite 220 | Clearwater | FL. | 34615 |
| 160 | Columbia Largo Medical Center | 100248 | 30936 | Columbia Homecare | 107213A | 36962 | Branch | 3165 McMullen Booth Road, Suite 4 | Clearwater | FL. | 34621 |

C. 64

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 161 | Columbia Largo Medical Center | 100218 | 30936 | Columbia Homecare | 107211A | 36962 | Branch | 1501 U.S. Alt 19, Suite P | Tarpon Springs | FL. | 34689 |
| 162 | Columbia Largo Medical Center | 100218 | 30936 | Columbia Homecare | 107211A | 36962 | Branch | 42678 U.S. Highway 19 North | Tarpon Springs | FL. | 34689 |
| 163 | Columbia Raulerson Hospital | 100252 | 30933 | Columbia Homecare Raulerson | 107195 | 38917 | Parent | 217 SW Park Street | Okeechobee | FL. | 34974 |
| 164 | Columbia Tallahassee Community Hospital | 100254 | 30954 | Columbia Homecare | 107214 | 37901 | Parent | 1229 West Base Street | Madison | FL. | 32203 |
| 165 | Columbia Tallahassee Community Hospital | 100254 | 30954 | Columbia Homecare | 107200A | 37901 | Parent | 233 Office Plaza Drive | Tallahassee | FL. | 32301 |
| 166 | Columbia Tallahassee Community Hospital | 100254 | 30954 | Columbia Homecare | 107200A | 37901 | Branch | P. O. Box 1059 | Bristol | FL. | 32321 |
| 167 | Columbia Regional Medical Center Bayonet Point | 100256 | 30951 | Columbia Homecare | 107366 | 38965 | Parent | 12029 Majestic Blvd., Suite 8 | Bayonet Point | FL. | 34667 |
| 168 | Columbia Regional Medical Center Bayonet Point | 100256 | 30951 | Columbia Homecare | 107387 | 36927 | Parent | 13910 Fivay Road, Suite 9 | Hudson | FL. | 34667 |
| 169 | Columbia Regional Medical Center Bayonet Point | 100256 | 30951 | Columbia Homecare | 107376A | 36966 | Parent | 13910 Fivay Road, Suite 7 | Hudson | FL. | 34667 |
| 170 | Columbia South Bay Hospital | 100259 | 37941 | Columbia Homecare | 107463 | 38924 | Parent | 3909 Galen Court, Suite B | Sun City Center | FL. | 33573 |
| 171 | Columbia South Bay Hospital | 100259 | 37941 | Columbia Homecare | 107356B | 38964 | Parent | 259 U.S. Highway 27 North | Sebring | FL. | 33870 |
| 172 | Columbia Medical Center - Port St. Lucie | 100260 | 30966 | Columbia Homecare Port St. Lucie | 107284 | 36996 | Parent | 1651 S.E. Tiffany Avenue, Suite 104 | Port St. Lucie | FL. | 34952 |
| 173 | Columbia Medical Center - Port St. Lucie | 100260 | 30966 | Sebastian Home Care | 107284 | 36996 | Branch | 1627 U.S. Hwy. 1, Suite 16 | Sebastian | FL. | 32958 |
| 174 | Columbia Medical Center - Port St. Lucie | 100260 | 30966 | Vero Home Care | 107284 | 36996 | Branch | 2300 3rd Court | Vero Beach | FL. | 32960 |
| 175 | Columbia Regional Medical Center - Oak Hill | 100264 | 30997 | Columbia Homecare | 107330A | 36970 | Parent | 12108 Cortez Blvd. | Brooksville | FL. | 34611 |
| 176 | Columbia Englewood Community Hospital | 100267 | 35952 | Able Care | 107195 | 36906 | Parent | 628 N. Indiana Avenue | Englewood | FL. | 34223 |

C, 165

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|----------|-------------|-------------|--------|------------|------------|--------|---------|------|-------|-----|
| 177 | Columbia Inglewood Community Hospital | 100267 | 35952 | Able Care | 107105 | 36906 | Branch | 3315 Tamiami Trail, Suite 225 | Venice | FL | 34285 |
| 178 | Columbia Palms West Hospital | 100269 | 37940 | Columbia Homecare | 107502 | 6556 | Parent | 12989 Southern Blvd., Suite 101 | Loxahatchee | FL | 33470 |
| 179 | Columbia Medical Center - Peninsula | 100868 | 30988 | Columbia Homecare | Commercial | 38990 | Parent | 525 Shadow Lakes Blvd., Suite 200 | Ormond Beach | FL | 32174 |
| 180 | Columbia JFK Medical Center | 100080 | 37969 | Columbia Homecare North | Commercial | 37972 | Parent | 44 Harvard Circle, Suite 700 | West Palm Beach | FL | 33409 |
| 181 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Longwood | | 38949 | Admin | 765 West State Road 434, Suite F | Longwood | FL | 32750 |
| 182 | Columbia Central Florida Regional Hosp (Sanford) | 100161 | 30953 | Columbia Homecare Palm Coast | 107164A | 6738 | Branch | 2 Office Park, Suite E | Palm Coast | FL | 32137 |
| 183 | Winter Park Memorial Hospital | 100162 | 35977 | Columbia Homecare | Commercial | 35982 | Parent | 130 University Park Drive, Suite 190 | Winter Park | FL | 32792 |
| 184 | Columbia Doctors Hospital | 100166 | 36930 | Columbia Homecare Sarasota | 107132A | 36951 | Branch | 9415, Benova | Sarasota | FL | 34235 |
| 185 | Columbia Clearwater Community Hospital | 100174 | 37953 | Columbia Homecare | 107273 | 38927 | Branch | 34990 U.S. Highway 19 North | Palm Harbor | FL | 34684 |
| 186 | Columbia Park Medical Center | 100221 | 30905 | Columbia Park Homecare | 107390 | 37982 | Branch | 7575 Dr. Phillips Blvd., Suite 245 | Orlando | FL | 32819 |
| 187 | Columbia Park Medical Center | 100221 | 30905 | Columbia Park Homecare | 107390 | 37982 | Branch | 5029 North Lane, Suite 1 | Orlando | FL | 32808 |
| 188 | Columbia Fort Walton Beach Medical Center | 100233 | 30909 | Advanced Home Health Care | 107276 | 36929 | Branch | 4432 Avalon Blvd. | Milton | FL | 32570 |
| 189 | Columbia University General Hospital | 100235 | 6795 | Columbia Homecare | 107228 | 38977 | Parent | 9423 Seminole Blvd., #2 | Seminole | FL | 34642 |
| 190 | Columbia Tallahassee Community Hospital | 100254 | 30954 | Advanced Home Health Care | 107244 | 37901 | Branch | Highway 20, Revell Bldg. | Bristol | FL | 32321 |
| 191 | Columbia Regional Medical Center/Oak Hill Hospital | 100264 | 30997 | Columbia Homecare | 107300A | 36970 | Branch | 5425 Commercial Way | Spring Hill | FL | 34606 |
| 192 | Columbia Regional Medical Center/Oak Hill Hospital | 100264 | 30997 | Columbia Homecare | 107300A | 36970 | Branch | 1188 Mariner Blvd., Suite A | Spring Hill | FL | 34609 |

C. 666

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 193 | Columbia Divisional Agency | Freestanding; | N/A | Columbia Homecare North | Commercial | 32972 | Parent | 2829 10th Avenue North | Lake Worth | FL | 33461 |
| 194 | Columbia Divisional Agency | Freestanding; | N/A | Columbia Homecare-South | Commercial | 35986 | Parent | 12701 West Sunrise Blvd. | Sunrise | FL | 31323 |
| 195 | Columbia Homecare Group | Freestanding; | N/A | Columbia Homecare | N/A | 7041 | Parent | 130 University Park Drive, Suite 190 | Winter Park | FL | 32792 |
| 196 | Columbia Homecare Group | Freestanding; | N/A | Columbia Homecare | N/A | 7041 | Branch | 3930 S. Nova Road, #202 | Port Orange | FL | 32127 |
| 197 | Columbia Homecare Group | Freestanding; | N/A | Columbia Homecare | N/A | 7041 | Branch | 4986 S. 25th Street | Ft. Pierce | FL | 34981 |
| 198 | Divisional Commercial Agency - Huntana Contract Only | N/A | 07172 | Columbia Homecare-Sarasota | 107258 | 7172 | Parent | 9415. Beneva, Suite 204B | Sarasota | FL | 34232 |
| 199 | Columbia Northlake Regional Medical Center | 110033 | 31055 | Clinical Arts Home Care Services, Inc. | 117065 | 6950 | Parent | 9144 Hwy. 278 East | Covington | GA | 30014 |
| 200 | Columbia Northlake Regional Medical Center | 110033 | 31055 | Clinical Arts Home Care Services, Inc | 117065 | 6950 | Branch | 215 East Church St., P. O. Box 1090 | Monroe | GA | 30655 |
| 201 | Columbia Coliseum Medical Centers | 110164 | 30151 | Healthfield Services of Middle Georgia | 117093 | 6951 | Parent | 2490 Riverside Drive | Macon | GA | 31204 |
| 202 | Columbia Redmond Regional Medical Center | 110168 | 31052 | North Georgia Home Health Agency | 117028 | 6952 | Parent | 1875 East Drive | Ft. Oglethorpe | GA | 30742 |
| 203 | Columbia Redmond Regional Medical Center | 110168 | 31052 | North Georgia Home Health Agency | 117028 | 6952 | Branch | 600 South Commerce Street | Summerville | GA | 30747 |
| 204 | Columbia Redmond Regional Medical Center | 110168 | 31052 | North Georgia Home Health Agency | 117028 | 6952 | Branch | 156 Main Street | Trenton | GA | 30752 |
| 205 | Columbia Redmond Regional Medical Center | 110168 | 31052 | North Georgia Home Health Agency | 117028 | 6952 | Branch | 610 South Glenwood Avenue | Dalton | GA | 30721 |
| 206 | Columbia Redmond Regional Medical Ctr. | 110168 | 31052 | Columbia Homecare Coosa Valley | 117041 | 31063 | Parent | 1 State Mutual Drive, Suite 102 | Rome | GA | 30163 |
| 207 | Columbia Redmond Regional Medical Ctr. | 110168 | 31052 | Columbia Homecare Coosa Valley | 117041 | 31063 | Branch | 401 N. Main Street, P. O. Box 226 | Cedartown | GA | 30125 |
| 208 | Columbia Redmond Regional Medical Ctr. | 110168 | 31052 | Columbia Homecare Coosa Valley | 117041 | 31063 | Branch | 197 Curtis Parkway | Calhoun | GA | 30701 |

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 209 | Columbia Redmond Regional Medical Ctr | 110168 | 31052 | Columbia Homecare Coosa Valley | 117011 | 31063 | Branch | P.O. Box 200782 | Cartersville | GA | 30120 |
| 210 | Columbia Redmond Regional Medical Ctr | 110168 | 31052 | Columbia Homecare Coosa Valley | 117011 | 31063 | Branch | 115 North Economy Street | Summerville | GA | 30747 |
| 211 | Columbia Redmond Regional Medical Ctr | 110168 | 31052 | Columbia Homecare Coosa Valley | 117011 | 31063 | Admin | 585 Redmond Road | Rome | GA | 30165 |
| 212 | Columbia West Paces Medical Center | 110171 | 31056 | Central Home Health Care | 117039A | 6182 | Parent | 6666 Powers Ferry Road, Suite 220 | Atlanta | GA | 30339 |
| 213 | Columbia West Paces Medical Center | 110171 | 31056 | Central Home Health Care | 117039A | 6182 | Branch | 519 Forest Parkway, Suite 100 | Forest Park | GA | 30050 |
| 214 | Columbia West Paces Medical Center | 110171 | 31056 | Central Home Health Care | 117039A | 6182 | Branch | 12 Felton Place, Suite 100 | Cartersville | GA | 30120 |
| 215 | Columbia West Paces Medical Center | 110171 | 31056 | Central Home Health Care | 117039A | 6182 | Branch | 1395 S. Marietta Parkway, Suite 220 | Marietta | GA | 30067 |
| 216 | Columbia Dunwoody Medical Center | 110172 | 31204 | Central Home Health Care | 117026 | 6949 | Parent | 4575 N. Shallowford Road | Atlanta | GA | 30338 |
| 217 | Columbia Dunwoody Medical Center | 110172 | 31204 | Central Home Health Care | 117026 | 6949 | Branch | 10001 Hurricane Shoals Rd, Bldg. C, Suite 100 | Lawrenceville | GA | 30243 |
| 218 | Columbia Dunwoody Medical Center | 110172 | 31204 | Central Home Health Care | 117026 | 6949 | Branch | 495 Winn Way, Suite 100 | Decatur | GA | 30030 |
| 219 | Columbia Dunwoody Medical Center | 110172 | 31204 | Central Home Health Care | 117026 | 6949 | Branch | 5255 Snapfinger Park Drive, Suite 130 | Decatur | GA | 30035 |
| 220 | Columbia Parkway Medical Center | 110179 | 31053 | Central Home Health Care | 117050 | 6953 | Parent | 8693 Hospital Drive | Douglasville | GA | 30134 |
| 221 | Columbia Parkway Medical Center | 110179 | 31053 | Central Home Health Care | 117050 | 6953 | Branch | 10 Bledsoe Road | Newnan | GA | 30265 |
| 222 | Columbia Parkway Medical Center | 110179 | 31053 | Central Home Health Care | 117050 | 6953 | Branch | 100 Professional Park, Suite 201 | Carrollton | GA | 30117 |
| 223 | Columbia Parkway Medical Center | 110179 | 31053 | Central Home Health Care | 117050 | 6953 | Branch | 130 Eagle Springs Court | Stockbridge | GA | 30281 |
| 224 | Columbia Parkway Medical Center | 110179 | 31053 | Central Home Health Care | 117050 | 6953 | Branch | 150 Carnegie Place, Suite 102 | Fayetteville | GA | 30214 |

C, 68

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 225 | Columbia Lanier Park Hospital | 110188 | 31079 | Tupelo Home Health Agency | 117016 | 6954 | Parent | 11929 Augusta Road | Lavonia | GA | 30553 |
| 226 | Columbia Lanier Park Hospital | 110188 | 31079 | Tupelo Home Health Agency | 117016 | 6954 | Branch | 8900 Rock Quarry Road Ext. | Toccoa | GA | 30577 |
| 227 | Columbia Lanier Park Hospital | 110188 | 31079 | Tupelo Home Health Agency | 117016 | 6954 | Branch | General Delivery - North Main Street | Clayton | GA | 30525 |
| 228 | Columbia Lanier Park Hospital | 110188 | 31079 | Tupelo Home Health Agency | 117016 | 6954 | Branch | 110 Camelot Way | Clarksville | GA | 30523 |
| 229 | Columbia Lanier Park Hospital | 110188 | 31079 | Tupelo Home Health Agency | 117305 | 7525 | Sub-Unit | 1856-14 Thompson Bridge Road | Gainesville | GA | 30501 |
| 230 | Columbia Lanier Park Hospital | 110188 | 31079 | Tupelo Home Health Agency | 117305 | 7525 | Sub-Unit | 432 B. Canton Hwy. | Cumming, | GA | 30130 |
| 231 | Columbia West Valley Medical Center | 130014 | 31201 | Columbia Homecare Idaho | 137006 | 31204 | Parent | 1717 Arlington Avenue | Caldwell | ID | 83605 |
| 232 | Columbia Eastern Idaho Regional Medical Center | 130018 | 31202 | Columbia Homecare Challis | 137018 | 31205 | Branch | 1031 Main Street | Challis | ID | 83226 |
| 233 | Columbia Eastern Idaho Regional Medical Center | 130018 | 31202 | Columbia Homecare Idaho Falls | 137048 | 31205 | Parent | 2635 Channing Way | Idaho Falls | ID | 83404 |
| 234 | Columbia LaGrange Memorial Hospital | 140065 | 31335 | Columbia Homecare West Suburbs | 147628 | 31338 | Parent | 6406 Joliet Road, 2nd Floor | Countryside | IL | 60525 |
| 235 | Columbia Michael Reese Hospital and Medical Center | 140075 | 31310 | Columbia Homecare Chicago | 147629 | 31302 | Parent | 2960 South Lake Park | Chicago | IL | 60616 |
| 236 | Columbia Olympia Fields Osteopathic Hospital and Med. | 140172 | 31336 | Columbia Homecare South Suburbs | 147457 | 31398 | Parent | 19991 Governors Drive | Olympia Fields | IL | 60461 |
| 237 | Columbia Grant Hospital | 140207 | 31316 | Columbia Homecare Chicago North | 147621 | 31322 | Parent | 550 West Webster, 2 N | Chicago | IL | 60614 |
| 238 | Columbia Hoffman Estates Medical Center | 140290 | 31304 | Columbia Homecare Northwest Suburbs | 147581 | 31309 | Parent | 2500 West Higgins Road, Suite 1065 | Hoffman Estates | IL | 60195 |
| 239 | Columbia Hoffman Estates Medical Center | 140290 | 31304 | Columbia Homecare Hoffman Estates (5) | 147581 | 31311 | Branch | 6406 Joliet Road | Countryside | IL | 60525 |
| 240 | Columbia Hoffman Estates Medical Center | 140290 | 31304 | Columbia Homecare Hoffman Estates (4) | 147581 | 31309 | Branch | 550 West Webster, 3rd Floor | Chicago | IL | 60614 |

07/20/2000

C, 169

## Columbia/HCA
## Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | IHHA PROV # | IHHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 241 | Columbia Hoffman Estates Medical Center | 140290 | 31301 | Columbia Homecare Hoffman Estates (2) | 147581 | 31309 | Branch | 1030 North Clarke, Suite 300 | Chicago | IL | 60610 |
| 242 | Chicago Division Lagrange | N/A | 31335 | Columbia Hospice Chicago | 141523 | 7761 | Parent | 6406 Joliet Road, 2nd Floor | Countryside | IL | 60525 |
| 243 | Columbia Homecare Group | N/A | 07492 | Columbia Homecare | 147282 | 7492 | Parent | 10560 W. Cermak Road | Westchester | IL | 60154 |
| 244 | Columbia Terre Haute Regional Hospital | 150036 | 31408 | Columbia Homecare Terre Haute | 157255 | 31414 | Parent | 3901 S. 7th Street | Terre Haute | IN | 47802 |
| 245 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Southern Indiana | 157422 | 31409 | Parent | 590 Missouri Avenue, Suite 202 | Jeffersonville | IN | 47130 |
| 246 | Columbia Audubon Hospital | 180014 | 31702 | Caretenders of Southern Indiana | 157422 | 31409 | Branch | 590 Missouri Avenue, Suite 101 | Jeffersonville | IN | 47130 |
| 247 | Columbia Wesley Medical Center | 170123 | 31608 | Total Home Care | 177170 | 31626 | Parent | 537 S. Main, P.O. Box 3208 | Wichita | KS | 67201 |
| 248 | Columbia Wesley Medical Center | 170123 | 31608 | Total Home Care | 177170 | 31626 | Branch | 114 E. 5th Avenue | Augusta | KS | 67010 |
| 249 | Columbia Wesley Medical Center | 170123 | 31608 | Total Home Care | 177170 | 31626 | Branch | 2455 North Woodlawn, Suite 200 | Wichita | KS | 67220 |
| 250 | Columbia Halstead Hospital | 170144 | 31620 | Heartland Home Health | 177247 | 31631 | Parent | 328 Poplar | Halstead | KS | 67056 |
| 251 | Bethany Medical Center | 170148 | 7900 | Bethany Home Care | 178037 | 7902 | Parent | 21 North 12th Street, Suite 475 | Kansas City | KS | 66102 |
| 252 | Columbia Western Plains Medical Complex | 170175 | 31601 | Western Plains Home Health | 177267 | 31609 | Parent | 100 Ross Blvd., Bldg. A, P. O. Box 1478 | Dodge City | KS | 67801 |
| 253 | Columbia Overland Park Regional Medical Center | 170176 | 31602 | Columbia Homecare Overland Park | 177148 | 31615 | Parent | 12301 W. 106th Street, Suite 100 | Overland Park | KS | 67215 |
| 254 | Columbia Overland Park Regional Medical Center | 170176 | 31602 | American Nursing Services | Commercial | 31624 | Parent | 6701 W. 64th Street, Suite 307 | Shawnee Mission | KS | 66202 |
| 255 | Columbia Homecare Group | Freestanding | N/A | Columbia Homecare Midwest | Commercial | 31624 | Parent | 10600 Quivira Road, Suite 10 | Overland Park | KS | 67215 |
| 256 | Columbia Hospital Lexington | 180007 | 31785 | Columbia Homecare Central Kentucky | 187155 | 7042 | Parent | 310 S. Limestone Street | Lexington | KY | 40508 |

C,70

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 257 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Parent | 100 Mallard Creek Road, Suite 200 | Louisville | KY | 40207 |
| 258 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 148 Midland Trail Court | Shelbyville | KY | 40065 |
| 259 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 101-B East Main Street | LaGrange | KY | 40031 |
| 260 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 100 Mallard Creek Drive, Suite 200 | Louisville | KY | 40207 |
| 261 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 100 Mallard Creek Drive, Suite 200 | Louisville | KY | 40207 |
| 262 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 100 Mallard Creek Drive, Suite 200 | Louisville | KY | 40207 |
| 263 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 9820 Third Street Road | Louisville | KY | 40272 |
| 264 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 322 E. Highway 44, P. O. Box 6757 | Shepherdsville | KY | 40165 |
| 265 | Columbia Audubon Regional Medical Center | 180014 | 31702 | Caretenders of Louisville | 187078 | 31704 | Branch | 100 Mallard Creek Drive, Suite 200 | Louisville | KY | 40207 |
| 266 | Columbia Hospital Georgetown | 180101 | 31738 | Columbia Homecare Central Kentucky | 187156 | 7180 | Parent | 11501 Lexington Road, Suite 4 | Georgetown | KY | 40324 |
| 267 | Columbia Pine Lake Regional Hospital | 180116 | 31717 | Columbia Homecare Pinelake | 187134 | 31786 | Parent | 203 E. North Street | Mayfield | KY | 42066 |
| 268 | Columbia Pine Lake Regional Hospital | 180116 | 31717 | Columbia Homecare Pinelake | 187114 | 31786 | Branch | 3125 Lone Oak Road, Suite B | Paducah | KY | 42003 |
| 269 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Parent | 2425 Scottsville Road, Suite 118 | Bowling Green | KY | 42101 |
| 270 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 120 E. Ohio Street, P. O. Box 624 | Morgantown | KY | 42261 |
| 271 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 412 S. Main Street, P. O. Box 864 | Brownsville | KY | 42210 |
| 272 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 251 Hopkinsville Road, Suite E | Russellville | KY | 42276 |

C, 71

**Columbia/HCA**
**Home Health Agency List for 1996 and 1997**

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | IHA PROV # | IHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 273 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 150 Interstate Plaza, P. O. Box 597 | Munfordville | KY | 42765 |
| 274 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 202 E. Main Street, P. O. Box 305 | Scottsville | KY | 42164 |
| 275 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 1725 Kenton Street, P. O. Box 441 | Hopkinsville | KY | 42240 |
| 276 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 2816 Veach Road, Bldg. 4, Suites 405 & 406 | Owensboro | KY | 42303 |
| 277 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | Northside Ctr., 1050 Thornberry Dr., Suite 4 | Madisonville | KY | 42431 |
| 278 | Columbia Greenview Regional Hospital | 180124 | 31767 | Columbia Homecare Greenview Reg. Hospital | 187072 | 31776 | Branch | 2425 Scottsville Road, Suite 120 | Bowling Green | KY | 42104 |
| 279 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Parent | 114 Hardin Lane | Somerset | KY | 42501 |
| 280 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 810 N. Main Street, P. O. Box 801 | Burkesville | KY | 42717 |
| 281 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 1216 N. Race Street, Suite C | Glasgow | KY | 42141 |
| 282 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | Hardin Medical Plaza | Salyersville | KY | 41465 |
| 283 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 330 US, 31 West Bypass, Suite 401 | Bowling Green | KY | 42101 |
| 284 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 169 Joe T. Petty Drive, P. O. Box 573 | Russell Springs | KY | 42642 |
| 285 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 207 Stanford Street | Lancaster | KY | 40444 |
| 286 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | North Mayo Trail-Mayo Plaza | Paintsville | KY | 41240 |
| 287 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 200 Twin Lakes Med. Ctr., Suite E, Foothills Ave. | Albany | KY | 42602 |
| 288 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 933 Russell Road, Suite 91 | Columbia | KY | 42728 |

C.72

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 289 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | Route 1, Box 5A | Liberty | KY | 42539 |
| 290 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 517 Columbia Highway | Greensburg | KY | 42743 |
| 291 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | Trailway Shopping Center, P. O. Box 65 | Monticello | KY | 42633 |
| 292 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 35 Turpin Court, P. O. Box 1149 | Somerset | KY | 42501 |
| 293 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 1401 E. West Stockton | Edmonton | KY | 42129 |
| 294 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | P. O. Box 1401 | Prestonsburg | KY | 41653 |
| 295 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 1020 North Dixie Hwy. | Elizabethtown | KY | 42701 |
| 296 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 125 Kingswood Drive | Campbellsville | KY | 42718 |
| 297 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 207 Stanford Street | Lancaster | KY | 40444 |
| 298 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 207 Stanford Street | Lancaster | KY | 40444 |
| 299 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 112 Bank Street, P. O. Box 536 | Harrodsburg | KY | 40143 |
| 300 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | P. O. Box 58 | Whitley City | KY | 42653 |
| 301 | Columbia Lake Cumberland Regional Hospital | 180132 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 539 Main Street, Suite B, P. O. Box 395 | West Liberty | KY | 41472 |
| 302 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 0700 Middle Fork Road, P. O. Box 2104 | Inez | KY | 41224 |
| 303 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 10815 Dixie Street | Horse Cave | KY | 42749 |
| 304 | Columbia Lake Cumberland Regional Hospital | 180112 | 31709 | Lake Cumberland Home Health | 187022 | 31712 | Branch | 500 Bypass Road, 510 River Ridge Plaza | Brandenburg | KY | 40108 |

C, 73

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 305 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown | 187085 | 31754 | Parent | 1107 Crowne Pointe Drive, Suite 11 | Elizabethtown | KY | 42701 |
| 306 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown | 187085 | 31754 | Branch | 1002 Woodland Drive | Elizabethtown | KY | 42701 |
| 307 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown-Bullit Co. | 187085 | 31754 | Branch | 11737 S. Preston Highway | Lebanon Junction | KY | 40150 |
| 308 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown-Grayson Co. | 187085 | 31754 | Branch | 105 N. Main Street | Leitchfield | KY | 42754 |
| 309 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown Larue Co. | 187085 | 31754 | Branch | 928 Old Elizabethtown Rd., Suite 2 | Hodgenville | KY | 42748 |
| 310 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown-Marion Co. | 187085 | 31754 | Branch | 259 W. Walnut Street | Lebanon | KY | 40033 |
| 311 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown | 187085 | 31754 | Branch | Hwy. 1051, Suite 6 | Brandenburg | KY | 40108 |
| 312 | Columbia Southwest Hospital | 180133 | 31713 | Carelenders of Elizabethtown-Nelson Co. | 187085 | 31754 | Branch | 208 W. John Fitch Avenue, Suite 208 | Bardstown | KY | 40004 |
| 313 | Columbia Dauterive Hospital | 190003 | 31854 | Columbia Homecare Dauterive | 187085 | 35801 | Parent | 117 Iberia Street | New Iberia | LA | 70560 |
| 314 | Columbia Dauterive Hospital | 190003 | 31854 | Columbia Homecare Dauterive | 197459 | 35801 | Branch | 1111 Northwest Blvd. | Franklin | LA | 70538 |
| 315 | Savoy Medical Center | 190025 | 7850 | Savoy Home Health | 197057 | 7852 | Parent | 700 Poinciana, Suite B | Mamou | LA | 70654 |
| 316 | Savoy Medical Center | 190025 | 7850 | Savoy Home Health | 197057 | 7852 | Branch | 250 East Laurel | Eunice | LA | 70595 |
| 317 | Rapides Regional Medical Center | 190026 | 31840 | Rapides Home Health/Hospice Care | 197044 | 31843 | Parent | 807 Jackson Street | Alexandria | LA | 71301 |
| 318 | Rapides Regional Medical Center | 190026 | 31840 | Rapides Home Health/Hospice Care | 197044 | 31843 | Branch | P.O. Drawer 175 | Marksville | LA | 71351 |
| 319 | Rapides Regional Medical Center | 190026 | 31840 | Rapides Home Health/Hospice Care | 197044 | 31843 | Branch | 127 Chevy Lane | Bunkie | LA | 71322 |
| 320 | Rapides Regional Medical Center | 190026 | 31840 | Rapides Home Health/Hospice Care | 197044 | 31843 | Branch | 300 Second Street | Colfax | LA | 71417 |

C, 74

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 321 | Rapides Regional Medical Center | 190026 | 31840 | Rapides Home Health/Hospice Care | 197116 | 31843 | Sub-Unit | P.O. Box 670 | Urania | LA | 71480 |
| 322 | Rapides Regional Medical Center | 190026 | 31840 | Rapides Home Health/Hospice Care | 197317 | 31843 | Sub-Unit | 1612 S. Fifth Street | Leeville | LA | 71446 |
| 323 | Rapides Regional Medical Center | 190026 | 31840 | Rapides Home Health/Hospice Care | 197318 | 31843 | Sub-Unit | 800 Audubon Drive | Jonesville | LA | 71343 |
| 324 | Columbia Springhill Medical Center | 190088 | 31806 | Columbia Homecare Northwest | 197226 | 31809 | Parent | 816 Benton Road | Bossier City | LA | 71111 |
| 325 | Columbia Springhill Medical Center | 190088 | 31806 | Columbia Homecare Northwest | 197226 | 31809 | Branch | P.O. Box 65 | Plain Dealing | LA | 71064 |
| 326 | Columbia Springhill Medical Center | 190088 | 31806 | Columbia Homecare Northwest | 197226 | 31809 | Branch | 1110 B Doctors Drive | Springhill | LA | 71075 |
| 327 | Columbia Springhill Medical Center | 190088 | 31806 | Columbia Homecare Northwest | 197226 | 31809 | Branch | 1140 Polk Street | Mansfield | LA | 71052 |
| 328 | Columbia Springhill Medical Center | 190088 | 31806 | Columbia Homecare Northwest | 197226 | 31809 | Branch | 870 Olive Street, Suite A | Shreveport | LA | 71104 |
| 329 | Columbia Springhill Medical Center | 190088 | 31806 | Columbia Homecare Northwest | 197226 | 31809 | Branch | 625 East Carol, Suite D | Coushatta | LA | 71019 |
| 330 | Winn Parish Medical Center | 190090 | 31802 | Winn Parish Medical Center Home Health | 197670 | 31812 | Parent | 118 - C West Main Street, P.O. Box 152 | Winfield | LA | 71483 |
| 331 | Oakdale Community Hospital | 190106 | 31803 | Oakdale Community Hospital Home Health | 197016 | 7089 | Parent | 107 North 13th Street | Oakdale | LA | 71463 |
| 332 | Columbia Highland Hospital | 190112 | 31833 | Columbia Homecare Highland | Commercial | 6578 | Parent | 8730 Youree, Suite C | Shreveport | LA | 71115 |
| 333 | Tulane University Hospital and Clinic | 190176 | 31810 | Tulane Home Health | 197143 | 35806 | Parent | 1440 Canal Street, Suite 1191 | New Orleans | LA | 70112 |
| 334 | Columbia Lakeview Regional Medical Center | 190177 | 31824 | Columbia Homecare Lakeview | 197087 | 31869 | Parent | 195 Highland Park Entrance | Covington | LA | 70433 |
| 335 | Columbia Doctors' Hospital of Opelousas | 190191 | 31826 | Columbia Homecare Acadiana | 197263 | 35808 | Parent | 3849 149 Service Road South | Opelousas | LA | 70570 |
| 336 | Columbia Doctors' Hospital of Opelousas | 190191 | 31826 | Columbia Homecare Acadiana | 197263 | 35808 | Branch | 417 Martin Luther King Dr. | Simmesport | LA | 71369 |

07/20/2000

C, 75

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 337 | Columbia Doctors' Hospital of Opelousas | 190191 | 31826 | Columbia Homecare Franklin | 197270 | 35808 | Parent | 305 Prairie, P.O. Box 311 | Winnsboro | LA | 71295 |
| 338 | Columbia North Monroe Hospital | 190197 | 31834 | Columbia Homecare North Monroe | 197668 | 31838 | Parent | 513 Walnut Street | Monroe | LA | 71201 |
| 339 | Lakeland Medical Center | 190200 | 31817 | Columbia Lakeland Homecare | 197016 | 31858 | Parent | 3200 Ridgelake Drive, Suite 200 | Metairie | LA | 70002 |
| 340 | Columbia Medical Center of Southwest Louisiana | 190205 | 31857 | Columbia Homecare Lafayette | 197665 | 6782 | Parent | 4212 W. Congress, Suite 1300 | Lafayette | LA | 70506 |
| 341 | Columbia Riverview Medical Center | 190207 | 31855 | Columbia Homecare Baton Rouge | 197417 | 6709 | Branch | 1759 Physician's Park Drive, Suite C | Baton Rouge | LA | 70816 |
| 342 | Columbia Riverview Medical Center | 190207 | 31855 | Columbia Homecare Gonzales | 197417 | 6709 | Parent | 2647 S. Riverview Blvd., Suite 320 | Gonzales | LA | 70737 |
| 343 | Columbia Lake Area Medical Center | 190201 | 31822 | Columbia Homecare Southwest Louisiana | 197684 | 6572 | Parent | 109 South Elms Street | Welsh | LA | 70591 |
| 344 | Columbia MetroWest Medical Center | 220089 | 32101 | Columbia Homecare MetroWest | 227050B | 32103 | Parent | 85 Lincoln Street | Framingham | MA | 01702 |
| 345 | Columbia MetroWest Medical Center | 220089 | 32101 | Columbia Homecare MetroWest | 227050B | 32103 | Branch | 67 Union Street | Natick | MA | 01760 |
| 346 | Columbia Independence Regional Health Center | 260095 | 32501 | Columbia Independence Regional Hospice | 261594 | 7994 | Parent | 5105 Blue Ridge Blvd., Suite 101 | Raytown | MO | 64133 |
| 347 | Columbia Independence Regional Health Center | 260095 | 32501 | Columbia Independence Regional Home Health | 267094 | 32502 | Parent | 5105 Blue Ridge Blvd., Suite 111 | Raytown | MO | 64133 |
| 348 | Columbia Hospitals North and South | 260197 | 32506 | Community Home Health | 267169 | 32519 | Parent | 2828 North National | Springfield | MO | 65803 |
| 349 | Columbia Hospitals North and South | 260197 | 32506 | Community Home Health | 267169 | 32519 | Branch | 325 N. Main | Mt. Grove | MO | 65711 |
| 350 | Columbia Hospitals North and South | 260197 | 32506 | Community Home Health | 267169 | 32519 | Branch | 624 East Mt. Vernon Blvd. | Mt. Vernon | MO | 65712 |
| 351 | Columbia Raleigh Community Hospital | 340071 | 33311 | Columbia Homecare North Carolina | 347030 | 6972 | Parent | 1101 Weaver Dairy Road | Chapel Hill | NC | 27514 |
| 352 | Columbia Raleigh Community Hospital | 340071 | 33311 | Columbia Homecare North Carolina | 347188 | 33317 | Parent | 3400 Wake Forest Rd. | Raleigh | NC | 27609 |

C, 76

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 353 | Columbia Davis Medical Center | 340144 | 33301 | Columbia Homecare North Carolina | 347182 | 6597 | Parent | 1105 Skyway Drive | Monroe | NC | 28110 |
| 354 | Presbyterian Orthopaedic Hospital | 340153 | 33326 | HCHI Homecare | 347184 | 6871 | Parent | 1901 Randolph Road | Charlotte | NC | 28207 |
| 355 | Columbia Davis Medical Center | 340144 | 33301 | Columbia Advantage Homecare | 347184 | 33327 | Branch | 4508 East Independence Blvd., Suite 203 | Charlotte | NC | 28205 |
| 356 | Columbia Parkland Medical Center | 300017 | 32905 | Columbia Homecare Parkland Medical Center | 307076 | 32911 | Parent | 44 Birch Street, Suite 104 | Derry | NH | 03038 |
| 357 | Columbia Parkland Medical Center | 300017 | 32905 | Columbia Homecare Parkland Medical Center | 307076 | 32911 | Branch | 90 Stiles Road | Salem | NH | 03079 |
| 358 | Columbia Portsmouth Regional Hospital | 300029 | 32902 | Portsmouth Regional Home Health & Hospice | 307006A | 6727 | Parent | 127 Parrott Avenue | Portsmouth | NH | 03801 |
| 359 | Columbia Medical Center of Carlsbad | 320063 | 33101 | Columbia Homecare Carlsbad | 327043 | 33105 | Parent | 800 W. Pierce | Carlsbad | NM | 88220 |
| 360 | Columbia Lea Regional Medical Center | 320065 | 33102 | Columbia Homecare Hobbs | 327150 | 33109 | Parent | North 5419 Lovington Highway, Suite 17 | Hobbs | NM | 88240 |
| 361 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Clovis | 450005 | 6612 | Branch | 2905 N. Prince, Suite G | Clovis | NM | 88101 |
| 362 | Columbia Medical Center - West | 450107 | 39307 | El Paso Nurses Unlimited of Las Cruces | 327151 | 6786 | Parent | 1165 South Telshor, Suite 306 | Las Cruces | NM | 88011 |
| 363 | Columbia Medical Center - West | 450107 | 39307 | Nurses Unlimited of Santa Teresa | 327151 | 6786 | Branch | 1212 Country Club, Suite C-4 | Santa Teresa | NM | 88008 |
| 364 | Columbia Sunrise Hospital and Medical Center | 290008 | 32801 | Columbia Homecare Sunrise | 297061 | 32823 | Parent | 3201 South Maryland Parkway, Suite 615 | Las Vegas | NV | 89109 |
| 365 | Columbia Sunrise Hospital and Medical Center | 290003 | 32801 | Columbia Homecare | 297071 | 32821 | Parent | 3196 South Maryland Parkway, Suite 311 | Las Vegas | NV | 89109 |
| 366 | Mercy Medical Center | 360070 | 31501 | Columbia Homecare Mercy Medical Center | 367256 | 31518 | Parent | 1320 Mercy Drive NW | Canton | OH | 44708 |
| 367 | Columbia Tulsa Regional Medical Center | 370078 | 33652 | Columbia Homecare Oklahoma | 377210 | 33653 | Parent | 1418 E. 71st Street, Suite A | Tulsa | OK | 74136 |
| 368 | Columbia Tulsa Regional Medical Center | 370078 | 33652 | Columbia Homecare Oklahoma | 377210 | 33653 | Branch | 201 Evans Road | Mannford | OK | 74044 |

07/20/2000

C, 77

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | IHHA PROV # | IHHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 369 | Columbia Tulsa Regional Medical Center | 370078 | 33652 | Columbia Homecare Oklahoma | 377210 | 33653 | Branch | 116 W. Commercial Street | Broken Arrow | OK | 74012 |
| 370 | Columbia Tulsa Regional Medical Center | 370078 | 33652 | Columbia Homecare Oklahoma | 377210 | 33653 | Branch | 19 South Main | Owasso | OK | 74055 |
| 371 | Columbia Tulsa Regional Medical Center | 370078 | 33652 | Columbia Homecare Oklahoma | 377210 | 33653 | Branch | 405 S. Main | Sapulpa | OK | 74066 |
| 372 | Columbia Tulsa Regional Medical Center | 370078 | 33652 | Columbia Homecare Oklahoma | 377210 | 33653 | Branch | 201 E. Broadway | Sand Springs | OK | 74063 |
| 373 | Columbia Tulsa Regional Medical Center | 370078 | 33652 | Columbia Homecare Oklahoma | 377210 | 33653 | Branch | P. O. Box 707 | Hominy | OK | 74035 |
| 374 | Columbia Southwestern Medical Center | 370097 | 33604 | Columbia Homecare Oklahoma Southwestern | 377053 | 33649 | Parent | 1970 N.W. Ferris, Suite 9 | Lawton | OK | 73506 |
| 375 | Columbia Southwestern Medical Center | 370097 | 33604 | Columbia Homecare Oklahoma Southwestern | 377053 | 33649 | Branch | 501 S. Main | Hobart | OK | 73651 |
| 376 | Columbia Southwestern Medical Center | 370097 | 33604 | Columbia Homecare Oklahoma Southwestern | 377053 | 33649 | Branch | 700 1/2 North Commerce | Ardmore | OK | 73401 |
| 377 | Columbia Southwestern Medical Center | 370097 | 33604 | Columbia Homecare Oklahoma Southwestern | 377053 | 33649 | Branch | 402 1/2 North Broadway | Walters | OK | 73572 |
| 378 | Columbia Edmond Medical Center | 370148 | 33603 | Columbia Homecare Oklahoma - West | 377032 | 33640 | Parent | 7508 N. Broadway Ext., Suite 110 | Oklahoma City | OK | 73116 |
| 379 | Columbia Edmond Medical Center | 370148 | 33603 | Columbia Homecare Oklahoma - West | 377032 | 33640 | Branch | 601 W. 3rd, P. O. Box 762 | Elk City | OK | 73648 |
| 380 | Columbia Edmond Medical Center | 370148 | 33603 | Columbia Homecare Oklahoma - West | 377032 | 33640 | Branch | 1500 N. Airport Rd., P. O. Box 2135 | Weatherford | OK | 73096 |
| 381 | Columbia Edmond Medical Center | 370148 | 33603 | Columbia Homecare Oklahoma - West | 377032 | 33640 | Admin | 221 W. Main, P. O. Box 374 | Hydro | OK. | 73048 |
| 382 | Columbia Bethany Hospital | 370159 | 33602 | Columbia Homecare Oklahoma | 377086 | 33646 | Parent | 7704 NW 23rd Street | Bethany | OK | 73008 |
| 383 | Columbia Wagoner Hospital | 370166 | 33605 | Columbia Homecare Oklahoma | 377180 | 33648 | Parent | 306 S. Lloyes | Wagoner | OK | 74467 |
| 384 | Columbia Wagoner Hospital | 370166 | 33605 | Columbia Homecare Oklahoma | 377180 | 33648 | Branch | 204 West Blue Starr Drive | Claremore | OK | 74017 |

C, 78

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 385 | Columbia Wagoner Hospital | 170166 | 33605 | Columbia Homecare Oklahoma | 377180 | 33648 | Branch | 430 South Wilson | Vinita | OK | 74301 |
| 386 | Columbia Wagoner Hospital | 170166 | 33605 | Columbia Homecare Oklahoma | 377180 | 33648 | Branch | 413 Main Street | Heavener | OK | 74937 |
| 387 | Columbia Medical Center of Sherman | 450393 | 38335 | Columbia Homecare Texoma | 457570 | 6649 | Branch | 502 East First Street | Heavener | OK | 74937 |
| 388 | Divisional Agency | Freestanding | N/A | Columbia Hospice Oklahoma | 371530 | 6789 | Branch | 5807 S. Garnett, Suite E | Tulsa | OK | 74146 |
| 389 | Divisional Agency | Freestanding | N/A | Columbia Hospice Oklahoma | 371530 | 6789 | Branch | 800 S. 4th Street, Rt. 4, Box 14 | Weatherford | OK | 73096 |
| 390 | Divisional Agency | Freestanding | N/A | Columbia Hospice Oklahoma | 371520 | 6789 | Branch | 717 W. 3rd | Elk City | OK | 73644 |
| 391 | Divisional Agency | Freestanding | N/A | Columbia Homecare Oklahoma | Commercial | 6789 | Parent | 2622 Villa Prom | Oklahoma City | OK | 73107 |
| 392 | Columbia West Valley Medical Center | 130014 | 31201 | Columbia Homecare Ontario | 137006 | 31204 | Branch | 49 N.W. 1st Street | Ontario | OR | 97914 |
| 393 | Columbia West Valley Medical Center | 130014 | 31201 | Columbia Homecare Lakeview | 381705 | 31204 | Sub-Unit | 100 "D" Street, Suite 4 | Lakeview | OR | 97914 |
| 394 | Columbia Douglas Medical Center | 380064 | 33702 | Columbia Homecare Douglas | 382062 | 33706 | Parent | 738 West Harvard Blvd | Roseburg | OR | 97470 |
| 395 | Columbia Willamette Valley Medical Center | 380071 | 33703 | Columbia Homecare Willamette Valley | 387136 | 33707 | Parent | 419 E. 6th Street | McMinnville | OR | 97128 |
| 396 | Trident Medical Center | 420079 | 34001 | Columbia Homecare Doctors | 427009 | 7088 | Parent | 2440 Mall Drive, Suite 110 | N. Charleston | SC | 29406 |
| 397 | Trident Medical Center | 420079 | 34001 | Columbia Homecare Doctors | 427009 | 7088 | Branch | 1091 Hires Street | Walterboro | SC | 29488 |
| 398 | Trident Medical Center | 420079 | 34001 | Columbia Homecare Doctors | 427009 | 7088 | Branch | 600 Front Street | Georgetown | SC | 29440 |
| 399 | Trident Medical Center | 420079 | 34001 | Columbia Homecare Coastal Carolina | 427054 | 34009 | Parent | 291 Leinbach Drive, Bldg. B, Unit 3 | Charleston | SC | 29407 |
| 400 | Columbia Sycamore Shoals Hospital | 440018 | 36204 | Columbia Homecare Tennessee | 447118 | 36241 | Parent | 403 East Market Street | Johnson City | TN | 37601 |

C, 79

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 401 | Columbia Sycamore Shoals Hospital | 440008 | 36204 | Columbia Homecare Tennessee | 447118 | 36241 | Branch | 2528 Wesley Street | Johnson City | TN | 37601 |
| 402 | Columbia Horizon Medical Center | 440006 | 36243 | Columbia Homecare Ashland | 447217 | 36245 | Branch | 108 South Main Street, Suite 7 | Ashland City | TN | 37015 |
| 403 | Columbia Horizon Medical Center | 440006 | 36243 | Columbia Homecare Dickson | 447217 | 36245 | Parent | 117 Hwy, 70 East | Dickson | TN | 37055 |
| 404 | Columbia Southern Tennessee Medical Center | 440058 | 36227 | Columbia Homecare Tennessee | 447248 | 36212 | Parent | 118 North Jefferson Street | Winchester | TN | 37398 |
| 405 | Columbia Southern Tennessee Medical Center | 440058 | 36227 | Columbia Homecare Tennessee | 447248 | 36212 | Branch | 105 N. McCreary St. | Woodbury | TN | 37190 |
| 406 | Columbia Southern Tennessee Medical Center | 440058 | 36227 | Columbia Homecare Tennessee | 447248 | 36212 | Branch | 408 West Main Street | Monteagle | TN | 37356 |
| 407 | Columbia Southern Tennessee Medical Center | 440058 | 36227 | Columbia Homecare Tennessee | 447248 | 36212 | Admin | 1024 Dinah Shore Blvd. | Winchester | TN | 37398 |
| 408 | Columbia Volunteer General Hospital | 440061 | 36231 | Columbia Homecare Northwest Tennessee | 447178 | 34278 | Parent | 215 Hawks Road, Bldg. 1, P.O. Box 106 | Martin | TN | 38237 |
| 409 | Columbia Volunteer General Hospital | 440061 | 36231 | Columbia Homecare Northwest Tennessee | 447178 | 34278 | Branch | 426 South Lake | Paris | TN | 38242 |
| 410 | Columbia Volunteer General Hospital | 440061 | 36231 | Columbia Homecare Northwest Tennessee | 447478 | 34278 | Branch | 109 Mary Jane Street | Troy | TN | 38260 |
| 411 | Columbia Trinity Hospital | 440149 | 36286 | Columbia Homecare Trinity | 447536 | 36220 | Parent | 608 Metcalf Drive | Erin | TN | 37061 |
| 412 | Columbia Summit Medical Center | 440150 | 34223 | Columbia Homecare Clarksville | 447223 | 34277 | Branch | 1947 - B Madison Street | Clarksville | TN | 37043 |
| 413 | Columbia Summit Medical Center | 440150 | 34223 | Columbia Homecare Hermitage | 447223 | 34277 | Branch | 5651 Frist Blvd., Suite 731 | Hermitage | TN | 37076 |
| 414 | Columbia Summit Medical Center | 440150 | 34223 | Columbia Homecare Lebanon | 447223 | 34277 | Branch | 510-D West Main Street | Lebanon | TN | 37087 |
| 415 | Columbia Summit Medical Center | 440150 | 34223 | Columbia Homecare Summit | 447223 | 34277 | Parent | 565 Marriott Drive, Suite 140 | Nashville | TN | 37214 |
| 416 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Parent | 6080 Shallowford, Suite 109 | Chattanooga | TN | 37112 |

07/20/2000

Page 26 of 58

C.80

Columbia/HCA
Home Health Agency List for 1996 and 1997

| HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|
| 417 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | P.O. Box 216, Hwy 56 & 108 | Altamont | TN | 37301 |
| 418 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | 5201 Copper Country Plaza 64E, P.O. Box 10 | Ducktown | TN | 37326 |
| 419 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | 10 Rankin Avenue North, P.O. Box 1028 | Dunlap | TN | 37327 |
| 420 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | 159 Omni Drive | McMinnville | TN | 37110 |
| 421 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | 7971 Rhea County Highway | Dayton | TN | 37321 |
| 422 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | 1860 Executive Park North, Suite E | Cleveland | TN | 37311 |
| 423 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | P. O. Box 190, Pikeville Clinic Basement | Pikeville | TN | 37367 |
| 424 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | 1019 Elm Avenue | South Pittsburg | TN | 37380 |
| 425 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Branch | 401 Front Street | Spring City | TN | |
| 426 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare Tennessee | 447156 | 34214 | Admin | 2115 Chapman Road, Suite 105 | Chattanooga | TN | 37421 |
| 427 | Columbia Parkridge Medical Center | 440156 | 34224 | Central Home Health Care of Chattanooga | 447521 | 34214 | Parent | 6080 Shallowford Road, Suite 108 | Chattanooga | TN | 37421 |
| 428 | Columbia Parkridge Medical Center | 440156 | 34224 | Central Home Health Care of Chattanooga | 447521 | 34214 | Branch | 744 Tell Street, P.O. Box 1309 | Athens | TN | 37303 |
| 429 | Columbia Parkridge Medical Center | 440156 | 34224 | Columbia Homecare | Commercial | 34284 | Parent | 2115 Chapman Road, Suite 115A | Chattanooga | TN | 37421 |
| 430 | Columbia Indian Path Medical Center | 440176 | 34255 | Columbia Homecare Indian Path | 447322 | 34276 | Parent | 701 North State of Franklin Road, Suite 2 | Johnson City | TN | 37604 |
| 431 | Columbia Indian Path Medical Center | 440176 | 34255 | Columbia Homecare Indian Path | 447322 | 34276 | Branch | 1241 Volunteer Parkway, 400 Executive Park | Bristol | TN | 37620 |
| 432 | Columbia Indian Path Medical Center | 440176 | 34255 | Columbia Homecare Indian Path | 447322 | 34276 | Branch | 1000 Preston Place North, Suite 102 | Kingsport | TN | 37660 |

C, 81

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 433 | Columbia Indian Path Medical Center | 440176 | 34255 | Columbia Homecare Indian Path | 447422 | 34276 | Branch | 4329 Highway 66 | Rogersville | TN | 37857 |
| 434 | Columbia Indian Path Medical Center | 440176 | 34255 | Columbia Homecare Indian Path | 447422 | 34276 | Branch | 1413 North Main Street, P.O. Box 237 | Erwin | TN | 37650 |
| 435 | Columbia Indian Path Medical Center | 440176 | 34255 | Columbia Homecare Indian Path | 447422 | 34276 | Branch | 1010 West Summer Street | Greeneville | TN | 37743 |
| 436 | Columbia Indian Path Medical Center | 440176 | 34255 | Columbia Homecare Indian Path | 447422 | 34276 | Admin | 2300 Pavilion Drive | Kingsport | TN | 37660 |
| 437 | Columbia East Ridge Hospital | 440178 | 34206 | Columbia Homecare Tennessee | 447516 | 34212 | Parent | 941 Spring Creek Road | Chattanooga | TN | 37412 |
| 438 | Columbia Livingston Regional Hospital | 440187 | 34298 | Columbia Homecare Livingston | 447260 | 36240 | Parent | 1084 Radford Hicks Drive, P.O. Box 276 | Livingston | TN | 38570 |
| 439 | Columbia Regional Hospital Jackson | 440189 | 34229 | Columbia Homecare Jackson | 447315 | 7069 | Parent | 367 Hospital Blvd. | Jackson | TN | 38302-2661 |
| 440 | Columbia Hendersonville Hospital | 440194 | 34296 | Columbia Homecare Carthage | 447296 | 36219 | Branch | 132 Greensville Hwy. | Carthage | TN | 37030 |
| 441 | Columbia Hendersonville Hospital | 440194 | 34296 | Columbia Homecare Hendersonville | 447296 | 36219 | Parent | 130 Imperial Blvd. | Hendersonville | TN | 37075 |
| 442 | Columbia Hendersonville Hospital | 440194 | 34296 | Columbia Homecare Nashville | 447296 | 36219 | Branch | 1900 Patterson, Suite 201 | Nashville | TN | 37203 |
| 443 | Columbia Hendersonville Hospital | 440194 | 34296 | Columbia Homecare Portland | 447296 | 36219 | Branch | 121 Village Drive, Suite 201 | Portland | TN | 37148 |
| 444 | Columbia Hendersonville Hospital | 440194 | 34296 | Columbia Homecare White House | 447296 | 36219 | Branch | 2821 Highway 31W South | White House | TN | 37188 |
| 445 | Columbia Southern Hills Medical Center | 440197 | 34242 | Columbia Homecare Southern Hills | 447121 | 34268 | Parent | 230 Cumberland Bend, Suite D | Nashville | TN | 37207 |
| 446 | Columbia Livingston Regional Hospital | 440187 | 34298 | Columbia Homecare Crossville | 447260 | 36240 | Branch | 208 Lantana Road | Crossville | TN | 38555 |
| 447 | Columbia Livingston Regional Hospital | 440187 | 34298 | Columbia Homecare Cookeville | 447260 | 36240 | Branch | 778-B South Jefferson | Cookeville | TN | 38501 |
| 448 | Columbia Medical Center of Pampa | 450009 | 38328 | Columbia Homecare Amarillo | 450005 | 39241 | Branch | 4106 West 51st | Amarillo | TX | 79109 |

07/20/2000

Page 28 of 38

C,82

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|----------|-------------|-------------|--------|------------|------------|--------|---------|------|-------|-----|
| 449 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Borger | 458005 | 39241 | Branch | 401 West 10th Street | Borger | TX | 79007 |
| 450 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Childress | 458005 | 39241 | Branch | 504 Second Street NE | Childress | TX | 79201 |
| 451 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Clarendon | 458005 | 39241 | Branch | 219 West 2nd Street, P.O. Drawer 1380 | Clarendon | TX | 79226 |
| 452 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Dalhart | 458005 | 39241 | Branch | 1616 Tennessee | Dalhart | TX | 79022 |
| 453 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Dumas | 458005 | 39241 | Branch | 801 S. Bliss, Suite 107 | Dumas | TX | 79029 |
| 454 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Lubbock | 458005 | 39241 | Branch | 6307 Indiana Avenue | Lubbock | TX | 79413 |
| 455 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Pampa | 458005 | 39241 | Parent | 912 W. Kentucky Avenue | Pampa | TX | 79065 |
| 456 | Columbia Medical Center of Pampa | 450099 | 38128 | Columbia Homecare Pampa | 458005 | 39241 | Admin | 100 W. 30th, Suite 107 | Pampa | TX | 79065 |
| 457 | Columbia Doctors Regional Medical Center | 450118 | 34331 | Columbia Homecare Corpus Christi | 677740 | 39369 | Parent | 3643 South Staples | Corpus Christi | TX | 78411 |
| 458 | Columbia East Houston Medical Center | 450126 | 37355 | Columbia Homecare Bayshore | 677647 | 37384 | Branch | 1001 E. Southmore, Suite 414 | Pasadena | TX | 77502 |
| 459 | Columbia East Houston Medical Center | 450126 | 37355 | Columbia Homecare Baytown | 677647 | 37384 | Branch | 1515 Alexander, Suite 311 | Baytown | TX | 77520 |
| 460 | Columbia East Houston Medical Center | 450126 | 37355 | Columbia Homecare East Houston Med. Ctr. | 677647 | 37384 | Parent | 15201 East Freeway, Suite 260 | Channelview | TX | 77530 |
| 461 | Columbia East Houston Medical Center | 450126 | 37355 | Columbia Homecare Humble | 677647 | 37384 | Branch | 9816 Memorial Drive, Suite 207 | Humble | TX | 77338 |
| 462 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare Bee Area | 457642 | 39217 | Branch | 1145 East Sinton Street | Sinton | TX | 78387 |
| 463 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare Bee Area | 457642 | 39217 | Branch | 126 North Courthouse | Goliad | TX | 77963 |
| 464 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare Bee Area | 457642 | 39217 | Branch | 3001 Houston | George West | TX | 78022 |

C.83

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 465 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare Bee Area | 457642 | 39217 | Branch | 312 Sunset Strip | Kenedy | TX | 78119 |
| 466 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare Bee Area | 457642 | 39217 | Branch | P. O. Box 1777 | Beeville | TX | 78104 |
| 467 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare North Bay | 457642 | 39217 | Branch | 2309 Hwy. 35 North | Rockport | TX | 78382 |
| 468 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare Northwest | 457642 | 39217 | Parent | 4316 FM 1889 | Robstown | TX | 78380 |
| 469 | Columbia Northwest Hospital | 450131 | 37379 | Columbia Homecare Northwest | 457642 | 39217 | Branch | 1212 North 14th Street | Kingsville | TX | 78363 |
| 470 | Columbia DeTar Hospital | 450147 | 38323 | Columbia Homecare DeTar | 677168 | 39237 | Parent | 4204 North Laurent | Victoria | TX | 77902 |
| 471 | Columbia DeTar Hospital | 450147 | 38323 | Columbia Homecare DeTar | 677168 | 39237 | Branch | 105 South Esplande | Cuero | TX | 77954 |
| 472 | Columbia DeTar Hospital | 450147 | 38323 | Columbia Homecare DeTar | 677168 | 39237 | Branch | 113 W. Main Street | Kenedy | TX | 78119 |
| 473 | Columbia DeTar Hospital | 450147 | 38323 | Columbia Homecare DeTar | 677168 | 39237 | Branch | 210 N. Texana | Hallettsville | TX | 77964 |
| 474 | Columbia DeTar Hospital | 450147 | 38323 | Columbia Homecare DeTar | 677168 | 39237 | Branch | 310 W. Pearl | Goliad | TX | 77963 |
| 475 | Columbia DeTar Hospital | 450147 | 38323 | Columbia Homecare DeTar | 677168 | 39237 | Branch | 717 South Alamo | Refugio | TX | 78377 |
| 476 | Columbia Gulf Coast Medical Center | 450214 | 38343 | Columbia Hospice Gulf Coast | 451586 | 38395 | Parent | 1102 N. Mechanic Street, Suite B | El Campo | TX | 77437 |
| 477 | Columbia Gulf Coast Medical Center | 450214 | 38343 | Columbia Homecare Gulf Coast | 677008 | 38395 | Parent | 2918 N. Richmond | Wharton | TX | 77488 |
| 478 | Columbia Gulf Coast Medical Center | 450214 | 38343 | Columbia Homecare Gulf Coast | 677008 | 38395 | Branch | 1102 N. Mechanic Street | El Campo | TX | 77437 |
| 479 | Columbia Gulf Coast Medical Center | 450214 | 38343 | Columbia Homecare Gulf Coast | 677008 | 38395 | Branch | 2408 Avenue F | Bay City | TX | 77414 |
| 480 | Columbia Gulf Coast Medical Center | 450214 | 38343 | Columbia Homecare Gulf Coast | 677008 | 38395 | Branch | 1106 Morton Street, Morton Square, Suite A | Richmond | TX | 77469 |

C.183

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 481 | Columbia Medical Center Brazos Valley | 450299 | 34306 | Columbia Homecare Brazos Valley | 458117 | 38316 | Parent | 2411 Texas Avenue | College Station | TX | 77840 |
| 482 | Columbia Medical Center Brazos Valley | 450299 | 34306 | Columbia Homecare Brazos Valley | 458117 | 38316 | Branch | 400 E. Washington, Suite 201 | Navasota | TX | 77868 |
| 483 | Columbia Medical Center of San Angelo | 450110 | 38306 | Columbia Homecare West Texas | 678098 | 39230 | Parent | 2117 Knickerbocker Road, Suite A | San Angelo | TX | 76904 |
| 484 | Columbia Alice Physicians & Surgeons Hospital | 450153 | 38313 | Columbia Homecare Alice | 677582 | 39218 | Parent | 1000 Harkins Avenue | Alice | TX | 78332 |
| 485 | Columbia Alice Physicians & Surgeons Hospital | 450153 | 38313 | Columbia Homecare Freer | 677582 | 39218 | Branch | 1101 E. Riley, P.O. Box 1786 | Freer | TX | 78357 |
| 486 | Columbia Alice Physicians & Surgeons Hospital | 450153 | 38313 | Columbia Homecare Hebbronville | 677582 | 39218 | Branch | 402 N. Smith | Hebbronville | TX | 78361 |
| 487 | Columbia Alice Physicians & Surgeons Hospital | 450153 | 38313 | Columbia Homecare Premont | 677582 | 39218 | Branch | 145 N. W. First Street | Premont | TX | 78375 |
| 488 | Columbia Medical Center of Sherman | 450093 | 38305 | Columbia Homecare Texoma | 457570 | 39205 | Parent | 1111 Gallagher Road | Sherman | TX | 75090 |
| 489 | Columbia Medical Center of McKinney (NTMC) | 450403 | 38333 | Columbia Homecare Farmersville | 457627 | 39225 | Branch | 102 McKinney Street | Farmersville | TX | 75442 |
| 490 | Columbia Medical Center of McKinney (NTMC) | 450403 | 38333 | Columbia Homecare McKinney | 457627 | 39225 | Parent | 130 South Central Expressway | McKinney | TX | 75070 |
| 491 | Columbia Medical Center of McKinney (NTMC) | 450403 | 38333 | Columbia Homecare Plano | 457627 | 39225 | Branch | 3900 W. 15th Street, Suite 402 | Plano | TX | 75075 |
| 492 | Columbia Woodland Heights Medical Center | 450484 | 37563 | Columbia Homecare Woodland Heights | 677618 | 39204 | Parent | 232 N. John Redditt Drive | Lufkin | TX | 75904 |
| 493 | Columbia Silsbee Doctors Hospital | 450570 | 39121 | Columbia Homecare Silsbee | 677167 | 39356 | Parent | 1104 N. Fifth Street, Suite 100 | Silsbee | TX | 77656 |
| 494 | Columbia Silsbee Doctors Hospital | 450570 | 39121 | Columbia Homecare Jasper | 677167 | 39358 | Branch | 162 E. Lamar, Suite 101 | Jasper | TX | 75951 |
| 495 | Columbia Brownwood Regional Medical Center | 450567 | 38320 | Columbia Homecare Brownwood | 675476 | 39202 | Parent | 125 South Park Drive, Suite A | Brownwood | TX | 76801 |
| 496 | Columbia Brownwood Regional Medical Center | 450567 | 38320 | Columbia Homecare Brownwood | 675476 | 39202 | Branch | 902 N. Main Street | Cross Plains | TX | 76443 |

C, 84

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 497 | Columbia Brownwood Regional Medical Center | 450587 | 38320 | Columbia Homecare Brownwood | 675176 | 39202 | Branch | 106 17th Street | Brady | TX | 76825 |
| 498 | Columbia Brownwood Regional Medical Center | 450587 | 38320 | Columbia Homecare Brownwood | 675176 | 39202 | Branch | 100 East Central | Comanche | TX | 76442 |
| 499 | Columbia Clear Lake Regional Medical Center | 450617 | 34136 | Columbia Homecare Alvin | 450809 | 39178 | Branch | 301 Medic Lane | Alvin | TX | 77511 |
| 500 | Columbia Clear Lake Regional Medical Center | 450617 | 34136 | Columbia Homecare Clear Lake | 450809 | 39178 | Parent | 450 Medical Center Blvd, Suite 410 | Webster | TX | 77598 |
| 501 | Columbia Clear Lake Regional Medical Center | 450617 | 34136 | Columbia Homecare Mainland | 450809 | 39178 | Branch | 6801 Emmett F. Lowry Expressway | Texas City | TX | 77591 |
| 502 | Metropolitan Methodist Hospital | 450633 | 34392 | Methodist Home Care | 457703 | 39240 | Parent | 5282 Medical Drive, Suite 416 | San Antonio | TX | 78229 |
| 503 | Metropolitan Methodist Hospital | 450633 | 34392 | Methodist Home Care | 457703 | 39240 | Branch | 222 Sidney Baker South, Suite 410 | Kerrville | TX | 78028 |
| 504 | Metropolitan Methodist Hospital | 450633 | 34392 | Methodist Home Care | 457703 | 39240 | Branch | 12602 Toepperwein, Suite 210 | San Antonio | TX | 78233 |
| 505 | Metropolitan Methodist Hospital | 450633 | 34392 | Methodist Home Care | 457703 | 39240 | Branch | 1222 North Main, Suite 200 | San Antonio | TX | 78212 |
| 506 | Metropolitan Methodist Hospital | 450633 | 34392 | Methodist Home Care | 457703 | 39240 | Branch | 5282 Medical Drive, Suite 416 | San Antonio | TX | 78229 |
| 507 | Columbia Medical Center of Denton | 450634 | 38329 | Columbia Homecare Decatur | 677401 | 39220 | Branch | 116 S. State Street | Decatur | TX | 76234 |
| 508 | Columbia Medical Center of Denton | 450634 | 38329 | Columbia Homecare Denton | 677401 | 39220 | Parent | 1310 Scripture | Denton | TX | 76201 |
| 509 | Columbia Medical Center of Denton | 450634 | 38329 | Columbia Homecare Gainesville | 677401 | 39220 | Branch | 115 N Commerce | Gainesville | TX | 76240 |
| 510 | Columbia Medical Center of Denton | 450634 | 38329 | Columbia Homecare Lewisville | 677401 | 39220 | Branch | 475 W. Elm, Suite 105 | Lewisville | TX | 75057 |
| 511 | Columbia Doctors Hospital of Laredo | 450643 | 38324 | Columbia Homecare Doctors Hospital of Laredo | 677536 | 6580 | Parent | 1303 Calle Del Norte, Suite 700 | Laredo | TX | 78041 |
| 512 | Columbia West Houston Medical Center | 450644 | 34327 | Columbia Homecare Conroe | 457190 | 39245 | Branch | 500 Medical Center Blvd., #120 | Conroe | TX | 77304 |

C.85

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 513 | Columbia West Houston Medical Center | 450644 | 34327 | Columbia Homecare North Houston | 457190 | 39245 | Branch | 7407 North Freeway | Houston | TX | 77076 |
| 514 | Columbia West Houston Medical Center | 450644 | 34327 | Columbia Homecare West Houston | 457190 | 39245 | Parent | 12121 Richmond, Suite 413 | Houston | TX | 77082 |
| 515 | Columbia Medical Center - East | 450646 | 39309 | El Paso Nurses Unlimited | 457591 | 39354 | Parent | 100 Executive Center Blvd. | El Paso | TX | 79902 |
| 516 | Columbia Medical Center - East | 450646 | 39309 | Nurses Unlimited of Van Horn | 457591 | 39354 | Branch | 701-A Broadway | Van Horn | TX | 79855 |
| 517 | Columbia Hospital at Medical City Dallas | 450647 | 34325 | Columbia Homecare Corsicana | 677419 | 38301 | Branch | 118 Mall Drive | Corsicana | TX | 75110 |
| 518 | Columbia Hospital at Medical City Dallas | 450647 | 34325 | Columbia Homecare Dallas | 677419 | 38301 | Parent | 833 E. Arapaho, Suite 103 | Richardson | TX | 75081 |
| 519 | Columbia Hospital at Medical City Dallas | 450647 | 34325 | Columbia Homecare Duncanville | 677419 | 38301 | Branch | 606 Oriole Blvd., Suite 300 | Duncanville | TX | 75116 |
| 520 | Columbia Hospital at Medical City Dallas | 450647 | 34325 | Columbia Homecare Mabank/Gun Barrel City | 677419 | 38301 | Branch | 1030 West Main Street | Gun Barrel City | TX | 75147 |
| 521 | Columbia Hospital at Medical City Dallas | 450647 | 34325 | Columbia Homecare Terrell | 677419 | 38301 | Branch | 102 E. Moore Street, Suite 305 | Terrell | TX | 75160 |
| 522 | Columbia Valley Regional Medical Center | 450662 | 37358 | Columbia Homecare Rio Grande Regional | 458454 | 39228 | Branch | 2208 Primrose Blvd., Bldg. D | McAllen | TX | 78504 |
| 523 | Columbia Valley Regional Medical Center | 450662 | 37358 | Columbia Homecare Valley Regional | 458454 | 39228 | Parent | One Ted Hunt Blvd. | Brownsville | TX | 78523 |
| 524 | Columbia Beaumont Medical Center | 450666 | 34314 | Columbia Homecare Beaumont | 458690 | 39342 | Parent | 810 Hospital Drive, Suite 115 | Beaumont | TX | 77701 |
| 525 | Columbia Plaza Medical Center of Fort Worth | 450672 | 34318 | Columbia Homecare Ft. Worth | 677462 | 39219 | Parent | 2501 Parkview Drive, Suite 560 | Fort Worth | TX | 76102 |
| 526 | Columbia Plaza Medical Center of Fort Worth | 450672 | 34318 | Columbia Homecare Granbury | 677462 | 39219 | Branch | 1327 N. Plaza Drive | Granbury | TX | 76048 |
| 527 | Columbia Plaza Medical Center of Fort Worth | 450672 | 34318 | Columbia Homecare Stephenville | 677462 | 39219 | Branch | 1915 South Graham | Stephenville | TX | 76401 |
| 528 | Columbia Plaza Medical Center of Fort Worth | 450672 | 34318 | Columbia Homecare Waco | 677462 | 39219 | Branch | 1105 Wooded Acres, Suite 3 | Waco | TX | 76710 |

07/20/2000

**Columbia/HCA**
**Home Health Agency List for 1996 and 1997**

| HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|
| 529 | Columbia Plaza Medical Center of Fort Worth | 450672 | 34118 | Columbia Homecare Weatherford | 677462 | 39219 | Branch | 1424 Clear Lake Road | Weatherford | TX | 76086 |
| 530 | Columbia Women's Hospital of Texas | 450674 | 34119 | Columbia Homecare Houston | 677671 | 39257 | Parent | 7400 Fannin, Suite 1295 | Houston | TX | 77054 |
| 531 | Columbia Women's Hospital of Texas | 450674 | 34119 | Columbia Homecare Katy | 677671 | 39257 | Branch | 20501 Katy Freeway, Suite 228 | Katy | TX | 77450 |
| 532 | Columbia Women's Hospital of Texas | 450674 | 34119 | Columbia Homecare Spring Branch | 677671 | 39257 | Branch | 8000 Waterbury, Suite 330 | Houston | TX | 77055 |
| 533 | Columbia Medical Center of Arlington | 450675 | 34309 | Columbia Homecare MidCities | 677473 | 39224 | Parent | 3100 Matlock Road, Suite 103 | Arlington | TX | 76015 |
| 534 | Columbia Medical Center of Arlington | 450675 | 34309 | Columbia Homecare MidCities | 677473 | 39224 | Branch | 6162 E. Mockingbird Lane, Suite 207 | Dallas | TX | 75214 |
| 535 | Columbia Medical Center of Arlington | 450675 | 34309 | Columbia Homecare MidCities | 677473 | 39224 | Branch | 1500-A Norwood, Suite 100 | Hurst | TX | 76054 |
| 536 | Columbia Longview Regional Medical Center | 450702 | 38317 | Columbia Homecare Longview Reg. Med. Ctr. | 457644 | 38376 | Parent | 101-A Simpson | Gilmer | TX | 75644 |
| 537 | Columbia Longview Regional Medical Center | 450702 | 38317 | Columbia Homecare Longview Reg. Med. Ctr. | 457644 | 38376 | Branch | 1009 N. 4th Street, Suite 106 | Longview | TX | 75601 |
| 538 | Columbia Medical Arts Hospital of Texarkana | 450703 | 38334 | Columbia Homecare Northeast Texas | 457723 | 39213 | Parent | 4939 North Elizabeth Street | Texarkana | TX | 75503 |
| 539 | Columbia Medical Arts Hospital of Texarkana | 450703 | 38334 | Columbia Homecare Northeast Texas | 457723 | 39213 | Branch | 1104 Broadway St. | Daingerfield | TX | 75638 |
| 540 | Columbia Medical Arts Hospital of Texarkana | 450703 | 38334 | Columbia Homecare Northeast Texas | 457723 | 39213 | Branch | 109 S. W. Front Street | DeKalb | TX | 75559 |
| 541 | Columbia Medical Arts Hospital of Texarkana | 450703 | 38334 | Columbia Homecare Northeast Texas | 457723 | 39213 | Branch | 301 Pinecrest Drive | Atlanta | TX | 75551 |
| 542 | Columbia Medical Arts Hospital of Texarkana | 450703 | 38334 | Columbia Homecare Northeast Texas | 457723 | 39213 | Branch | 614 S. Washington Street | Marshall | TX | 75670 |
| 543 | Columbia St. David's South Hospital | 450713 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Parent | 2028 E. Ben White Blvd., Suite 310 | Austin | TX | 78741 |
| 544 | Columbia St. David's South Hospital | 450713 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | 8303 Mopac Expressway, Suite A-202 | Austin | TX | 78759 |

C, 87

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 545 | Columbia St. David's South Hospital | 450711 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | 101 Hwy. 281, Suite 310 | Marble Falls | TX | 78651 |
| 546 | Columbia St. David's South Hospital | 450711 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | 100 W. Washington | Giddings | TX | 78942 |
| 547 | Columbia St. David's South Hospital | 450711 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | 220 N. Washington | LaGrange | TX | 78945 |
| 548 | Columbia St. David's South Hospital | 450713 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | Highway 71 East, Route 4, Box 197 | Bastrop | TX | 78602 |
| 549 | Columbia St. David's South Hospital | 450713 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | 1205 Hwy. 123, Suite 102 | San Marcos | TX | 78666 |
| 550 | Columbia St. David's South Hospital | 450713 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | 215 Rutkin Lane | Lockhart | TX | 78644 |
| 551 | Columbia St. David's South Hospital | 450713 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Branch | 900 Round Rock Ave., Suite 307 | Round Rock | TX | 78681 |
| 552 | Columbia St. David's South Hospital | 450713 | 34320 | Columbia Homecare Lifeway | 457697 | 39244 | Admin | 2028 E. Ben White Blvd., Suite 300 | Austin | TX | 78741 |
| 553 | Columbia Bay Area Medical Center | 450788 | 39333 | Columbia Hospice of the Bay | 451652 | 39251 | Parent | 7101 S.P.I.D., Bldg. 100B | Corpus Christi | TX | 78412 |
| 554 | Columbia Medical Center of Sherman | 450393 | 38335 | Columbia Homecare Whitesboro | 457570 | 39205 | Branch | 2535 Highway 82-E, Suite A-2 | Whitesboro | TX | 76273 |
| 555 | Columbia Medical Center of McKinney (NTMC) | 450403 | 38313 | Columbia Homecare Farmersville | 467267 | 39225 | Branch | 102 McKinney Street | Farmersville | TX | 75442 |
| 556 | Columbia Mainland Medical Center | 450530 | 37313 | Columbia Homecare Mainland | 677785 | 38385 | Parent | 6801 Emmett F. Lowry Expressway | Texas City | TX | 77591 |
| 557 | Metropolitan Methodist Hospital | 450633 | 34392 | Methodist Home Care | Commercial | 39239 | Parent | 5282 Medical Drive, Suite 190 | San Antonio | TX | 78229 |
| 558 | Columbia St. David South Hospital (South Austin MC) | 450713 | 34320 | Columbia Homecare Lifeway | 457795 | 39244 | Parent | 2028 E. Ben White Blvd. | Austin | TX | 78731 |
| 559 | Columbia Homecare Group | Freestanding | N/A | Columbia Hospice Dallas | 451556 | 8044 | Parent | 1300 West Mockingbird, Suite 160 | Dallas | TX | 75247 |
| 560 | Columbia Homecare Group | Freestanding | N/A | Columbia Hospice Fort Worth | 451556 | 8044 | Branch | One Summit Avenue, Suite 905 | Fort Worth | TX | 76102 |

07/20/2000

C.88

Columbia/HCA
Home Health Agency List for 1996 and 1997

| # | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 561 | Columbia Homecare Group | Freestanding | N/A | Columbia Hospice West | 151564 | 8041 | Branch | 1227 N. Valley Mills Drive, Suite A | Waco | TX | 76710 |
| 562 | Columbia Homecare Group | Freestanding | N/A | Columbia Homecare | 457162 | 37124 | Parent | 2900 North Loop West, Suite 580 | Houston | TX | 77092 |
| 563 | Columbia Homecare Group | Freestanding | N/A | Columbia Homecare | 677367 | 37322 | Parent | 1300 West Mockingbird, Suite 160 | Dallas | TX | 75247 |
| 564 | Columbia Homecare Group | Freestanding | N/A | Nurses Unlimited of El Paso | 677650 | 39360 | Parent | 100 Executive Center Blvd. | El Paso | TX | 79902 |
| 565 | Columbia Homecare Group | Freestanding | N/A | Columbia Homecare | 677367 | 37322 | Branch | 833 E. Arapaho, Suite 105 | Richardson | TX | 75081 |
| 566 | Columbia Ogden Regional Medical Center | 460005 | 34415 | Columbia Homecare Utah | 467012 | 34482 | Parent | 5495 South 500 East | Ogden | UT | 84405 |
| 567 | Columbia Ogden Regional Medical Center | 460005 | 34415 | Columbia Homecare Utah | 467012 | 34482 | Branch | 101 Commercial Street, P. O. Box 769 | Morgan | UT | 84050 |
| 568 | Columbia Castleview Hospital | 460011 | 34412 | Columbia Homecare Utah | 467078 | 34479 | Parent | 295 South Highway 55 | Price | UT | 84501 |
| 569 | Columbia Mountain View Hospital | 460013 | 34409 | Columbia Homecare Utah | 467082 | 34481 | Parent | 39 N. Professional Way, Suite 2 | Payson | UT | 84651 |
| 570 | Columbia Mountain View Hospital | 460013 | 34409 | Columbia Homecare Utah | 467082 | 34481 | Branch | 2200 N. University Parkway, #2C | Provo | UT | 84604 |
| 571 | Columbia Brigham City Community Hospital | 460017 | 34410 | Columbia Homecare Utah | 467099 | 34478 | Parent | 984 South 500 West, Suite 100 | Brigham City | UT | 84302 |
| 572 | Columbia Brigham City Community Hospital | 460017 | 34410 | Columbia Homecare Utah | 467099 | 34478 | Branch | 1395 North 400 East, Suite C | Logan | UT | 84341 |
| 573 | Columbia Brigham City Community Hospital | 460017 | 34410 | Columbia Homecare Utah | 467099 | 34478 | Branch | 471 W. 600 North, Unit A | Tremonton | UT | 84337 |
| 574 | Columbia Ashley Valley Medical Center | 460090 | 34413 | Columbia Homecare Utah | 467016 | 34477 | Parent | 38 East 100 North | Vernal | UT | 84078 |
| 575 | Columbia Lakeview Hospital | 460042 | 34411 | Columbia Homecare Utah | 467000 | 34480 | Parent | 520 East Medical Drive, Suite 330 | Bountiful | UT | 84010 |
| 576 | Columbia Lakeview Hospital | 460042 | 34411 | Columbia Homecare Utah | 467000 | 34480 | Branch | 2084 Robins, Suite 301 | Layton | UT | 84041 |

C.89

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 577 | Columbia St. Marks Hospital | 460037 | 34107 | Columbia Homecare Utah | 467028 | 34476 | Parent | 1935 East Vine Street, Suite 400 | Salt Lake City | UT | 84121 |
| 578 | Columbia St. Marks Hospital | 460037 | 34107 | Columbia Homecare Utah | 467028 | 34476 | Branch | 75 South 100 East, Suite 1D | St. George | UT | 84770 |
| 579 | Columbia St. Marks Hospital | 460037 | 34107 | Columbia Homecare Utah | 467028 | 34476 | Branch | 39 North Main Street | Tooele | UT | 84074 |
| 580 | Columbia St. Marks Hospital | 460037 | 34107 | Columbia Homecare Utah | 467028 | 34476 | Branch | P. O. Box 669, 280 E. Center Street | Kamas | UT | 84036 |
| 581 | Columbia St. Marks Hospital | 460037 | 34107 | Columbia Homecare Utah | 467028 | 34476 | Branch | 3540 S. 4000 West, Suite 150 | West Valley | UT | 84120 |
| 582 | Columbia Divisional Agency | Freestanding | N/A | Columbia Homecare Utah | Commercial | 34483 | Parent | 150 Wright Brothers Drive, Suite 540 | Salt Lake City | UT | 84116 |
| 583 | Columbia Indian Path Medical Center | 440076 | 34225 | Columbia Homecare Indian Path | 447422 | 34276 | Branch | 103 East Jackson Street, Suite 200 | Gate City | VA | 24251 |
| 584 | Columbia Lewis-Gale Medical Center | 490048 | 34630 | Columbia Homecare Lewis-Gale Medical Center | 497509 | 34670 | Parent | 1900 Electric Road | Salem | VA | 24153 |
| 585 | Columbia Clinch Valley Medical Center | 490060 | 34607 | Columbia Homecare Clinch Valley | 497484 | 34608 | Branch | P. O. Box 2754 | Grundy | VA | 24614 |
| 586 | Columbia Clinch Valley Medical Center | 490060 | 34607 | Columbia Homecare Clinch Valley | 497484 | 34608 | Parent | 2951 West Front Street, Suite 2100 | Richlands | VA | 24641 |
| 587 | Columbia Reston Hospital Center | 490107 | 7026 | Columbia Homecare Northern Virginia | 497517 | 7031 | Parent | 1850 Town Center Parkway | Reston | VA | 22090 |
| 588 | Columbia Montgomery Regional Hospital | 490110 | 34610 | Columbia Homecare Montgomery Reg. Hospital | 497407 | 34642 | Parent | 3705 S. Main Street | Blacksburg | VA | 24060 |
| 589 | Columbia Montgomery Regional Hospital | 490110 | 34610 | Columbia Homecare Montgomery Reg. Hospital | 497407 | 34642 | Branch | 201 S. Locust Street | Floyd | VA | 24091 |
| 590 | Columbia Chippenham & Johnston-Willis Hospitals, Inc. | 490112 | 34632 | Columbia Hospice and Family Care | 491506 | 34632 | Parent | 1405 Johnston-Willis Drive | Richmond | VA | 23235 |
| 591 | Columbia Chippenham & Johnston-Willis Hospitals, Inc. | 490112 | 34632 | Columbia Homecare Central Virginia | 497125 | 35268 | Parent | 1401 Johnston-Willis Drive | Richmond | VA | 23235 |
| 592 | Columbia Chippenham & Johnston-Willis Hospitals, Inc. | 490112 | 34632 | Columbia Homecare Central Virginia | 497125 | 35268 | Branch | 411 W. Randolph Road | Hopewell | VA | 23860 |

C.90

Columbia/HCA
Home Health Agency List for 1996 and 1997

| | HOSPITAL | HOSP PROV # | HOSP COID # | AGENCY | HHA PROV # | HHA COID # | STATUS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 593 | Columbia Chippenham & Johnston Willis Hospitals, Inc. | 490112 | 34632 | Columbia Homecare Central Virginia | 497125 | 35268 | Branch | 2619 Floyd Avenue | Richmond | VA | 23220 |
| 594 | Columbia Pulaski Community Hospital | 490116 | 34605 | Columbia Homecare Pulaski Comm. Hosp. | 490075 | 34661 | Parent | 2000 Lee Highway, P.O. Box 759 | Pulaski | VA | 24301 |
| 595 | Columbia Pulaski Community Hospital | 490116 | 34605 | Columbia Homecare Pulaski Comm. Hosp. | 490075 | 34661 | Branch | 1480 E. Main Street, Suite 702 | Wytheville | VA | 24382 |
| 596 | Columbia Alleghany Regional Hospital | 490126 | 34654 | Columbia Homecare Alleghany Regional Hospital | 497292A | 34657 | Parent | 1 Alleghany Regional Hospital Lane | Low Moor | VA | 24457 |
| 597 | Columbia St. Luke's Hospital | 510067 | 34901 | Columbia Homecare | Pending | 34918 | Parent | 705 South College Avenue | Bluefield | VA | 24605 |
| 598 | Columbia Homecare Group | Freestanding | N/A | Columbia Homecare | Commercial | 34667 | Parent | 9200 Arboretum Parkway, Suite 120 | Richmond | VA | 23236 |
| 599 | Columbia Saint Francis Hospital | 510001 | 34910 | Columbia Homecare Charleston | 517110 | 6648 | Parent | 3331 Laidley Street, P. O. Box 471 | Charleston | WV | 25322 |
| 600 | St. Joseph's Hospital | 510033 | 6760 | ServCare, Inc. | 517097A | 7066 | Parent | 1213 Garfield Avenue | Parkersburg | WV | 26101 |
| 601 | St. Joseph's Hospital | 510033 | 6760 | ServCare, Inc. | 517097A | 7066 | Branch | 208 Clayton Street | Pennsboro | WV | 26415 |
| 602 | Columbia St. Luke's Hospital | 510067 | 34901 | Columbia Homecare | 517106 | 34918 | Parent | 1333 Southview Drive, Suite 3 | Bluefield | WV | 24701 |
| 603 | Columbia Raleigh General Hospital | 510070 | 34907 | Extend-A-Care Home Health | 517054 | 7842 | Parent | 713 S. Oakwood Avenue | Beckley | WV | 25801 |
| 604 | Columbia Raleigh General Hospital | 510070 | 34907 | Extend-A-Care Home Health | 517054 | 7842 | Satellite | 119 Main Street N., Suite C | Oak Hill | WV | 24901 |
| 605 | Columbia Raleigh General Hospital | 510070 | 34907 | Extend-A-Care Home Health & Hospice | 517054 | 7842 | Satellite | 103 Guyandotte Avenue | Mullens | WV | 25882 |
| 606 | Columbia Raleigh General Hospital | 510070 | 34907 | Columbia Homecare at Raleigh General Hospital | 517108 | 34919 | Parent | 302 Carriage Drive | Beckley | WV | 25801 |
| 607 | Columbia Riverton Memorial Hospital | 530008 | 35001 | Columbia Homecare Riverton | 570011 | 35003 | Parent | 2300 Rose Lane | Riverton | WV | 82501 |

07/20/2000

C, 91

ATTACHMENT 5
TO CIVIL AND ADMINISTRATIVE SETTLEMENT AGREEMENT
BETWEEN U.S. AND HCA

Claims Raised in *Qui Tams* That are Co-Extensive With This
Agreement[1]

I.   **Cases For Which HCA And The United States Agree That The
     Entire Complaint Is Co-Extensive With The Covered Conduct**

(1)  U.S. ex rel. Wyman and Rothfeder v. HealthTrust,
     Columbia/HCA, et al., No. 99-3310 (D.D.C.)(formerly D.
     Utah).

(2)  U.S. ex rel. Health Outcomes Technologies v. Columbia
     Medical Center-East, et al., No. 99-3297 (D.D.C.)(formerly
     E.D. Pa.).

(3)  U.S. ex rel. McLendon v. Columbia Healthcare Corp., et al.,
     No. 99-3295 (D.D.C.)(formerly N.D. Ga.).

(4)  U.S. ex rel. Cianci v. Columbia/HCA Healthcare Corp., et
     al., No. 99-2761 (D.D.C.)(formerly M.D. Fla.).

II.  **Cases For Which HCA and the United States Agree That Some
     Claims Are Co-Extensive With The Covered Conduct**

(5)  U.S. ex rel. Atchison v. Columbia/HCA Healthcare, Inc., No.
     99-2399 (D.D.C.)(formerly M.D. Tenn.).

     Co-extensive claims in Second Amended Qui Tam Complaint:

          ¶¶ 40 & 41 (relating to "Home Health Care")

(6)  U.S. ex rel Atchison v. Columbia/HCA Healthcare, Inc., No.
     99-3307 (D.D.C.)(formerly W.D. Tex.).

     Co-extensive claims in First Amended Qui Tam Complaint:

          ¶¶ 60 & 61 (relating to "Home Health Care")

---

[1] This list is intended to cover only claims that are within
the scope of the Covered Conduct, as defined in the Agreement.
Claims in these cases against non-HCA defendants (e.g.,
individuals, entities not owned or controlled by HCA) are
excluded from the Covered Conduct and thus will not be dismissed
pursuant to the Agreement.

C.92

(7)   <u>U.S. ex rel. Boston v. Columbia/HCA Healthcare Corp.</u>, No. 99-3301 (D.D.C.)(formerly N.D. Tex.).

Co-extensive claims in Complaint:

> The complaint is covered to the extent it alleges home health billing allegations described in the Covered Conduct, including, but possibly not limited to, ¶¶ 24, 25 (except ¶ 25(A)(4)) and 36 ((a) through (d) only).

(8)   <u>U.S. ex rel. Christian, Long and Kuhn v. Columbia/HCA Healthcare Corp., et al.</u>, No. 99-3303 (D.D.C.)(formerly S.D. Tex.).

Co-extensive claims in Relator's Original Complaint:

> All claims in the complaint with the exception of the venipuncture allegation in ¶ 55.

(9)   <u>U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp., et al.</u>, No. 99-3294 (D.D.C.)(formerly M.D. Ga.).

Co-extensive claims in Complaint:

> The complaint is covered to the extent it alleges conduct described in the Covered Conduct.  The United States and HCA will have further discussions about what claims, if any, are not covered.

(10)  <u>U.S. ex rel. Lanni v. Curative Health Services, Inc., et al.</u>, No. 00-2584 (D.D.C.)(formerly S.D.N.Y.)

Co-extensive claims in Complaint:

> The complaint is covered to the extent it alleges fraudulent submission of outpatient laboratory claims described in the Covered Conduct by HCA hospitals.  The complaint is not covered with respect to conduct by other defendants.

(11)  <u>U.S. ex rel. Ortega v. Columbia/HCA Healthcare Corp., et al.</u>, No. 99-3305 (D.D.C.)(formerly W.D. Tex.)

C, 93

Co-extensive claims in Plaintiff's First Amended Complaint:

¶¶ 18 & 19 (upcoding allegations)

(12) <u>U.S. ex rel. Rappaport v. Hospital Corp. of America, et al.,</u> No. 99-3288 (D.D.C.)(formerly N.D. Ala.)

Co-extensive claims in Sealed Complaint With Demand For Jury Trial:

¶¶ 93 & 94 (relating to "Improperly Changing Diagnosis To Enhance Medicare Billing")

(13) <u>U.S. ex rel. Schilling v. Columbia/HCA Healthcare Corp., et al.,</u> Civ. No. 99-3289 (D.D.C.)(formerly M.D. Fla.)

Co-extensive claims in First Amended Complaint and Demand For Jury Trial:

¶¶ 31 and 36-40 (relating to conduct covered by Home Health Management Fees and Home Health Community Educators portions of Covered Conduct)

3

C, 94

## CORPORATE INTEGRITY AGREEMENT
### BETWEEN THE
### OFFICE OF INSPECTOR GENERAL
### OF THE
### DEPARTMENT OF HEALTH AND HUMAN SERVICES
### AND
### HCA–THE HEALTHCARE COMPANY

## I.   PREAMBLE

HCA--The Healthcare Company ("HCA") hereby enters into this Corporate

Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United

States Department of Health and Human Services ("HHS") to promote compliance by

itself, its subsidiaries, and their employees, contractors, agents, and physicians with the

requirements of Medicare, Medicaid and all other Federal health care programs (as

defined in 42 U.S.C. § 1320a-7b(f))(hereinafter collectively referred to as the "Federal

health care programs.")  This CIA shall be applicable only to those operations of HCA

that are subject to United States law and regulations.  HCA's compliance with the terms

and conditions in this CIA shall constitute an element of HCA's present responsibility

with regard to participation in the Federal health care programs.  Whenever the term

"HCA" is used in this CIA, it includes all of HCA's subsidiaries, as defined in this

agreement.  Contemporaneously with this CIA, HCA is entering into a Settlement

C, 95

Agreement with the United States, and this CIA is incorporated by reference into the Settlement Agreement. HCA currently operates an Ethics and Compliance Program, which HCA agrees to operate in a manner consistent with the terms of this CIA.

## II.   TERM OF THE CIA AND DEFINITIONS

A. Term. The period of the compliance obligations assumed by HCA under this CIA shall be eight years from the effective date of this CIA (unless otherwise specified). The effective date of this CIA shall be the date that the court(s) accept the plea(s) and impose a sentence in the criminal proceedings related to the plea agreement entered into between HCA and the United States on or about the date of the signing of this CIA. Sections VII, VIII, IX, X and XI of this CIA shall remain in effect until OIG has completed its review of the final annual report and any additional materials submitted by HCA pursuant to OIG's request. The compliance obligations of the Corporate Integrity Agreement in place for Lanier Park Hospital in Gainesville, Georgia, shall not apply to the time period beginning on the effective date of this CIA (sections II.D, II.E, III, V, and VI of the Lanier Park CIA shall remain in effect until OIG has completed its review of the most recent annual report and any additional materials submitted by HCA pursuant to OIG's request), and upon the effective date of this CIA Lanier Park Hospital shall be subject to the provisions of this CIA to the same extent as other HCA facilities.

C, 96

B. <u>Definitions</u>.  For the purposes of this CIA, the following terms have the following meanings.

1. Covered Person:  (a) any officer, director, or employee of HCA or any of its subsidiaries; or (b) any agent or other individual who furnishes health care items or services to any Federal health care program beneficiary at a facility owned or operated by HCA or any of its subsidiaries for which HCA or any of its subsidiaries claims reimbursement from any Federal health care program.  Notwithstanding the above, this term does not include part-time or *per diem* employees, agents or other individuals who are not reasonably expected to work more than 160 hours per year, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during the calendar year.

2. Subsidiary:  any corporation or other entity that provides items or services for which payment may be made by any Federal health care program, or prepares or submits requests for such payment, and in which HCA (i) has at least a 50% ownership interest, or (ii) has at least a 5% ownership interest and either manages or controls.

3. Covered Contractor:  any agent or other individual (who is not a covered person) who prepares claims, cost reports, or other requests for reimbursement from any Federal health care program on behalf of HCA or any of its subsidiaries on a regular basis (i.e., for more than 80 hours within the calendar year).

C, 97

## III.   CORPORATE INTEGRITY OBLIGATIONS

HCA shall ensure that its Ethics and Compliance Program includes the following elements during the term of this CIA.

### A. Compliance Officers and Committees.

1. *Ethics, Compliance and Corporate Responsibility Committee of the Board of Directors.* HCA currently has an Ethics, Compliance and Corporate Responsibility Committee of the Board of Directors ("Board Committee") comprised of five outside directors of HCA. The Board Committee is responsible for the review of matters related to the Ethics and Compliance Program, this CIA, and compliance with requirements of Federal health care programs. The Board Committee shall meet at least quarterly. When new members of the Board Committee are appointed or the responsibilities or authorities of the Board Committee are substantially changed, HCA shall notify the OIG, in writing, within 15 days of such a change.

2. *Senior Vice President for Compliance.* HCA currently has a Senior Vice President for Ethics, Compliance, and Corporate Responsibility ("SVP-Compliance"). The SVP-Compliance is and shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with the requirements of the Federal health care programs. The SVP-Compliance is and shall be a member of senior management of HCA, shall make

C, 98

regular (at least quarterly) reports regarding compliance matters directly to the CEO and/or to the Board of Directors (including the Board Committee) of HCA, and shall be authorized to report to the Board of Directors (including the Board Committee) at any time. The SVP-Compliance shall be responsible for monitoring the day-to-day activities engaged in by HCA to further its compliance objectives as well as for any reporting obligations created under this CIA. In the event a new SVP-Compliance is appointed or the responsibilities or authorities of the SVP-Compliance are substantially changed, HCA shall notify the OIG, in writing, within 15 days of such a change.

3. *Ethics, Compliance and Corporate Responsibility Department.* HCA currently has an Ethics, Compliance and Corporate Responsibility Department ("EC Department"). The EC Department is managed by the SVP-Compliance and is responsible for the operation of the Ethics and Compliance Program and for compliance with the requirements of this CIA and of the Federal health care programs. In the event the responsibilities or authorities of the EC Department are substantially changed, HCA shall notify the OIG, in writing, within 15 days of such a change.

4. *Local Ethics and Compliance Officers.* HCA currently has a Local Ethics and Compliance Officer ("ECO") at each of its facilities (for the purpose of this CIA, a "facility" is any hospital, ambulatory surgery center, clinic or group of clinics, or other location where health care items or services are provided by HCA or one of its

C, 99

subsidiaries). Each ECO shall have sufficient management responsibility so as permit the effective performance of his or her duties. Each ECO is responsible for implementation and oversight of the Ethics and Compliance Program at the facility and for the facility's compliance with the requirements of this CIA and of the Federal health care programs. HCA shall make proper execution of ECO duties a major component of the performance evaluations of ECOs. HCA shall continually assess the effectiveness of ECOs and the methods and findings of any such assessments shall be made available to the OIG upon request. HCA shall not implement any substantial change in the responsibilities or authorities of the ECOs relating to HCA's Ethics and Compliance Program without prior written approval from the OIG.

    5. *Corporate Ethics and Compliance Committees.* HCA currently has a Corporate Ethics and Compliance Steering Committee ("Compliance Steering Committee"). The Compliance Steering Committee is chaired by the SVP-Compliance and includes the Corporate CEO, COO, the two group presidents, and certain senior vice presidents. The Compliance Steering Committee oversees the effectiveness of the Ethics and Compliance Program and makes decisions on investments in the Program. The Compliance Steering Committee shall be responsible for overseeing the implementation of the requirements of this CIA. HCA also currently has a Corporate Ethics and Compliance Policy Committee ("Compliance Policy Committee"). The Compliance

C, 100

Policy Committee is chaired by the SVP-Compliance and includes the group CFOs, three hospital presidents, a number of senior vice presidents, e.g., Internal Audit, General Counsel, Quality, Information Systems, Human Resources, Government Programs, and executives representing major compliance areas, such as coding, billing, physician relationships, and cost reports. The Compliance Policy Committee reviews and approves all compliance-related policies. The two committees shall conduct at least 12 meetings per year in aggregate. The committees shall keep a record of their proceedings that shall be available to the OIG upon request.

6. *Hospital Compliance Committees*. Each Hospital shall have a Hospital Ethics and Compliance Committee ("Hospital Committee"). The Hospital Committee shall be chaired by the ECO of the facility and include the heads of each of the facility's major compliance-related departments. The Hospital Committee shall be responsible for assisting the ECO in implementing the Ethics and Compliance Program, and ensuring compliance by the facility with this CIA and the requirements of Federal health care programs. The Hospital Committee shall also be responsible for reporting on compliance issues to the ECO.

7. *Responsible Executives*. HCA has designated certain individuals ("Responsible Executives") to be responsible for development and implementation of a portion of the Ethics and Compliance Program related to a specific compliance risk area.

C, 101

For example, the Vice President, Health Information Management Services, is the Responsible Executive for coding compliance. The Responsible Executives work with the SVP-Compliance, EC Department, Compliance Policy Committee, and others to develop, oversee, monitor, and implement compliance policies within their designated areas of responsibility. HCA shall not discontinue or materially alter its current Responsible Executive structure without written approval from the OIG.

B. Written Standards.

1. *Code of Conduct.* HCA currently has a Code of Conduct. HCA has implemented a program to distribute the Code of Conduct to covered persons. HCA shall make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of managers, supervisors, and all other employees. HCA has implemented a program to obtain an acknowledgment from each covered person that he or she has received HCA's Code of Conduct and understands that it represents the mandatory policies of the organization. Within 90 days of the effective date of this CIA, HCA shall obtain a certification from each of its facilities and corporate departments that, based on information and belief, this distribution and acknowledgment process is complete. New covered persons shall receive the Code of Conduct and shall complete the required acknowledgment within 30 days after becoming a covered person. HCA shall annually review the Code of Conduct and shall make any necessary revisions. These

C, 102

revisions shall be distributed as expeditiously as possible after initiating such a change and no later than 30 days after the effective date of the revised Code of Conduct. HCA shall implement a program to obtain an acknowledgment from each covered person that he or she has received the revised Code of Conduct, understands that it represents the mandatory policies of the organization, and agrees to abide by it. Within 90 days of the effective date of the revised Code of Conduct, HCA shall obtain a certification from each of its facilities and corporate departments that, based on information and belief, this distribution and acknowledgment process is complete. HCA shall obtain the acknowledgments and certifications described in the preceding two sentences every time that a revised Code of Conduct is distributed (but in any event no less frequently than every three years).

2. *Covered Contractor Requirements.* HCA shall require a Covered Contractor to: (a) agree to abide by HCA's Code of Conduct or adopt its own Code of Conduct substantially similar to HCA's Code of Conduct; (b) distribute either (i) HCA's Code of Conduct or (ii) its Code of Conduct and information about HCA's Confidential Disclosure Program (including the Ethics Line number) to employees working on HCA matters; and, (c) certify to HCA that employees working on HCA matters have received a copy of (i) HCA's Code of Conduct or (ii) its Code of Conduct and information about HCA's Confidential Disclosure Program (including the Ethics Line number). Where the

C, 103

Covered Contractor is a solo practitioner, the Covered Contractor must be provided with HCA's Code of Conduct and certify that he or she will abide by it.

       3. *Policies and Procedures*. HCA is developing written compliance Policies and Procedures. Prior to the effective date of this CIA, HCA has implemented many such Policies and Procedures and provided them to the OIG. HCA shall assess and update as necessary the Policies and Procedures at least annually and more frequently, as appropriate. HCA shall provide a summary of changes to its Policies and Procedures in its Annual Reports under this CIA and the current Policies and Procedures shall continue to be available to OIG upon request. HCA represents that it has distributed its Policies and Procedures to its facilities. Compliance staff at both the facilities and the corporate headquarters, including the Responsible Executives, shall be available to explain any and all Policies and Procedures.

       C. <u>Training and Education</u>. HCA shall meet the following training requirements. The training requirements are cumulative (not exclusive) so that one person may be required to attend training in several substantive areas in addition to the general training. All training requirements set forth below in paragraphs 1 to 5 shall be implemented as specified below. With respect to the initial training required to be provided within a certain time period after the effective date of this CIA, HCA need not provide such training to persons who have received training in the six-month period prior to the

C,104

effective date of this CIA, if the training provided meets all the subject matter and duration requirements that would apply to the initial training under the CIA.

    1. *General Training.* HCA shall provide at least two hours of training initially (within 90 days of the effective date of this CIA) to each covered person, and one hour of refresher training annually thereafter. The training shall cover HCA's Ethics and Compliance Program, its Code of Conduct, and the requirements of this CIA. The training conducted by HCA when it issued its Code of Conduct, *One Clear Voice*, and its ethics and compliance refresher training, *Commitments We Share*, and/or its revised Code of Conduct, *A Tradition of Caring*, (all of which explained HCA's Ethics and Compliance Program and its Code of Conduct) regardless of the date the training occurred will satisfy this requirement for training within 90 days notwithstanding the fact that such training did not cover the CIA. Covered persons who have received prior training described in the previous sentence must receive at least one hour of refresher training (including discussion of the CIA) during the first year covered by the CIA and annually thereafter. Within 90 days after the effective date of this CIA, HCA shall notify all covered persons of the execution of the CIA and provide a summary of the key provisions of this CIA through electronic mail, its internet and/or intranet sites, newsletters, and other appropriate means. All general training conducted after the effective date of this CIA shall include training on the CIA.

Corporate Integrity Agreement
HCA -- The Healthcare Company        11

*C, 105*

2. *Coding Training*. HCA shall continue to have in place an introductory training course for each hospital inpatient coder, as well as an intermediate coding course. HCA shall provide at least eight hours of coding training to inpatient hospital coders and supervisors within 180 days of the effective date of this CIA. HCA shall maintain its DRG coding course for hospital inpatient coders accessible through its intranet. HCA shall maintain and enforce its current policy requiring 30 hours of continuing education annually for hospital inpatient coders.

3. *Billing Training*. HCA shall provide training to all individuals (including Laboratory and Business Office Directors and other billing personnel) responsible for Federal health care program billing in their facilities. HCA shall provide at least eight hours of such training within 180 days of the effective date of this CIA and during each subsequent year. The training shall include the following subject matters:

a. the submission of accurate bills for services rendered to Federal health care program beneficiaries;

b. policies, procedures and other requirements applicable to the documentation of medical records;

c. the personal obligation of each individual involved in the billing process to ensure that such billings are accurate;

d. applicable reimbursement statutes, regulations, and program requirements and directives;

Corporate Integrity Agreement
HCA -- The Healthcare Company                    12

C,106

e. the legal sanctions for improper billings; and

f. examples of proper and improper billing practices.

4. *Cost Report Training*. HCA shall ensure that covered persons who prepare cost reports receive at least eight hours of training on preparation of cost reports for Federal health care programs within 180 days of the effective date of this CIA. HCA shall maintain and enforce its current practice requiring 40 hours of continuing education annually to include Federal and/or state statutes, regulations, and guidelines, compliance, and Corporate policies for covered persons who prepare cost reports.

5. *Physician Relations Training*. Within 90 days of the effective date of this CIA and annually thereafter, HCA shall provide at least one hour of training to its Hospital CEOs, CFOs, and all other personnel substantially involved in negotiating or monitoring physician relationships on the statutes and regulations related to hospital/physician relationships (including but not limited to 42 U.S.C. §§ 1320a-7b(b) and 1395nn). HCA shall annually distribute its physician relationship policy checklist to such personnel.

6. *Overall Compliance Training*. HCA shall continue its process of establishing individual training profiles for its employees. HCA shall pursue the implementation of these training profiles in order to ensure that all covered persons are familiar with areas of compliance risk relevant to their positions.

c,107

7. *New Persons*. Affected new covered persons shall receive the General Training described in section III.C.1 above by the end of the first 30 days after the person begins work. The orientation training (which is defined as all other training required, under section III.C, to be accomplished within 180 days or less after the effective date of this CIA) required by this CIA shall also be promptly provided to appropriate new covered persons (but in no event later than 90 days after the person begins work on the matter for which they must be trained) so that the persons are fully qualified by virtue of such training to perform whatever responsibilities may be assigned to them. In any situation where training requirements have not been completed, a fully trained HCA employee shall carefully monitor the work of the untrained person.

8. *Covered Contractor Requirements*. HCA must document completion of the applicable coding, billing, cost report, or physician relationships training to employees of Covered Contractors working on HCA matters if: (i) the Covered Contractor is a solo-practitioner; (ii) the Covered Contractor was not retained because of its professional expertise in the area for which training is necessary; or (iii) the Covered Contractor has not complied with the requirements of section III.B.2. HCA is responsible for ensuring the expertise and compliance of Covered Contractors.

9. *Certifications and Retention*. HCA shall maintain sufficient records to demonstrate that the required training has occurred. These records shall include certifications from covered persons that they have attended the required training. The

Corporate Integrity Agreement
HCA – The Healthcare Company                14

C, 108

certifications may be acquired through: attendance/sign-in sheets for in-person group training sessions; computer attestations for computer-based training; or similar mechanisms for other forms of training. Facility ECOs and/or Responsible Executives shall retain training records and certifications in a manner that permits reporting to the SVP-Compliance to enable the SVP-Compliance to report on the training, and provide the specific course materials and certifications, to the OIG upon request.

    D. Review Procedures.

        1. *Retention of Independent Review Organization.* HCA shall retain an entity (or entities), such as an accounting, auditing or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform review procedures to assist HCA in assessing the adequacy of its Policies and Procedures, Ethics and Compliance Program, its compliance with this CIA, and its compliance with the requirements of Federal health care programs. The reviews shall be performed annually during the term of the CIA in accordance with the attached workplans. These reviews shall cover the calendar years 2001 through 2008, unless otherwise specified in a workplan. The Independent Review Organization used for each review must have expertise in the matters to be reviewed and particularly with the requirements of the Federal health care programs relevant to that area of review. The Independent Review Organization must be retained to conduct the reviews for the first year within 90 days of the effective date of this CIA. An IRO may engage qualified sub-IROs (including, as appropriate, law firms),

C, 109

as necessary and HCA shall have the right to designate a different IRO for any particular area of compliance concern if it believes that such different IRO would be better qualified to undertake a particular focused review. HCA shall have the right to designate a new IRO at any time it chooses. If HCA designates a new IRO, it shall provide written notice to the OIG within 15 days of designating the new IRO. This written notice will include the following: (a) the name, address, and primary contact person at the new IRO; (b) a brief description of the qualifications of the new IRO; and (c) a brief description of the reasons that a new IRO was designated.

2. *Types of Reviews.* The IRO(s) and HCA appropriate internal resources or directed external resources shall annually perform the reviews described in the audit work plans ("workplans") attached to, and incorporated by reference into, this CIA. The workplans address the following areas: (1) Diagnosis Related Groups (DRGs); (2) Laboratory Billing; (3) Outpatient Prospective Payment; and (4) Physician Relationships. The workplans require reviews of systems and processes in place at HCA and its facilities, and of claims submitted by HCA and paid by Federal health care programs (the physician relationship workplan includes review of physician relationships rather than claims). The reviews of claims more specifically described in the workplans fall into two general categories: (1) probe samples of a set number of claims (with no pre-determined statistical confidence or precision parameters); and (2) full samples of claims from which an overpayment amount can be projected to the total population of claims in question

Corporate Integrity Agreement
HCA -- The Healthcare Company                    16

C 110

within pre-determined statistical confidence and precision parameters. HCA and the IRO will evaluate the IRO work plans annually based upon prior year results. If appropriate, HCA will submit revised IRO work plan(s) to the OIG for its review and action.

   3. *Statistical Sampling and Appraisal Methodologies for Reviews.* All matters related to this CIA and the workplans that involve statistical sampling or appraisal, or the review of claims, including probe samples and full samples, shall be conducted in accordance with the provisions of Appendix A to this CIA.

   4. *Ethics and Compliance Program Review.* The IRO shall conduct a compliance review providing findings regarding whether HCA's Ethics & Compliance Program, Policies and Procedures, and operations comply with the terms of this CIA. This review shall include section by section findings regarding the requirements of this CIA. In addition, the IRO shall provide findings regarding whether HCA has complied with its obligation under the Settlement Agreement: (a) not to resubmit to any Federal health care program payors any previously denied claims related to the conduct addressed in the Settlement Agreement, and its obligation not to appeal any such denials of claims; and (b) not to charge to, or otherwise seek payment from, federal or state payors for unallowable costs (as defined in the Settlement Agreement) and its obligation to identify and adjust any past charges of unallowable costs.

   5. *Review Reports.* HCA and the IRO(s) shall annually produce reports corresponding to all of the required reviews and including all of the information required

Corporate Integrity Agreement
HCA -- The Healthcare Company                    17

*C, 112*

by this section of the CIA, workplans, and the Claims Review Reports described in Appendix A. A complete copy of all of the reports for the reporting year shall be included in each of HCA's Annual Reports to OIG.

6. *Verification/Validation.* In the event that the OIG has reason to believe that any of HCA's reviews fail to conform to its obligations under the CIA or indicates improper billings not otherwise adequately addressed in the audit report, and thus determines that it is necessary to conduct an independent review to determine whether or the extent to which HCA is complying with its obligations under this CIA, HCA agrees to pay for the reasonable cost of any such review by the OIG or any of its designated agents. Prior to proceeding with such an independent review, the OIG shall notify HCA of its intent to do so and its reasons for believing such a review is necessary, and shall attempt to resolve any issues without proceeding with an independent review. This attempt to resolve issues may include permitting HCA to recommend further work it or the IRO may undertake to address the OIG's concerns. However, it shall remain in the sole discretion of the OIG to proceed with an independent review as described above.

E. Confidential Disclosure Program. HCA has established a Confidential Disclosure Program. HCA provides a toll free "Ethics Line" to enable employees, contractors, agents or other individuals to disclose, to the EC Department or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with HCA's Policies and Procedures, practices, or operations with

Corporate Integrity Agreement
HCA -- The Healthcare Company                    18

C, 113

respect to any Federal health care program, believed by the individual to be inappropriate. HCA shall continue to publicize the existence of the Ethics Line to all covered persons. HCA has established a Policy governing its handling of disclosures made through the Ethics Line. HCA shall continue to operate the Ethics Line through such Policy. HCA shall continue to forbid retribution or retaliation for disclosures and allow for anonymous, confidential disclosures. The EC Department shall maintain a confidential disclosure log, which shall include a record and summary of each allegation received, the status of the respective investigations, and any corrective action taken in response to the investigation.

F. Ineligible Persons.

1. *Definition.* For purposes of this CIA, an "Ineligible Person" shall be any individual or entity who: (i) is currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs; or (ii) has been convicted of a criminal offense related to the provision of health care items or services but has not yet been excluded, debarred, or otherwise declared ineligible.

2. *Screening Requirements.* HCA shall not hire or engage as contractors, or grant staff privileges to, any Ineligible Person. To prevent hiring or contracting with, or granting staff privileges to, any Ineligible Person, HCA shall screen all prospective employees and prospective contractors prior to engaging their services and screen physicians prior to granting staff privileges by (i) requiring applicants to disclose whether they are Ineligible Persons, and (ii) reviewing the General Services Administration's List

C, 114

of Parties Excluded from Federal Programs (available through the Internet at http://epls.arnet.gov) and the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.hhs.gov/oig) (these lists will hereinafter be referred to as the "Exclusion Lists").

      3. *Review and Removal Requirement.* HCA has reviewed its list of current employees and contractors paid through automated means against the Exclusion Lists. Within 180 days of the effective date of this CIA, HCA shall review its list of current physicians with staff privileges against the Exclusion Lists. HCA shall review the lists of employees, contractors, and physicians with staff privileges against the Exclusion Lists at least semi-annually during the duration of this CIA. In addition, HCA shall require employees, contractors and physicians with staff privileges to disclose immediately any debarment, exclusion or other event that makes the person an Ineligible Person. If HCA has notice that an employee, agent, or physician has become an Ineligible Person, HCA shall remove such person from responsibility for, or involvement with, HCA's business operations related to the Federal health care programs and shall remove such person from any position for which the person's salary or the items or services rendered, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the person is reinstated into participation in the Federal health care programs.

Corporate Integrity Agreement
HCA – The Healthcare Company        20

C, 115

4. *Pending Charges and Proposed Exclusions*.  If HCA has notice that an employee or contractor is charged with a criminal offense related to any Federal health care program, or is proposed for exclusion during his or her employment or contract, HCA shall take all appropriate actions to ensure that the responsibilities of that employee or contractor have not and shall not adversely affect the quality of care rendered to any beneficiary, patient or resident, or the accuracy of any claims submitted to any Federal health care program.

G. <u>Notification of Proceedings</u>.  Within 30 days of discovery by HCA, HCA shall notify OIG, in writing, of any ongoing investigation or legal proceeding conducted or brought by a governmental entity or its agents involving an allegation that HCA has committed a crime or has engaged in fraudulent activities.  This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding.  HCA shall also provide written notice to OIG within 30 days of the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the proceedings, if any.

H. <u>Reporting</u>.

1. *Overpayments*

a. *Definition of Overpayments*.  For purposes of this CIA, an "overpayment" shall mean the amount of money HCA has received in excess of the amount due and payable under any Federal health

Corporate Integrity Agreement
HCA -- The Healthcare Company                    21

C, 116

care program requirements. HCA may not subtract any underpayments for purposes of determining the amount of relevant "overpayments."

b. *Reporting of Overpayments.* If, at any time, HCA identifies or learns of any overpayments, HCA shall notify the payor (e.g., Medicare fiscal intermediary or carrier) and repay any identified overpayments within 30 days of identification and take remedial steps within 60 days of identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem and the overpayments from recurring. Also, within 30 days of identification of the overpayment, HCA shall repay the overpayment to the appropriate payor to the extent such overpayment has been quantified (submission of corrected bills in conformance with payor policy within 30 days fulfills this requirement). If not yet quantified, within 30 days of identification, HCA shall notify the payor of its efforts to quantify the overpayment amount along with a schedule of when such work is expected to be completed. Notification and repayment to the contractor should be done in accordance with the contractor policies. For Medicare overpayments identified through HCA's Ethics and

C, 117

Compliance Program and/or the processes required under this CIA, (including internal and IRO audits, Ethics Line cases, or other corporate-level monitoring or review), the notice to the contractor must include the information contained on the Overpayment Refund Form, attached to this as Appendix B to this CIA (unless the contractor has authorized the form not to be submitted for this particular type of claim correction).

2. *Reportable Events.*

   a. *Definition of Reportable Event.* For purposes of this CIA, a "Reportable Event" means anything that involves:

   > (i) a substantial overpayment; or

   > (ii) a matter that a reasonable person would consider a potential violation of any criminal, civil, or administrative statute or regulation applicable to any Federal health care program for which criminal penalties, civil monetary penalties, or exclusion may be authorized.

   A Reportable Event may be the result of an isolated event or a series of occurrences.

   b. *Reporting of Reportable Events.* If HCA determines that there is a Reportable Event, HCA shall notify OIG, in writing, within 30

C, 118

days of making the determination that the Reportable Event exists. The report to the OIG shall include the following information:

(i)  If the Reportable Event results in an overpayment, the report to the OIG shall be made at the same time as the notification to the payor required in section III.H.1, and shall include all of the information on the Overpayment Refund Form, as well as:

(A)  the payor's name, address, and contact person to whom the overpayment was sent; and

(B) the date of the check and identification number (or electronic transaction number) on which the overpayment was repaid/refunded;

(ii)  a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

(iii) a description of HCA's actions taken to correct the Reportable Event; and

(iv) any further steps HCA plans to take to address the Reportable Event and prevent it from recurring.

C, 119

I. Corrective Actions Related to Investigation of Physician Relationships.

In the context of the investigation, self-audit, and settlement discussions related to the issue of physician relationships, certain such relationships have been identified as anomalies. HCA shall take appropriate measures to review these anomalous relationships. Those relationships that are determined by HCA o be non-compliant shall be terminated or amended to conform to HCA's Ethics and Compliance Program and the requirements of the Federal health care programs. HCA shall report on these measures as required in section V and all supporting documents shall be available to the OIG upon request.

IV.   **NEW AND DIVESTED LOCATIONS**

In the event that HCA:  (1) purchases or establishes a new hospital, freestanding ambulatory surgery center, home health agency, or another line of business that provides services that are billed to Federal health care programs; or (2) sells or divests an existing hospital, freestanding ambulatory surgery center, or home health agency, HCA shall notify OIG of this fact within 30 days of the date of purchase, establishment, sale, or divestiture.  This notification shall include the location of the operation(s), telephone number, fax number, Federal health care program provider number(s) (if any), and the corresponding payor(s) (contractor specific).  All covered persons at new locations shall be subject to the requirements in this CIA that apply to new covered persons (e.g., completing certifications and undergoing training).  If HCA sells all of the assets or its

Corporate Integrity Agreement
HCA -- The Healthcare Company                    25

C, 120

ownership interest related to a location, then that location shall no longer be considered part of HCA for the purposes of this CIA. If the location is still owned or operated in whole or in part by HCA or any of its subsidiaries or their successors, then the location shall continue to be considered part of HCA for the purposes of this CIA. If a hospital or ambulatory surgery center shall no longer be subject to the CIA due to a sale or transfer from HCA, HCA shall require as a condition of the sale that buyer or transferee represents and agrees that it has or shall implement and maintain with respect to its operations of the facility an effective program to prevent and detect violations of the legal requirements applicable to the delivery of goods and services in connection with any health care benefits and that such a program will comply with the provisions of the U.S. Sentencing Guidelines relating to corporate compliance programs and will be mindful of any applicable guidance issued by the OIG or other components of HHS; and that the buyer or transferee agrees that it will maintain such program for no less than five years from the date of sale or transfer.

## V.   IMPLEMENTATION AND ANNUAL REPORTS

A. Implementation Report. Within 120 days after the effective date of this CIA, HCA shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA. This Implementation Report shall include:

1. the name, title, address, facility name (if applicable), and telephone number of all of the individuals who are in positions, or on committees,

Corporate Integrity Agreement
HCA -- The Healthcare Company                    26

C, 121

described in section III.A (except that with respect to section III.A.6 only, the SVP-Compliance shall certify that the Hospital Committees are in place as required and the information otherwise required by this section shall be available to the OIG upon request);

2.  the copy of all Policies and Procedures required by section III.B.2 that have not been previously provided to the OIG;

3.  a description of the training required by section III.C, including a description of the targeted audiences and a schedule of when the training sessions were held;

4.  a certification by the SVP-Compliance that:

   a.  the Policies and Procedures required by section III.B have been developed and implemented, and have been distributed to all pertinent covered persons;

   b.  all covered persons have completed the Code of Conduct certification required by section III.B.1; and

   c.  all covered persons have completed the training and executed the certification required by section III.C.

5.  the identity of the Independent Review Organization(s) and the proposed start and completion date of the first set of reviews by the Independent

C, 122

Review Organization(s) and appropriate HCA internal resources or directed

external resources;

6.  a summary of personnel actions taken pursuant to section III.F (other

than hiring or granting of staff privileges);

7.  a summary of the actions taken to ensure that the anomalous physician

relationships identified in the investigation, self-audit, and settlement

discussions have been reviewed, and terminated or amended, as appropriate,

in conformance with section III.I.;

8.  a list of all of HCA's locations (including physical locations and mailing

addresses), the corresponding name under which each location is doing

business, the corresponding phone numbers and fax numbers, each

location's Medicare provider identification number(s), and the contractor's

name and address; and

9.  To the extent not already furnished to OIG, or if modified, a description

of HCA's corporate structure, including identification of any parent, sister,

and other related companies, subsidiaries and their respective lines of

business.

    B.  Annual Reports.  HCA shall submit to OIG Annual Reports with respect to the

status and findings of HCA's compliance activities.  The first Annual Report shall cover

the time period from the effective date of this CIA through December 31, 2001 and shall

Corporate Integrity Agreement
HCA -- The Healthcare Company                28

C, 123

be received by the OIG no later than April 30, 2002.  Subsequent Annual Reports shall cover each of the calendar years 2002 through 2008 and shall be received by the OIG no later than April 30 of the year following the year covered in the report.  Each Annual Report shall include:

    1. any change in the identity, title, address, facility name (if applicable), telephone number, and position description of all of the individuals who are in positions, or on committees, described in section III.A (except that with respect to section III.A.6 only, the SVP-Compliance shall certify that the Hospital Committees are in place as required and the information otherwise required by this section shall be available to the OIG upon request);

    2. a certification by the SVP-Compliance that:

        a. all covered persons have completed the annual Code of Conduct certification required by section III.B.1;

        b. all covered persons have completed the training and executed the certification required by section III.C; and

        c. HCA has complied with the following specified obligations under the Settlement Agreement:  (i) not to resubmit to any Federal health care program payors any previously denied claims related to the conduct addressed in the Settlement Agreement, and its obligation not to appeal any such denials of claims; and (ii) not to charge to or

C, 124

otherwise seek payment from federal or state payors for unallowable

costs (as defined in the Settlement Agreement) and its obligation to

identify and adjust any past charges of unallowable costs.

3. notification of any changes or amendments to the Policies and Procedures

referenced in section III.B and the reasons for such changes (e.g., change in

contractor policy);

4. a complete copy of the reports prepared pursuant to the reviews required

in section III.D, including a copy of the methodologies used, along with a

copy of the IRO's engagement letter;

5. HCA's response/corrective action plan to any issues raised in the reviews

conducted under section III.D;

6. a summary of Reportable Events required to be identified and reported

by section III.H and an update on corrective actions taken in response to

such Reportable Events;

7. a report of the aggregate overpayments identified through HCA's Ethics

and Compliance Program and/or the processes required under this CIA,

(including internal and IRO audits, Ethics Line cases, or other corporate-

level monitoring or review) that have been returned to the Federal health

care programs.  Overpayment amounts shall be broken down into the

following categories:  inpatient Medicare; outpatient Medicare; Medicaid

C,125

(report each applicable state separately); and other Federal health care programs;

8.  a copy of the confidential disclosure log required by section III.E and a description of any changes to the Confidential Disclosure Program or Ethics Line referenced in that section;

9.  a description of any personnel actions (other than hiring or granting staff privileges) taken by HCA as a result of the obligations in section III.F; and, with respect to any person that falls within the ambit of section III.F.4, the name, title, and responsibilities of the person, and the actions taken by HCA in response to the obligations set forth in that section;

10.  a summary describing any ongoing investigation or legal proceeding conducted or brought by a governmental entity involving an allegation that HCA has committed a crime or has engaged in fraudulent activities, which is required to be reported by section III.G.  The statement shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation, legal proceeding or requests for information;

11.  to the extent that such relationships still exist and have not been appropriately altered and reported in an earlier report to the OIG, a summary of the actions taken to ensure that the anomalous physician

C, 126

relationships identified in the investigation, self-audit, and settlement discussions have been reviewed, and terminated or amended, as appropriate, in conformance with section III.I; and

12. a description of all changes to the most recently provided list (as updated) of HCA's locations (including physical locations and mailing addresses) as required by section V.A.7, the corresponding name under which each location is doing business, the corresponding phone numbers and fax numbers, each location's Federal health care program provider identification number(s), and the contractor name and address that issued each provider identification number.

C. Certifications. The Implementation Report and Annual Reports shall include a certification by the SVP-Compliance that: (1) except as otherwise explicitly described in the applicable report, HCA is in compliance with all of the requirements of this CIA, to the best of his or her knowledge; and (2) the SVP-Compliance has reviewed the report and has made reasonable inquiry regarding its content and believes that the information is accurate and truthful.

## VI.   NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing subsequent to the effective date of this CIA, all notifications and reports required under this CIA shall be submitted to the entities listed below:

Corporate Integrity Agreement
HCA – The Healthcare Company                32

C, 127

OIG:

> Civil Recoveries Branch - Compliance Unit
> Office of Counsel to the Inspector General
> Office of Inspector General
> U.S. Department of Health and Human Services
> Cohen Building, Room 5527
> 330 Independence Avenue, SW
> Washington, DC 20201
> Phone 202.619.2078
> Fax    202.205.0604

HCA:

> Alan Yuspeh
> Senior Vice President
> Ethics, Compliance, and Corporate Responsibility
> HCA -- The Healthcare Company
> One Park Plaza
> Nashville, TN 37203
> Phone 615.344.1005
> Fax    615.344.1045

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery or other means, provided that there is proof that such notification was received.  For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt.

## VII.   OIG INSPECTION, AUDIT AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine HCA's books, records, and other documents and supporting materials and/or conduct an on-site review for the

C, 128

purpose of verifying and evaluating: (a) HCA's compliance with the terms of this CIA; and (b) HCA's compliance with the requirements of the Federal health care programs in which it participates. The documentation described above shall be made available by HCA to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of HCA's employees, contractors, or agents who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. HCA agrees to assist OIG in contacting and arranging interviews with such individuals upon OIG's request. HCA's employees may elect to be interviewed with or without a representative of HCA present.

## VIII.   DOCUMENT AND RECORD RETENTION

In addition to any other requirements for record retention, HCA shall maintain for inspection all documents and records: (1) related to reimbursement from the Federal health care programs for at least five years after the submission of the request for reimbursement (or longer if otherwise required); and (2) necessary to establishing HCA's compliance with this CIA for at least three years following the submission of the Annual Report covering the relevant year. Imaged copies of documents shall satisfy this requirement.

C,129

## IX. Disclosures

Consistent with HHS's Freedom of Information Act ("FOIA") procedures, set forth in 45 C.F.R. Part 5, the OIG shall make a reasonable effort to notify HCA prior to any release by OIG of information submitted by HCA pursuant to its obligations under this CIA and identified upon submission by HCA as trade secrets, commercial or financial information and privileged and confidential under the FOIA rules. With respect to such releases, HCA shall have the rights set forth at 45 C.F.R. § 5.65(d). HCA shall refrain from identifying any information as trade secrets, commercial or financial information and privileged and confidential that does not meet the criteria for exemption from disclosure under FOIA.

## X. BREACH AND DEFAULT PROVISIONS

HCA is expected to fully and timely comply with all of its CIA obligations.

A. Stipulated Penalties for Failure to Comply with Certain Obligations. As a contractual remedy, HCA and OIG hereby agree that failure to comply with certain obligations set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1. A Stipulated Penalty of $2,500.00 (which shall begin to accrue on the day after the date the obligation became due) for each day, beginning 90 days after the

Corporate Integrity Agreement
HCA -- The Healthcare Company                35

C, 130

effective date of this CIA and concluding at the end of the term of this CIA, HCA fails to have in place any of the following:

> a. all of the personnel and committees required in section III.A;
>
> b. a written Code of Conduct as required in section III.B.1;
>
> c. written Policies and Procedures as required in section III.B.2;
>
> d. a training program as required in section III.C; and
>
> e. a Confidential Disclosure Program as required in section III.E;

2. A Stipulated Penalty of $2,500.00 (which shall begin to accrue on the day after the date the obligation became due) for each day HCA fails meet any of the deadlines to submit the Implementation Report or the Annual Reports to the OIG.

3. A Stipulated Penalty of $2,500.00 (which shall begin to accrue on the date the failure to comply began) for each day HCA employs, contracts with, or grants staff privileges to an Ineligible Person and that person: (i) has responsibility for, or involvement with, HCA's business operations related to the Federal health care programs; or (ii) is in a position for which the person's salary or the items or services rendered, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds (the Stipulated Penalty described in this paragraph shall not be demanded for any time period during which HCA

C, 131

can demonstrate that it did not discover the person's exclusion or other ineligibility after making a reasonable inquiry (as described in section III.F) as to the status of the person).

4. A Stipulated Penalty of $2,500.00 (which shall begin to accrue on the date the HCA fails to grant access) for each day HCA fails to grant access to the information or documentation as required in section VII of this CIA.

5. A Stipulated Penalty of $2,500.00 (which shall begin to accrue on the date the failure began) for a failure by HCA to report a Reportable Event, take corrective action, and pay the appropriate refunds, as provided in section III.H;

6. A Stipulated Penalty of $2,000.00 (which shall begin to accrue 10 days after the date that OIG provides notice to HCA of the failure to comply) for each day HCA fails to comply fully and adequately with any obligation of this CIA and such failure is not already subject to a penalty in section X.A.1 through 5 above. In its notice to HCA, the OIG shall state the specific grounds for its determination that the HCA has failed to comply fully and adequately with the CIA obligation(s) at issue.

B. Payment of Stipulated Penalties.

1. *Demand Letter*. Upon a finding that HCA has failed to comply with any of the obligations described in section X.A and determining that Stipulated Penalties are appropriate, OIG shall notify HCA of: (a) HCA's failure to comply; and (b) the OIG's exercise of its contractual right to demand payment of the Stipulated Penalties (this notification is hereinafter referred to as the "Demand Letter"). Within 10 days after

Corporate Integrity Agreement
HCA -- The Healthcare Company                37

C, 132

receiving the Demand Letter, HCA shall either: (a) cure the breach to the OIG's satisfaction and pay the applicable stipulated penalties; or (b) request a hearing before an HHS administrative law judge ("ALJ") to dispute the OIG's determination of noncompliance, pursuant to the agreed-upon provisions set forth below in section X.D.  In the event HCA elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until HCA cures, to the OIG's satisfaction, the alleged breach in dispute.  Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under section X.C.

2. *Timely Written Requests for Extensions.* HCA may submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA.  Notwithstanding any other provision in this section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after HCA fails to meet the revised deadline set by the OIG. Notwithstanding any other provision in this section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until two business days after HCA receives OIG's written denial of such request.  A "timely written request" is defined as a request in writing received by

C, 133

OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

3. *Form of Payment.* Payment of the Stipulated Penalties shall be made by certified or cashier's check, payable to "Secretary of the Department of Health and Human Services," and submitted to OIG at the address set forth in section VI.

4. *Independence from Material Breach Determination.* Except as otherwise noted, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for the OIG's determination that HCA has materially breached this CIA, which decision shall be made at the OIG's discretion and governed by the provisions in section X.C, below.

C. Exclusion for Material Breach of this CIA

1. *Notice of Material Breach and Intent to Exclude.* The parties agree that a material breach of this CIA by HCA constitutes an independent basis for OIG to exclude HCA and/or any of its subsidiaries from participation in the Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)). Upon a determination by OIG that HCA has materially breached this CIA and that exclusion should be imposed, the OIG shall notify HCA by certified mail of: (a) HCA's material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion (this notification is hereinafter referred to as the "Notice of Material Breach Letter").

Corporate Integrity Agreement
HCA – The Healthcare Company                    39

C, 134

2. *Opportunity to Cure*.  HCA shall have 30 days after receiving the Notice

of Material Breach Letter to demonstrate to the OIG's satisfaction that:

    a.    HCA is in full compliance with this CIA;

    b.    the alleged material breach has been cured; or

    c.    the alleged material breach cannot be cured within the 30-day

period, but that:  (i) HCA has begun to take action to cure the

material breach; (ii) HCA is pursuing such action with due

diligence; and (iii) HCA has provided to OIG a reasonable

timetable for curing the material breach.

3. *Exclusion Letter*.  If at the conclusion of the 30-day period, HCA fails to

satisfy the requirements of section X.C.2, OIG may exclude HCA and/or any of its

subsidiaries from participation in the Federal health care programs.  OIG shall notify

HCA in writing of its determination to exclude HCA and/or any of its subsidiaries (this

letter shall be referred to hereinafter as the "Exclusion Letter").  Subject to the Dispute

Resolution provisions in section X.D, below, the exclusion shall go into effect 30 days

after the date of the Exclusion Letter.  The exclusion shall have national effect and shall

also apply to all other federal procurement and non-procurement programs.  If HCA

and/or any of its subsidiaries is excluded under the provisions of this CIA, HCA may seek

reinstatement pursuant to the provisions at 42 C.F.R. §§ 1001.3001-.3004.

Corporate Integrity Agreement
HCA -- The Healthcare Company        **40**

*C, 135*

4. *Material Breach*. A material breach of this CIA means:

    a. a failure by HCA to report a Reportable Event, take corrective action and pay the appropriate refunds, as provided in section III.H, provided that any of the following individuals at HCA had notice of the Reportable Event:  an officer; a director; a Responsible Executive; an ECO; a member of the EC Department; or an attorney in the Legal Department;

    b. repeated or flagrant violations of the obligations under this CIA, including, but not limited to, the obligations addressed in section X.A of this CIA;

    c. a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with section X.B above; or

    d.  a failure to retain and use an Independent Review Organization for review purposes in accordance with section III.D.

D.  Dispute Resolution

    1. *Review Rights*.  Upon the OIG's delivery to HCA of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under the obligation of this CIA, HCA shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to

Corporate Integrity Agreement
HCA -- The Healthcare Company      41

C, 136

this CIA. Specifically, the OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an ALJ and, in the event of an appeal, the Departmental Appeals Board ("DAB"), in a manner consistent with the provisions in 42 C.F.R. §§ 1005.2-1005.21. Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving stipulated penalties shall be made within 10 days of HCA receiving the Demand Letter and the request for a hearing involving exclusion shall be made within 20 days of HCA receiving the Exclusion Letter.

2. *Stipulated Penalties Review.* Notwithstanding any provision of Title 42 of the United States Code or Chapter 42 of the Code of Federal Regulations, the only issues in a proceeding for stipulated penalties under this CIA shall be: (a) whether HCA was in full and timely compliance with the obligations of this CIA for which the OIG demands payment; and (b) the period of noncompliance. HCA shall have the burden of proving its full and timely compliance and the steps taken to cure the noncompliance, if any. If the ALJ finds for the OIG with regard to a finding of a breach of this CIA and orders HCA to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision notwithstanding that HCA may request review of the ALJ decision by the DAB.

3. *Exclusion Review.* Notwithstanding any provision of Title 42 of the United States Code or Chapter 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be: (a) whether

Corporate Integrity Agreement
HCA -- The Healthcare Company                    42

C, 137

HCA was in material breach of this CIA; (b) whether such breach was continuing on the

date of the Exclusion Letter; and (c) whether the alleged material breach could not have

been cured within the 30-day period, but that (i) HCA had begun to take action to cure the

material breach within that period, (ii) HCA has pursued and is pursuing such action with

due diligence, and (iii) HCA provided to OIG within that period a reasonable timetable

for curing the material breach.  For purposes of the exclusion herein, exclusion shall take

effect only after an ALJ decision that is favorable to the OIG.  HCA's election of its

contractual right to appeal to the DAB shall not abrogate the OIG's authority to exclude

HCA and/or any of its subsidiaries upon the issuance of the ALJ's decision.  If the ALJ

sustains the determination of the OIG and determines that exclusion is authorized, such

exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding

that HCA may request review of the ALJ decision by the DAB.

XI.    **EFFECTIVE AND BINDING AGREEMENT**

Consistent with the provisions in the Settlement Agreement pursuant to which this

CIA is entered, and into which this CIA is incorporated, HCA and OIG agree as follows:

A. This CIA shall be binding on the successors, assigns, and transferees of HCA,

consistent with the terms of Section IV;

B. This CIA shall become final and binding on the date that the court(s) accept the

plea(s) and impose a sentence in the criminal proceedings related to the plea agreement

C,/38

entered into between HCA and the United States on or about the date of the signing of this CIA;

C.  Any modifications to this CIA shall be made with the prior written consent of the parties to this CIA; and

D.  The undersigned HCA signatories represent and warrant that they are authorized to execute this CIA.  The undersigned OIG signatory represents that he is signing this CIA in his official capacity and that he is authorized to execute this CIA.

Corporate Integrity Agreement
HCA -- The Healthcare Company                    44

C,139

## ON BEHALF OF HCA

_(signature)_

Thomas F. Frist, Jr., M.D
Chairman and Chief Executive Officer
HCA -- The Healthcare Company

12/12/00
**DATE**

_(signature)_

Alan Yuspeh
Senior Vice President
Ethics, Compliance, and Corporate Responsibility
HCA -- The Healthcare Company

12/12) 00
**DATE**

## ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
## OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

Lewis Morris
Assistant Inspector General for Legal Affairs
Office of Inspector General
U. S. Department of Health and Human Services

**DATE**

C,140

## ON BEHALF OF HCA

_____          _____
Thomas F. Frist, Jr., M.D                DATE
Chairman and Chief Executive Officer
HCA -- The Healthcare Company


_____          _____
Alan Yuspeh                              DATE
Senior Vice President
Ethics, Compliance, and Corporate Responsibility
HCA -- The Healthcare Company


## ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
## OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES


_____          _12/14/00_____
Lewis Morris                             DATE
Assistant Inspector General for Legal Affairs
Office of Inspector General
U. S. Department of Health and Human Services

C,141

**APPENDIX B**

# OVERPAYMENT REFUND

## TO BE COMPLETED BY MEDICARE CONTRACTOR

Date:_____

Contractor Deposit Control #_____     Date of Deposit: _____

Contractor Contact Name:_____Phone

#_____

Contractor
Address:_____

Contractor Fax:_____

## TO BE COMPLETED BY PROVIDER/PHYSICIAN/SUPPLIER

*Please complete and forward to Medicare Contractor. This form, or a similar document*
*containing the following information, should accompany every voluntary refund so that receipt*
*of check is property recorded and applied.*

PROVIDER/PHYSICIAN/SUPPLIERNAME_____
_____

ADDRESS_____
_____

PROVIDER/PHYSICIAN/SUPPLIER #_____CHECK
NUMBER#_____

CONTACT PERSON:_____PHONE
#_____AMOUNT OF CHECK $_____ CHECK
DATE_____

### REFUND INFORMATION

**For each Claim, provide the following:**

Patient Name_____HIC
#_____

Medicare Claim Number_____Claim Amount Refunded
$_____

Reason Code for Claim Adjustment:_____ (Select reason code from list below. Use one reaso
n per claim)

C, 142

*(Please list all claim numbers involved. Attach separate sheet, if necessary)*

Note: *If Specific Patient/HIC/Claim #/Claim Amount data not available for all claims due to Statistical Sampling, please indicate methodology and formula used to determine amount and reason for overpayment:*_____

_____

**For Institutional Facilities Only:**

Cost Report Year(s) _____

(If multiple cost report years are involved, provide a breakdown by amount and corresponding cost report year.)

**For OIG Reporting Requirements:**

Do you have a Corporate Integrity Agreement with OIG?    _____ Yes _____ No

**Reason Codes:**

| Billing/Clerical Error | MSP/Other Payer Involvement | Miscellaneous |
|---|---|---|
| 01 - Corrected Date of Service | 08 - MSP Group Health Plan Insurance | 13 - Insufficient Documentation |
| 02 - Duplicate | 09 - MSP No Fault Insurance | 14 - Patient Enrolled in an HMO |
| 03 - Corrected CPT Code Rendered | 10 - MSP Liability Insurance | 15 - Services Not |
| 04 - Not Our Patient(s) | 11 - MSP, Workers Comp.(Including Black Lung | 16 - Medical Necessity |
| 05 - Modifier Added/Removed | | 17 - Other (Please Specify) |
| 06 - Billed in Error | 12 - Veterans Administration | _____ |
| 07 - Corrected CPT Code | | |

C,143

# APPENDIX A
## to
## HCA Corporate Integrity Agreement

**A.**   **Claims Review.**

   1. *Definitions.*

       a. Claims Review: Any review procedure described in the CIA or the workplans that involves the review of bills, claims, or other submissions to any Federal health care program.

       b. Claims Review Sample: A statistically valid, randomly selected, sample of items selected for appraisal in a Claims Review.

       c. Item: Any discrete unit that can be sampled (e.g., code, line item, beneficiary, patient encounter, etc.).

       d. Overpayment: Consistent with the definition of Overpayment in section III.H.1.a of the CIA, the amount of money HCA has received in excess of the amount due and payable under any Federal health care program requirements. For the purposes of the workplans, any Claims Reviews, and all reporting to the OIG under this CIA, HCA shall not subtract or "net out" underpayments when determining the amount of relevant Overpayments.

       e. Gross Financial Error Rate: the total amount of overpayments divided by the total payment amounts received under Federal health care programs for the sample Items reviewed.

       f. Paid Claim: A code or line item submitted by HCA and for which HCA has received reimbursement from the Medicare program.

       g. Population: All Items for which HCA has submitted a code or line item and for which HCA has received reimbursement from the Medicare program (i.e., a Paid Claim) during the one year period covered by the Claims Review, unless a different period is specified in the appropriate workplan. To be included in the Population, an Item must have resulted in at least one Paid Claim.

       h. Probe Sample: A Claims Review Sample of a pre-determined number of Items selected through random sampling from the Population. The Probe Sample may be used for the purpose of determining whether to perform a Claims Review with

C,144

a Full Sample, or for the purpose of estimating the mean and standard deviation of the Population (to calculate the minimum number of Items to be included in the Full Sample), or both. If the results from the probe sample already achieve the statistical confidence and precision parameters set froth in this Appendix A, then the Probe Sample results can be used as the Full Sample results and another sample will not be required.

i. <u>Full Sample</u>: A Claims Review Sample from which an overpayment amount can be projected to the total population of claims in question within the statistical confidence and precision parameters set forth in this Appendix A.

j. <u>RAT-STATS</u>: OIG's Office of Audit Services Statistical Sampling Software. RAT-STATS is publicly available to download through the Internet at "www.hhs.gov/oig/oas/ratstat.html."

2. ***Description of Claims Review Methodology***. Each Claims Review shall be conducted in the manner set forth in the applicable workplans consistent with the CIA and this Appendix A.

a. <u>Selection of Samples</u>. Whenever a sample of anything, *e.g.*, claims, beneficiaries, hospitals, is selected pursuant to the CIA or the workplans, the sample shall be selected through the use of the RAT-STATS "Random Numbers" function.

b. <u>Confidence and Precision Requirements for Full Samples</u>. To the extent that a workplan requires a Full Sample, it shall meet the following requirements (or alternatively, the full universe of Items may be reviewed). The Full Sample must contain a sufficient number of Items so that if the Overpayments identified in the Full Sample were projected to the Population, the projection would provide a 90% confidence level and a maximum relative precision (*i.e.*, semi-width of the confidence interval) of plus or minus 25% of the point estimate. In other words, if the Full Sample Overpayment results were projected to the Population at a 90% confidence level, the confidence interval (expressed in dollars) must be sufficiently narrow that the upper bound of the confidence interval would not exceed 125% of the midpoint of the confidence interval (the point estimate), and the lower bound of the confidence interval would not be less than 75% of the midpoint of the confidence interval.

c. <u>Probe Sample to Determine Whether to Review a Full Sample</u>. Whenever a Probe Sample is required by a workplan to determine whether to conduct a review of a Full Sample, the determination shall be based upon the Gross Financial Error

C, 145

Rate based on the estimated Overpayment identified in the Probe Sample. To the extent that a financial error threshold (such as 5%) is used for sample expansion, the threshold has no bearing on other matters (such as extrapolation of overpayments). Nothing in the CIA, this Appendix A, or the workplans relieves HCA of its responsibility to correct and repay Overpayments identified in a Probe Sample.

d. <u>Probe Sample to Determine Sample Size for Full Sample</u>. Whenever a Probe Sample is used to determine the sample size for a Full Sample, it shall meet the following criteria. The Probe Sample shall include a random sample of at least 50 Items. Once all Paid Claims associated with the Items included in the Probe Sample have been reviewed, the estimated mean and standard deviation of the Population shall be determined. This determination is based on the Overpayment amount received by HCA for each Item in the sample. The "Variable Appraisals" function of RAT-STATS shall be used to calculate the estimated mean and standard deviation of the Population. For purposes of estimating the mean and standard deviation of the Population, and entering this information into the "Variable Appraisals" function of RAT-STATS, any underpayment identified for a Paid Claim in the Probe Sample shall be treated as a zero overpayment. If no Overpayments are found in the Probe Sample, then the Claims Review can be terminated with the results of the Probe Sample, and the results of the Probe Sample shall be reported in lieu of the Claims Review of the Full Sample.

e. <u>Calculation of Full Sample Size and Selection of the Full Sample</u>. The estimates of the mean and the standard deviation of the Population obtained through the review of the Probe Sample shall be used to calculate the minimum size of the Full Sample. In order to determine the minimum number of Items that must be included in the Full Sample to meet the 90% confidence level and 25% precision requirements, RAT-STATS "Sample Size Estimators" (located under the "Utility Programs" file) shall be used. The Full Sample shall be a random sample from the entire Population, with the Population including those Items reviewed as part of the Probe Sample, so that all Items in the Population have an equal chance of inclusion in the Full Sample.

f. <u>Item Appraisal</u>. For each Item appraised (either as part of a Probe Sample or a Full Sample), only Paid Claims shall be evaluated. Every Paid Claim in the Claims Review Sample shall be evaluated to determine whether the claim submitted was correctly coded, submitted, and reimbursed. Each appraisal must be sufficient to provide all information required under the Claims Review Report.

C, 146

g. Paid Claims without Supporting Documentation. For the purpose of appraising Items included in the Claims Review, any Paid Claim for which HCA cannot produce documentation sufficient to support the Paid Claim shall be considered an error and the reimbursement received by HCA for the unsupported portion of such Paid Claim shall be deemed an Overpayment. Replacement sampling for Paid Claims with missing documentation is not permitted.

h. Use of First Samples Drawn. For the purposes of all samples selected pursuant to the CIA and the workplans, the Paid Claims associated with the Items selected in the first sample (or first sample for each strata, if applicable) shall be used. In other words, it is not permissible to generate a number of random samples and then select one for use as a Probe Sample or Full Sample.

**B. Claims Review Report.** In addition to the information specifically required by the workplans, the following information shall be included in a Claims Review Report for each Claims Review performed:

1. *Claims Review Methodology*

a. Claims Review Objective: A clear statement of the objective intended to be achieved by the Claims Review.

b. Sampling Unit: A description of the Item as that term is utilized for the Claims Review.

c. Claims Review Population: A description of the Population subject to the Claims Review.

d. Sampling Frame: A description of the sampling frame, which is the totality of Items from which the Probe and Full Samples have been selected and an explanation of the methodology used to identify the sampling frame. In most circumstances, the sampling frame will be identical to the Population.

e. Sources of Data: A description of the documentation relied upon when performing the Claims Review (e.g., medical records, physician orders, certificates of medical necessity, requisition forms, local medical review policies, HCFA program memoranda, Medicare carrier or intermediary manual or bulletins, other policies, regulations, or directives).

f. Review Protocol: A narrative description of how the Claims Review was conducted and what was evaluated.

C, 147

2. *Statistical Sampling Documentation*

    a. The number of Items appraised in the Probe Samples and in the Full Samples.

    b. A copy of the RAT-STATS printouts of the random numbers generated by the "Random Numbers" function.

    c. A copy of the RAT-STATS printouts of the "Sample Size Estimators" results used to calculate the minimum number of Items for inclusion in the Full Samples.

    d. A copy of the RAT-STATS printout of the "Variable Appraisals" function results for the Probe Samples.

    e. The Sampling Frame used in the Probe Samples and the Full Samples will be available to the OIG upon request.

3. *Claims Review Results*

    a. The total number and percentage of instances in which it was determined that the Paid Claim submitted by HCA ("Claim Submitted") differed from what should have been the correct claim ("Correct Claim"), regardless of the effect on the payment.

    b. Total number and percentage of instances in which the Claim Submitted differed from the Correct Claim and in which such difference resulted in an Overpayment to HCA.

    c. The total dollar amount of all Paid Claims in the Claims Review Sample and the total dollar amount of Overpayments associated with the Paid Claims identified by the Claims Review. (This is the total dollar amount of the Overpayments identified in section B.3.b above.)

    d. A spreadsheet of the Claims Review results that includes the following information for each Paid Claim appraised: Federal health care program billed, beneficiary health insurance claim number, date of service, procedure code submitted, procedure code reimbursed, allowed amount reimbursed by payor, correct procedure code, correct allowed amount, dollar difference between allowed amount reimbursed by payor and the correct allowed amount. (See Attachment 1 to this Appendix.)

C, 148

**4. *Credentials*.** The names and credentials of the individuals who: (1) designed the statistical sampling procedures and the review methodology utilized for the Claims Reviews; and (2) performed the Claims Reviews.

C.149

## Claim Review Results

| Federal Health Care Program Billed | Bene HIC # | Date of Service | Procedure Code Submitted | Procedure Code Reimbursed | Allowed Amount Reimbursed | Correct Procedure Code (IRO determined) | Correct Allowed Amt (IRO determined) | Dollar Difference between Amt Reimbursed and Correct Allowed Amt |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Attachment to Appendix A
HCA Corporate Integrity Agreement

C.150

# HCA DRG WORKPLAN

## I.     INTRODUCTION

This workplan describes the review procedures that HCA–The Healthcare Company (the Company) and the Independent Review Organization (IRO) will be required to follow with respect to the Company's inpatient DRG coding processes. The focus of this testing will be to investigate outliers identified through a benchmarking process of certain Medicare inpatient DRG ratios.

In addition, the IRO will obtain an understanding of the Company's processes and controls that are designed to prevent and detect Federally funded payor inpatient DRG coding errors. The IRO and the Company will use this understanding of processes and controls to select the acute care hospitals to test in detail and subject, as appropriate, to record level DRG validation testing. The focus of the procedures will be on the Company's acute care hospitals' processes and controls designed to ensure compliance with DRG coding requirements.

## II.    CORPORATE FEDERALLY FUNDED PAYOR INPATIENT DRG COMPLIANCE RISK MANAGEMENT PROCESS

The IRO will begin its understanding of the Company's DRG coding compliance by understanding the process performed at the Corporate level. The focus will be on the Company's controls affecting the entire acute care hospital system. After gaining this understanding, the IRO and the Company will design agreed upon procedures which will allow the Company and the OIG to evaluate the effectiveness of the Corporate Compliance Risk Management Process. The key steps the IRO will follow to gain an understanding of the corporate compliance control environment include the following:

### A.     Understand the Federally Funded Payor Inpatient DRG Coding Compliance Process

The IRO will obtain an understanding of the regulatory environment, of key assumptions underlying DRG coding processes and the impact of changes on potential compliance risks to the Company. Procedures will include:

1. Interview the Corporate Ethics and Compliance Officer, SVP Government Programs, Health Information Management Services (HIMS) VP and other key personnel to:

DRG Workplan
HCA Corporate Integrity Agreement

C, 151

    a. Understand how the Company evaluates risk and changes in the compliance environment.

    b. Understand how these changes become integrated into the overall compliance strategy.

    c. Understand how these changes are implemented in the acute care hospitals.

2. Read related documentation such as written assessments of changes in regulations.

**B.**    **Understand Federally Funded Payor DRG Coding Policies, Procedures, Tools and Resources**

The IRO will understand how the Company establishes the DRG coding policies and procedures by performing the following procedures:

1. Read organizational charts to understand compliance infrastructure.

2. Read policy and procedure manuals and other tools and resources and compare to regulatory requirements.

3. Understand how the Federally funded inpatient DRG coding policies and procedures are established by interviewing the Corporate Ethics and Compliance Officer, SVP Government Programs, HIMS VP and other key personnel.

4. Read the Company's documentation regarding the process for creating, updating and distributing the policies and procedures.

**C.**    **Understand the Design and Implementation of Education and Training Control Processes**

The IRO will understand how the Company ensures that DRG Coding personnel have the appropriate training and expertise to implement risk control processes by performing the following procedures:

1. Interview key personnel regarding the design and implementation of education and training processes.

C.152

2. Read training materials at the corporate and facility levels and compare to Company policies for content.

3. Select a random sample of HIMS coding personnel and determine if training requirements are being met.

**D.    Understand the Compliance Monitoring Function**

The IRO will understand how the Company measures, monitors and assesses the performance of the compliance process by performing the following procedures:

1. Inquire as to the types of monitoring tools and plans that are in place to prevent and detect non-compliance.

2. Understand and observe benchmarking techniques utilized by the Company in identifying outliers for subsequent testing.

3. Read a random sample of interim monitoring reports.

4. Review a random sample of implementation plans for process improvements and error correction.

5. Read the findings of a random sample of the Company DRG coding reviews.

**E.    Understanding the Information Technology Framework**

The IRO will identify the electronic data processing systems that are used to process data relevant to the DRG coding practices.  The IRO shall gain an understanding of the control environment over these systems related to:

1. Access to critical data.

2. Security over data and critical applications.

3. Application and program change controls.

DRG Workplan
HCA Corporate Integrity Agreement                    3

C, 153

**F.     Understand the Process for Corrective Action**

The IRO will understand how the Company's procedures for ensuring that non-compliance within the DRG coding process is addressed by performing the following procedures:

1.  Interview key personnel regarding the process for reporting errors and creating action plans.

2.  Determine that action plans were prepared and select a random sample of 5 action plans and incorporate into the design of detailed testing procedures.

3.  Read the Company's recommendations for process improvements to prevent potential future non-compliance and integrate into the design of detailed tests.

**III.   BENCHMARKING AND COMPLIANCE REVIEWS OF MEDICARE INPATIENT DRG OUTLIERS**

The Company and IRO will perform coding engagement procedures upon completion of the Corporate level process testing as follows:

**A.     Benchmarking of Medicare Inpatient DRG Outliers**

1. The Company will benchmark its acute care hospitals' Medicare inpatient DRGs against industry peer groups for 17 Medicare Inpatient DRG ratios for the immediately preceding calendar year each January. The DRG ratios to be benchmarked will be agreed upon by the OIG and the Company at the end of each calendar year. Unless the OIG notifies the Company otherwise, the Company will benchmark the 17 Medicare DRG ratios listed in Attachment A. (If the Company proposes to amend the list of DRG ratios to be benchmarked, it shall provide notice to the OIG of the proposed DRG ratios at least 90 days before the end of the calendar year.) The benchmarking will be performed as follows:

a. Each January, the most recently available MedPar data, comprised of all non-HCA hospitals, will be used to determine non-HCA DRG ratio benchmarks and case counts.

C, 154

b.  The definition of non-HCA acute care hospitals which will be used to determine the non-HCA Medicare DRG ratios is those acute care hospitals that the Company did not own during the timeframe that is represented in the MedPar data being used.  For example, if an acute care hospital had been owned by the Company in 1999 but was sold during 2000, this acute care hospital would be included as an HCA acute care hospital and excluded as a non-HCA acute care hospital for the benchmarks that are based on MedPar 1999 data.

c.  Each January, internal Company data from the twelve months of the just-completed calendar year will be used to determine the acute care hospitals' ratios and the case counts used in the benchmarking process.

d.  The industry Medicare DRG ratio benchmarks will be calculated as the national 75th percentile.

e.  Each acute care hospital's Medicare DRG ratio results will be compared to the industry Medicare DRG ratio benchmarks and those Medicare DRG ratio results in excess of the industry Medicare DRG ratio benchmark will be identified.

f.  For each of the 17 DRGs in the numerator of a DRG ratio, the national 90th percentile of case counts for non-HCA acute care hospitals will be determined using MedPar data.

g.  For each of the Medicare DRG ratios over the benchmark identified in section III.A.1.e., at a particular acute care hospital, it will be determined if the case count for that DRG at that acute care hospital is at or above the national 90th percentile of case counts for that DRG among non-HCA hospitals.

h.  Subject to the following provisions, an acute care hospital shall be identified for further review if it has at least 2 of the 17 DRG ratios over the industry benchmark and the case count for these DRGs is at or above the national 90th percentile of case counts for that DRG among non-HCA hospitals.

DRG Workplan
HCA Corporate Integrity Agreement               5

C, 155

i. The hospitals that meet the criteria in section III.A.1.h shall be ranked based on the number of "primary" (non-cc) DRG ratios that are over the industry benchmark at that hospital, regardless of the case counts for these DRGs, e.g., a hospital that has 4 primary DRG ratios over the industry benchmark would be ranked higher than a hospital that has 3 primary DRG ratios over the industry benchmark.

j. The 20 highest ranked hospitals shall be selected for DRG review. If fewer than 20 hospitals are ranked, then all of the ranked hospitals will be selected for review. If fewer than 16 hospitals are ranked, then the highest ranked hospitals will be reviewed along with the unranked hospitals with the highest case counts of DRGs above the industry benchmarks in order to ensure that at least 16 hospitals are reviewed. In no event shall fewer than 16 hospitals be reviewed.

k. The hospitals to be reviewed under this analysis shall be reviewed over the four quarters of the calendar year.

2. The IRO will verify that current Company data is the source for establishing the Company's Medicare DRG ratios that will be benchmarked.

3. The IRO will verify that the most recent MedPar data as described in section III.A.1.a-b, comprised of all non-HCA acute care hospitals is the source for establishing industry Medicare DRG ratio benchmarks and case counts and will annually recompute the industry peer group Medicare DRG ratio benchmarks and case counts utilized by the Company.

4. Each February (or the month after any benchmarking takes place), the IRO will obtain current Company data and recalculate benchmarking on a random sample of at least 10% of the Company's hospitals. For example, if the number of acute care hospitals owned was 220, a minimum of 22 acute care hospitals Medicare DRG ratio results would be reviewed (220 acute care hospitals X 10% = 22 acute care hospitals to be tested).

C, 156

**B. DRG Claims Review of Outliers**

1. For those hospitals selected for review in section III.A.1.j above, the Company will perform a DRG Claims Review of a Full Sample (as described in Appendix A to the CIA) of the higher weighted DRG for each DRG ratio above the benchmark. For the purpose of a Claims Review under this audit work plan, the Items to be reviewed shall be the paid inpatient Medicare bills for the DRGs in question. The Claims Review of each Item shall include an independent code validation of the medical record to assess the accuracy of the diagnosis and procedure codes, financial class, discharge disposition, sex, age, and DRG assignment. The Population of Claims to be reviewed in each Claims Review shall be the Items from the rolling 12-month period immediately preceding the Claims Review.

2. If a Probe Sample is conducted pursuant to Appendix A and that Probe Sample meets the statistical parameters set forth in Appendix A for Full Samples, e.g., the 90% confidence level and 25% precision requirements, then the Company may treat the Probe Sample as the Full Sample for that DRG. Wherever a DRG Claims Review of a Full Sample is required, the Company may choose to review 100% of the claims in the universe rather than selecting a sample.

3. The IRO will verify the benchmarking approach, e.g., acute care hospitals identified, case counts, subsequent review methodology (probe or universe) and the Company's Medicare DRG Claims Review results.

4. The IRO will select a random sample of at least 10% of the medical records included in the Medicare DRG Claims Reviews performed by the Company and re-perform the Company's workplan steps. Findings will be summarized in the IRO's Report. For example, if the Company reviewed 20,000 files, the IRO would reperform reviews of 10% or 2,000 files.

**IV. ACUTE CARE HOSPITAL LEVEL FEDERALLY FUNDED PAYOR INPATIENT DRG COMPLIANCE PROCESS REVIEW**

**A. Overall Acute Care Hospital Assessment**

1. The Company will annually complete and maintain a DRG risk and controls profile for each acute care hospital. The profile will contain indicators including:

C, 157

- Number of Medicare outlier DRGs
- Accuracy results of Federal health care program inpatient DRG coding reviews
- Percentage increase in Medicare Case Mix Index
- Percentage of Medicare complications and co-morbidities ("CC's")
- Implementation of Company Coding Policies and Procedures
- Turnover of certain hospital management and coding personnel
- Existence of internal quality assessment monitoring program
- Coding staff fulfillment of continuing education requirements

(See Attachment B for the DRG Risk and Controls Profile.)

2. Based on the results of step IV.A.1, the Company will gain an understanding of the acute care hospital's compliance and control environment and identify the "higher" risk acute care hospitals for further detailed process and controls testing based on the risk score determined using the profiles. The profile will consist of a series of indicators that will be assigned points. Each of the criteria in the risk and controls profile will be worth a certain number of points as indicated in Attachment B.

3. At a minimum, the Company will annually test (as outlined in sections IV.B and C, below) a minimum of 10% of its acute care hospitals or 22 hospitals, whichever is greater, (but in no event shall the Company be required to test more than 15% of its acute care hospitals annually under this provision) that will include at least 2/3 "higher risk" acute care hospitals and 1/3 randomly selected "lower risk" acute care hospitals.

   a. The acute care hospitals with the lowest scores from the risk profiling described in step 2, other than those acute care hospitals tested in step III.B above will be considered "higher risk."

   b. The "lower risk" acute care hospitals will be a random selection of the remaining acute care hospitals not selected in step IV.A.3.a above and not tested in step III.B.

4. The IRO will:

   a. Read the Company's DRG risk and controls profiles.

C, 158

b. Compare the information contained in this profile for a random sample of at least 10% of the Company's acute care hospitals to source documents and recompute their overall risk score. For example, if the Company owned 220 acute care hospitals, this would include a minimum of 22 acute care hospitals.

c. Compare the Company's identification of the "higher" risk acute care hospitals to the acute care hospital sample population based on the computed risk score.

5. For the acute care hospitals selected for detailed review in steps IV.A.1 through 3 above, steps IV.B and C, outlined below, will be performed.

6. The hospitals to be reviewed under this analysis shall be reviewed over the four quarters of the calendar year.

## B. Understand the DRG Coding Process and Controls

1. The Company will obtain an understanding of the compliance controls and the Federal health care programs inpatient DRG Coding processes operating at each acute care hospital identified in section IV.A by performing the following procedures:

a. Interview acute care hospital personnel.

b. Read documentation at the acute care hospital level that supports the DRG coding process.

c. Observe the use of various tools and materials provided to the acute care hospitals from Corporate.

d. Determine if coding training requirements are being met for acute care hospital inpatient DRG coding personnel.

e. Document the process and significant control points in the workpapers.

2. The Company will compare the process at each acute care hospital identified in section IV.A.3 process to the model process from Corporate (reviewed in Section

DRG Workplan
HCA Corporate Integrity Agreement                9

C, 159

II above) and identify any control gaps or points within the processes for the acute care hospitals selected that may result in non-compliance. Where primary controls are not properly implemented as outlined in the model process from Corporate, the Company will review documentation to determine if any secondary controls exist to reduce the risk of inaccurate Federal health care program inpatient DRG assignment.

3. The Company will perform procedures for the acute care hospitals identified in section IV.A.3 above that focus on the control gaps and key control points identified in step IV.B.2. Procedures will include inquiry, observation of process steps, and testing of supporting information relating to the following:

    a. Controls regarding the physician documentation in the inpatient medical record.

    b. Inpatient medical record completion.

    c. Encoder use for DRG assignment.

    d. Code editing and submission on Federal health care program inpatient DRGs.

4. The IRO will:

    a. Read all documentation prepared by the Company in steps IV.B.1-3 above.

    b. Jointly perform the steps above for a random selection of at least 10% of the acute care hospitals to be tested. For example, if the Company tested 22 acute care hospitals, the IRO would jointly perform testing at 3 of the acute care hospitals.

    c. Perform the Company's workplan steps on a random sample selected by the IRO of at least 10% of the acute care hospitals to be tested. For example, if the Company tested 22 acute care hospitals, the IRO would perform testing at 3 of the acute care hospitals.

C, 160

## C. <u>Testing of Federal Health Care Program Payor Inpatient DRG Coding Process Controls</u>

The Company will test the controls for the Company's acute care hospitals as identified in step IV.A to determine if the controls are operating effectively to reduce the compliance risk associated with the Federal health care program DRG coding process. The Company will review a sample of Federal health care program inpatient DRG medical records to test the overall controls at the acute care hospitals selected in step IV.A for testing as follows:

1. The Company will perform a Claims Review of a Probe Sample of at least 30 inpatient Federal health care program DRG bill (Item) from the rolling 12-month period immediately preceding the review at each selected acute care hospital. The Claims Review of each Item shall include an independent code validation of the medical record to assess the accuracy of the diagnosis and procedure codes, financial class, discharge disposition, sex, age, and DRG assignment. Based on the results of this testing, the Company will determine whether a Claims Review of a Full Sample is required as follows:

   a. If the Probe Sample results indicate a gross financial error rate of less than 5%, no further testing will be performed.

   b. If the Probe Sample results indicate a gross financial error rate of 5% or more, the Company will conduct a Claims Review of a Full Sample of Federal health care program DRG claims from the CIA year at each acute care hospital in accordance with Appendix A.

2. The IRO will:

   a. Read the Company's documentation regarding the review results and determine whether the appropriate reviews, including Probe Sample and Full Sample Claims Reviews, were performed based on the criteria outlined above, the CIA, and Appendix A.

   b. Select a random sample of at least 10% of the acute care hospitals reviewed by the Company in section IV.C and reperform the testing described above.

C, 161

c. Perform testing on the acute care hospitals the IRO reviewed in section IV.B.

d. Read the documentation of the DRG Claims Reviews noting completion of all workplan steps.

e. Recompute a random sample of the extrapolations of error rates resulting from the Claims Reviews of Full Samples performed by Company.

## V. TREATMENT OF REVIEWS IN FIRST YEAR

Notwithstanding the other provisions of this workplan, the Company may choose to conduct the reviews in the first year after the effective date of the CIA in the following manner.

A. The quarterly reviews shall cover Items related to the time period from January 1, 2001, to the date of the review (rather than always relating to the full preceding 12-month time period as is required in other years).

B. At least 25% of each type of review conducted (e.g., those conducted pursuant to section III and those conducted pursuant to section IV) shall cover the preceding 12-month period.

C. At least 25% of each type of review conducted (e.g., those conducted pursuant to section III and those conducted pursuant to section IV) shall cover the preceding 9-month period.

D. The remaining reviews (those not described in sections V.B and C above) shall include the preceding 6-month period.

## VI. NOTIFICATION OF SELECTED ACUTE CARE HOSPITALS

The Company and the IRO will ensure that information about which acute care hospitals are subject to review under this work plan will not be disclosed to personnel at the acute care hospitals until notice is necessary to make arrangements to conduct on-site review processes required in the work plan, but in no event earlier than four weeks prior to commencement of such review.

C, 162

## VII. **REPORTING**

Upon completion of all testing of process controls, Medicare benchmarking and testing of Federal health care program DRG coding engagement procedures, the Company will quantify the results and findings and will report to the OIG. The Company's report will include the following:

A. The information required for the Claims Review Report in Appendix A.

- Claims Review Objective
- Sampling Unit: DRG
- Claims Review Population
- Sampling Frame
- Sources of Data
- Review Protocol
- Statistical Sampling Documentation
- Claims Review Results
- Credentials

B. The results of testing the Company's Federal health care program inpatient DRG coding operations (including, but not limited to, the operation of the coding system, strengths and weaknesses of the system, internal controls, effectiveness of the system).

C. The Company's procedures to correct inaccurate DRG assignment or reporting to Federal health care programs.

D. The steps the Company is taking to bring its operations into compliance or to correct problems identified by any of the reviews described above.

The IRO will read the Company's results and findings reported to the OIG and issue a report that enumerates the procedures performed and the findings for each procedure.

The IRO will report the results of all reperformed work required in the DRG Work Plan. Based on the review results, the IRO will make appropriate recommendations for improvement of Company practices.

C, 163

| HCA | | | |
| --- | --- | --- | --- |
| DRG Workplan | | | |
| 17 Medicare DRG Ratios to be Benchmarked in Year One | | | |
| 76 | 82 | 76/(76+82) | Primary Medicare DRG |
| 79 | 89 | 79/(79+89) | Primary Medicare DRG |
| 87 | 88, 127 | 87/(87+88+127) | Primary Medicare DRG |
| 89 | 90 | 89/(89+90) | CC Medicare DRG |
| 121 | 122 | 121/(121+122) | CC Medicare DRG |
| 124 | 125 | 124/(124+125) | CC Medicare DRG |
| 132 | 140, 143 | 132/(132+140+143) | Primary Medicare DRG |
| 138 | 139 | 138/(138+139) | CC MedicareDRG |
| 148 | 149 | 148/(148+149) | CC Medicare DRG |
| 174 | 175 | 174/(174+175) | CC Medicare DRG |
| 182 | 183 | 182/(182+183) | CC Medicare DRG |
| 197 | 198 | 197/(197+198) | CC Medicare DRG |
| 210 | 211 | 210/(210+211) | CC Medicare DRG |
| 296 | 297 | 296/(296+297) | CC Medicare DRG |
| 316 | 127 | 316/(316+127) | Primary Medicare DRG |
| 416 | 320, 277 | 416/(416+320+277) | Primary Medicare DRG |
| 475 | (Total # cases for all Medicare DRGs) | 475/Total Medicare Discharges | Primary Medicare DRG |

Attachment A to DRG workplan
HCA CIA

C.164

# HCA ACUTE CARE HOSPITAL DRG RISK
# AND CONTROLS PROFILE

1. <u>Benchmarking</u>   The results of the Benchmarking of Medicare DRG ratios performed in section III of the workplan, using no case count thresholds, will be used as a component to determine "higher risk" facilities. Scores will be awarded based on the number of times a hospital's DRG ratios are over the benchmark (i.e., "outliers") as follows:

| | |
|---|---|
| 10 or more outliers | 0 points |
| 9 outliers | 3 points |
| 8 outliers | 6 points |
| 7 outliers | 9 points |
| 6 outliers | 12 points |
| 5 outliers | 15 points |
| 4 outliers | 17 points |
| 3 outliers | 19 points |
| 2 outliers | 21 points |
| 1 outliers | 23 points |
| 0 outliers | 25 points |

2. <u>Accuracy Reviews</u>   The results of the most recently performed Medicare, Medicaid, and/or CHAMPUS/TriCare Inpatient DRG accuracy reviews relating to coding will be used to award points based on the % of accuracy achieved are as follows:

| | |
|---|---|
| 98% or better | 30 points |
| 95%-97% | 20 points |
| 90%-94% | 10 points |
| 86%-89% | 0 points |
| 80%-85% | -5 points |
| Less than 80% | -10 points |

DRG Risk Profile (attachment B to DRG workplan)
HCA Corporate Integrity Agreement

C, 165

3. <u>Percentage Increase in Medicare CMI</u> A hospital will receive 15 points if the percent increase in the Medicare Case Mix Index, compared to the prior year, is less than the mean plus 1 standard deviation. The hospital will receive 0 points if the percent increase in the Medicare Case Mix Index, compared to the prior year, is greater than the mean plus 1 standard deviation. (NOTE: the mean and standard deviation will be calculated using the hospital's most recent 8 quarters Medicare Case Mix Index results.)

4. <u>Medicare CC%</u>    A hospital will receive 20 points if their Medicare CC% is below the National 75th percentile. The hospital will receive 0 points if their Medicare CC% is above the National 75th percentile.

5. <u>Policy Implementation</u>   The Hospital will lose 2 points for each of the following policies that it has not implemented.

HIM COD 001 – Coding Documentation Policy for Inpatient Services
HIM COD 003 – Coding References and Tools
HIM COD 004 – Coding Help Line
HIM COD 005 – Coding Orientation and Training
HIM COD 006 – Coding Continuing Education Requirements

6. <u>Turnover</u>    Deductions will be made for turnover in the following positions over the prior year.

| | |
|---|---|
| CEO | -2 points |
| CFO | -2 points |
| ECO | -2 points |
| Coding Manager/Lead Coder | -5 points |
| HIMS Director | -5 points |
| Inpatient Coders | -5 points (up to a maximum of 15 points) |

C, 166

7. <u>Quality Assessment</u>     10 points will be added if the hospital currently has an
internal quality assessment monitoring program for coding
accuracy and productivity in place. (This would also include
quality assessment monitoring outsourced to external vendors
sub-contracted by the hospital, but not Corporate HIMS.)

8. <u>Continuing Education</u>     Deduct points based on the percentage of the hospital's
inpatient coding staff that has met their 30 hours of continuing
education and other training requirements during the prior
year.

| Percentage of Staff that has met requirements | Points added or (deducted) |
|---|---|
| 100% | 0 |
| 96-99% | -2 |
| 91-95% | -4 |
| 86-90% | -6 |
| 81-85% | -8 |
| 75-80% | -10 |
| 75% or less | -15 |

HMA30A6.wpd

DRG Risk Profile (attachment B to DRG workplan)
HCA Corporate Integrity Agreement          3

C, 167

### HCA – The Healthcare Company.
### OUTPATIENT LABORATORY WORKPLAN

## I. INTRODUCTION

This workplan describes the review process that HCA – The Healthcare Company (the "Company") and the Independent Review Organization ("IRO") will follow with respect to testing the Company's Outpatient Laboratory ("Lab") billing process related to Medicare, Medicaid and other federally funded payors.

The IRO will gain an understanding of the Company's processes and controls that are designed to prevent and detect billing errors. The Company and IRO will use their understanding of processes and controls to select which hospitals to review in detail. The focus of the procedures will be on the Company and hospitals' processes and controls designed to ensure compliance with Outpatient Laboratory billing requirements.

## II. OUTPATIENT LABORATORY BILLING CORPORATE COMPLIANCE PROCESS

The IRO will begin its understanding of the Company's Outpatient Laboratory billing compliance by understanding the process performed at the Corporate level. The focus will be on the Company's controls affecting the hospitals. After gaining this understanding, the IRO and the Company will design agreed upon procedures which will allow the Company and the OIG to evaluate the effectiveness of the Corporate Compliance Infrastructure. Focusing on the Company's infrastructure, processes, controls, and monitoring systems, the IRO will:

## A. Understand Outpatient Laboratory Billing Compliance Process

The IRO will understand the Company Outpatient Laboratory Billing Compliance Plan ("Plan") which is based on the OIG's Clinical Laboratory Compliance Program Guidance (OIG-CPG). The following interviews/reviews will be performed to understand the implementation of the Plan designed to mitigate risk and achieve compliance:

> 1. Read organizational charts and understand outpatient laboratory billing compliance infrastructure.

> 2. Interview the Corporate Ethics and Compliance Officer, VP Governmental Operations Support (GOS) and other key personnel to:

> · Understand the strategy and process used to create the Plan.

1

C,168

- Understand the process used to review and revise the Plan, including laboratory billing policies and procedures.

3. Compare the Plan to the OIG-CPG, identify variations and determine if these variations have a significant impact on compliance.

4. Understand the process used to implement changes and revisions to the Plan and how they are communicated to the hospitals.

5. Read training plans developed at corporate level and understand how they are implemented at the hospital level. Identify critical areas not covered by such training.

6. Understand the use and role of the corporate preferred electronic billing vendor and corporate defined edits through discussions with GOS VP, Director, Monitoring and other key personnel.

## B. Review Outpatient Laboratory Billing Compliance Plan Controls

The IRO will understand how the Company ensures that controls are in place that support the Plan in order to reduce compliance risk, identify laboratory overpayments, and repay the appropriate payors. Procedures to gain this understanding include:

1. Compare the Company suite of electronic billing vendor edits to GOS outpatient laboratory policies which incorporate regulatory requirements. Check for validity of all HCPCS/CPT codes and identify variances.

2. Read and/or observe the Company's quality control process for established electronic billing vendor edits and determine if any defined edits referenced in Section B.1. above are missing or not operating correctly.

3. Understand the process of accessing and revising the application and maintenance of the Company's standardized Laboratory chargemaster and the process qualified personnel use to access and update the chargemaster.

4. Review the results of the assessment performed by an external review organization of the Company's standardized Laboratory chargemaster.

5. Read selected training programs and related materials to assess implementation and consistency with regulations.

2

C, 169

6. Select a sample of 10 hospitals from the corporate compliance training database and test for hospital attendance/participation.

7. Understand the Company's efforts to keep abreast of new federal laboratory billing rules and changes and understand how the Company informs its hospitals to conform their billing processes and controls to such a change(s).

8. Determine whether changes in new federal laboratory billing rules and requirements have been  incorporated into GOS outpatient laboratory billing policies.

## C.  Understand Outpatient Laboratory Billing Compliance Monitoring Function

The IRO will understand how the Company measures, monitors and assesses the performance of the compliance process through the following procedures:

1. Interview the Corporate Ethics and Compliance Officer, GOS and other key personnel.

2. Identify the types of monitoring plans, tools and reports that are in place to prevent and detect non-compliance.

3. Review a representative sample of 10 results of monitoring activities from 10 hospitals, including corrective action plans. Compare the action taken to appropriate billing rules and regulations and identify any non-conformance.

4. Compare plans, tools, and reports to rules, regulations and policies, identify variances and make recommendations for additional tools to facilitate monitoring activities.

## D.  Summarize the Outpatient Laboratory Billing Compliance Process

The IRO will summarize its procedures and findings from sections II.A through C outlined above to allow the OIG and the Company to evaluate the following:

1. Whether the established outpatient laboratory infrastructure is successfully designed to comply with relevant regulations.

2. Whether the Company's existing processes, controls and monitoring activities address major  areas of outpatient laboratory compliance risk.

3

C, 170

3. Whether controls may not exist in certain areas to reduce risk to an appropriate level.

4. The IRO will review with and make recommendations to Company management for improvements to the infrastructure, including processes, controls, and monitoring activities.

## III. OUTPATIENT LABORATORY BILLING HOSPITAL LEVEL COMPLIANCE PROCESS REVIEW

### A. Test of Laboratory Billing Process Controls

1. As part of the Company's monitoring program, the Company will implement appropriate procedures and tools to ensure proper CPT/HCPCS coding and billing of tests by performing the following procedures:

a. Apply HCFA's National Correct Coding Initiative (NCCI) edits included in HCFA's Outpatient Code Editor (OCE) to the Company's Medicare outpatient laboratory billing and test actual claims data for bundling, billing of mutually exclusive codes and comprehensive/component codes simultaneously.

b. Adopt a standard laboratory chargemaster and assess the hospitals' adoption in full of the Company standard.

c. Implement edits to prevent duplicate charges on the same claim.

d. Analyze frequency of potential add-on tests, by utilizing benchmarks from HCFA's non-HCA industry data to compare each hospital's use of the six most common tests that are billed with chemistry, organ or blood gas panels to the appropriate industry benchmark for Medicare only. Use results to identify hospitals for further review.

e. Analyze and institute corrective action plans for significant compliance issues identified.

f. Assess if Company has taken appropriate steps to ensure overpayments are returned to the payor.

g. Create a compliance risk profile for each hospital that summarizes the hospital's:

4

C, 171

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

    a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

    b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

    c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

    a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

    b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

    c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

· Accuracy rates of outpatient laboratory billing audits;

· Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

· Adoption of the standardized laboratory chargemaster;

· Training and education efforts for applicable personnel;

· Frequency of Billing Compliance Committee meetings; and

· Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

· Accuracy rates of outpatient laboratory billing audits;

· Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

· Adoption of the standardized laboratory chargemaster;

· Training and education efforts for applicable personnel;

· Frequency of Billing Compliance Committee meetings; and

· Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

· Accuracy rates of outpatient laboratory billing audits;

· Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

· Adoption of the standardized laboratory chargemaster;

· Training and education efforts for applicable personnel;

· Frequency of Billing Compliance Committee meetings; and

· Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

   ·    Accuracy rates of outpatient laboratory billing audits;

   ·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

   ·    Adoption of the standardized laboratory chargemaster;

   ·    Training and education efforts for applicable personnel;

   ·    Frequency of Billing Compliance Committee meetings; and

   ·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

  a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

  b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

  c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

· Accuracy rates of outpatient laboratory billing audits;

· Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

· Adoption of the standardized laboratory chargemaster;

· Training and education efforts for applicable personnel;

· Frequency of Billing Compliance Committee meetings; and

· Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

•     Accuracy rates of outpatient laboratory billing audits;

•     Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

•     Adoption of the standardized laboratory chargemaster;

•     Training and education efforts for applicable personnel;

•     Frequency of Billing Compliance Committee meetings; and

•     Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

     a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

     b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

     c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

·    Accuracy rates of outpatient laboratory billing audits;

·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·    Adoption of the standardized laboratory chargemaster;

·    Training and education efforts for applicable personnel;

·    Frequency of Billing Compliance Committee meetings; and

·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

·     Accuracy rates of outpatient laboratory billing audits;

·     Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·     Adoption of the standardized laboratory chargemaster;

·     Training and education efforts for applicable personnel;

·     Frequency of Billing Compliance Committee meetings; and

·     Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

    a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

    b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

    c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

·   Accuracy rates of outpatient laboratory billing audits;

·   Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·   Adoption of the standardized laboratory chargemaster;

·   Training and education efforts for applicable personnel;

·   Frequency of Billing Compliance Committee meetings; and

·   Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

· Accuracy rates of outpatient laboratory billing audits;

· Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

· Adoption of the standardized laboratory chargemaster;

· Training and education efforts for applicable personnel;

· Frequency of Billing Compliance Committee meetings; and

· Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

· Accuracy rates of outpatient laboratory billing audits;

· Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

· Adoption of the standardized laboratory chargemaster;

· Training and education efforts for applicable personnel;

· Frequency of Billing Compliance Committee meetings; and

· Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

·    Accuracy rates of outpatient laboratory billing audits;

·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·    Adoption of the standardized laboratory chargemaster;

·    Training and education efforts for applicable personnel;

·    Frequency of Billing Compliance Committee meetings; and

·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

·     Accuracy rates of outpatient laboratory billing audits;

·     Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·     Adoption of the standardized laboratory chargemaster;

·     Training and education efforts for applicable personnel;

·     Frequency of Billing Compliance Committee meetings; and

·     Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

·    Accuracy rates  of outpatient laboratory billing audits;

·    Use of the  six most common tests that are billed with chemistry, organ or disease, hematology  or blood gas panels;

·    Adoption  of the standardized laboratory chargemaster;

·    Training and education efforts for applicable personnel;

·    Frequency of  Billing Compliance Committee meetings; and

·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2.  The IRO will:

a.  Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b.  Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c.  Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1.  Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review.  The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g.  The risk profile  will consist of a series of statistical measures as well as process and  controls assessment consisting of 100 points.

2.  At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20,  of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

    a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

    b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

    c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

·     Accuracy rates of outpatient laboratory billing audits;

·     Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·     Adoption of the standardized laboratory chargemaster;

·     Training and education efforts for applicable personnel;

·     Frequency of Billing Compliance Committee meetings; and

·     Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

.    Accuracy rates of outpatient laboratory billing audits;

.    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

.    Adoption of the standardized laboratory chargemaster;

.    Training and education efforts for applicable personnel;

.    Frequency of Billing Compliance Committee meetings; and

.    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

·    Accuracy rates of outpatient laboratory billing audits;

·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·    Adoption of the standardized laboratory chargemaster;

·    Training and education efforts for applicable personnel;

·    Frequency of Billing Compliance Committee meetings; and

·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

    ·     Accuracy rates of outpatient laboratory billing audits;

    ·     Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

    ·     Adoption of the standardized laboratory chargemaster;

    ·     Training and education efforts for applicable personnel;

    ·     Frequency of Billing Compliance Committee meetings; and

    ·     Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A.1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

·    Accuracy rates of outpatient laboratory billing audits;

·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·    Adoption of the standardized laboratory chargemaster;

·    Training and education efforts for applicable personnel;

·    Frequency of Billing Compliance Committee meetings; and

·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

     a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

     b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

     c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

   ·   Accuracy rates of outpatient laboratory billing audits;

   ·   Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

   ·   Adoption of the standardized laboratory chargemaster;

   ·   Training and education efforts for applicable personnel;

   ·   Frequency of Billing Compliance Committee meetings; and

   ·   Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

· Accuracy rates of outpatient laboratory billing audits;

· Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

· Adoption of the standardized laboratory chargemaster;

· Training and education efforts for applicable personnel;

· Frequency of Billing Compliance Committee meetings; and

· Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a.  Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b.  Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c.  Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review.  The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g.  The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

    ·    Accuracy rates of outpatient laboratory billing audits;

    ·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

    ·    Adoption of the standardized laboratory chargemaster;

    ·    Training and education efforts for applicable personnel;

    ·    Frequency of Billing Compliance Committee meetings; and

    ·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

    a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

    b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

    c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

·    Accuracy rates of outpatient laboratory billing audits;

·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·    Adoption of the standardized laboratory chargemaster;

·    Training and education efforts for applicable personnel;

·    Frequency of Billing Compliance Committee meetings; and

·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

    ·    Accuracy rates of outpatient laboratory billing audits;

    ·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

    ·    Adoption of the standardized laboratory chargemaster;

    ·    Training and education efforts for applicable personnel;

    ·    Frequency of Billing Compliance Committee meetings; and

    ·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a.  Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b.  Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c.  Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review.  The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g.  The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

·     Accuracy rates of outpatient laboratory billing audits;

·     Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·     Adoption of the standardized laboratory chargemaster;

·     Training and education efforts for applicable personnel;

·     Frequency of Billing Compliance Committee meetings; and

·     Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

   a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

   b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

   c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

   ·      Accuracy rates of outpatient laboratory billing audits;

   ·      Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

   ·      Adoption of the standardized laboratory chargemaster;

   ·      Training and education efforts for applicable personnel;

   ·      Frequency of Billing Compliance Committee meetings; and

   ·      Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates  of outpatient laboratory billing audits;

- Use of the  six most common tests that are billed with chemistry, organ or disease, hematology  or blood gas panels;

- Adoption  of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of  Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

    a.  Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

    b.  Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

    c.  Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review.  The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g.  The risk profile  will consist of a series of statistical measures as well as process and  controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20,  of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

## B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172

·    Accuracy rates of outpatient laboratory billing audits;

·    Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

·    Adoption of the standardized laboratory chargemaster;

·    Training and education efforts for applicable personnel;

·    Frequency of Billing Compliance Committee meetings; and

·    Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

C, 172

- Accuracy rates of outpatient laboratory billing audits;

- Use of the six most common tests that are billed with chemistry, organ or disease, hematology or blood gas panels;

- Adoption of the standardized laboratory chargemaster;

- Training and education efforts for applicable personnel;

- Frequency of Billing Compliance Committee meetings; and

- Appropriate development of action plans;

(See Attachment A for a copy of the Risk Profile.)

2. The IRO will:

a. Select a 10% random sample of risk profiles outlined in step III.A.1.g. and compare the information contained in these profiles to source documents.

b. Reperform the benchmarking process as outlined in step III.A. 1.d. above for a random sample of at least 10% of the hospitals.

c. Select a random sample of 30 outpatient laboratory overpayments and confirm that overpayments discovered by the Company were promptly repaid to the appropriate payor.

**B. Understand and Review the Outpatient Laboratory Billing Compliance Process and Controls**

1. Using the results of section III.A, the IRO and the Company will gain an understanding of the hospital compliance and control environment and identify the "higher" risk hospitals for further process and control review. The Company will select the higher risk hospitals for detailed process and control testing based on the risk profile outlined in section III.A.1.g. The risk profile will consist of a series of statistical measures as well as process and controls assessment consisting of 100 points.

2. At a minimum, the IRO will annually test (as outlined in steps III.B.2 through 7 below) a minimum of 10%, but no less than 20, of the Company's hospitals including at least 2/3 "higher risk" facilities and 1/3 randomly selected "lower risk" hospitals.

5

C, 172